## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Marvin Gerber,

     Plaintiff,

vs.

Henry Herskovitz, Gloria Harb, Tom Saffold,
Rudy List, Chris Mark, Deir Yassin Remembered, Inc.,
Jewish Witnesses for Peace and Friends, the City of Ann Arbor,
Ann Arbor Mayor Christopher Taylor, in his official
and individual capacities, Ann Arbor Community Services
Administrator Derek Delacourt, in his official and individual
capacities, Ann Arbor City Attorney Stephen Postema, in his
official and individual capacities, and Senior Assistant
City Attorney Kristen Larcom, in her official and
individual capacities,

     Defendants, Jointly and Severally.

Civil Action No.:
Hon.

_____/

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
Attorney for Plaintiff

_____/

## COMPLAINT AND JURY DEMAND

**NOW COMES** Marvin Gerber, by and through his attorney Marc M. Susselman, pursuant to the First and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. §§1981, 1982, 1983, 1985, and 1986, seeking injunctive relief and compensatory and punitive damages against the named Defendants, and states:

## INTRODUCTION

Every Saturday morning since September, 2003, for the last 16 years, Defendant Herskovitz has led a group of protesters, numbering from 6 to 12 individuals at any one time, to place signs, posters and placards on the grass section adjacent to the sidewalk in front of Beth Israel Synagogue ("Synagogue"), located at 2000 Washtenaw Ave., Ann Arbor, Michigan, as well as on the grass section across Washtenaw Ave., facing the Synagogue.  The signs/placards bear such statements as:  "Resist Jewish Power"; "Jewish Power Corrupts"; "Fake News: Israel Is A Democracy"; "Stop Funding Israel"; "End the Palestinian holocaust"; "No More Holocaust Movies"; "The United States of Israel?!"; "America First"; etc.  The signs/placards number 18-20 signs. Most of the signs/placards are placed on the grass sections leaning against trees and portable chairs which the protesters bring with them. Some of the protesters also carry signs, either holding them in their hands or attached to twine hanging from their necks.

The protesters arrive every Saturday morning, which is the Jewish Sabbath, at approximately 9:30 A.M., position their signs/placards in place, and stay until approximately 11:00 or 11:30 A.M.  The time period coincides with the time when members of the Synagogue arrive to enter the Synagogue in order to conduct and participate in the Sabbath service. All of the signs are anti-Israeli and anti-Zionist. Several of the signs are also flagrantly Antisemitic, e.g., "Resist Jewish Power"; "Jewish Power Corrupts"; "End the Palestinian holocaust"; and "No more holocaust movies." These signs promote age-old Antisemitic tropes about purported Jewish outsized influence in world finance and controlling power in international political affairs. They also promote factually erroneous and inflammatory statements relating to the Israeli-Palestinian conflict. The messages on the signs/placards are readily visible to the congregants, many of whom are accompanied by their children, as they enter their house of worship.

Over the entire 16-year period, the protesters have not picketed any other house of worship of any other religion, or any establishment whose clientele is predominantly non-Jewish. This focus only on a Jewish place of worship, to the exclusion of all other houses of worship, demonstrates, in addition to the Antisemitic content of several of the signs, that the motive for the protesters' project of picketing Beth Israel Synagogue is an overriding commitment to Antisemitism.

The protesters do not have a permit to engage in their conduct, have never applied for a permit, have never been granted a permit, and the City of Ann Arbor ("City") has never required that they obtain a permit.  The protesters' conduct violates the Ann Arbor City Code ("Code"), since it is clear that the Code either requires that the protesters have a permit to place the signs on the grass sections in question, or they are prohibited from placing the signs there altogether. Yet, despite numerous efforts by the Synagogue and its congregants requesting that the City take some action to curtail the protesters' conduct, the City, through its administrators named as Defendants in this lawsuit, have insisted that there is nothing they can do to curtail the protesters' conduct, claiming that the conduct is protected by the freedom of speech provision in the 1st Amendment of the United States Constitution. At no time have the administrators made any effort to enforce its Code's provisions, which precludes the protesters from engaging in a substantial part of their protest activity.

The City's claim that the protesters' conduct is protected by the 1st Amendment is erroneous, based on numerous 1st Amendment principles set forth in Supreme Court and other federal court precedents that have been clearly established for many years now. These principles are as follows:

1.      The Synagogue is located in an area which is zoned Residential. The protesters'

repeated picketing, week after week for 16 years, in front of a residentially zoned building constitutes targeted picketing, which the Supreme Court has held may be subject to restrictions without violating the 1st Amendment. *See Frisby v. Schultz,* 487 U.S. 474 (1988).

2.     The members of the congregation, as they approach the house of worship of their choice, constitute a captive audience. It is well settled that an individual does not have a free speech right to compel those who do not wish to hear or see the message s/he wishes to convey to be subjected to that speech. *See Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974); *Hill v. Colorado,* 530 U.S. 703, 716 (2000).   Cases such as the Skokie Nazi march case (*National Socialist Part v. Skokie,* 432 U.S. 43 (1977); *Collin v. Smith,* 578 F.2d 1197 (7th Cir. 1978)) and *Snyder v, Phelps,* 562 U.S. 443 (2011), are distinguishable because the courts held in both cases that the intended recipients of the messages did not constitute a captive audience. In the Skokie case, the residents of Skokie, many of whom were Holocaust survivors, could avoid seeing the marchers in their Nazi uniforms by simply not going to downtown Skokie where the march was scheduled to take place. In *Snyder,* the Court determined that the attendees at the funeral were not able to see the homophobic signs of the protesters.   Here, however, the protesters are deliberately bringing their hateful, Antisemitic messages to where the congregants worship and within their eyesight, week after week, year after year.

3.     The conduct of the protesters is infringing on the 1st Amendment right of the congregants to exercise their freedom of religion without being harassed and insulted by the protesters. The City, by its failure to enforce its own Code provisions to curtail the protesters' conduct, is aiding and abetting the protesters harassment of the congregants, thereby making the protesters state actors under 42 U.S.C. §1983 and the protesters and the City co-conspirators under 42 U.S.C. §§1983 and 1985(3).

4

4.     The conduct of the protesters is having an adverse emotional effect on Jewish children and young adults who, approaching the Synagogue, see the signs/placards insulting their religion and denouncing their loyalty to Israel. The Supreme Court has held in numerous decisions that 1st Amendment rights are subject to heightened scrutiny and regulation when the emotional health of children and young adults is involved. *See, e.g., Ginsberg v. New York*, 390 U.S. 629 (1968); *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978).

5.     The 1st Amendment right of free speech does not entitle a speaker to use that right repeatedly as a bludgeon, for weeks and years at a time, in the same location, rather than as a means of legitimate communication in an effort to convey information and persuade others to the speaker's point of view. The 1st Amendment right of free speech, like other rights in the Bill of Rights, is subject to appropriate limitations on its continued and repeated usage. The 1st Amendment right to petition the government for a redress of grievances, for example, which entails the right of access to the courts, is subject to the restrictions of the doctrine of *res judicata,* which precludes repeatedly suing the same individuals alleging the same legal claims. The right to invoke the writ of habeas corpus is protected under Article I, Sec. 9, clause 2, of the Constitution. Yet the Supreme Court has approved of legislation that places limits on the number of times a prison inmate may initiate legal proceedings seeking the writ's application. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

The convergence of all of the above factors, and the legal precedents articulating their applicability, demonstrate that the deliberately harassing conduct of the protesters week after week, for 16 years, is not protected by the free speech provision of the 1st Amendment.

The Plaintiff, Marvin Gerber, is a resident of Ann Arbor and a long time member of the Synagogue's congregation. He has seen the protesters' signs as he has approached the

Synagogue in order to participate in the Sabbath worship on numerous occasions. The Antisemitic message of several of the signs, and the virulently anti-Israeli messages of the signs/placards, offend and anger him, cause him extreme emotional distress, significantly diminish his enjoyment in attending Sabbath services, and have adversely affected his willingness to attend Sabbath services at the Synagogue in order to exercise his 1st Amendment right of freedom of religion. He has standing to pursue this lawsuit both by virtue of his being a member of the Synagogue's congregation, and as an Ann Arbor taxpayer, whose taxes are intended to be used to finance the municipality's services, yet the City has refused to use the monies which Gerber has been paying in taxes for the entire 16 years that the protesters have been engaging in their conduct to enforce its own Code provisions which prohibit a substantial part of the protesters' conduct.

This lawsuit seeks injunctive relief which either precludes the protesters from continuing their harassing conduct altogether, or which places reasonable distance, temporal, and numerical limitations on their conduct. The lawsuit also seeks compensatory and punitive damages against the protesters for the emotional distress their conduct has caused Plaintiff, as well as compensatory damages against the City, and compensatory and punitive damages against the City's administrators and employees named in their individual capacities, for aiding and abetting the protesters by failing to enforce the City's Code provisions against the protesters, and for their deliberate indifference to the protesters' infringement on Plaintiff's 1st Amendment right of freedom of religion and freedom of travel.

## JURISDICTION AND VENUE

1.      This action arises under the First and Fourteenth Amendments of the United States Constitution and is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985(3), 1986 and 1988.

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1343, and supplemental jurisdiction over the Michigan state law claims under.28 U.S.C. §1367(a).

3.      Venue is proper in the Eastern District of Michigan under 28 U.S.C. §1391 because the events giving rise to the claims detailed herein occurred in the Eastern District of Michigan.

## PARTIES

4.      Plaintiff Marvin Gerber is a tax-paying resident of the City of Ann Arbor and a long-time dues paying member of the Beth Israel Congregation.

5.      Defendant Henry Herskovitz, upon information and belief, is a resident of Ann Arbor, a founder of the organizations Deir Yassin Remembered, Inc., and Jewish Witnesses for Peace and Friends, the principal organizer of the protests being conducted in front of Beth Israel Synagogue, and an avowed Holocaust denier.

6.      Defendant Gloria Harb, upon information and belief, is a resident of Ann Arbor and a supporter of Herskovitz, Deir Yassin Remembered and Jewish Witnesses for Peace and Friends. Harb has participated, and continues to participate, in the protest activity organized by Herskovitz.

7.      Defendant Tom Staffold, upon information and belief, is a resident of Pittsfield Township, Michigan, and a supporter of Herskovitz, Deir Yassin Remembered and Jewish Witnesses for Peace and Friends. Staffold has participated in the protest activity organized by Herskovitz.

8.     Defendant Rudy List, upon information and belief, is a resident of Dexter, Michigan, and a supporter of Herskovitz, Deir Yassin Remembered and Jewish Witnesses for Peace and Friends. List has participated, and continues to participate, in the protest activity organized by Herskovitz and is an avowed Holocaust denier.

9.     Defendant Chris Mark, upon information and belief, is a resident of Eastpointe, Michigan, and a supporter of Herskovitz, Deir Yassin Remembered and Jewish Witnesses for Peace and Friends. Mark has participated, and continues to participate, in the protest activity organized by Herskovitz.

10.     Defendant Deir Yassin Remembered, Inc., is an organization which, upon information and belief, was formed by Herskovitz, and whose purpose is to publicize information about a military confrontation which occurred in the Village of Deir Yassin in Palestine, on April 9, 1948, during the Israeli War for Independence. The organization presents a view of the encounter from the Palestinian perspective and asserts that it is intended to promote "the struggle for peace and justice in Palestine."   (*See* https://www.deiryassin.org/ and https://blog.deiryassin.org/.)

11.     Defendant Jewish Witnesses for Peace and Friends is an organization formed by Herskovitz for the purpose of organizing the protests in front of Beth Israel Synagogue. (*See* https://localwiki.org/ann-arbor/Jewish_Witnesses_for_Peace_and_Friends.) (Parties 5 through 11 are hereafter sometimes referred to as "The Protester Defendants.")

12.     Defendant City of Ann Arbor is a municipality in the State of Michigan.

13.     Defendant Christopher Taylor is the current Mayor of Ann Arbor. He was elected in November, 2014, and is a licensed attorney in the State of Michigan.

14.     Defendant Derek Delacourt is the Community Services Administrator of Ann

Arbor.

15.     Defendant Stephen Postema is the Cit Attorney of Ann Arbor.

16.     Defendant Kristen Larcom is the Senior Assistant City Attorney of Ann Arbor. (Defendants 12 through 16 are hereafter sometimes referred to as "The City Defendants.")

## FACTUAL ALLEGATIONS

17.     Every Saturday morning since September, 2003, for the last 16 years, Defendant Herskovitz has led a group of protesters, numbering from 6 to 12 individuals at any one time, to place signs, posters and placards on the grass section adjacent to the sidewalk in front of Beth Israel Synagogue, located at 2000 Washtenaw Ave., Ann Arbor, Michigan. as well as on the grass section across Washtenaw Ave., facing the Synagogue.

18.     Upon information and belief, the protesters have not engaged in any similar conduct in front of any other house of worship affiliated with any other religion other than Judaism.

19.     Plaintiff, as a long-time member of the Congregation, has seen the protesters' signs as he has approached the Synagogue in order to participate in the Sabbath worship on numerous occasions. The Antisemitic messages of several of the signs, as well as the virulently anti-Israeli messages, offend and anger him, cause him extreme emotional distress, significantly diminish his enjoyment in attending the Sabbath services, and have adversely affected his willingness to travel to the Synagogue's location to attend Sabbath services in order to exercise his 1st Amendment right of freedom of religion.

20.     Beth Israel Synagogue is located in an area of Ann Arbor which is zoned R1B, or Residential 1B. *(See* Ann Arbor City Zoning Map, attached as Exhibit 1, and Tax Description, Class, attached as Exhibit 2.)

21.     The signs/placards bear such statements as:   "Resist Jewish Power"; "Jewish Power Corrupts"; "Fake News: Israel Is A Democracy"; "Stop Funding Israel"; "End the Palestinian holocaust"; "No More Holocaust Movies"; "The United States of Israel?!"; "America First"; etc.  (*See* photographs of examples of the signs/placards in front of the Synagogue, attached hereto as Exhibit 3; and Exhibit 4, across Washtenaw Ave., facing the Synagogue.)

22.     The signs/placards number 18-20 signs. Most of the signs/placards are placed on the grass sections leaning against trees and portable chairs which the protesters bring with them. Some of the protesters also carry signs, either holding them in their hands or attached to twine hanging around their necks.

23.     The protesters arrive every Saturday morning, which is the Jewish Sabbath, at approximately 9:30 A.M., position their signs/placards in place, and stay until approximately 11:00 or 11:30 A.M.  The time period coincides with the time when members of the Synagogue arrive to enter the Synagogue in order to conduct and participate in the Sabbath service.

24.     Defendants Harb, Saffold, List and Mark have been present at most of the Saturday protests, accompanying Herskovitz. They either carry one of the signs, or sit by one of the signs which is positioned on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue.  (*See* videos links at https://blog.deiryassin.org/2019/06/21/report-on-beth-israel-vigil-06-15-19/).

25.     All of the signs are anti-Israeli and anti-Zionist. Several of the signs are also flagrantly Antisemitic, e.g., "Resist Jewish Power," "Jewish Power Corrupts"; "End the Palestinian holocaust"; and "No more holocaust movies." These signs promote age-old Antisemitic tropes about purported Jewish outsized influence in world finance and controlling power in international political affairs and accuse Jewish Americans, including the members of

the Beth Israel Congregation, of having a dual national loyalty. They also promote factually erroneous and inflammatory statements relating to the Israeli-Palestinian conflict.

26.     The messages on the signs/placards are readily visible to the congregants, many of whom are accompanied by their children, as they enter their house of worship.

27.     The protesters do not have a permit to engage in their conduct, have never applied for a permit, have never been granted a permit, and the City of Ann Arbor has never required that they obtain a permit.

28.     The protesters' conduct violates the Ann Arbor City Code ("Code"), since it is clear that the Code either requires that the protesters have a permit to place the signs on the grass sections in question, or they are prohibited from placing the signs there altogether.

29.     Code Section 4:1 states: "Streets regulated by this chapter include all areas defined as a "street" by section 1:8 of this Code. ... "  (*See* excerpt from the Code, attached as Exhibit 5.)

Code Section 1:8 defines "street" as follows:  "Street, highway, alley. The entire width subject to an easement for public right of way, or owned in fee by the city, county, or state, of every way or place, of whatever nature, whenever any part thereof is open to the use of the public, as a matter of right for purposes of public travel.  The word, "alley," shall mean any such way or place providing a secondary means of ingress and egress from a property.

"Sidewalk" is defined as that portion of a street between the curb lines or lateral lines and the right-of-way lines which is intended for the use of pedestrians."

Therefore, under the Code, a street includes the sidewalk and extends beyond the sidewalk through to, and including, the street on which vehicles traverse.  This would include any grassy section on which the protesters sit or stand and place their signs.

Code Section 4:2 (2) states: "No person shall place or maintain **any article, thing** or obstruction in any street, except as specifically permitted by this Code, but this provision shall not be deemed to prohibit such temporary obstructions as may be incidental to the expeditious movement of articles and things to and from abutting premises, nor to the lawful parking of vehicles within the part of the street reserved for vehicular traffic." (Emphasis added.)

30.     None of the protesters, while engaging in their weekly protests, have been engaged in moving articles or things to and from an abutting premise to the Synagogue. They are statically setting their signs and placards "in the street," for which they were required to have a permit, but have never applied for a permit and have never been granted a permit by the City.

31.     Even if the protesters had applied for a permit, under the conditions that must be met in order to be issued a permit listed in Code Section 4:14, they would not have qualified for one. For example, the manner in which they were engaging in their picketing activity violated the following provisions of Section 4:14:

> (1) The City Administrator may issue revocable permits to occupy a portion of any city street or sidewalk if the Administrator determines the occupancy will not:
>
> ...
>
> (b)     Unreasonably interfere with **the view** or access to or use of property adjacent to said street.
>
> . .
>
> (h)     Conceal or detract from the appearance of landscaping features in or adjacent to the street.
>
> . . .
>
> (j)     Be attached to or reduce the effectiveness of or access to any utility pole, sign or other traffic control device.

The conduct of the picketers violated the above provisions because the multiplicity of the signs and placards interfered with the view and detracted from the appearance of the landscaping features. In addition, their attaching signs to the telephone poles violated sub-section (j).

32. Even if the picketers had applied for a permit, there was only one kind of permit that they would have qualified for, a "Daily sidewalk occupancy" under Section 4:14(2)(b), which states,: "All applicants who wish to apply for a daily permit beginning May 1 shall provide written notice addressed to 'Business Owner or Manager' at the address directly adjacent to the sidewalk area to be occupied, at least 72 hours before a permit can be issued to occupy any area between the edge of the vehicle use area of the street and the right-of-way or property line. The notice shall include a description of the area to be occupied, the goods or services to be offered, and listing of the conditions for occupancy under section 4:14(1) above." The protesters had never given the Synagogue advance notice of their intent to picket the Synagogue 72 hours before any Sabbath.

33. The Synagogue's administration has on several occasions requested that the City take action to curtail the protesters' conduct. On at least two occasions, Taylor and Postema have addressed the members of the Congregation and asserted that there is no action which the City can take to prohibit, limit or restrict the protesters' activity in front of the Synagogue.

34. The City has never enforced its Code requirement that the protesters must have a permit to place their signs/placards on the grass section in front of the Synagogue and on the grass section across Washtenaw Ave., facing the Synagogue.

35. On numerous occasions Ann Arbor police have been present while the protesters have been engaged in their protest activity, with the numerous signs and placards positioned on the grass sections in front of the Synagogue, and across Washtenaw Ave., and the police have

stood by, taking no action against the protesters, and not ordering them to remove the signs on the grass sections.

36.     In fact, on May 11, 2019, police officers in a squad car engaged in a conversation with two of the protesters. The protesters were contending that their conduct never violated the City's Code, particularly with regard to their placing miniature American flags at various places on the grass. (*See* video at https://www.youtube.com/watch?v=2YYAhi_ZvTM&t=127s.) At 2:17 in the video, one of the protesters says to one of the police officers, "We have always been in compliance officer."  The officer responds, "Absolutely you are."  Then, at 3:34, the officer says, "I am not going to cite you."  In the background of the video, one can see a multitude of signs, all sitting on the grass section in front of the Synagogue, placed there without a permit in clear violation of the Code sections cited above.

37.     On May 16, 2019, Plaintiff's attorney wrote a letter to Larcom, whom he had been advised was the attorney in the City Attorney's Office responsible for dealing with issues relating to the issuance of permits under the Code, explaining that he had reviewed relevant ordinances of the City Code and had concluded that the protesters were required to have a permit to engage in their picketing activity, that they were violating the Code by not applying for a permit, and that even if they did apply for a permit, under the terms of the Code, given the nature of their conduct, by placing signs and placards on the ground leaning against trees and lawn chairs, they were not entitled to obtain a permit. Plaintiff's counsel asked, if she disagreed with his interpretation of the Code, that she explain specifically how he had misinterpreted it, and if she did not disagree with his interpretation, why the City had not enforced the Code to prevent the protesters from engaging in their conduct without a permit for 16 years.

38.     On May 29, Larcom responded that she had received his May 16 letter and that she intended to visit the Synagogue on the upcoming Saturday, June 1, in order to observe the protesters' conduct. Plaintiff's counsel replied by email, indicating that he also intended to be present at the Synagogue that Saturday and would introduce himself to her.

39.     When Plaintiff's counsel arrived at the Synagogue on June 1, he introduced himself to Larcom and they exchanged pleasantries.  Larcom indicated that she had been working in the Ann Arbor City Attorney's Office for 30 years and that she had visited Beth Israel Synagogue in the past to observe the protesters' activity.

40.     Plaintiff's counsel asked Larcom if the signs and their messages had changed from when she previously saw them. She indicated that they were substantially the same. He inquired whether she was aware that the protesters did not have a permit to engage in their conduct, and she acknowledged that this was correct, and that they had never been granted a permit.

41.     Plaintiff's counsel then indicated that he had a copy of the City's Code with him and asked Larcom whether she agreed that the definition of the word "street" under Section 4:1 of the Code included the sidewalk directly in front of the Synagogue, the grass section adjacent to the sidewalk, the road over which vehicles traversed, the grass section on the opposite side of Washtenaw Ave., and then the sidewalk adjacent to the grass section up to the property lines of the buildings across the street. Larcom agreed that this was correct.  Plaintiff's counsel then asked her if she also agreed that the signs and placards which the protesters were placing on the grass section in front of the Synagogue, and on the grass section on the opposite side of Washtenaw Ave., constituted an "article" or "thing" under Section 4:2(2) of the Code. Larcom agreed that they obviously did. Plaintiff's counsel then asked her if she agreed that under the

express terms of Section 4:2(2), the protesters were required to have a permit to place the signs and placards on the grass sections, since the grass sections were part of the "street" as defined in the Code, and she had agreed that the signs and placards were "articles" or "objects," which Section 4:2(2) expressly stated could not be placed in any street unless permitted by the Code. Larcom responded that the Code was very long and that she needed additional time to further evaluate it.

42.     Plaintiff's counsel then stated that the conduct by the protesters had been occurring for 16 years, during which time she indicated she had been employed as a City Attorney and acknowledged that she had seen the conduct in question. He then asked Larcom how much more time did she need to determine whether they needed a permit in order to engage in their conduct. At this point Ms. Larcom became indignant and accused Plaintiff's counsel of being argumentative. Plaintiff's counsel then indicated that he had been informed that she was the principal person in the City Attorney's Office responsible for enforcing the permit provisions of the Code. Larcom responded that decisions regarding the issuance of permits were made by the City's Records Department.  She proceeded to take additional pictures of the signs and then left the vicinity.

43.     Plaintiff's counsel thereafter sent an email to Larcom in which he summarized the substance of their conversation earlier that day. Given her denial that she was responsible for evaluating whether an individual was required to obtain a permit in order engage in certain activity, and whether they were qualified to obtain a permit, Plaintiff's counsel asked her to identify the names of the City employees and administrators who were responsible for making these decisions. He then repeated the same questions which he had included in his May 16 correspondence and May 24 email, requesting that, if she disagreed with his interpretation of the

Code, that she explain why she disagreed with his interpretation, and if she did not disagree with his interpretation, why the City had failed to enforce its Code provisions against the protesters, despite numerous requests by the Synagogue that they do something to curtail the protests.

44. When Plaintiff's counsel did not receive a response from Larcom identifying the employee(s) and/or administrator(s) of the City who were responsible for issuing permits and evaluating when permit requirements had been violated, he called the City's offices and inquired who the person was who was responsible for interpreting and enforcing the City's Code provisions regarding signs. He was informed that the individual in question was Jon Barrett, the City's Zoning Coordinator, and the phone call was transferred to Barrett's office.

45. When Barrett picked up the phone, he asked Plaintiff's counsel what was the purpose of his call. He responded that he had been advised that Barrett was the City's expert and the person responsible for interpreting the City Code's provisions relating to signs, and Barrett affirmed that was the case. Plaintiff's counsel indicated he was calling to find out if individuals were required to obtain a permit in order to place signs and placards on a grass section next to a sidewalk on Washtenaw Ave. Barrett asked if the location was in the historic district, to which Plaintiff's counsel responded that he did not know, but that he was referring to Beth Israel Synagogue, which was located on Washtenaw Ave., between Hill Street and Stadium Boulevard. Barrett indicated that that was not part of the historic district and asked for a description of the signs in question.

46. Plaintiff's counsel explained that a group of individuals were placing numerous signs with various messages written on them on the grass section next to the sidewalk in front of the Synagogue, as well as on the grass section across the street. Based on the description, Barrett stated that no permit for such conduct was required because no permit for such conduct was even

permitted to be issued. He indicated that, as described, the signs and placards were being placed in the public right-of-way, which was prohibited by Section 5.24.10L of the City's Unified Development Code.

47. When Plaintiff's counsel indicated that he was not familiar with the Unified Development Code and had not seen it on the City's website, Barrett explained that it was a special part of the Code and explained how it could be accessed on the City's website.

48. Plaintiff' counsel then asked Barrett if he was aware of the protesters who were appearing in front of Beth Israel Synagogue every Saturday morning and posting the signs that he had been referring to. Barrett asked what did the signs say, and Plaintiff's counsel described the messages that were on some of the signs. Barrett hesitated and then indicated that he was surprised. Plaintiff's counsel asked him how long he had been working for the City and whether he had ever driven in that area of Washtenaw Ave. on a Saturday morning. Barrett responded that he had been working for the City for three years and that he had never driven down Washtenaw Ave. on a Saturday morning and had never seen the activity referred to.

49. Plaintiff's counsel then asked Barrett if he had ever been consulted by the Mayor's Office or by any of the attorneys in the City Attorney's Office about the compliance of the signs as he had described with the City Code. Barrett responded that he had never been informed about the conduct in question by anyone working for the City, that he had never been consulted regarding the compliance of the signs with the City's Code, and that his conversation with Plaintiff's counsel was the first time he had ever heard about the conduct in question.

50. Barrett asked Plaintiff's counsel if he had any photographs of the signs in question, and he responded that he knew a member of the congregation who had taken photos of the signs and he would ask the individual to email the photos to Barrett.

51.     Barrett then indicated that he was going to ask his supervisor's permission to visit the Synagogue on the upcoming Saturday morning to see for himself what was occurring. He explained that since he was only paid to work Monday through Friday, he needed permission to work on official business on Saturday. Plaintiff's counsel asked Barrett that if he did visit the location of the Synagogue and saw signs being posted as he had described, what action could he take. Barrett responded that he had authority to order that the signs and placards be removed, or he could remove them himself. Plaintiff's counsel ended the conversation indicating that he would be visiting the Synagogue the upcoming Saturday morning as well, and he looked forward to meeting him.

52.     After speaking with Barrett, Plaintiff's counsel found the Unified Development Code ("UDC") on the City's website. (See excerpt of the UDC, attached hereto as Exhibit 6.) The section referred to by Barrett, 5.24.10, states:

> Any Sign that is not specifically permitted by this Section 5.24 is prohibited. The following Signs are prohibited:
>
> A.     Signs that incorporate in any manner or are Illuminated by any flashing intermittent, or moving lights. This Section 5.24.10 does not include barber poles that meet the other requirements of this section.
>
> B.     Exterior banners, pennants, spinners and streamers, other than a banner of pennant used as a permitted Sign under Section 5.24.44 or a special event banner under 5:24.9.J.
>
> C.     Exterior string lights used in connection with commercial Premises, other than holiday decorations.
>
> D.     Any Sign which has any visible motion other than permitted flags or banners.
>
> E.     Any Sign which is structurally or electrically unsafe.
>
> F.     Any Sign erected on a tree or utility pole except Signs of any political subdivision of this State.

G.     Any Business Sign or Sign Structure that no longer advertises a bona fide Business conducted or a product sold.

H.     Except as provided in Section 5.24.9D and Chapter 47, Section 4:14, any freestanding Exterior Sign not permanently anchored or secured to either a Building or the ground.

I.     Any Sign on a motor vehicle or trailer that is parked in front of a Business for the purpose of advertising a Business or product or service of a Business located on the Premises where such vehicle is parked.

J.     Any Sign on a motor vehicle or trailer that projects more than 6 inches from the surface of that vehicle when it is parked at a location visible from a Public Right –of-Way street.

K.     Any Sign Structure or frame no longer containing a Sign.

L.     Any Sign erected on the Public Right-of-Way, except for Signs of a political subdivision of this state, portable "open house" Signs as permitted by Section 5.24.9D, Political Signs as permitted by Section 5.24.8B. **The City may remove and destroy or otherwise dispose of, without notice to any Person, any Sign that is erected on the Public Right-of-Way in violation of this chapter.** (Emphasis added.)

53.    Under the express, unambiguous terms of Section 5.24.10, the miniature flags which the protesters have been placing on the grass sections in front of the Synagogue, and on the grass section across the street are, and have been, prohibited by sub-section B. All of the signs which the protesters placed on the grass sections which were freestanding and not permanently anchored or secured to either a building or the ground are, and have been, prohibited by sub-section H. All of the signs were, and have been, further prohibited by sub-section L, as Barrett indicated, because they did not come within any of the exemptions in any of the Sections listed in sub-section L.

54.     After reviewing the UDC, Plaintiff's counsel sent an email to Barrett asking him some questions regarding its application. He indicated that the UDC stated that it was adopted on July 16, 2018, effective July 29, 2018, and asked if there was a prior version of the UDC with comparable provisions and whether it contained a prohibition comparable to Section 5.24.10L. He also asked for a clarification of the use of the word "erected" in the sub-section.  He indicated that he was having photographs of the signs emailed to Barrett and that he would be at the Synagogue on June 6 at 9:30 A.M.

55.     On June 5, Barrett sent an email to Plaintiff's counsel in which he indicated that there was a prior version of the UDC that had provisions with text identical to the provisions in the UDC, but which were numbered differently. (*See* Ann Arbor City Code, Chapter 61, adopted June 9, 1975, attached as Exhibit 7.)  He further indicated that there was no definition of the word "erected" in the UDC.  He stated that he had received photographs of the signs and noted that some of the signs were accompanied by active protesters. He indicated that if he did a site visit, he would not engage with the protesters, which would be a matter better left to the City Attorney's Office or the Ann Arbor police. He indicated that if he did visit the Synagogue and found unaccompanied signs, then "I MAY be able to remove them."

56.     The UDC's precursor, Chapter 61 (exhibit 7) contained a section, 5:508, with language identical to that of UDC Section 5.24.10.

57.     On June 5, at 9:37 AM, Plaintiff's counsel sent an email to Barrett requesting clarifications regarding some of the statements in Barrett's earlier email. These included an explanation regarding what he meant by "accompanied" and how Section 4:2(2) applied to the presence of the signs. Plaintiff's counsel indicated in the email that he was an attorney.

58.     On June 5, at 9:42 AM, Barrett sent an email to Brett Lenart and Kevin McDonald, copied to Derek Delacourt, stating: "Gentleman, I need to discuss the issues and complexities of this situation with you as soon as we can. Thank you."

59.     On June 5, at 11:09 AM, McDonald, the Deputy City Attorney, sent an email to Larcom, stating: "Kristen, I am forwarding this for your review and response given your history with this subject. (Please note the email below, as well as the detailed email that is attached [referring to the email exchange between Barrett and Plaintiff's counsel].) Derek is aware that protests on Washtenaw in front of Beth Israel Synagogue is a complicated and longstanding issue and that our office has provided about this before. Thanks."

60.     On June 5, at 10:13 AM, Plaintiff's counsel received an email from Delacourt, stating: "Jon Barrett forwarded your email to me for review. Based on the nature of the questions identified in your email I've forwarded it to the City Attorney's office for review and response. McDonald from the Attorney's office is cc'd on this email. If you have any additional questions direct them to Mr. McDonald or me."

61.     On June 5, at 5:02 PM, Plaintiff's counsel received an email from Larcom which stated, in relevant part: "We learned today that you have been contacting City staff directly. Please discontinue doing so.  All further communications must be through this Office.  As you know, I am the main contact person.  Feel free to call me at any time.  Thank you in advance for complying with our **requirement**."  (Emphasis added.)

62.     On June 5, at 5:53 PM, Larcom sent an email to McDonald, copied to Postema, Lenart and Barrett, stating: "FYI: I just e-mailed Mr. Susselman and spoke with him telling him all further communications must be through the City Attorney's Office."

63.     Plaintiff's counsel responded by email to Larcom's email at 9:28 PM, stating:

Ms. Larcom,

I assume that you know that you and your Office have no legal right to make the demand that you are making that I have no further contact with employees of the City of Ann Arbor, and that your purported "requirement" violates my First Amendment rights, as well as the First Amendment rights of residents of Ann Arbor for whom I am requesting the information, and who are entitled to obtain information from appropriate employees of the City regarding the application of various sections of the Ann Arbor Code. Indeed, any citizen of the State of Michigan has a constitutional right to contact any employee of the City of Ann Arbor they wish to in order to obtain information, and neither you nor your Office has the authority to say that they may not do so. Your demand, frankly, is an outrageous exercise in power by a governmental entity, particularly since there is no pending litigation between members of Beth Israel Synagogue and the City of Ann Arbor and my request for information from employees of the City does not violate any attorney-client privilege. If you have any case authority that you believe justifies your imposed "requirement," I would be interested in your providing it to me.

Since I assume that your Office has sent an email or other communication to every Department of the City ordering them not to engage in any communication with me, I will make no further effort to communicate with City employees. I just want you know that what you have demanded, and any restriction that you have placed on the City's employees not to communicate with me, is unlawful and unconstitutional.

Yours truly,

Marc M. Susselman
Attorney at Law

64.     To date, Larcom has not provided Plaintiff's counsel with a citation to any case authority holding that a governmental attorney can prohibit a citizen, even a citizen who is an attorney, from communicating with a governmental employee, who is employed by the governmental entity which the governmental attorney represents, regarding information relating to the operation of the governmental entity, in the absence of pending litigation between the governmental entity and the attorney, or any of the attorney's clients, and in the absence of the information being sought being classified, confidential, or privileged.

65.     On June 6, Plaintiff's counsel received a telephone call at 2:15 PM. He allowed his answering machine to pick up the call, at which point the caller identified himself as Jon Barrett. Plaintiff's counsel was surprised that Barrett was calling him, since he had not contacted him, or any other employee of the City, after having received Larcom's email the previous day. Plaintiff's counsel picked up the phone, thanked Barrett for calling him, and stated that he would appreciate it if Barrett could clarify the City's requirements relating to the placing of signs on grass sections next to sidewalks. At this point Barrett stated, "Oh, you're Marc Susselman, I'm not allowed to talk to you." Plaintiff's counsel asked Barrett if he had been instructed by the City Attorney's Office not to speak with him, and Mr. Barrett responded, "I cannot talk to you" and hung up.

66.     After concluding his conversation with Barrett, Plaintiff's counsel sent an email to Barrett summarizing the content of their telephone conversations and the emails which they had exchanged. At the end of the email, Plaintiff's counsel stated:  "If any statement which I have written above does not accurately reflect what was said by you or by me, please respond to this email in writing and advise me specifically what is not accurate.  If I do not receive a response from you, I will assume that what I have written above is accurate in its entirety." Plaintiff's counsel concluded the email with the closing, "Marc Susselman, Attorney at Law."

67.     On June 6, Larcom sent Plaintiff's counsel a letter, which stated, in relevant part:

We write in response to your letter of May 16, 2019, having reviewed the ordinances you cite and your interpretation of them. We disagree with your interpretation. The ordinances you cite do not require one to obtain a permit to engage in the activities you describe. Moreover, the First Amendment right to freedom of speech is a critical consideration in the application of ordinances under these circumstances.

68.     On June 7, Plaintiff's counsel received an email from Barrett in which Barrett quoted only one paragraph contained in the email sent to him on June 6 – the penultimate

paragraph, which stated: "On June 6, you called me at 2:15 P.M. I explained to you that I wanted a clarification regarding the placing of signs on a grass portion of the sidewalk. You responded, 'Oh, you're Marc Susselman. I'm not allowed to talk to you.' When I asked you if you had been instructed by the City Attorney's Office not to speak with me, you said, 'I cannot talk to you' and hung up." In his email Mr. Barrett disputed the accuracy of this paragraph, stating:

> The above is inaccurate. I dialed my desk phone to return a call to a citizen and inadvertently dialed your number due to the fact that I looked at a phone number wrong in my log book. Upon finding out that I dialed inaccurately, I apologized and informed you that I had to go. You asked if the City Attorney's office asked me not to talk to you. I responded by saying that I was not going to answer any questions. I said goodbye and hung up.

69.     On June 19, 2019, Plaintiff's counsel sent Larcom a letter responding to her letter of June 6, in which he stated:

> Dear Ms. Larcom:
>
> I am in receipt of your letter dated June 6, 2019, purporting to respond to my correspondence of May 16, 2019.
>
> In my correspondence of that date, I reviewed and quoted language from the Ann Arbor City Code under Sections 1:8; 4:2:(2); and 4:14, and indicated that based on the unambiguous language of Section 4:2(2), the protesters were required to have a permit to engage in the conduct of placing numerous signs and placards on the grass section immediately adjacent to the sidewalk bordering the property line of Beth Israel Synagogue. I specifically stated, "If you disagree with any portion of my above interpretation of the Code, please advise me which section(s) I am misinterpreting and **how I am misinterpreting them**." (Emphasis added.)
>
> On June 1, 2019, I sent you an email in which I summarized what you had told me when we had met in front of Beth Israel Synagogue in the morning earlier that day. In the email I indicated that you agreed that the definition of "street" in Code Section 1:8 encompassed the sidewalk, the grass section next to the sidewalk, the adjacent road over which automobiles traverse, the grass section on the other side of Washtenaw Ave., and the adjacent sidewalk. I also indicated in the email that I asked you if you agreed that the signs and placards which the protesters have been placing on the grass sections on both sides of Washtenaw Ave. constituted an "article [or] thing" as specified in Section 4.2(2) of the Code, and you agreed that they did. In that email I also indicated that you acknowledged

that the protesters who have been appearing in front of Beth Israel Synagogue every Saturday morning, for the last 16 years, and have been placing signs, posters and banners on the grass sections on both sides of Washtenaw Ave., and you acknowledged that the protesters did not have a permit to engage in that conduct, and had never applied for a permit.  In the email I asked if the protester were required under Section 4:2(2) to have a permit in order to engage in their conduct and asked, "If you do not believe they are required to have a permit, please explain **why they are not required to have a permit under the plain unambiguous language of Section 4:2(2)**, or identify for me another section of the Code that relieves them of this requirement."  (Emphasis added.)   Your correspondence of June 6 does not address my repeated request that, if you disagree with my interpretation of the Code, you specifically explain how I am misinterpreting the Code.

As you know, I recently spoke to Jon Barrett, who is the City's Zoning Coordinator and is regarded as the principal individual responsible for interpreting and enforcing the City's Sign Ordinance,  Based on my description of how the protesters were placing their signs and placards on the grass section next to the sidewalk in front of Beth Israel Synagogue, and on the grass section next to the sidewalk on the opposite side of Washtenaw Ave., Mr. Barrett indicated that the protesters were unlawfully placing the signs and placards in the public right-of-way, in violation of the Unified Development Code, Section 5.24.10(L), and that the protesters would not even be allowed to obtain a permit to engage in the activity in question.  Mr. Barrett also informed me that, although he has been working for the City for three years, he did not know about what the protesters were doing, had never been informed about the protesters and the conduct they were engaging in, and had never been consulted either by the City Attorney's Office or by the Mayor's Office regarding the legality of what the protesters were doing.

Regarding your claim that even if there was a City Ordinance either prohibiting what the protesters are doing, or requiring that they have a permit to engage in their conduct, their activity is protected by the free speech provision of the 1st Amendment, that claim is also erroneous.  Had you done even a minimal amount of legal research on this issue, you would have learned that there are numerous reasons why their conduct is not protected by the 1st Amendment.  I will inform you of only two such reasons, but there are several more.  First, Beth Israel Synagogue is zoned R1B, which means the Synagogue is zoned Residential.  The protesters are therefore engaging in "focused picketing" at a single location in a residential area.  The United States Supreme Court, and lower federal courts, have held on numerous occasions that focused picketing at a single location in a residential area may be prohibited by a city ordinance, and that such an ordinance would not violate the free speech provision of the 1st Amendment. *See, e.g., Frisby v. Schultz,* 487 U.S. 474 (1988); *Thorburn v. Austin,* 231 F.3d 1114 (8th Cir. 2000).

Second, the members of Beth Israel Synagogue, who are seeking to attend worship services at the Synagogue in peace and quiet, without being harassed and insulted by signs which attack their religion, as well as their loyalty to Israel, constitute a captive audience. Unlike the Jewish Holocaust survivors in *National Socialist Party v. Skokie,* 432 U.S. 43 (1977), and *Collin v. Smith,* 578 F.2d 1197 (7th Cir. 1978), who were told that the neo-Nazis had a right to march in downtown Skokie because the Holocaust survivors who lived in Skokie did not constitute a captive audience, since they could avoid seeing the neo-Nazis marching by simply not going downtown, the protesters here are deliberately bringing their anti-Semitic and anti-Israeli signs and placards and placing them directly in front of Beth Israel Synagogue in order to harass the Jewish worshippers who attend services there. The worshippers at Beth Israel Synagogue therefore constitute a captive audience. It is well established constitutional law that speakers do not have a 1st Amendment right to compel a captive audience to see or hear messages they do not wish to see or hear. *See, e.g., Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974) (candidate running for political office did not have a 1st Amendment right to have his political advertisements posted on the inside of city buses, since the patrons riding on the buses constituted a captive audience).

It is clear, therefore, contrary to your assertions, that either the protesters were required to obtain a permit, or were not even entitled to obtain a permit, to engage in their conduct and that the City of Ann Arbor, despite repeated requests by Beth Israel Synagogue and its members that the City take steps to curtail the protesters' conduct, has refused to do so, refusing to enforce its own City Code which, had it been implemented, could have put an end to the protesters' conduct – conduct which is not protected by the 1st Amendment - long ago. Instead, the City has demonstrated deliberate indifference to the 1st Amendment right of the members of the Synagogue to exercise their freedom of worship in peace, without being harassed and insulted.

70.      Despite Plaintiff's counsel having outlined in his June 19 letter to Larcom why the protesters' conduct was not protected by the 1st Amendment, and why they were prohibited under the City's own Code from engaging in their conduct, the City has continued to fail to enforce the Code's provisions against the protesters, who have continued to place their harassing Antisemitic signs and placards on the grass sections in front of the Synagogue and across Washtenaw Ave. every Saturday morning.

## CAUSES OF ACTION

## COUNT I

## VIOLATION OF 42 U.S.C. §1981 BY THE PROTESTER DEFENDANTS

71.     Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

72.     The First Amendment of the Constitution states, in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"

73.     Plaintiff has both constitutional and prudential standing to file this lawsuit based on his long-time membership in the Synagogue and the emotional injury he has incurred by seeing the offensive and harassing signs/placards in front of the Synagogue, the diminished enjoyment he experiences attending the Sabbath services due to the presence of the signs/placards, and the adverse impact the signs/placards have had on his willingness to attend services at the Synagogue and exercise his 1st Amendment right of freedom of religion constitute a concrete injury which confers constitutional standing under Article III of the Constitution. *See, e.g., American Civil Liberties U. v. City of St. Charles,* 794 F.2d 265 ( 7th Cir. 1986); *Mercier v. City of La Crosse,* 276 F. Supp.2d 961 (W.D. Wis. 2003); . Plaintiff also has standing with respect to the City Defendants by virtue of his residency in the City and having paid property taxes for many years, taxes which are supposed to support the municipal services which the City provides, but which, for 16 years, have not been used to enforce the City Code's provisions which prohibit the conduct which the protesters are engaging in. *See, e.g., Hawley v. City of Cleveland,* 773 F.2d 736 (6th Cir.1985); *Gwinn Area Community Schools v. State of Michigan,* 741 F.2d 840 (6th Cir. 1984). By failing to enforce its own Code provisions, the City is aiding and abetting the protesters in causing Plaintiff the emotional injury, diminishment in enjoyment,

and adverse effect on his willingness to attend Sabbath services which are caused by Plaintiff's seeing the offensive and harassing signs/placards. Plaintiff also has prudential standing since he is not suing to redress the injury of any third party.  He is suing to redress the injury exclusively to himself caused by the presence of the protesters and the deliberate indifference of the City.

74.     The protesters' conduct is not protected under the freedom of speech provision of the 1st Amendment, for the following combined reasons:

a.     The Synagogue is located in an area which is zoned Residential. The protesters' repeated picketing, week after week for 16 years, in front of a residentially zoned building constitutes targeted or focused picketing, which the Supreme Court, and other courts, have held may be subject to restrictions without violating the 1st Amendment. *See Frisby v. Schultz,* 487 U.S. 474 (1988). *Thorburn v. Austin,* 231 F.3d 1114 (8th Cir. 2000); *St. David's Episcopal Church v. Westboro Baptist,* 921 P.2d 821 (Ct. App. Kan. 1996).

b.     The members of the congregation, as they approach the house of worship of their choice, constitute a captive audience. It is well settled that an individual does not have a free speech right to compel those who do not wish to hear or see the message s/he wishes to convey to be subjected to that speech. *See Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974); *Hill v. Colorado,* 530 U.S. 703, 716 (2000); *Breard v. Alexandria.* 341 U.S. 622 (1951). Cases such as the Skokie Nazi march case (*National Socialist Part v. Skokie,* 432 U.S. 43 (1977); *Collin v. Smith,* 578 F.2d 1197 (7th Cir. 1978)) and *Snyder v, Phelps,* 562 U.S. 443 (2011), are distinguishable because the courts held in both cases that the intended recipients of the messages did not constitute a captive audience. In the

Skokie case, the residents of Skokie, many of whom were Holocaust survivors, could avoid seeing the marchers in their Nazi uniforms by simply not going to downtown Skokie where the march was scheduled to take place. In *Snyder,* the Court determined that the attendees at the funeral were not able to see the homophobic signs of the protesters.  Here, however, the protesters are deliberately bringing their hateful, Antisemitic messages to where the congregants worship and within their eyesight, week after week, year after year.

Since the Supreme Court decided *Snyder v, Phelps,* several courts have upheld the constitutionality of statutes and ordinances which have placed distance and temporal restrictions on demonstrations by the Westboro Church and its adherents based on the visibility of their hateful messages by people attending military funerals. *See, e.g., Phelps-Roper v. Strickland,* 539 F.3d 356 (6th Cir. 2008) (demonstrations limited to 300 ft. from funeral location and prohibited form one hour before to one hour after the ceremony); *Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012) (upholding similar restrictions); *Phelps-Roper v. Ricketts,* 867 F.3d 883 (8th Cir. 2017) (sustaining the constitutionality of a Nebraska statute imposing a 500 ft. buffer zone on funeral protesters).

c.    The conduct of the protesters is infringing on the 1st Amendment right of the congregants to exercise their freedom of religion without being harassed and insulted by the protesters. The 1st Amendment is applicable to the States via the Due Process Clause of the 14th Amendment. *Gitlow v. People of the State of New York,* 268 U.S. 652 (1925). This includes the freedom of association, which in turn encompasses association for the purpose of engaging in the free

exercise of religion. *Roberts v. United States Jaycees,* 468 U.S. 609 (1984). The City, by its failure to enforce its own Code provisions to curtail the protesters' conduct, is aiding and abetting the protesters harassment of the congregants, thereby making the protesters state actors under 42 U.S.C. §1983, and the protesters and the City co-conspirators under 42 U.S.C. §§1983 and 1985(3).

d.      The conduct of the protesters is having an adverse emotional effect on Jewish children and young adults who, approaching the Synagogue, see the signs/placards insulting their religion and denouncing their loyalty to Israel. The Supreme Court has held in numerous decisions that 1st Amendment rights are subject to heightened scrutiny and regulation when the emotional health of children and young adults is involved. *See, e.g., Ginsberg v. New York,* 390 U.S. 629 (1968); *FCC v. Pacifica Foundation,* 438 U.S. 726 (1978).

e.      While the 1st Amendment provides "freedom for the thought that we hate," *United States v. Schwimmer,* 279 U.S. 644, 655 (1929) (J. Holmes, dissenting), and protects a speaker's right to express radical and unpopular views to an audience willing to listen, *De Jonge v. State of Oregon,* 299 U.S. 353 (1937), it does not protect public expressions of malicious libel, speech which "exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy," *Beauharnais v. Illinois,* 343 U.S. 250 (1952), favorably cited in *R.A.V. v. St. Paul,* 505 U.S. 377, 383 (1992). *See also Virginia v. Black,* 538 U.S. 343 (2003) (cross burning done with an intent to intimidate may be prohibited without abridging 1st Amendment rights).

f.     The freedom of speech protected under the 1st Amendment is not unbounded. Its exercise may be subject to reasonable time, place and manner restrictions. The Supreme Court has "regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *United States v. Grace*, 461 U.S. 171, 177-78 (1983) (Citations omitted.) *See also Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640 (1981); *Grayned v. City of Rockford*, 408 U.S. 104 (1972).

g.     Freedom of speech does not immunize false statements, deliberately and willfully made, from civil liability. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Milkovich v. Lorain Journal*, 497 U.S. 1 (1990).

h.     Verbal harassment which creates a hostile work environment in the context of public sector employment can subject the public employee speaker to disciplinary action, notwithstanding that the harassment implicates the right of free speech under the 1st Amendment and necessitates state action. *See, e.g., Cutler v. Dorn*, 196 N.J. 419 (2008). Similarly, the 1st Amendment does not insulate a public employee who expresses racist comments from disciplinary action (*see, e.g., Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006)), nor does it insulate a public employee who expresses Antisemitic comments  from restrictions imposed by state action (*see, e.g., Jeffries v. Harleston*, 52 F.3d 9 (2d Cir. 1994)). Therefore, racist or Antisemitic harassing speech by private citizens which is repeated in close proximity to a house of worship week after week, for 16 years, thereby creating a hostile environment for the congregants who attend

religious services at that house of worship should enjoy no greater protection against restrictive state action.

      i.     The repeated use of the same signs, week after week, year after year, in front of a house of worship is not intended to utilize speech protected by the 1st Amendment to persuade others to one's point of view by the free exchange of ideas. Whatever persuasive value the signs were intended to possess has long since been expended on the members of the congregation. "The First Amendment protects [speech] which, taken as a whole, [has] serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas [the speech] represent[s]. 'The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about political and social changes desired by the people.'" *Miller v. California,* 413 U.S. 15, 34 (1973), quoting from *Roth v. United States,* 354 U.S. 476, 484 (1957). The repetitive use of the signs has transgressed the line that separates legitimate efforts at reasoned persuasion from unreasoned bullying. The protesters have ample other avenues of communication throughout Ann Arbor which they can utilize in order to persuade others to their point of view without harassing the members of the Beth Israel Congregation on a weekly basis.

      j.     The 1st Amendment right of free speech does not entitle a speaker to use that right repeatedly as a bludgeon, for weeks and years at a time, in the same location, rather than as a mean of legitimate communication in an effort to convey information and persuade others to the speaker's point of view. The 1st Amendment right of free speech, like other rights in the Bill of Rights, is subject

to appropriate limitations on its continued and repeated usage. The 1st Amendment right to petition the government for a redress of grievances, for example, which entails the right of access to the courts, is subject to the restrictions of the doctrine of *res judicata*, which precludes repeatedly suing the same individuals alleging the same legal claims. The right to invoke the writ of habeas corpus is protected under Article I, Sec. 9, clause 2, of the Constitution. Yet the Supreme Court has approved of legislation that places limits on the number of times a prison inmate may initiate legal proceedings seeking the writ's application. *See Slack v. McDaniel*, 529 U.S. 473 (2000). The right to bail is subject to restriction if there is a reasonable belief that an arrestee is likely to commit a crime if released. *United States v. Salerno*, 481 U.S. 739 (1987).

The convergence of all of the above factors, and the legal precedents articulating their applicability, demonstrate that the deliberately harassing and insulting conduct of the protesters week after week, for 16 years, is not protected by the free speech provision of the 1st Amendment.

75. "The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell,* 508 U.S. 476, 489-90 (1993). *See also United States v. Salameh*, 152 F.3d 88, 110, 112 (2d Cir. 1998).

76. "[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Varani,* 435 F.2d 758, 762 (6th Cir. 1970).

77. 42 U.S.C. §1981 states, in relevant part:

**(a) Statement Of Equal Rights**

All person within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

evidence, **and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens**, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

. . .

**(c) Protections Against Impairment**

The rights protected by this section **are protected against impairment by nongovernmental discrimination and impairment under color of State law**. (Emphasis added.)

78.  Jews qualify as a race for purposes of enforcement of the federal civil right statutes. *See Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987). Section 1981 was also intended to apply to discrimination based on ancestry and ethnicity. *See Saint Francis College v. Al-Khazraji,* 481 U.S. 604 (1987).

79.  Section 1981 applies to discriminatory acts by private citizens based on race and ethnicity of others. *See Chapman v. Higbee Co.,* 319 F.3d 825 (6th Cir. 2003), *cert. denied,* 542 U.S. 945 (2004). It is self-evident, based on the messages on the protesters' signs, that the protesters have targeted the members of the Synagogue based on the fact that they are Jewish, and therefore, under *Shaare Tefila, supra,* based on their race, and under *Saint Francis College, supra,* based on their ethnicity. It is also apparent that the protesters are discriminating against the congregants of the Synagogue based on their race and ethnicity, since they have not engaged in any protest activity in front of any other house of worship of any other religion in Ann Arbor.

80.  The Protester Defendants are therefore liable to Plaintiff for their violation of §1981.

81.  A party aggrieved by a violation of 42 U.S.C. §1981 is entitled to both equitable and legal relief, including compensatory and punitive damages. *See Johnson v. Railway Express Agency,* 421 U.S. 454 (1975).

82. While state action to enjoin verbal or written speech must be justified by "a compelling state interest and ... [be] narrowly drawn to achieve that end," *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45 (1983), such a compelling state interest exists here, where the Protester Defendants' conduct is infringing on Plaintiff's free exercise of his religion, and where the speech in question is not protected by the 1st Amendment, and therefore , in this specific context, is not entitled to any protection whatsoever. A single legitimate governmental interest is sufficient to sustain a content-neutral regulation. *See Heffron, supra,* 452 U.S. 640, 650, note 13 (1981).

83. The Protester Defendants' conduct has been willful and malicious.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs or placards on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages; award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT II

## VIOLATION OF 42 U.S.C. §1982 BY THE PROTESTER DEFENDANTS

84.     Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

85.     42 U.S.C. §1982 states:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

86.     The reference in the statute to "hold[ing]" real property includes and applies to a citizen's use of real property, as well as the right to come and go to and from the property as a guest, even if the citizen does not possess an ownership interest in the property. *See U.S. Brown,* 49 F.3d 1162 (6th Cir. 1995); *U.S. v. Greer,* 939 F.2d 1076 (5th Cir. 1991), *aff'd en banc,* 968 F.2d 433 (5th Cir. 1992), *cert. denied,*    U.S.    (1993); *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2d Cir. 1974).

87.     The statute applies to the rights of Jews to use property without interference and harassment. *Shaare Tefila Congregation, supra; Brown, supra.*

88.     The protesters' conduct in using the signs to harass and intimidate Plaintiff and other members of the Congregation in their use of the Synagogue's property violated, and continues to violate, 42 U.S.C. §1982.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M.

37

on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs or placards on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages; award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT III

### CIVIL CONSPIRACY BETWEEN THE PROTESTER DEFENDANTS AND BETWEEN THE PROTESTER DEFENDANTS AND THE CITY DEFENDANTS, IN VIOLATION OF 42 U.S.C. §1982

89.     Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

90.     The Protester Defendants were, and are, engaged in a civil conspiracy to infringe on the right of the congregants, including Plaintiff's, to use the property located at 2000 Washtenaw Ave. in violation of 42 U.S.C. §1982, as demonstrated by the fact that they met every Saturday morning for 16 years at the same location, in front of the Synagogue, at approximately the same time and jointly positioned the signs and placards on the grass sections in front of the Synagogue and across Washtenaw Ave., and carried other signs as they walked back and forth in front of the Synagogue and across Washtenaw Ave. Every Saturday morning, the protesters took overt steps in furtherance of the conspiracy by placing their harassing, insulting and invidious signs on the grass sections in front of the Synagogue and across

Washtenaw Ave.

91.     The protesters were aided and abetted in this conspiracy by the City Defendants by their failure, for 16 years, to enforce the City's Code provisions which prohibited the protest activity which the protesters were engaging in; by telling the protesters, erroneously, that their conduct was "in  absolute compliance" with the City Code; and by misrepresenting to the Congregation that there was nothing the City could do to curtail the protesters' conduct. The protesters were "willful participant[s] in joint action with the State and its agents." *Dennis v. Sparks,* 449 U.S. 24, 28 (1980).

92.     "Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Haffner v. Brown,* 983 F.2d 570, 577 (4th Cir. 1992).  "[S]uch 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct evidence." *Pangburn v. Culbertson,* 200 F.3d 65, 73 (2d Cir. 1999). "[N]othing more than an 'understanding' and 'willful participation' between private and state defendants is necessary to show the kind of joint action that will subject private parties to §1983 liability." *Benburg v. Dempsey,* 909 F.2d 463, 469 (11th Cir. 1990).

93.     "It is fundamental that a conspiracy need not be established by direct evidence of an unlawful agreement. Its existence may be shown by proof of facts from which the logical inference is that the unlawful overt acts were committed in furtherance of a common design of the alleged conspirators. ... Participation in the formation of the conspiracy was not essential ... to culpability. If, after it was formed, [the governmental officer] aided or abetted it with an understanding of its purpose, he became a party to it. The rule of acquiescence in or failure to prevent a conspiracy or criminal act is not sufficient to render one liable ... does not apply in every circumstance to one whose duty it is under the law to prevent the act. [A]cquiescence may

amount to purposeful furtherance; it may be the deliberate removal of an otherwise troublesome obstacle from the path of the law violator and thus become affirmative cooperation." *Burkhardt v. United States,* 13 F.2d 841, 842 (6th Cir. 1926) (Citations omitted).

94. The City Defendants' conduct has been willful and malicious.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff holding that the Protester Defendants and the City Defendants have engaged in a civil conspiracy to infringe on Plaintiff's right to use the property located at 2000 Washtenaw Ave. and have violated, and continue to violate, 42 U.S.C. §1982; that the Court enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs or placards on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and his compensatory and punitive damages against the Protester Defendants and the individual City Defendants named in their individual capacities; award his attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the court may deem just and proper.

## COUNT IV

## VIOLATION OF 42 U.S.C. §1983 BY THE CITY DEFENDANTS

95.     Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

96.     42 U.S.C. §1983 states, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... .

97.     Under Michigan law, the rules of construction which apply to the interpretation of statutes also apply to the interpretation of city ordinances. *See Kircher v. City of Ypsilanti*, 269 Mich. App. 224 (Mich. Ct. App. 2005).

98.     Under Michigan's rules of statutory construction, "a clear and unambiguous statute is not subject to judicial construction or interpretation." *GMAC LLC v. Department of Treasury,* 286 Mich. App. 365, 372 (Mich. Ct. App. 2009). "When interpreting statutes, courts should give effect to every phrase, clause, and word included. ... 'If the statutory language is certain and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written.'" *In re Schwein Estate,* 314 Mich. App. 51, 59 (Mich. Ct. App.) (Citation omitted.) *See also U.S. v. Plavcak,* 411 F.3d 655 (6th Cir. 2005); *U.S. v. Smith,* 481 F. Supp.2d 846 (E.D. Mich. 2007).

99.     Under the express, unambiguous terms of Section 5.24.10 of the UDC (Exhibit 6), the protesters are and were prohibited by the language of sub-section B from placing their miniature flags on the grass section in front of the Synagogue and on the grass section across Washtenaw Ave. They are and were further prohibited under sub-sections H and L from placing

any of their signs on the grass sections in front of the Synagogue and across Washtenaw Ave. None of the exemptions listed in sub-section L applied to any of the signs used by the protesters.

100.   The ordinance's prohibitions are not based on the messages contained on the signs. The prohibitions apply to all pennants, signs and placards, regardless the content or the viewpoint of the messages they contain. The ordinance is therefore content and viewpoint neutral and does not violate the 1st Amendment. *See R.A.V. v. St. Paul,* 505 U.S. 377 (1992); *Gauhhan v. City of Cleveland,* 212 Fed. Appx. 405 (6th Cir. 2007); *Coalition for the Abolition of Marijuana Prohibitions v. City of Atlanta,* 219 F.3d 1301 (11th Cir. 2000); *Foti v. City of Menlo Park,* 146 F.3d 629 (9th Cir. 1998); *Vittitow v. City of Upper Arlington,* 43 F.3d 1100 (6th Cir. 1995); *Chicago Observer, Inc. v. City of Chicago,* 929 F.d2d 325 (7th Cir. 1991); *Wheeler v. Commissioner of Highways,* 822 F.2d 586 (6th Cir. 1987); *Hansel v. City of Little Falls,* 992 F. Supp.2d 916 (D. Minn. 2014); *King Enterprises v. Thomas Township,* 215 F. Supp.2d 891 (E.D. Mich. 2002); *Gannett Co. v. Troy,* 156 Mich. App. 126 (Mich. Ct. App. 1986).

101.   The identical language of the UDC appeared in its precursor, Chapter 61 (Exhibit 7), which was adopted in 1975. Therefore, for the entire 16-year period during which the protesters were engaging in their conduct in front of the Synagogue, the City had an ordinance which prohibited them from engaging in a substantial part of their conduct.

102.   During the entire 16-year period, the City failed to enforce its own Code provisions which prohibited the protesters from engaging in their conduct. During this time period, Ann Arbor police were frequently present at the Synagogue, observing the protesters' conduct, but failed to enforce the City's Code. Indeed, the police on occasion told the protesters that they were doing nothing wrong and were in compliance with the Code, when signs which violated the ordinance were in full view and the protesters clearly were not in compliance. (*See*

averment 36, *supra*.)

103.  During this time period, the Synagogue's administration and congregants on several occasions requested that the City take some action to curtail the protesters' conduct. On at least two occasions Defendants Taylor and Postema appeared before the Congregation and informed the congregants that there was nothing the City could do to curtail the protesters' conduct. These assertions were clearly false, since the City's Code prohibited the protesters' conduct, and the protesters' conduct was not protected by the 1st Amendment. (*See* averment 74, *supra*.) During the last three years of this time period, the individual City Defendants did not even bother to consult with Jon Barrett, the City's principal interpreter of the City's sign ordinance, in order to obtain his opinion regarding whether the protesters' conduct complied with the Code.

104.  By the City Defendants' conduct, they engaged in a policy of not enforcing the City's own Code provisions, which aided and abetted the protesters in violating 42 U.S.C. §1981, which in turn infringed on the congregants' right, including Plaintiff's, to engage in the free exercise of their religion under the 1st Amendment. The City Defendants thereby, acting under color of law, violated 42 U.S.C. §1983. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978).

105.  In addition, the decision not to enforce the City's Code provisions which prohibited the protesters' conduct was made by the City's principal policy makers, i.e., Defendants Taylor, Delacourt and Postema, thereby rendering the City liable for violating 42 U.S.C. §1983. *See Pembauer v. Cincinnati,* 475 U.S. 409 (1986). *See also Beaver v. Borough of Johnsonburg,* 375 F. Supp.326, 328  (W.D. Pa. 1974) ("[M]embers of the Zoning Board are persons acting under color of state law and ... their action **or inaction** in the involvement of

Zoning Ordinances could cause the deprivation of civil rights." (Emphasis added.)

106.    The law which the City Defendants have violated was clearly established years before the protesters began engaging in their protest activity in 2003. The City Defendants named in their individual capacities are therefore not entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Hafer v. Melo*, 502 U.S. 21 (1991)

107.    The City Defendants' conduct has been willful and malicious.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction requiring the City of Ann Arbor to enforce its Code provisions relating to signs and prohibit the protesters from placing any signs, placards or other articles/objects on the public right-of-way in front of the Synagogue, or across Washtenaw Ave.; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT V

## VIOLATION OF 42 U.S.C. §1983 BY THE PROTESTER DEFENDANTS

108.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

109.    Under 42 U.S.C. §1983, a private citizen can be deemed to be acting under color of state law and qualify as a state actor where the evidence indicates that the private citizen was

"jointly engaged with state officials in the prohibited action ... [and] is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970).

110.    State agents, by their inaction in failing to enforce the law, may have "elected to place [their] power, property and prestige behind the admitted discrimination," thereby qualifying the private citizen committing the discrimination as a state actor. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725 (1961).

111.    Here, by virtue of the police erroneously informing the protesters that they have been in "absolute compliance" with the City's Code; by the City's inaction for 16 years in failing to enforce its own Code provisions, which unambiguously stated that the protesters were prohibited from engaging in their conduct by placing the signs and placards on the grass sections directly in front of the Synagogue and across Washtenaw Ave.; and by misrepresenting to the Congregation that there was nothing the City could do to curtail the protesters' conduct, the City has become so entangled with the protesters' discriminatory conduct that the protesters qualify as state actors subject to liability under 42 U.S.C. §1983.

112.    Under the terms of §1983, Plaintiff is entitled to both equitable and legal redress against the protesters.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the

Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs, placards or other articles on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages; award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT VI

### CIVIL CONSPIRACY BETWEEN THE PROTESTER DEFENDANTS AND BETWEEN THE PROTESTER DEFENDANTS AND THE CITY DEFENDANTS, IN VIOLATION OF 42 U.S.C. §1983

113.   Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

114.   The Protester Defendants were, and are, engaged in a civil conspiracy to infringe on the 1st Amendment right of the congregants, including Plaintiff, to exercise their freedom of religion, as demonstrated by the fact that they met every Saturday morning for 16 years at the same location, in front of the Synagogue, at approximately the same time and jointly positioned the signs and placards on the grass sections in front of the Synagogue and across Washtenaw Ave., and carried other signs as they walked back and forth in front of the Synagogue and across Washtenaw Ave. Every Saturday morning, the protesters took overt steps in furtherance of the conspiracy by placing their harassing, insulting and invidious signs on the grass sections in front of the Synagogue and across Washtenaw Ave.

115.   The protesters were aided and abetted in this conspiracy by the City Defendants

by their failure, for 16 years, to enforce the City's Code provisions which prohibited the protest activity which the protesters were engaging in; by telling the protesters, erroneously, that their conduct was "in  absolute compliance" with the City Code; and by misrepresenting to the Congregation that there was nothing the City could do to curtail the protesters' conduct. The protesters were "willful participant[s] in joint action with the State and its agents." *Dennis v. Sparks,* 449 U.S. 24, 28 (1980).

116.   "Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Haffner v. Brown,* 983 F.2d 570, 577 (4th Cir. 1992).  "[S]uch 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct evidence." *Pangburn v. Culbertson,* 200 F.3d 65, 73 (2d Cir. 1999). "[N]othing more than an 'understanding' and 'willful participation' between private and state defendants is necessary to show the kind of joint action that will subject private parties to §1983 liability." *Benburg v. Dempsey,* 909 F.2d 463, 469 (11th Cir. 1990).

117.   "It is fundamental that a conspiracy need not be established by direct evidence of an unlawful agreement. Its existence may be shown by proof of facts from which the logical inference is that the unlawful overt acts were committed in furtherance of a common design of the alleged conspirators. ... Participation in the formation of the conspiracy was not essential ... to culpability. If, after it was formed, [the governmental officer] aided or abetted it with an understanding of its purpose, he became a party to it. The rule of acquiescence in or failure to prevent a conspiracy or criminal act is not sufficient to render one liable ... does not apply in every circumstance to one whose duty it is under the law to prevent the act. [A]cquiescence may amount to purposeful furtherance; it may be the deliberate removal of an otherwise troublesome obstacle from the path of the law violator and thus become affirmative cooperation." *Burkhardt*

*v. United States,* 13 F.2d 841, 842 (6th Cir. 1926) (Citations omitted).

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff holding that the Protester Defendants and the City Defendants have engaged in a civil conspiracy to infringe on Plaintiff's 1st Amendment right to exercise his freedom of religion and have violated, and continue to violate, 42 U.S.C. §1983; that the Court enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs or placards on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and his compensatory and punitive damages against the Protester Defendants and the individual City Defendants named in their individual capacities; award his attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the court may deem just and proper.

## COUNT VII

## VIOLATON OF 42 U.S.C. §1985(3) BY THE PROTESTER DEFENDANTS

118. Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

119.   42 U.S.C. §1985(3) states:

42 U.S. Code § 1985. Conspiracy to interfere with civil rights.

. . .

(3) Depriving Persons Of Rights Or Privileges

**If two or more persons in any State or Territory conspire** or go in disguise on the highway or on the premises of another, **for the purpose of depriving, either directly or indirectly, any person or class of persons** of the equal protection of the law, or **of equal privileges and immunities under the laws**; or for the purpose of preventing or hindering the constituted authorities of any State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, **if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is** injured in his person or property, or **deprived of having and exercising any right or privilege of a citizen of the United States**, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. (Emphasis added.)

120.   The provision applies to any conspiracy engaged in by **private citizens** to deprive any person or class of persons of equal privileges and immunities under the law, or to  any conspirators who, in furtherance of the conspiracy, deprive any person of exercising any right or privilege of a citizen of the United States. *See Griffin v. Breckenridge,* 403 U.S. 88 (1971).

121.   The provision applies to any conspiracy of private citizens which is motivated by a class-based animus relating to race or religion. *See Bray v. Alexandria Clinic,* 506 U.S. 263 (1993); *Brokaw v. Mercer County,* 235 F.3d 1000 (7th Cir. 2000); *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,* 968 F.2d 286 (2d Cir. 1992); *LeBlanc-Sternberg v. Fletcher, LeBlanc-Sternberg v. Fletcher,* 781 F. Supp. 261 (S.D.N.Y. 1991).

122.   The provision applies to any conspiracy of private citizens which interferes with

the intra-state travel of other citizens, without the involvement or support of state action. *See Spencer v. Casavilla,* 903 F.2d 171 (2d Cir. 1990); *Selevan v. New York Thruway Authority,* 584 F.3d 82 (2d Cir. 2009); *Johnson v. City of Cincinnati,* 310 F.3d 484 (6th Cir. 2002).

123.     The provision applies to any conspiracy of private citizens which interferes with any right protected by the 1st Amendment, including the right of free exercise of religion, which also involves the direct or indirect support of state action. *See Carpenter v. Scott,* 436 U.S. 825 (1983). State action may be manifested by the inaction of state actors in not enforcing the law. *See N.Y. State Org. for Women v. Terry,* 704 F. Supp. 1247, 1260, note 16 (S.D.N.Y. 1989), *aff'd as modified,* 886 F.2d 1339 (2d Cir. 1989), *cert. denied,* 495 U.S. 947 (1990). "State involvement in a given conspiracy may occur when the state, unintentionally and unwillingly, furthers the goals of the conspiracy ... . Under such circumstances, the state may act as the unwitting dupe of the conspirators. However, state involvement may also occur under less innocent circumstances, as when the state knows of the existence of the defendants' conspiracy but turns a blind eye to its evils. The state then plays the role of the conspirators' accomplice rather than their hapless stooge." *Women's Health Care v. Operation Rescue,* 773 F. Supp. 258, 266 (D. Kan. 1991).

124.     It is self-evident that the protesters are engaged in a conspiracy, since they have been acting in concert, appearing week after week at the same location, at the same time, for 16 years;

125.     It is self-evident that the conspiracy is motivated by a class-based animus towards Jews and Judaism, since they only appear in front of the Synagogue, and not in front of the house of worship of any other religion. The class-based animus is also evidenced by the messages on their signs. Reliance on the messages as evidence of motive does not violate the 1st Amendment, *See Wisconsin v. Mitchell, supra; United States v. Salameh, supra.*

126. The protesters' conspiracy interferes with Plaintiff's willingness to travel from his home to the Synagogue in order to attend Sabbath services.

127. The protesters' conspiracy interferes with Plaintiff's 1st Amendment right to freely exercise his religion. The protester's conduct is supported by state action, since the City, for 16 years, has failed and refused to enforce its Code provisions which prohibit the protesters' conduct. The protesters' conduct has also received the imprimatur of the Ann Arbor police. *See* averments 35 and36, *supra.*

128. Plaintiff is entitled to both injunctive relief and damages for violation of 42 U.S.C. §1985(3). *Bell v. Hood,* 327 U.S. 678 (1946); *N.Y. State Org. for Women v. Terry,* 886 F.2d 1339 (2d Cir. 1989), *cert. denied.*

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs, placards or other articles on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages; award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such

other and further relief as the Court may deem just and proper.

## COUNT VIII

### CIVIL CONSPIRACY BETWEEN THE CITY DEFENDANTS AND
### THE PROTESTER DEFENDANTS IN VIOLATION OF 42 U.S.C. §1985(3)

129.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

130.    By failing and refusing to enforce its Code provisions which prohibited the protesters form engaging in their conduct, and by the City's police giving their imprimatur to the protesters' conduct, the City Defendants have aided and abetted the protesters' conspiracy in violation of 42 U.S.C. §1985(3), and have thereby become co-conspirators with the protesters, in violation of 42 U.S.C. §1985(3).

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff holding that the Protester Defendants and the City Defendants have engaged in a civil conspiracy to infringe on Plaintiff's freedom of travel and on his 1st Amendment right to exercise his freedom of religion and have thereby violated, and continue to violate, 42 U.S.C. §1985(3); that the Court enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs, placards or other articles on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at

the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and his compensatory and punitive damages against the Protester Defendants and the individual City Defendants named in their individual capacities; award his attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the court may deem just and proper.

## COUNT IX

## VIOLATION OF 42 U.S.C. §1986 BY THE CITY DEFENDANTS

131. Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

132. 42 U.S.C. §1986 states:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refused so to do, if such wrongful act be committed shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow, then for the benefit of the next of kin of the deceased. But no action under the provision of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

133. The City Defendants had the power to prevent the protesters from engaging in their conspiratorial conduct by enforcing the City's sign Code provisions, but neglected and refused to do so.

134. Since the protesters' conspiracy is ongoing, and has been occurring every Saturday for every week of the last 52 weeks, this action is being commenced within one year

after the cause of action accrued.

135.    Since there is no allegation that the conspiracy has caused anyone's death, Plaintiff's damages are not limited to $5,000.

136.    Plaintiff is entitled to both injunctive relief and damages for violation of 42 U.S.C. §1986. *Bell v. Hood, supra.*

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction requiring the City of Ann Arbor to enforce its Code provisions relating to signs and prohibit the protesters from placing any signs, placards or other articles/objects on the public right-of-way in front of the Synagogue, or across Washtenaw Ave.; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT X

## VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT BY THE CITY DEFENDANTS

137.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

138.    A governmental entity may be held liable for demonstrating a deliberate indifference to repeated violations of a citizen's rights. and manifests a "clearly unreasonable response in light of the known circumstances." *Davis v. Monroe County Bd. of Education,* 526 U.S. 629, 648 (1999). *See also T.E. v. Pine Bush Central School Dist.,* 58 F. Supp.3d 332

(S.D.N.Y. 2014); *Ligon v. City of New York,* 925 F. Supp.2d 478 (S.D.N.Y. 2013).

139.    Deliberate indifference to repeated violations of a citizen's rights constitutes a violation of the citizen's substantive due process rights under the 14th Amendment when the state's actions are "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 847, n.8 (1998). *See also Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415 (2d Cir. 2009).

140.    In the instant case, the language of the City's Code provisions cited above was clear and unambiguous. It unequivocally prohibited the protesters from placing their miniature flags and insulting and harassing signs and placards in the public right-of-way. Yet the protesters continued to engage in their unlawful conduct, week after week, year after year, in full view of the Ann Arbor police and with the complete knowledge of the City Defendants. The police even went so far as to tell the protesters that they were in full compliance with the City Code and that they would not be fined or given a citation – when there were multitudes of signs, placards and miniature American flags in full view in flagrant violation of the City Code's sign ordinance. Nor was this a case where the police or other City authorities were required to make a split second decision under circumstances of life or death. They have had years to read their own Code. Larcom acknowledged that she had been employed as a City Attorney for 30 years and had seen the signs and placards on several other occasions when she had visited the site, yet claimed that she needed more time to evaluate the situation because the Code was "very long." So is the Constitution, but state and federal judges do not require years to render a decision regarding the constitutionality and legality of actions brought before them.

141.    Moreover, the fact that the protesters' conduct was not protected by the 1st Amendment had been settled in numerous Supreme Court and lower federal court precedents

many years before the protesters began their unlawful picketing in 2003.  The provisions of the Code which rendered their conduct unlawful were in effect during this entire time period. Both the constitutional law and the municipal law were clearly established during the entire time period of inaction by the City Defendants.

142.    While the unlawful conduct of the protesters and the deliberate indifference of the City Defendants did not cause the death or serious physical injury of any of the several hundred congregants who belong to the Synagogue, including Plaintiff, it did cause them incalculable emotional injury and significantly diminished enjoyment in their religious worship, seeing their religion insulted, scoffed at, belittled and degraded by a group of Antisemitic, Holocaust denying neo-Nazis, week after week, year after year, while the police stood by, and the City Defendants stood by, and did nothing. Their inaction, their indifference, has been "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," thereby violating the substantive due process right of Plaintiff, and indeed of all of the members of Beth Israel Synagogue.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction requiring the City of Ann Arbor to enforce its Code provisions relating to signs and prohibit the protesters from placing any signs, placards or other articles/objects on the public right-of-way in front of the Synagogue, or across Washtenaw Ave.; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant

Plaintiff such other and further relief as the Court may deem just and proper.

**COUNT XI**

**VIOLATION OF THE RIGHT TO PETITION THE GOVERNMENT FOR REDRESS OF GRIEVANCES AND ACCESS TO THE COURTS UNDER THE FIRST AMENDMENT BY THE CITY DEFENDANTS**

143.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

144.    The 1st Amendment right to petition the Government for a redress of grievances incorporates the right of access to the courts. *See, e.g., California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972); *Berryman v. Rieger,* 150 F.3d 561, 567 (6th Cir. 1998); *In re A.L.Z.,* 247 Mich. App. 264, 276 (Mich. Ct. App. 2001)).

145.    Postema, Larcom and Delacourt engaged in concerted action in an effort to prevent Plaintiff's attorney from obtaining factual information regarding how the City interpreted the provisions of the City's Code relating to the display of signs.

146.    The information which Plaintiff's attorney was seeking was factual information regarding how the City's Code provisions relating to signs were being interpreted and implemented from the City's employee who was the acknowledged expert on this subject. The information Plaintiff's attorney was seeking was not classified or confidential.

147.    Upon information and belief, said Defendants, and/or someone else in the City Attorney's Office, directed Barrett not to engage in any further communication with Plaintiff's attorney, regardless whether Plaintiff's attorney requested information which bore on legal issues relating to the City's Code, or was seeking factual information regarding the City's Code.

148.    Barrett and the individual City Defendants are public officers and employees. "A public office is a public trust and a fiduciary standard should be imposed on public officials."

*Barkey v. Nick,* 11 Mich. App. 381, 385 (Mich. Ct. App. 1968). "[T]he government and its public officials, in the exercise of the duty of informing, occupy a position of trust and a fiduciary standard should be applied to them." *Alan v. Wayne County,* 388 Mich. 210, 352-53, (1972). "Public officers and employees owe a duty of loyalty to the public. ... 'All public officers are agents, and their official powers are fiduciary. They are trusted with public functions of the good of the public; to protect, advance and promote its interests. ....'" *Macomb County Prosecutor v. Murphy,* 464 Mich. 149, 164 (2001).

149.    Barrett had a fiduciary duty to provide Plaintiff's attorney with accurate information regarding the questions he was being asked relating to the operation and applicability of the sign ordinances which were within his area of responsibility and expertise.

150.    By directing Barrett not to engage in any further communication with Plaintiff's attorney, the named Defendants breached their fiduciary duty to the public and interfered with Barrett's fiduciary duty to the public.

151.    Defendants Larcom, Postema and Delacourt engaged in a cover-up in order to prevent the disclosure of information which indicated that the City's Code prohibited the conduct which the protesters had been engaging in for 16 years, information which demonstrated that Postema and Taylor had been prevaricating when they told the Synagogue's administration and congregants that there was nothing the City could do to curtail the protesters' conduct.

152.    By instructing, or otherwise suggesting to Barrett that he not engage in any further communications with Plaintiff's attorney, regardless the nature of the communication, said Defendants obstructed and interfered with the efforts by Plaintiff's attorney to obtain factual information from Barrett and other City employees, and thereby infringed on Plaintiff's 1st Amendment right to obtain information that is supposed to be publicly available in order to

petition the government for a redress of grievances, a right enforceable pursuant to 42 U.S.C. §1983.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter an injunction requiring that the City and the individually named Defendants issue a statement informing Mr. Barrett and all City employees that they have an obligation to provide members of the public, including Plaintiff, and their legal representatives with accurate factual information regarding matters within their area of responsibility and expertise, as long as the requested information is not classified or confidential, and its provision would not interfere with that attorney-client privilege; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT XII

### CITY DEFENDANTS' VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT AND OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT BY PLACING A SUBSTANTIAL BURDEN ON PLAINTIFF'S EXERCISE OF HIS FREEDOM OF RELIGION BY THE CITY DEFENDANTS' FAILURE TO ENFORCE THE CITY'S CODE PROVISIONS WHICH PROHIBIT THE CONDUCT ENGAGED IN BY THE PROTESTER DEFENDANTS

153.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

154.    In *Employment Div. v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that the State of Oregon had not violated the Free Exercise Clause of the 1st Amendment when it denied unemployment benefits to two Native Americans who had been terminated by their

employer because they had ingested peyote for sacramental purposes at a ceremony of the Native American Church, to which they belonged as members. The State held that the Native Americans were disqualified from obtaining unemployment benefits because peyote was listed as a controlled substance and they had been lawfully terminated for misconduct. The Native Americans appealed, arguing that since the peyote had been ingested as part of a religious service, their use of the peyote was protected under the Free Exercise Clause, and therefore the denial of unemployment benefits because of their use of peyote violated the 1st Amendment.

155.    The Supreme Court sustained the State's denial of benefits, on the ground that the Free Exercise Clause did not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)'.". *Id.* at 879. In rendering its decision, the Court held that the compelling state interest test, which requires that state action restricting or regulating a right protected by the 1st Amendment be justified by a compelling state interest, did not apply in the context of the case before the Court.

156.    The Court's rejection of the application of the compelling state interest test in the context of a Free Exercise defense alarmed and upset many members of the United States Congress. In response to the decision, Congress enacted the Religious Freedom Restoration Act ("RFRA") , 42 U.S.C. §2000bb, *et. seq.*, which states, in relevant part:

42 U.S. Code §2000bb. Congressional findings and declaration of purposes

(a) **Findings** The Congress finds that –

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification;

(4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes** The purposes of this chapter are –

(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 373 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb-1. Free exercise of religion protected

**(a) In General**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

**(b) Exception**   Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person –

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

**(c) Judicial Relief**

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

157.    In *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir. 1996), the City of Boerne in Texas had enacted Ordinance 91-05 in order to "protect, enhance and perpetuate selected historic landmarks" and to "safeguard the City's historic and cultural heritage." The Archbishop of San Antonio authorized the parish of Saint Peter Catholic Church in Boerne to construct a larger facility. The church applied for a building permit to allow it to add an addition to the church which would not affect the facade of the church. The City denied the permit, invoking the provisions of the Ordinance. The church filed suit in federal court, claiming that the denial of the permit pursuant to the Ordinance violated the RFRA, *supra.*

158.    The trial court dismissed the lawsuit, holding that the RFRA was unconstitutional because, by seeking to legislatively overturn a Supreme Court decision, it had violated the separation of powers. 877 F. Supp. 355 (W.D. Tex. 1995) The 5th Circuit Court of Appeals reversed, holding that Congress had the power to enact the RFRA pursuant to Section 5 of the 14th Amendment, and therefore the statute was constitutional. 73 F.3d 1352 (5th Cir. 1996).

159.    On appeal, the Supreme Court reversed, stating, in relevant part, 521 U.S. 507, 519- 536 (1997):

> Congress' power under § 5 ... extends only to "enforc[ing]" the provisions of the Fourteenth Amendment. The Court has described this power as "remedial." ... The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what it is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."
>
> While the line between **measures that remedy or prevent unconstitutional actions** and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and

proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect. History and our case law support drawing the distinction, one apparent from the text of the Agreement.

. . .

... Sweeping coverage [under the RFRA] ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter. RFRA's restrictions apply to every agency and official of the Federal, State, and local Governments. ... RFRA applies to all federal and state law, statutory or otherwise, whether adopted before or after its enactment. ... RFRA has no termination date or termination mechanism. **Any law is subject to challenge at any time by any individual who alleges a substantial burden on his or her free exercise of religion.**

. . .

It is for Congress in the first instance to "determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment," and its conclusions are entitled to much deference. ... Congress' discretion is not unlimited, however, and the courts retain the power, as they have since *Marbury b. Madison*, to determine if Congress has exceeded its authority under the Constitution. Broad as the power of Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance. **The judgment of the Court of Appeals sustaining the Act's constitutionality is reversed.** (Emphasis added; citations omitted.)

160.    On its face, the Supreme Court's decision in *City of Bourne* held that the RFRA was unconstitutional, and therefore unenforceable, in its entirety. Yet, that is not how it has been interpreted. Rather, subsequent decisions have interpreted the ruling to apply only to those contexts on which the Court's rationale for ruling the statute unconstitutional was based. Thus, for example, although the Supreme Court literally held that the entire RFRA was unconstitutional, several federal courts have held that the ruling does not apply to federal legislation, since the basis for the Court's decision was that Section 5 of the 14th Amendment, which was supposed to be remedial in application, did not authorize Congress **to overturn** state legislation which arguably violated the RFRA by placing a substantial burden on the exercise of

religion. *See, e.g., Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627, 638 (1999) (In *Boerne* "this Court held that the [RFRA] exceeded Congress' authority under § 5 of the Fourteenth Amendment, insofar as RFRA was made applicable to the States."); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006) (RFRA applies to the Controlled Substances Act); *Christians v. Evangelical,* 141 F.3d 854 (8th Cir. 1998), *cert. denied,* 119 S.Ct. 43 (1998) (RFRA continues to apply to federal enactments); *U.S. v. Ramon,* 86 F. Supp.2d 665, 678 (W.D. Tex. 2000) ("It is unclear ... whether the *Boerne* decision invalidated RFRA in its entirety, or whether i invalidated RFRA only in its application to state laws.")

161.    Even as the decision in *Boerne* applied to the application of the RFRA to the States, it only held it objectionable in its "**displacing laws** and **prohibiting official actions** of almost every description," noting that, "Any law is subject to challenge at any time by any individual who alleges a substantial burden on his or her free exercise of religion."  Thus the Court was holding that the RFRA exceeded Congress' authority under §5 of the 14th Amendment in its potential to **overturn** State and local governmental enactments by placing a substantial burden on religion.

162.    Here, Plaintiff is not seeking to **overturn** Ann Arbor's sign ordinance, or seeking to **prohibit official actions** by Ann Arbor's executive and administrators. Rather, Plaintiff's objection is that Ann Arbor is **failing to enforce its sign Ordinance.** Likewise, Plaintiff is not objecting to actions taken by Ann Arbor, but rather Ann Arbor's **inaction** in **failing to enforce** its Code provisions.  It is Ann Arbor's **failure** to enforce its Code provisions, and **lack of action** which, by allowing the Protester Defendants to continue in their harassing conduct unopposed, substantially burdens Plaintiff's religious exercise, thereby violating the RFRA. A determination

that by its inaction and failure to enforce its own Code provisions, which prohibit the protesters' conduct, the City is violating the RFRA does not contravene anything stated in the Supreme Court's *Boerne* decision.

163.    In 2000, Congress amended the RFRA to add the following provisions:

As used in this chapter –

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

(2) the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4) the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.

164.    The term "United States" refers to "the collective name of the states which are united by and under the Constitution." *Hooven Allison Co. v. Evatt,* 324 U.S. 652, 672 (1945). Therefore the RFRA still applies to the individual States and their sub-divisions to the extent that the RFRA is not "displacing laws [or] prohibiting official actions," but rather, as in this case, is being applied to governmental inaction and the failure to enforce its own laws/ordinances.

165.    Consequently, by failing to enforce its Code provisions which prohibit the protesters from engaging in their conduct, the City Defendants have substantially burdened Plaintiff's exercise of his religion without a compelling justification.

166.    Moreover, by failing to enforce its own Code provisions against the conduct of the protesters, the City is sanctioning their conduct and thereby directly violating the Free Exercise Clause of the 1st Amendment.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of

Plaintiff and enter a preliminary injunction requiring the City of Ann Arbor to enforce its Code provisions relating to signs and prohibit the protesters from placing any signs, placards or other articles/objects on the public right-of-way in front of the Synagogue, or across Washtenaw Ave.; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

### COUNT XIII

### VIOLATION OF THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSON ACT OF 2000 BY THE CITY DEENDANTS

167. Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

168. In 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. 2000cc, *et seq.*, which provides, in relevant part:

**SEC. 2. PROTECTION OF LAND USE AS RELIGIOUS EXERCISE.**

(a) SUBSTANTIAL BURDENS.

(1) GENERAL RULE. – No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution –

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

(2) SCOPE OF APPLICATION. –

. . .

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

. . .

## SEC. 4. JUDICIAL RELIEF

(a) CAUSE OF ACTION. – A person may assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

(b) BURDEN OF PERSUASION. – If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

. . .

## SEC. 8. DEFINITIONS.

In this Act:

. . .

(3) FREE EXERCISE CLAUSE. – The term "Free Exercise Clause" means that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion.

(4) GOVERNMENT. – The term "government" –

(A) means –

(i) a State, county, municipality, or other governmental entity created under the authority of a State;

(ii) any branch, department, agency, instrumentality, or

official of an entity listed in clause (i); and

(iii) any other person acting under color of State law; ...

(5) LAND USE REGULATION. – The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

169.     The RLUIPA is constitutional as a valid exercise by Congress of its remedial power under §5 of the 14th Amendment and applies to the States and their subdivisions. *See Westchester Day School v. Village of Mamaroneck,* 379 F. Supp.2d 550 (S.D.N.Y. 2005); *Freedom Baptist Church v. Township of Middleton,* 204 F. Supp.2d 857 (E.D. Pa. 2002). No court has held otherwise.

170.     The City of Ann Arbor has procedures in place which allow it to make individual assessments of the proposed use of the property in which parties have a legal interest.

171.     The City's sign ordinances constitute land use regulations as defined under the RLUIPA, for the following reasons:

a.     Under Michigan law, the Synagogue has a property interest in the public right-of way adjacent to the sidewalk in front of the Synagogue. In *Baum Family Trust v. Babel,* 488 Mich. 136 (Mich. 2010), the Michigan Supreme Court held that a property owner possesses two property interests in the street abutting the property. The Court stated, *id.* at 155-57:

[T]he abutting landowner possesses a reversionary interest to the center of the street. "It is elementary that upon vacation of a street or alley, the land reverts to the abutting owner or owners."

. . .

[T]he abutting landowner's relationship to the street includes a

right of access to his or her own property. This right is considered a natural easement and one of the incidents of ownership or occupancy of land. ..This "right of access" is considered a "private right" that flows from a deed that refers to a plat, and is distinct form the public's rights in the road. ... And it is well settled that this right of access constitutes a property right that adds value to the land. ... (Citations omitted.)

*See also Eyde Bros. Development Co. v. Eaton County Drain Commissioner,* 427 Mich. 271, 282 (1986) (A property owner "retains the title in fee simple to property up to the center line of a highway dedicated by user.")

b.     Beth Israel Synagogue is owned by the Beth Israel Congregation. (*See* exhibit 2.) As a dues paying member of the Beth Israel Congregation, Plaintiff possesses a property interest in the Synagogue's property and therefore has standing to make this claim. *See, e.g., Park Slope Jewish Center v. Congregation B'nai Jacob,* 90 N.Y.2d 517, 522 (N.Y. 1997).

c.     Statutes and ordinances which regulate the kind and character of signs which may be placed on land constitute "land use regulations." *See, e.g., Ryan Outdoor Advertising, Inc. v. U.S.,* 559 F.2d 554 (9th Cir. 1977) (outdoor advertising displays on federal lands regulated by issuance of Special Land Use Permits); *People, Dept. of Transportation v. Naeglele Outdoor Advtg. Co.,* 38 Cal.3d 509 (Cal. 1985) (California regulations relating to erecting billboards on Indian reservations constitute land use regulations); *Trinity v. People's Counsel,,* 407 Md. 53, 91 (Md. 2008) ("[T]he RLUIPA specifically embraces religious exercise as including '[t]he use, building, or conversion of real property' for a religious purpose. ... Obviously, the Sign Law and the provisions for variances from its standards are land use regulations.") (Citation omitted.); *City of Walnut*

*Grove v. Questco, Ltd.*, 275 Ga. 266 (Ga. 2002) (since sign ordinance was a land use regulation, its enactment had to comply with Zoning Procedures Law); *Harston v. Commonwealth*, 2010-CA-000615-MR (Ky. Ct. of App., 2011) ("Kentucky's Billboard Act is the equivalent of a zoning ordinance in that it 'limits the manner in which a claimant may develop or use property in which the claimant has an interest.' Therefore, Kentucky's Billboard Act is subject to analysis under RLUIPA." *Id.* at 14.)

d.      Under the RLUIPA, "a government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant has an interest." *Prater v. City of Burnside*, 289 F.3d 417, 434 (6th Cir. 2002).

e.      The UDC in which the City's sign ordinances appear is a zoning ordinance. Therefore, since the Synagogue possesses a reversionary property interest up to the center of Washtenaw Ave., and thereby encompasses the public right-of-way on which the protesters are placing their signs and placards, as well as a property interest in a right of ingress and egress which crosses the public right-of-way, the City's sign ordinance 5.24.10, which "limits or restricts" the Synagogue's use of the public right-of-way, constitutes a land use regulation that is subject to the terms of the RLUIPA.

172.    Since the City's sign ordinance 5.14.10 is subject to the terms of the RLUIPA, if the Synagogue decided to place a Star of David in the public right-of-way in front of the Synagogue where the protesters have been placing their signs and placards, and the City cited the

Synagogue for violating the ordinance, the City would be "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise" of the Synagogue and its congregants.

173.    By the same token, by allowing the protesters to place their signs and placards on the public right-of-way in which the Synagogue possesses a property interest, signs and placards which insult, harass and demean the Synagogue's congregants and their religion as they approach their place of worship, the City, by not enforcing the ordinance which prohibits the protesters from engaging in their conduct, is implementing the sign ordinance in a manner which imposes a substantial burden on the religious exercise by the Synagogue's congregants, including Plaintiff, and is not in furtherance of a compelling governmental interest. The City Defendants are consequently violating the RLUIPA, and in turn violating Plaintiff's right, as a dues paying member of the Congregation, to the free exercise of religion and have been doing so since 2003 when the protesters began their unlawful conduct.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction requiring the City of Ann Arbor to enforce its Code provisions relating to signs and prohibit the protesters from placing any signs, placards or other articles/objects on the public right-of-way in front of the Synagogue; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Plaintiff's attorney reasonable attorney fees pursuant to 42 U.S.C. §1988; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## PENDENT STATE LAW CLAIMS

## COUNT XIV

## VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT BY THE PROTESTER DEENDANTS

174.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

175.    The Michigan Elliott-Larsen Civil Rights Act ("Act" or "ELCRA"), M.C.L. 37.2301, *et seq.*, provides, in relevant part:

Sec. 301.  As used in this article:

(a) "Place of public accommodation" means a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, **or institution of any kind**, whether licensed or not, whose goods, **services**, **facilities**, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available **to the public**. ...

Sec. 302. Except where permitted by law, **a person** shall not:

(a) Deny an individual **the full and equal enjoyment of** the goods, **services, facilities**, privileges, advantages, or accommodations of a **place of public accommodation or public service** because of **religion, race,** color, **national origin**, age, sex, or martial status. (Emphasis added.)

176.    Section 103 of the Act defines "person" as "an individual, agent, association, corporation, .... unincorporated organization, the state or a political subdivision of the state or an agency of the state, or any other legal or commercial entity."

177.    Under Article 8 of the Act, Sec.'s 37.801-02, a person alleging a violation of the Act may commence "a civil action for appropriate injunctive relief, or damages, or both, ... in the circuit court for the county where the alleged violation occurred ... ." Damages means "damages for injury or loss caused by **each violation** of this act, including reasonable attorney's fees." If

the plaintiff prevails, the Court can award "all or a portion of the costs of litigation, including reasonable attorney fees and witness fees ...." (Emphasis added.)

178.    The Synagogue qualifies as a "place of public accommodation" under the Act. It is a place of worship which is open to any member of the public, regardless of their religion. No one checks the religion of people as they enter the sanctuary. *See Institute In Basic Life Principles, Inc. v. Watersmeet Township,* 217 Mich. App. 7 (Mich. Ct. App. 1996) (not-for-profit corporation qualified as a "house of public worship" for taxation purposes); *Congregation B'Nai Jacob v. City of Oak Park,* 102 Mich. App. 724 (Mich. Ct. App. 1981) (same). Places of worship generally are classified as places of public accommodation under the Americans With Disabilities Act, 42 U.S.C. §1201, *et seq.,* but are expressly excluded from the statute's coverage under 42 U.S.C. §12187. *See White v. Denver Seminary,* 157 F. Supp.2d 1171 (D. Colo. 2001).

179.    The Synagogue also provides religious and spiritual services to those who attend services there.

180.    The protesters' use of signs and placards in front of the Synagogue, and in front of no other house of worship, which insult and demean Plaintiff's religion, race and ethnicity, deny him the full and equal enjoyment of the religious and spiritual services which the Synagogue provides.

181.    The protesters' conduct creates, and has created for 16 years, a hostile environment by purveying invidious, virulently Antisemitic messages in front of a Jewish house of worship. *See Williams v. Port Huron Area School Dist. Board of Education,* Case No. 06-14556 (E.D. Mich. 2010) ("Because the ELCRA expressly prohibits discrimination based on race, this Court concludes that Michigan courts would recognize a hostile environmental claim based on racial harassment ... ." *Id.* at 25.)

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs or placards on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages; award Plaintiff's attorney reasonable attorney fees; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT XV

## VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT BY THE CITY DEENDANTS

182.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

183.    Article 7, Sec. 701(b) of the ELCRA states, "Two or more persons shall not conspire to, or a person shall not ... (b) Aid, abet, incite, compel, or coerce a person to engage in a violation of this act."

184.    The City Defendants, by their failure to enforce the City Code's sign provisions which prohibit the protesters from engaging in their conduct, have aided and abetted the

protesters in their violating the ELCRA.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction requiring the City of Ann Arbor to enforce its Code provisions relating to signs and prohibit the protesters from placing any signs, placards or other articles/objects on the public right-of-way in front of the Synagogue, or across Washtenaw Ave.; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their capacities; that the Court award Plaintiff's attorney reasonable attorney fees pursuant; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT XVI

## CONSPIRACY BETWEEN THE PROTESTER DEFENDANTS, AND BETWEEN THE PROTESTER AND CITY DEFENDANTS, IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT

185.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

186.    Article 7, Sec. 701(c) of the ELCRA states, "Two or more persons shall not conspire to, or a person shall not ... (c) Attempt directly or indirectly to commit an act prohibited by this act."

187.    The Protester Defendants have acted in concert, and thereby conspired, to attempt to engage in conduct which violates the ELCRA, and week after week, for 16 years, have succeeded in their attempts.

188.    The City Defendants, by their failure to enforce the City Code's sign provisions

which prohibit the protesters from engaging in their conduct, have acted in concert with the Protester Defendants, and have thereby conspired with the Protester Defendants to attempt to violate the ELCRA, week after week, for 16 years, and have succeeded in their attempts.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff holding that the Protester Defendants and the City Defendants have engaged in a civil conspiracy to violate the Michigan Elliott-Larsen Civil Rights Act; that the Court enter a preliminary injunction against the Protester Defendants precluding them from engaging in the picketing conduct altogether, or, alternatively, precluding them from engaging in any aspect of their protest within 1,000 feet of the Synagogue's property line, precluding them from engaging in such conduct between the hours of 9:00 A.M. and 12:00 P.M. on any Saturday, and on any Jewish holiday while services are being conducted in the Synagogue, limiting the number of protesters to not exceed five protesters at any given time; and precluding them from placing any signs, placards or other articles on the grass section adjacent to the sidewalk in front of the Synagogue, or on the grass section across from the Synagogue on Washtenaw Ave; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and his compensatory and punitive damages against the Protester Defendants and the individual City Defendants named in their individual capacities; award his attorney reasonable attorney; and grant Plaintiff such other and further relief as the court may deem just and proper.

## COUNT XVII

## GROUP DEFAMATION BY THE PROTESTER DEFENDANTS

189.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

190.    At the beginning of the Sabbath service in the Synagogue, typically approximately 60 congregants are in attendance. As the morning service continues, more congregants arrive. Some congregants arrive late, in order to avoid seeing the signs being used by the protesters. On a typical Sabbath, the maximum number of congregants who attend is approximately 100. On an occasion when a bar or bat mitzvah is being conducted, the number of congregants will generally number up to 200 attendees, including congregants and family members and friends of the bar or bat mitzvah boy or girl.

191.    One of the signs which the protesters use, and have used, every week, states: "End the Palestinian holocaust."

192.    The word "holocaust" is defined as: "a mass slaughter of people, especially genocide." Merriam-Webster Dictionary. The Oxford English Dictionary defines "holocaust" as "complete destruction, esp. of a large number of persons; a great slaughter or massacre."

193.    The protesters' use of the word in lower case is intended to invoke a reference to the Holocaust, the systematic program of extermination against the Jewish people utilized by the Nazis, causing the death of 6,000,000 Jews. Garner's Modern American Usage, 3rd Edition, states that the word "brings to most modern minds the Nazi campaign to exterminate European Jews during World War II. When referring to that ghastly series of atrocities, the word is capitalized. And because of its association with those acts of genocide, the word is generally seen as inappropriate when used in reference to deaths that are (1) not caused by malice and (2)

not on a massive scale."

194.   The statement on the sign constitutes libel because it is both defamatory and demonstrably false. The statement is intended to imply that Israel's conduct towards the Palestinians constitutes the genocide and massive slaughter of the Palestinian people, comparable to the Holocaust perpetrated by the Nazis against the Jews. Whatever one's perspective may be regarding how Israel is treating, or mistreating, the Palestinians during the ongoing Israeli-Palestinian conflict, it is objectively and demonstrably false, as a matter of fact, to compare the Israeli actions to the Nazis' deliberate, programmatic effort to exterminate the Jewish people. There are no concentration camps in Israel, in the West Bank,, or in Gaza. There are no crematoria in Israel; in the West Bank, or in Gaza. Not a single Palestinian has ever been put to death in a gas chamber by the Israelis or had his/her body incinerated in an oven. There is no Israeli program which requires that Palestinians engage in forced labor for the benefit of Israel, and which condemns Palestinians to a starvation diet. While any death attributable to ethnic violence is deplorable, over the span of the multiple Jewish-Israeli/Palestinian-Arab disputes and armed conflicts the total number of individuals who have died has been approximately 116,100 Jews/Israelis and Arabs/Palestinians combined [https://www.jewishvirtuallibrary.org/total-casualties-arab-israeli-conflict], as compared to the 6 million unarmed Jews who were murdered by the Nazis. Whereas the Nazis killed 90% of Jews under their control in continental Europe and destroyed one-third of world Jewry, in Israel, the West Bank, and Gaza, the Palestinian population over the last 50 years has grown, and continues to grow, far more rapidly than the Jewish population and now constitutes a majority between the Jordan River and the Mediterranean Sea. Unlike the inhumane treatment which the Nazis perpetrated against European Jews, in Israel proper the Palestinians have elaborate, well-funded, effective networks

of educational, cultural and health institutions which are financed and supported by the Israeli government. Israel is not engaged in a genocide of the Palestinian people. The sign's assertion that Israel is committing genocide against the Palestinian people comparable to the Nazis' slaughter of unarmed Jews is intended to equate Israelis, and Jews generally, with Nazis, and is a despicable and factually false slur.

195.    The statement on the sign constitutes a defamatory, libelous statement, which is intended to humiliate and demean the Jewish congregants of the Synagogue as they approach the Synagogue to participate in the Sabbath service.

196.    Since this sign is used every week, it is intended to apply to all of the congregants who are attending services on that particular Saturday, which may vary from week to week and numbers no more than 60-100 attendees.

197.    On June 15, 2019, one of the Synagogue's congregants, Victor Lieberman, was taking pictures of the signs. A video of Lieberman's actions was taken by Herskovitz and was published by Herskovitz on his website blog, Deir Yassin Remembered. (*See* https://blog.deiryassin.org/2019/06/21/report-on-beth-israel-vigil-06-15-19/, second video.) The offending defamatory sign can plainly be seen in the video at 1:53. Herskovitz has thus published this defamatory sign on the internet, for all in the world to see.

198.    By placing the sign in front of a Jewish Synagogue, week after week, year after year, the protesters intend to associate the Jewish congregants who worship at the Synagogue, including Plaintiff, with the falsely alleged genocide being committed by the Israelis against the Palestinian people. The sign is intended to accuse the members of the congregation, including Plaintiff, of being complicit with Israel in a falsely alleged genocidal program against the Palestinians, thereby equating the congregants, including Plaintiff, with the Nazis. The offending

defamatory sign is therefore of and concerning every member of the Congregation who is attending services at the Synagogue on each and every Saturday on which the sign is, and has been, displayed.

199.    Since genocide is a crime condemned under international law, the assertion that all of the members of the Congregation who are attending services on any particular Saturday are the equivalent of Nazis engaged in, or aiding and abetting, the genocide of the Palestinian people constitutes libel *per se*.

200.    While the offending sign does not refer to Plaintiff specifically, Plaintiff is a member of the class being defamed.

201.    The presence of the offending defamatory sign in front of the Synagogue every Saturday morning for multiple years constitutes small group defamation. *See, e.g., Ellias v. Rolling Stone LLC,* 872 F.3d 97, 107 (2d Cir. 2017).

202.    Moreover, the protesters are trafficking in age-old, widely believed Antisemitic stereotypes regarding Jews, increasing the likelihood that people seeing the sign will understand it to apply to all individuals who attend services at the Synagogue, thereby libeling each and every member of the Congregation attending services. *See Brady v. Ottaway Newspapers,* 84 A.D.2d 226, 229, note 2 (N.Y. App. Div. 1981).

203.    The sign makes a statement of fact, and is not excusable as a statement of mere opinion. *See Milkovich, supra; Armstrong v. Shirvell,* 596 Fed. Appx. 433 (6th Cir. 2015); *Smith v. Anonymous Joint Enterprise,* 487 Mich. 102 (Mich. 2010).

204.    Plaintiff is neither a public official nor a public figure, but is, rather, a private figure.

205.    Since the statement on the sign relates to a matter of public concern, the burden is

on Plaintiff to prove that the statement is false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986). Since the statement is demonstrably false, Plaintiff can carry that burden.

206. The Protester Defendants have been publishing the false and defamatory message on the offending sign with actual malice and with a reckless disregard for the truth.

207. "Racial defamation is insidious, and can easily become pervasive. It has no place in the marketplace of ideas. History should have taught us, by now, that the pith of extremism rests in fervently held beliefs, political thought, and the terrorist's notion of 'truth' – none of which ... the first amendment was ever intended to protect." To Stimulate, Provoke, or Incite? Hate Speech and the First Amendmenrt, 3 St. Thomas L. F. 49 (1991).

208. On November  20, 2019, Plaintiff sent a letter to Herskovitz by certified mail demanding that Herskovitz and the other Protester Defendants cease using the offending defamatory sign and that they publish a retraction of the defamatory statement. On November 29, Herskovitz sent Plaintiff a letter refusing to publish a retraction. The Protester Defendants have continued to use the defamatory sign,

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction against the Protester Defendants precluding them from using the sign which states, "End the Palestinian holocaust"; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages; award Plaintiff's attorney reasonable attorney fees pursuant to M.C.L. 600.2911(7); and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT XVIII

### PLACING PLAINTIFF AND THE MEMBERS OF THE SYNAGOGUE'S CONGREGATION IN A FALSE LIGHT BY THE PROTESTER DEFENDANTS

209. Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

210. The tort of false light invasion of privacy can be committed in either of two ways. *See Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich. App. 583 (Mich. Ct. App. 1984); *Reed v. Pontin,* 15 Mich. App. 423 (Mich. Ct. App. 1968). These are:

    a. Misappropriating an individual's likeness or personal information and publicly revealing that likeness or personal information in an unflattering manner without the individual's permission.

    b. Placing an individual in a false light by broadcasting false information about an individual to the public in general or to a large number of people.

211. By displaying the factually false sign "End the Palestinian holocaust" in front of the Synagogue week after week for passing pedestrians and motorists to see, and posting a video of the sign on the internet, the Protester Defendants have published a false, defamatory statement about the members of the Congregation, including Plaintiff, to the public in general and to a large number of people.

212. The Protester Defendants have acted with malice and with reckless disregard for the truth.

213. The widespread publication of the false information accusing members of the Congregation, including Plaintiff, of participating in the alleged genocide of the Palestinian people, and thereby behaving like the Nazis who engaged in a program of extermination against

the Jewish people, is highly offensive to a reasonable person.

214.    The Protester Defendants have consequently committed the tort of false light invasion of privacy.

215.    The use and widespread publication of the offending false sign has caused Plaintiff extreme emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction against the Protester Defendants precluding them from using the sign which states, "End the Palestinian holocaust"; that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages; award Plaintiff's attorney reasonable attorney fees; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT XIX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### BY THE PROTESTER DEFENDANTS

216.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

217.    The Protester Defendants' outrageous and egregious conduct has caused Plaintiff severe emotional distress

218.    The Protester Defendants have acted with recklessness and an intent to harm the members of the Congregation, including Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory and punitive damages against the Protester Defendants;

award Plaintiff's attorneys reasonable attorney fees; and grant Plaintiff such other and further relief as the Court may deem just and proper.

## COUNT XX

### VIOLATION OF THE MICHIGAN CONSTITUTION BY THE CITY DEFENDANTS

219.    Plaintiff incorporates herein each and every of the prior averments as if fully stated herein.

220.    Article I, §4 of the Michigan Constitution states, in relevant part:

Every person shall be at liberty to worship God according to the dictates of his own conscience. ... The civil and political rights, privileges and capacities of no person shell be diminished or enlarged on account of his religious belief.

221.    By failing and refusing to enforce the City's Code sign provisions which prohibited the protesters' conduct, and by misrepresenting to the Congregation of the Synagogue that there was no action which the City could take to curtail the protesters' conduct, the City Defendants violated Plaintiff's rights under Article I, §4 of the Michigan Constitution. *See Smith v. Dep't of Public Health,* 428 Mich. 540, 544 (1987); *Mays v. Snyder,* 323 Mich. App. 1, 57 (Mich. Ct. App. 2018).

222.    The City Defendants acted pursuant to an official policy to not enforce the City's Code sign provisions against the protesters.

223.    The City Defendants' failure to enforce the City's Code sign provisions against the protesters has caused Plaintiff emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and enter a preliminary injunction requiring the City of Ann Arbor to enforce its Code provisions relating to signs and prohibit the protesters from placing any signs, placards or other articles/objects on the public right-of-way in front of the Synagogue, or across Washtenaw Ave.;

that the Court convert the preliminary injunction into a permanent injunction at the conclusion of the lawsuit; that the Court conduct a jury trial in order to determine any disputable issues of fact and to determine Plaintiff's compensatory damages against the City and compensatory and punitive damages against the City Defendants, named in their individual capacities; that the Court award Plaintiff's attorney reasonable attorney fees; and grant Plaintiff such other and further relief as the Court may deem just and proper.

> Marc M. Susselman
> Attorney at Law
> 43834 Brandywyne Rd.
> Canton, Michigan 48187
> (734) 416-5186
> marcsusselman@gmail.com
> P29481
>
> By:    _____s/ Marc M. Susselman_____
> Attorney for Plaintiff

Dated: December 19, 2019

## JURY DEMAND

Plaintiff hereby demands a jury trial for all issues triable by a jury.

> Marc M. Susselman
> Attorney at Law
> 43834 Brandywyne Rd.
> Canton, Michigan 48187
> (734) 416-5186
> marcsusselman@gmail.com
> P29481
>
> By:    _____s/ Marc M. Susselman_____
> Attorney for Plaintiff

Dated: December 19, 2019