**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Marvin Gerber, Dr. Miriam Brysk,

      Plaintiffs,

vs.                                Civil Action No. 2:19-cv-13726
                                      Hon. Victoria Roberts

Henry Herskovitz, *et al.*,

      Defendants, Jointly and Severally.

_____/

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
Attorney for Plaintiffs

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Constitutional Litigation Associates, PC
Attorneys for Defendants Henry Herskovitz,
Gloria Harb, Tom Saffold, Rudy List and
Chris Mark
220 Bagley St., Ste. 740
Detroit, MI 48226
(313) 961-2255/Fax: (313) 922-5130
Heenan@CoLitPC.Com
Davis@ConLitPC.Com

John A. Shea (P37634)
Attorney for Defendants
Herskovitz, Harb, Saffold, List and Mark
120 N. Fourth Avenue
Ann Arbor, Michigan 48104
(734) 995-4646
jashea@earthlink.net

_____/

**<u>PLAINTIFFS' RESPONSE TO PROTESTER DEFENDANTS' MOTION TO SET ASIDE
THE DEFAULT OF JEWISH WITNESSES FOR PEACE AND FRIENDS
AND BRIEF IN SUPPORT</u>**

Plaintiffs, by and through their attorney Marc M. Susselman, in response to the individually named Protester Defendants' motion to set aside default of Defendant Jewish Witnesses for Peace and Friends ("Witnesses"), state as follows:

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     Admitted.

5.     Denied as untrue as worded, for the reason that the First Amended Complaint was also served on Defendant Witnesses since it was served on Herskovitz's attorneys as agents of Herskovitz, and therefore in turn was served on Witnesses, since Herskovitz is an agent of Witnesses and had already been personally served with the original Complaint and Summons.

6.     Admitted.

7.     Admitted, with the qualification that none of the added three counts were pled against Witnesses, but were each pled against the City of Ann Arbor.

8.     Admitted.

9.     Denied for the reason that the allegation is untrue.  The averment clearly identified Witnesses as an unincorporated voluntary association/organization which was subject to suit.

10.     Denied as untrue as worded, since the averment was not "buried" in the First Amended Complaint, but was readily visible and readable. Moreover, the description of Witnesses did not modify its status from that alleged in the original Complaint as an unincorporated voluntary association/organization.

11.     No contest, and states further that counsel's oversight also applied to the equivalent description of Witnesses in the original Complaint.

12.     Denied in part as legally untrue, since Witnesses as described in the original

Complaint, as a matter of law, was an unincorporated voluntary association/organization subject to suit.  No contest regarding the balance of the allegation.

13.    Denied as untrue, since the mistake was not "innocent" given the amount of time that their attorneys had to appear on behalf of Witnesses and answer the Complaint and the First Amended Complaint, or otherwise plead.

14.    Denied as untrue as a matter of fact and law, as demonstrated in the supporting brief accompanying this response.

15.    No contest regarding the individual Protester Defendants intention to file a motion pursuant to Fed. R. Civ. P. 12(b)(6), but deny the balance of the allegation for the reason that it is untrue as a matter of fact and law, as demonstrated in the accompanying brief.

16.    No contest.

17.    Denied as untrue as a matter of law, as demonstrated in the accompanying brief.

18.    Denied as untrue as a matter of fact and law, since Plaintiffs have pled numerous cognizable claims against both Witnesses and the individually named Protester Defendants.

19.    Admitted.

**WHEREFORE,** Plaintiffs request the Court deny the individually named Protester Defendants' motion to set aside the default entered against Witnesses and further deny their request for an assessment of sanctions against Plaintiffs' counsel.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

By:      s/ Marc M. Susselman_____
Attorney for Plaintiff

Dated:  February 13, 2020

2

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR RESPONE TO DEFENDANTS'**
**MOTION TO SET ASIDE DEFAULT**

**TABLE OF CONTENTS**

QUESTIONS PRESENTED .................................................................... ii

CONTROLLING AUTHORITY ............................................................. iii

INDEX OF AUTHORITIES ................................................................. iv

STATEMENT OF FACTS ................................................................... 1

INTRODUCTION ............................................................................ 2

ARGUMENT ................................................................................. 4

I.    WITNESSES DOES NOT HAVE A MERITORIOUS DEFENSE........ 5

      A.    The Holding Of The Supreme Court In *Beauharnais v. Illinois,*
            *343 U.S. 250 (1954), Is Dispositive.* ...................................... 6

      B.    The Protesters' Conduct Can Be Restricted Without Violating
            The 1st Amendment Because It Constitutes Targeted
            Picketing In A Residentially Zoned Area. ................................ 10

      C.    The Congregants, Including Plaintiffs, As They Walk To The
            Synagogue,Their Preferred House Of Worship, Constitute
            A Captive Audience.......................................................... 11

      D.    The Effects That The Protesters' Conduct Have On Children
            Who Accompany Their Parents Are Entitled To Serious
            Consideration.................................................................. 17

      E.    The Protesters' Conduct Creates A Hostile Environment......... 18

II.   PLAINTIFFS WILL BE PREJUDICED IF THE DEFAULT IS SET ASIDE.    19

III.  DEFENSE COUNSELS' CULPABLE CONDUCT LED TO THE DEFAULT.    20

CONCLUSION AND RELIEF ............................................................. 23

CERTIFICATE OF SERVICE............................................................. 24

i

## QUESTIONS PRESENTED

1.      Whether the Court should grant the Protester Defendants' otion to set aside default against

        Defendant Jewish Witnesses for Peace and Friends.

Plaintiffs answer "No."

2.      Whether the Court should grant the Protester Defendants' request that sanctions be

assessed against Plaitnffs' counsel pursuant to 28 U.S.C. §1927.

Plaintiffs ansswer "No."

## CONTROLLING AUTHORITY

*Beauharnais v. Illinois,* 343 U.S. 250 (1954)

*Elrod v. Burns,* 427 U.S. 347 (1976)

*Frisby v. Schultz,* 487 U.S. 474 (1988)

*Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974)

## <u>INDEX OF AUTHORITIES</u>

<u>CASES</u>                                                                    Pages

### <u>Federal</u>

*Beard v. Alexandria,* 341 U.S. 622 (1951) ................................................................ 13

*Beauharnais v. Illinois,* 343 U.S. 250 (1954) ........................................................ 6, 7, 9, 22

*Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986).................................. 17

*Clark v. International Union, United Mine Workers of America,*
    722 F. Supp. 250 (W.D. Va. 1989) ................................................................ 6

*Collin v. Smith,* 578 F.2d 1197 (7th Cir. 1978)........................................................ 13, 14

*Douglas v. Brownell,* 88 F.3d 1511 (8th Cir. 1996)................................................ 10

*Elrod v. Burns,* 427 U.S. 347 (1976)........................................................................ 19

*FCC v. Pacifica Foundation,* 438 U.S. 726 (1978).................................................. 17

*Frisby v. Schultz,* 487 U.S. 474 (1988)..................................................................... 10, 12, 22

*Ginsberg v. New York,* 390 U.S. 629 (1968)............................................................ 17

*Grayned v. City of Rockford,* 408 U.S. 104 (1972).................................................. 6

*Gregory v. Chicago,* 394 U.S. 111 (1969)................................................................ 11

*Gunasekera v. Irwin,* 551 F.3d 461 (6th Cir. 2011) ................................................ 6

*Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640 (1981) .................. 6

*Hill v. Colorado,* 530 U.S. 703 (2000) ..................................................................... 12

*Kikumura v. Hurley,* 242 F.3d 950 (10th Cir. 2001) ................................................ 20

*Konigsberg v. State Bar,* 366 U.S. 36 (1961) ........................................................... 9

*Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974)........................................... 12, 13

*Locurto v. Giuliani,* 447 F.3d 159 (2d Cir. 2006) ................................................... 18

*Nat'l Labor Relations Bd. v. Enjoi Transp., LLC,* Case No. 18-13597,
    (E.D. Mich. 2019)    ................................................................................... 21

*National Socialist Party v. Skokie*, 432 U.S. 43 (1977).......................................... 13

*New York v. Ferber*, 458 U.S. 747 (1982) .......................................................... 9

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) ............................................ 9

*Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) ...................... 17

*Phelps-Roper v. Strickland*, 539 F.3d 356 (6th Cir. 2008) ................................ 17

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)........................................................ 9, 11

*Rowan v. U.S. Post Office Dept.*, 397 U.S. 728 (1970) ....................................... 12

*Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) ............................... 9

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ................................. 9

*Smith v. C.I.R.*, 926 F.2d 1470 (6th Cir. 1991) ............................................ 4

*Snyder v, Phelps*, 562 U.S. 443 (2011)......................................................... 14, 15

*Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002).............. 20

*Thorburn v. Austin*, 231 F.3d 1114 (8th Cir. 2000)....................................... 10

*United States v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018) .................................. 9

*United States v. Schwimmer*, 279 U.S. 644 (1929) ......................................... 11

*Virginia v. Black*, 538 U.S. 343 (2003) ........................................................ 8

*Williams v. Port Huron Area School Dist. Board of Education*,
  Case No. 06-14556 (E.D. Mich. 2010) ........................................................ 18

**State**

**Michigan**

*Burns v. City of Detroit*, 253 Mich. App. 608 (Mich. Ct. App. 2002) ................... 13

*Congregation B'nai Jacob v. City of Oak Park*,
  102 Mich. App. 724 (Mich. Ct. of App. 1981)............................................... 11

*Institute In Basic Life Principles, Inc. v. Watersmeet Township*,
  217 Mich. App. 7 (Mich. Ct. App. 1996)...................................................... 11

*TM v. MZ*, 326 Mich. App. 227 (Mich. Ct. App. 2018) .......................................... 9

**Other**

*Cutler v. Dorn,* 196 N.J. 419 ( N.J. 2008) ............................................... 18

*St. David's Episcopal Church v. Westboro Baptist,*
   921 P.2d 821; 22 Kan. App. 2d 537 (Kan. Ct. of Appeals, 1996) ............... 16

*Saint John's Church in the Wilderness v. Scott,* 296 P.3d 273 (Colo. App. 2012)... 18

## UNITED STATES CONSTITUTION

U.S. Const. amend. I   ............................................................... *passim*

## STATUTES

### Federal

28 U.S.C. §1927   ................................................................. 23

42 U.S.C. §1985(3)   ............................................................. 9

### Michigan

M.C.L. §211.7   .................................................................. 11

## COURT RULES

Fed. R. Civil P. 12(b)(6)   ...................................................... 5, 19

Fed. R. Civ. P. 55(a)   .......................................................... 23

**STATEMENT OF FACTS**

Every Saturday morning since September, 2003, for the last 16 years, Defendant Herskovitz has led a group of protesters, numbering from 6 to 12 individuals at any one time, to place signs, posters, placards and miniature American flags on the grass section adjacent to the sidewalk in front of Beth Israel Synagogue ("Synagogue"), located at 2000 Washtenaw Ave., Ann Arbor, Michigan, as well as on the grass section across Washtenaw Ave., facing the Synagogue. The signs/placards bear such statements as: "Resist Jewish Power"; "Jewish Power Corrupts"; "Zionists are Nazis"; "Dual Loyalty?"; "Fake News: Israel Is A Democracy"; "Stop Funding Israel"; "End the Palestinian holocaust"; "No More Holocaust Movies"; "The United States of Israel?!"; "America First"; etc. (*See* photographs of signs in front of the Synagogue, attached as Exhibit 1; photographs of signs across Washtenaw Ave., facing the Synagogue, attached as Exhibit 2.) They number 18-20 signs. Most of the signs/placards are placed on the grass sections leaning against trees and portable chairs which the protesters bring with them. Some of the protesters also carry signs, either holding them in their hands or attached to twine hanging from their necks.

The protesters arrive every Saturday morning, which is the Jewish Sabbath, at approximately 9:30 A.M., position their signs/placards in place, and stay until approximately 11:00 A.M. The time period coincides with the time when members of the Synagogue arrive to enter the Synagogue, or to attend Sabbath services in the annex next door, in order to conduct and participate in the Sabbath service. All the signs are anti-Israeli and anti-Zionist. Several of the signs are also flagrantly Antisemitic, e.g., "Resist Jewish Power"; "Jewish Power Corrupts"; "Zionists Are Nazis"; "End the Palestinian holocaust"; "Dual Loyalty?"; and "No More Holocaust Movies." These signs promote age-old Antisemitic tropes about purported Jewish outsized influence in world finance, controlling power in international political affairs, and dual

national loyalties. (*See* Affidavit of Professor Emeritus Kenneth Waltzer, retired Professor of Judaic Studies at Michigan State University, attached as Exhibit 3.) They also promote factually erroneous and inflammatory statements relating to the Israeli-Palestinian conflict. The messages on the signs are readily visible to the congregants, many of whom are accompanied by their children, as they enter their house of worship.

## INTRODUCTION

The individually named Protester Defendants maintain that the default which has been entered against Jewish Witnesses for Peace and Friends ("Witnesses") should be set aside because they claim that the individually named protesters have a meritorious defense against the lawsuit on the basis that their conduct constitutes political speech absolutely protected by the free speech provision of the 1st Amendment. They maintain that since they are members of Witnesses, the absolute defense which applies to them under the 1st Amendment likewise applies to Witnesses, and therefore constitutes a meritorious defense warranting setting aside the default which has been entered against Witnesses. Plaintiffs maintain that the protesters' conduct is not protected by the 1st Amendment, for the numerous reasons that are summarized in averment 83 of the 1st Amended Complaint and which will be briefly explained in greater detail, space permitting, below. In turn, the 1st Amendment does not protect Witnesses from restriction and regulation, and does not constitute a meritorious defense warranting setting aside the default. The protesters' conduct does not constitute protected political speech. Rather, it is hate speech that is being used to target a particular group of American citizens based on their religion and ethnicity. It is not being used for legitimate 1st Amendment reasons, to inform and persuade, but is being used to harass and insult Plaintiffs and other congregants who are a captive audience as they approach the Synagogue to attend religious services protected by the Free Exercise Clause of the 1st Amendment, conduct which therefore is not protected by any meritorious defense.

Plaintiffs wish to make clear they are not maintaining that the signs which are used by the protesters are not, under any circumstances, protected by the 1st Amendment. Plaintiffs' position is that the use of their signs, in this particular context, placing the signs in front of a Jewish house of worship, is not protected by the 1st Amendment and may be regulated and restricted in terms of time, place and manner of their display, in accordance with numerous United States Supreme Court precedents.   The protesters are free to display their signs, both the anti-Israeli and the Antisemitic signs, in numerous other locations in Ann Arbor, including at Arborland, on Main Street in Ann Arbor, on Huron Parkway in Ann Arbor, indeed in any other location in the United States, and Plaintiffs agree that such use, subject to the application of content and viewpoint neutral local ordinances, would be protected by the 1st Amendment.   The use of their signs, however – both the signs which are Antisemitic and the signs which are critical of the State of Israel – are not protected by the 1st Amendment when placed in proximity to a Jewish house of worship, and within the sight of the congregants who worship at that house of worship.

Plaintiffs wish also to emphasize that this lawsuit, and the position and arguments which Plaintiffs are advancing in support of the lawsuit, are not just about Jews and Jewish houses of worship. Their position and their arguments are equally applicable to Christian churches, to Muslim mosques, to Hindu and Sikh temples, indeed to any house of worship of any religion, whether monotheistic or otherwise. The protesters' conduct is no more protected by the 1st Amendment in front of Beth Israel Synagogue or any other Jewish synagogue or temple, than would be the use of signs by protesters in front of a Catholic church condemning pedophile priests and accusing members of that Catholic church of being complicit with the acts of pedophilia by such priests. It is no more protected by the 1st Amendment than would be the use of signs by protesters in front of an Episcopalian church which conducts gay marriages accusing the church of encouraging and approving the sin of sodomy, and accusing congregants who attend

services at that church of being complicit in that sin. It is no more protected by the 1st Amendment than would be the use of signs by protesters in front of a mosque, condemning Muslims for the acts of the terrorists on 9/11 and accusing congregants who attend services at that mosque of being complicit in causing 9/11 and the acts of Muslim terrorists elsewhere in the world. It is no more protected by the 1st Amendment than would be the use of signs by protesters in front of a church whose members are predominantly African-American which use the N-word and apply racist stereotypes about African-Americans, claiming that the individuals who attend services at that church are on welfare, are drug users and give birth to crack babies. The protesters in the prior scenarios would not enjoy the protection of the 1st Amendment for engaging in their protest activity for even one day of worship, let alone once a week, every week, for 16 years.

Such conduct would not be entitled to the protection of the 1st Amendment merely because, as the protesters maintain, they are not inciting a riot; or because they are not threatening anyone with physical violence; or because they are not being noisy or interfering with the religious service inside; or because they are not blocking the ingress or egress of the congregants. It is not protected by the 1st Amendment because it is being conducted in proximity to a house of religious worship, thereby infringing on – with or without state action - an equally sacrosanct 1st Amendment right, the right of free exercise of religion, regardless the religion, and because they **are targeting** that house of worship because of the particular religion and/or the particular race and/or the particular ethnicity of the individuals who attend services at that house of worship.

## ARGUMENT

In *Smith v. C.I.R.,* 926 F.2d 1470 (6th Cir. 1991), the Court identified the factors that must be proved in order to warrant setting aside a default as follows, *id.* at 1479-80:

> We have articulated the following factors to be considered in determining whether to set aside default:  1) whether the non-defaulting party will be prejudiced; 2) whether the defendant has a meritorious defense; and 3) whether the culpable conduct of the defendant led to the default.  ...  [W]e [have] further explained:

4

> "Where the defaulting party and counsel have not shown disrespect for the court, or have given evidence of respect for the court's process by their haste in acting to set aside the default, the courts have been inclined toward leniency. ... Clearly, however, the court may refuse to set aside a default, where the defaulting part has no meritorious defense, where the default is due to willfulness or bad faith, or where the defendant offers no excuse at all for the default." (Footnotes omitted.)

> We do not believe it appropriate to attempt a precise definition of "culpable conduct." Where the party in default satisfies the first two requirements for relief and moves promptly to set aside the default before a judgment is entered, the district court should grant the motion if the party offers a credible explanation for the delay **that does not exhibit disregard for the judicial proceedings**. (Emphasis added; citations omitted)

Plaintiffs will address each of the itemized factors below.

## I.   WITNESSES DOES NOT HAVE A MERITORIOUS DEFENSE.

Defendants contend the default should be set aside because they intend to file a motion pursuant to Fed. R. Civ. P. 12(b)(6) contending that all the claims pled against them in the 1st Amended Complaint are without legal merit and must be dismissed. It needs to be noted that each of the claims pled against the Protester Defendants requests both damages and injunctive relief. In order to prevail on this proposed motion, which they claim constitutes their meritorious defense, and in turn Witnesses' meritorious defense, Defendants must be able to demonstrate that **none** of the claims have pled a cognizable legal claim **for injunctive relief**. As will be demonstrated below, it is certain that Defendants will fail in this effort. Why? Because numerous Supreme Court decisions have held that the kind of conduct in which Defendants are engaging is subject - in compliance with the 1st Amendment - to regulations, including injunctions, which restrict the time, place and manner in which such protests are conducted. The freedom of speech protected under the 1st Amendment is not unbounded. Its exercise may be subject to reasonable time, place and manner restrictions. The Supreme Court has "regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and

however and wherever they please.'" *United States v. Grace,* 461 U.S. 171, 177-78 (1983) (Citations omitted.) *See also Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640 (1981); *Grayned v. City of Rockford,* 408 U.S. 104 (1972); *Clark v. International Union, United Mine Workers of America,* 722 F. Supp. 250, 251 (W.D. Va. 1989).

It is important to also note that in evaluating a 12(b)(6) motion, the factual allegations pled in the respective complaint are assumed to be true. *Gunasekera v. Irwin,* 551 F.3d 461, 466 (6th Cir. 2011). It will be virtually impossible under the facts pled in the 1st Amended Complaint for Defendants to prevail on their assertion that none of the legal claims pled against them warrant the imposition of injunctive relief using reasonable restrictions on the time, place and manner of their conduct, and that they have the absolute right to continue in their protest activity exactly in the same manner that they have been doing for the last 16 years, entirely unimpeded. It is virtually certain that this purported meritorious defense will fail, and therefore there is no basis for setting aside the default which has been entered against Witnesses.

### A.    The Holding Of The Supreme Court In *Beauharnais v. Illinois,* 343 U.S. 250 (1954), Is Dispositive.

In *Beauharnais v. Illinois,* 343 U.S. 250 (1954), the petitioner, Beauharnais, was convicted of violating an Illinois criminal statute which stated, in relevant part, *id.* at 251:

> It shall be unlawful for any person, firm or corporation to manufacture, sell, or offer for sale, advertise or publish, present or exhibit in any public place in this state any lithograph, moving picture, play, drama or sketch, which publication or exhibition portrays depravity, criminality, unchastity, or lack of virtue of a class of citizens, of any race, color, creed or religion which said publication or exhibition exposes the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots. ...

Beauharnais was charged with violating the statute, and convicted, for engaging in the following conduct, *id.* at 252:

> The information, cast generally in the terms of the statute, charged that Beauharnais "did unlawfully ... exhibit in public places lithographs, which publications portray depravity, criminality, unchastity or lack of virtue of citizens

of Negro race and color and which exposes [sic] citizens of Illinois of the Negro race and color to contempt, derision, or obloquy ...." The lithograph complained of was a leaflet setting forth a petition calling on the Mayor and City Council of Chicago "to halt the further encroachment, harassment and invasion of white people, their property, neighborhoods and persons, by the Negro ...." Below was a call for "One million self respecting white people in Chicago to unite ...." with the statement added that "If persuasion and the need to prevent the white race from becoming mongrelized by the negro will not unite us, then the aggressions ... rapes, robberies, knives, guns and marijuana of the negro, surely will. ..."

Notably, at trial, the court rejected a jury instruction requested by Beauharnais that, "in order to convict they must find 'that the article complained of was likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest." Also notably, the statute used the disjunctive "or" to indicate that speech which held a particular class of people up to "contempt, derision, or obloquy," regardless whether it also was "productive of breach of the peace or riots," was punishable under the statute. The jury convicted Beauharnais and he appealed, arguing that the statute was unconstitutional because it infringed on his 1st Amendment right of free speech. In a 5-4 majority opinion written by Justice Frankfurter, the Court sustained the constitutionality of the statute. J. Frankfurter wrote, *id.* at 257-58, 261:

> No one will gainsay that it is libelous falsely to charge another with being a rapist, robber, carrier of knives and guns, and user of marijuana. The precise question before us, then, is whether the protection of "liberty" in the Due Process Clause of the Fourteenth Amendment prevents a State from punishing such libels – as criminal libel has been defined, limited and constitutionally recognized time out of mind – directed at designated collectivities and flagrantly disseminated. There is even authority, however dubious, that such utterances were also crimes at common law. It is certainly clear that some American jurisdictions have sanctioned their punishment under ordinary criminal libel statutes. We cannot say, however, that the question is concluded by history and practice. But if an utterance directed at an individual may be the object of criminal sanctions, we cannot deny to a State power to punish the same utterance directed at a defined group, unless we can say that this is a wilful and purposeless restriction unrelated to the peace and well-being of the State.

> Illinois did not have to look beyond her own borders or await the tragic experience of the last three decades to conclude that **wilful purveyors of falsehood concerning racial and religious groups promote strife and tend powerfully to obstruct the manifold adjustments required for free, ordered life in a metropolitan, polyglot community**. ...

7

* * *

In the face of this history and the frequent obligato of extreme racial and religious propaganda, we would deny experience to say that the Illinois legislature was without reason in seeking ways to curb false or malicious defamation of racial and religious groups, made in public places and by means calculated to have a powerful emotional impact on those to whom it was presented. ... (Emphasis added; footnotes omitted.)

It is noteworthy that nowhere was there evidence that Beauharnais's conduct was addressed to a crowd and threatening mob violence; nowhere was there evidence that Beauharnais threatened physical violence against any African-American; nowhere was there evidence that Beauharnais blocked the movement of any African-Americans. Yet the Court upheld the constitutionality of the statute generally, and as it was being applied to Beauharnais. Moreover, unlike Plaintiffs' request for a preliminary injunction against the protesters, the Court held that criminalizing Beauharnais's conduct, engaged in anywhere in public, was not unconstitutional. Clearly, had he engaged in such conduct in front of a church attended predominantly by African-Americans, his crime would be no less egregious. Here, Plaintiffs are not seeking to have the protesters arrested or prosecuted, or bar them from engaging in their conduct elsewhere in Ann Arbor, or elsewhere in Michigan, or elsewhere in the United States. They can, and should be precluded from engaging in their conduct in front of a Jewish house of worship, and specifically in front of Beth Israel Synagogue. Moreover, if a state could constitutionally enact a statute criminalizing such conduct, then surely a federal court is authorized to enter a preliminary injunction prohibiting such conduct within the proximity of a particular house of worship without thereby offending the 1st Amendment. *See also Virginia v. Black*, 538 U.S. 343 (2003) (cross burning done with an intent to intimidate may be prohibited

without abridging 1st Amendment rights).[1]

Many of the signs utilized by the protesters are blatantly Antisemitic. They trade on age-old Antisemitic stereotypes of the sort popularized by the Protocols of the Elders of Zion, a virulently Antisemitic monograph published in Russia in 1903. (*See* affidavit of Prof. Waltzer, Exhibit 3.) They engage in the kind of communication of race and religion based "contempt, derision, or obloquy" which the Supreme Court held in *Beauharnais* could be legitimately punished and regulated without violating the 1st Amendment. Individuals attending services at the Synagogue, or at the next door annex, experience emotional distress and spiritual deflation in their enjoyment of worship due to seeing the signs. (*See* Affidavit of Marvin Gerber, Exhibit 4; Affidavit of Dr. Miriam Brysk, Exhibit 5; Affidavit of Jacqueline Shapo, Exhibit 6; Affidavit of Mara Isser Sax, Exhibit 7; video at https://www.youtube.com/watch?v=QFCKyEaJihE.) The Court therefore has the right and authority to issue a preliminary injunction placing distance, temporal and numerical restrictions on their use without violating the protesters' 1st Amendment rights. The balance of the signs which are anti-Israel and anti-Zionist can also be made subject to the terms of a preliminary injunction on the basis that they are deliberately being used in proximity to the Synagogue based on the race and religion of the individuals who worship there, in violation of 42 U.S.C. §1985(3).[2] Therefore, the protesters' conduct is not absolutely protected by the 1st Amendment and it does not provide them or Witnesses with a meritorious defense.

---

[1] The holding in *Beauharnais* has never been overturned or modified. Indeed, it has been favorably cited in numerous other Supreme Court, lower federal court, and state court decisions. *See, e.g., R.A.V. v. St. Paul,* 505 U.S. 377, 383 (1992); *New York v. Ferber,* 458 U.S. 747, 763 (1982); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67 (1973); *Konigsberg v. State Bar,* 366 U.S. 36, 50 (1961); *United States v. Gonzalez,* 905 F.3d 165, 191 (3d Cir. 2018); *TM v. MZ,* 326 Mich. App. 227, 237 (Mich. Ct. App. 2018).

[2] Jews qualify as a race for purposes of enforcement of the federal civil right statutes. *See Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987). Federal civil rights statutes are also intended to apply to discrimination based on ancestry and ethnicity. *See Saint Francis College v. Al-Khazraji,* 481 U.S. 604 (1987).

**B.     The Protesters' Conduct Can Be Restricted Without Violating The 1st Amendment Because It Constitutes Targeted Picketing In A Residentially Zoned Area.**

The Synagogue and its annex are located in an area which is zoned residential.  (*See* Ann Arbor City Zoning Map, attached as Exhibit 8, and Tax Description, Class, attached as Exhibit 9.) In numerous cases, the U.S. Supreme Court and lower federal courts have held that an injunction, ordinance or statute which prohibits "targeted picketing" of a single residence is not unconstitutional and does not violate the free speech rights of the picketers. In *Frisby v. Schultz*, 487 U.S. 474 (1988), the Court sustained the constitutionality of an ordinance enacted by the City of Brookfield, Wisconsin, which completely banned picketing before or about" any residence. The Court stated, *id.* at 486-88:

> The type of focused picketing prohibited by the Brookfield ordinance is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas. ... In such cases "the flow of information [is not] into ... household[s], but to the public." ... Here, in contrast, the picketing is narrowly directed at the household, not the public. **The type of picketing banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way.** Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt[,] ... In this case, for example, appellees subjected the doctor and his family to the presence of a relatively large group of protesters on their doorstep in an attempt to force the doctor to cease performing abortions. But the actual size of the group is irrelevant; **even a solitary picket can invade residential privacy.** ...
>
> . . .
>
> Because the picketing prohibited by the Brookfield ordinance is speech directed primarily **at those who are presumptively unwilling to receive it,** the State has a substantial and justifiable interest in banning it. The nature and scope of this interest make the ban narrowly tailored. **The ordiance also leaves open ample alternative channels of communication and is content neutral.** Thus, largely because of its narrow scope, the facial challenge to the ordinance must fail. ... (Emphasis added.)

*See also Thorburn v. Austin,* 231 F.3d 1114 (8th Cir. 2000), and *Douglas v. Brownell,* 88 F.3d 1511 (8th Cir. 1996), sustaining the constitutionality of ordinances which prohibited targeted

residential picketing; *Gregory v. Chicago,* 394 U.S. 111, 125 (1969) (J. Black, concurring) ("Were the authority of government so trifling as to permit anyone with a complaint to have the vast power to do anything he pleased, wherever he pleased, and whenever he pleased, our customs and our habits of conduct, social, political, economic, ethical, and religious would all be wiped out, and become no more than relics of a gone but not forgotten past.")[3]

By targeting a single location, week after week, year after year, the protesters are not endeavoring to inform the general public of their views, the intended objective of the 1st Amendment's protection, but are seeking deliberately to harass and humiliate the congregants who refuse to succumb to their zealotry. Their conduct is accordingly not entitled to 1st Amendment protection and may be restricted without violating the Constitution. Therefore, the 1st Amendment does not provide the protesters or Witnesses with a meritorious defense.

### C. The Congregants, Including Plaintiffs, As They Walk To The Synagogue, Their Preferred House Of Worship, Constitute A Captive Audience.

While the 1st Amendment protects the right of a speaker's freedom to express even "the thought that we hate," *United States v. Schwimmer,* 279 U.S. 644 (1929), Justice Holmes dissenting, at 655, it does not provide a megaphone allowing the speaker who wishes to force the

---

[3]  The protesters' attorneys will undoubtedly argue that, notwithstanding the fact that the Synagogue is located in a residentially zoned area, it is not itself a home. Such an argument would ignore the common view that a place of worship is akin to a second home. Thus, we frequently refer to "houses of public worship." *See Congregation B'nai Jacob v. City of Oak Park,* 102 Mich. App. 724, 727 (Mich. Ct. of App. 1981) (citing the reference to "[a]ll houses of public worship" in M.C.L. §211.7); *Institute In Basic Life Principles, Inc. v. Watersmeet Township,* 217 Mich. App. 7, 11 (Mich. Ct. App. 1996) ("The panel remanded the case to the tribunal for further proceedings on whether petitioner qualified for an exemption as a house of public worship.") It is a location where the faithful seek solace, peace and quiet – the same qualities that they value in their homes. Herskovitz has himself referred to the Synagogue as a "house of worship." *(See* Exhibit 10.) The protesters' picketing violates the expected peacefulness of that refuge, and is accordingly subject to being restricted by statute, ordinance or an injunction. Moreover, in referring to the decision in *Frisby,* courts have referred to it as "upholding, against facial challenge, a content-neutral ban on targeted residential picketing," *R.A.V., supra,* 505 U.S. at 386, not limiting its holding to homes specifically, but to residential areas generally.  Beth Israel Synagogue is in a residentially zoned area, surrounded by homes.

thoughts that others may hate down the throats of those who are unwilling to hear it. Such unwilling recipients of the speech of the propagandist are regarded as a "captive audience," and under the 1st Amendment they have a right, reciprocal to that of the speaker who insists on asserting his right of free speech, to invoke the Amendment's protection against such compelled indoctrination. No one has a right under the 1st Amendment to compel others to hear or see a message they do not wish to hear or see.

Numerous Supreme Court decisions have accordingly held that a citizen's 1st Amendment rights are drastically circumscribed when a speaker is addressing a captive audience. One of the leading cases espousing this doctrine was the Supreme Court's decision in *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), in which a candidate for public office argued that the city's policy of disallowing political advertising on the inside of its transit system vehicles, and precluding him from purchasing space to post a political advertisement supporting his candidacy, violated his 1st Amendment rights. The Court rejected his position and held that his free speech rights were limited by the fact that the patrons of the transit system constituted a captive audience. Justice Douglas, in his concurring opinion, expressed the holding of the decision as follows, 418 U.S. at 307: "While petitioner clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it. In my view the right of the commuters to be free from forced intrusion on their privacy precludes the city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience. ... There is no difference when the message is visual, not auricular. In each the viewer or listener is captive." *See also Frisby, supra; Hill v. Colorado,* 530 U.S. 703, 716 (2000) ("[T]he protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it."); *Rowan v. U.S. Post Office Dept.,* 397 U.S. 728 (1970)(statute allowing postal customers to

remove their names from the mailing lists of certain companies did not violate the 1st Amendment rights of publishers or mail order house); *Beard v. Alexandria,* 341 U.S. 622 (1951) (ordinance which prohibited door-to-door solicitations by magazine subscription salesman not unconstitutional); *Burns v. City of Detroit,* 253 Mich. App. 608, 624, note 9 (Mich. Ct. App. 2002) (a college classroom constitutes a captive audience whose students' rights may not be infringed on by a professor expressing profanity).

The congregants walking towards Beth Israel Synagogue and its annex, including Plaintiffs, constitute such a captive audience. The only way they can avoid the necessity of repeatedly averting their eyes and turning their heads away from the direction in which the offensive posters are positioned, would be to stay home and forego attending worship services altogether, or choose to attend a different synagogue, one which subscribes to a different denomination of Judaism from the Conservative form of Judaism practiced at Beth Israel, and which they prefer over a Reform synagogue or an Orthodox synagogue.[4] The 1st Amendment does not require they be put to making such a life changing choice in order to accommodate the purported 1st Amendment rights of the protesters.

The protesters' attorneys will undoubtedly trot out a number of Supreme Court decisions which they will insist constitute counter-examples to the cases cited above and demonstrate that the offensiveness of the objected to speech is not grounds for curtailing it in order to appease the sensibilities of an indignant audience. First and foremost, they can be expected to cite the famous Skokie decisions by the Supreme Court, *National Socialist Party v. Skokie,* 432 U.S. 43 (1977),

---

[4]  The fact that they are outside, moreover, rather than ensconced in their homes, held captive by picketers outside on their doorstep, does not make them any less a captive audience. The bus riders in *Lehman* were no less a captive audience by virtue of their being outside on a mobile vehicle. Nor were the bus riders in *Lehman* required to continually avert their eyes in order to avoid seeing the political ads in question; or use a different bus line; or disembark from the bus in order to avoid seeing the ads.

and the 7th Circuit Court of Appeals, *Collin v. Smith*, 578 F.2d 1197 (7th Cir. 1978), in which members of the National Socialist Party contested the refusal of the Village of Skokie to issue them a parade permit and challenged the entry of an injunction precluding them from marching in the Village, a particularly sensitive issue, since Skokie was home to a significant number of Jewish Holocaust survivors. The Illinois Supreme Court had refused to issue a stay of the injunction. The Supreme Court reversed the refusal to issue a stay. The Nazis then challenged the constitutionality of Skokie ordinances which prohibited the dissemination of materials which would promote hatred of persons based on their heritage, and which prohibited members of a political party from assembling while wearing military style uniforms. The Village argued that the ordinances were constitutional because the Jewish residents constituted a captive audience. The Court rejected this argument, stating, 578 F.2d at 1207:

> This case does not involve intrusion into people's homes. There need be no captive audience, as Village residents may, if they wish, simply avoid the Village Hall for thirty minutes on a Sunday afternoon, which no doubt would be their normal course of business. Absent such intrusion or captivity, there is no justifiable substantial privacy interest to save from constitutional infirmity, when attempts, by fiat, to declare the entire Village, at all times, a privacy zone that may be sanitized from the offensiveness of Nazi ideology and symbols.

Thus, the Jewish residents of Skokie were not a captive audience, since they could avoid going to where the Nazis were going to march. This is clearly distinguishable from the instant matter. The protesters have brought their offensive posters and placards to the Synagogue. The congregants cannot avoid seeing the insulting materials except by constantly averting their eyes, not going to Sabbath services altogether, or going to a different synagogue. They are not going to where the nuisance is located; the nuisance is coming to them. The congregants therefore, unlike the Jewish residents of Skokie, do constitute a captive audience.

The second case the protesters' attorneys are likely to invoke is the Westboro Church case, *Snyder v, Phelps*, 562 U.S. 443 (2011). The Westboro Baptist Church, which was

vehemently opposed to homosexuality as a sin, picketed military funerals, claiming God hates the United States because it tolerates homosexuality in general, and in the military in particular. Fred Phelps, the founder of the church, and many of his adherents traveled to Maryland to picket the funeral of Marine Lance Corporal Matthew Snyder. Phelps and his followers positioned their pickets on public land, a substantial distance from the church where the funeral was conducted, and did not interfere with any part of the funeral ceremony. They posted signs saying such things as, "Thank God For Dead Soldiers"; "Fags Doom Nations"; "America is Doomed"; "Priests Rape Boys"; and "You're Going To Hell." There is no indication in the case that Lance Corporal Snyder was homosexual. At the time of the funeral, Mr. Snyder did not actually see the messages on the signs. He only learned what they said when he later watched the news.

After the funeral, Corporal Snyder's father filed suit in federal court under diversity jurisdiction against Phelps and the church, alleging state tort claims of intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy. The Supreme Court affirmed a reversal of a jury verdict in the plaintiff's favor, stating, *id.* at 459-60:

> Snyder argues that even assuming Westboro's speech is entitled to First Amendment protection generally, the church is not immunized from liability for intrusion upon seclusion because Snyder was a member of a captive audience at his son's funeral. ... We do not agree. In most circumstances, "the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, ... the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes. ... As a result, "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is ... dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner."
>
> As a general matter, we have applied the captive audience doctrine only sparingly **to protect unwilling listeners from protected speech**. For example, we have upheld a statute allowing a homeowner to restrict the delivery of offensive mail to his home, ... and an ordinance prohibiting picketing "before or about" any individual's residence. ...
>
> Here, **Westboro stayed well away from the memorial service. Snyder could see**

**no more than the tops of the signs when driving to the funeral.** And there is no indication that the picketing in any way interfered with the funeral service itself. We decline to expand the captive audience doctrine to the circumstances presented here. (Emphasis added; citations omitted.)

The Court went on to say that its holding in the case was "narrow."

The dissimilarities between the Westboro Church case and the instant matter are obvious. Here, the protesters' signs and posters are not off in the unseeable distance. They are directly in front of the Synagogue, only a few feet from the property line, and are easily readable. Requiring that the congregants avert their eyes means they must each walk by the gauntlet of insulting posters and signs with their head turned in the opposite direction, and they must do this week after week, year after year. Under these circumstances, they constitute a captive audience.[5] The

---

[5]  In a different lawsuit involving Westboro, *St. David's Episcopal Church v. Westboro Baptist*, 921 P.2d 821; 22 Kan. App. 2d 537 (Kan. Ct. of Appeals, 1996), the Court sustained a temporary injunction against Westboro's picketing activity within a given distance of the Episcopal Church. The Church sued Westboro, alleging that its conduct near the church property constituted a private nuisance. The Court stated, *id.* at 828-29:

> The record shows that Westboro conducted its picketing activities for nearly a year before St. David's responded with picketing of its own. In addition, although St. David's may have engaged in picketing activity at some point, at issue in this case is the *manner* in which Westboro conducted its picketing activity at the locality. The affidavits before the trial court show that Westboro picketed in such a manner that the religious worship of St. David's was infringed by the fear held by St. David's members that physical violence might occur. **The trial court found these circumstances particularly escalated in light of the fact that children accompanied their parents to the religious services**. The trial court's findings are supported by the limited record that is before this court. Thus, there is substantial evidence to find that the gravity of the harm to St. David's outweighed the utility of Westboro's conduct. If the trial court finds that Westboro has employed constitutionally unprotected speech as well in its picketing activities, then this issue will weigh even more in St. David's favor.

> In short, the affidavits filed with St. David's petition show there was an interference with the use and enjoyment of its property that was intentional, substantial, and unreasonable. Based upon these affidavits, St. David's has a substantial likelihood of prevailing on its nuisance claim. " 'It is only necessary that plaintiffs establish a reasonable probability of success, and not an 'overwhelming' likelihood of success, in order for a preliminary injunction to

(footnote continued)

protesters, therefore, do not have a 1st Amendment right to impose their harassing and insulting views on a captive audience of congregants who simply want to enter their house of worship to pray. Again, the 1st Amendment does not provide Witnesses with a meritorious defense.

### D.  The Effects That The Protesters' Conduct Have On Children Who Accompany Their Parents Are Entitled To Serious Consideration.

A factor deserving serious consideration in evaluating the right of the protesters to exercise their purported 1st Amendment rights is the effect that their assault on Judaism is having on the children who are old enough to read and whose self-respect and pride in their faith is being adversely affected by the protesters' insults and aspersions. (*See* Affidavit of Jacqueline Shapo, Exhibit 6, an attorney with a Doctorate in Psychology, in which she expresses the concerns she had regarding the psychological effect the sight of the protesters and their signs were having on her minor children, when they lived in Ann Arbor and attended services at Beth Israel Synagogue; and the Affidavit of her now grown daughter, Gabrielle Shapo, recalling the effect seeing the signs had on her emotions when she was growing up, Exhibit 11.)

The Supreme Court has indicated in numerous decisions that the well being of America's youth is a primary consideration in evaluating the claimed 1st Amendment rights of litigants. In *Ginsberg v. New York,* 390 U.S. 629 (1968), the Court sustained the constitutionality of a New York criminal obscenity statute which prohibited the sale to minors under 17 years of age of material deemed to be obscene, whether or not it would be regarded as obscene for adults. In *FCC v. Pacifica Foundation,* 438 U.S. 726 (1978), the Court gave its imprimatur to the FCC's issuing a declaratory ruling against a radio station which had broadcast George Carlin's comedic

---

issue.'"  (Italics in the original; emphasis added; citations omitted.)

*See also Phelps-Roper v. Strickland,* 539 F.3d 356 (6th Cir. 2008) (Ohio statute imposing time, place and manner restrictions on funeral protests constitutional); *Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012)(same re a city ordinance).

monologue "Filthy Words" at 2:00 P.M., a time when young people would have been able to hear the broadcast. In *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986), the Court held that a high school had not violated the 1st Amendment rights of a student by suspending him for having given a nominating speech for a fellow student's election to a student office which was laced with graphic sexual innuendoes. In *Saint John's Church in the Wilderness v. Scott,* 296 P.3d 273 (Colo. App. 2012), the Court affirmed the issuance of a permanent injunction against defendants who engaged in anti-abortion demonstrations across the street from the Saint John's Church in the Wilderness. One of the considerations the Court cited in support of the injunction was concern for the effect that graphic pictures that the protesters used of mutilated fetuses had on children attending church services.  Concern for the psychological effect that the hostile signs are having on the children attending the Synagogue's services further buttress the prior ample bases for enjoining the protesters' conduct. This argument applies to all of the signs, both those which are Antisemitic and those which are anti-Israel, confirming again that the protesters and Witnesses do not have a meritorious defense by appealing to the 1st Amendment.

### E.    The Protesters' Conduct Creates A Hostile Environment.

Verbal harassment which creates a hostile environment in the context of public sector employment can subject the public employee speaker to disciplinary action, notwithstanding that the harassment implicates the right of free speech under the 1st Amendment and necessitates state action. *See, e.g., Cutler v. Dorn,* 196 N.J. 419 (N.J. 2008). Similarly, the 1st Amendment does not insulate a public employee who expresses racist comments from disciplinary action (*see, e.g., Locurto v. Giuliani,* 447 F.3d 159 (2d Cir. 2006)), nor does it insulate a public employee who expresses Antisemitic comments  from restrictions imposed by state action (*see, e.g., Jeffries v. Harleston,* 52 F.3d 9 (2d Cir. 1994)). *See also Williams v. Port Huron Area School Dist. Board of Education,* Case No. 06-14556 (E.D. Mich. 2010) ("Because the ELCRA expressly prohibits

discrimination based on race, this Court concludes that Michigan courts would recognize a hostile environmental claim based on racial harassment ... ." *Id.* at 25.) (Exhibit 12)

Therefore, racist or Antisemitic harassing speech by private citizens which is repeated in close proximity to a house of worship week after week, for 16 years, thereby creating a hostile environment for the congregants who attend religious services at that house of worship, should enjoy no greater protection against restrictive court action, again rebutting the claim that the 1st Amendment provides the protesters and Witnesses with a meritorious defense.[6]

In sum, the 1st Amendment does not provide Witnesses or the protesters with a meritorious defense against Plaintiffs' claims that they are entitled to injunctive relief against the organization. The 12(b)(6) motion to dismiss for failure to state a claim will accordingly fail.

## II.   PLAINTIFFS WILL BE PREJUDICED IF THE DEFAULT IS SET ASIDE.

Herskovitz and his fellow Witnesses members have continued to engage in their protest activity even after being served with the Complaint and 1st Amended Complaint, and Herskovitz has publicly stated he and his associates intend to continue to do so. (*See* https://www.mlive.com/news/ann-arbor/2019/12/ann-arbor-synagogue-protests-will-continue-despite-lawsuit-lead, Exhibit 13.) If the default is set aside, Witnesses will continue its harassing conduct, which is not protected by the 1st Amendment, unabated. The protesters' conduct of harassing and insulting Plaintiffs as they approach the Synagogue and its annex in order to worship is having an adverse effect on the Plaintiffs' right to freely exercise their freedom of worship under the 1st Amendment. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). This assertion applies equally to all rights protected under the 1st Amendment. The

---

[6]   Space limitations prevent Plaintiffs from discussing additional reasons why the protesters' conduct is not protected by the 1st Amendment, and does not provide them with a meritorious defense, as set forth in sub-paragraphs c, g and i of averment 83 of the 1st Amended Complaint.

protesters' right of free speech is not being exercised by the harassing and insulting conduct in which they are engaging, and therefore is not protected. By contrast, the Plaintiffs, and their fellow worshippers, are exercising their 1st Amendment freedom of worship as they approach the Synagogue, or its annex, in order to enter their respective sanctuaries to pray, a 1st Amendment right with which the protesters are interfering by their unprotected conduct. "Limitations on the free exercise of religion inflict irreparable injury." *Tenafly Eruv Ass'n v. Borough of Tenafly,* 309 F.3d 144, 178 (3d Cir. 2002). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley,* 242 F.3d 950, 963 (10th Cir. 2001) (quotations omitted). Allowing Witnesses to continue in its harassing conduct by setting aside the default will thus prejudice Plaintiffs by permitting Witnesses to continue to cause irreparable injury to their 1st Amendment right of free exercise of their religion, using speech which, by contrast, is not protected by the 1st Amendment.

## III.   DEFENSE COUNSELS' CULPABLE CONDUCT LED TO THE DEFAULT.

Despite the numerous cases which Plaintiffs have cited demonstrating that Witnesses was and is an unincorporated voluntary organization subject to suit, defense counsel continue to maintain that Plaintiffs did not adequately describe Witnesses as an unincorporated voluntary organization in their original Complaint and, despite Witnesses being more expressly described as an unincorporated voluntary organization in the 1st Amended Complaint, continue to insist in note 2 of their brief that, "The Protester Defendants are not conceding that JWP is a legal entity subject to being sued." As demonstrated in Plaintiffs' Reply Brief To Defendants' Answer To Motion For Entry Of A Default Judgment, defense counsels' position and argument is ludicrous.[7]

---

[7]  Defense counsel seek to buttress their position by stating, p. 4, "By way of example, the Court may take notice that there exist countless informal groups 'organized' for countless purposes – anything from book clubs to bowling teams to knitting circles. That such groups exist and were formed for a particular purpose does not render them legal entities that may be sued, nor impose (footnote continued)

They cite absolutely no cases that support their position, compared to the 11 cases which Plaintiffs have cited that support theirs.

There was no excuse for the defense counsel to fail to appear on behalf of Witnesses; fail to answer the original Complaint or otherwise plead on behalf of Witnesses within 21 days of being served; and failing to answer the 1st Amended Complaint or otherwise plead on behalf of Witnesses within 14 days of having been properly served with the 1st Amended Complaint by electronic service. Defense counsel's claim that they made "an honest mistake" and their conduct was not the product of willfulness (p. 5) is belied by their continuing insistence that Witnesses is not an unincorporated voluntary organization subject to suit, at the same time that they seek to hedge their bets by acknowledging that it might be. In so doing they are in fact exhibiting "disregard for the judicial proceedings." *Smith, supra.*

Plaintiffs have demonstrated that the Protester Defendants have established none of the three factors they must establish in order to justify setting aside the default. In *Nat'l Labor Relations Bd. v. Enjoi Transp., LLC,* Case No. 18-13597 (E.D. Mich. 2019) (Exhibit 14), the Court refused to set aside an entry of default. Rejecting the defendants' assertion that they had a meritorious defense, the Court stated, *id.* at *6-7:

---

liability upon the individual members for a judgment entered against the 'organization.'" They cite no case law supporting this claim, because there are none. The argument is frivolous. If, for example, the members of the South Bend Book Club acted in concert and assaulted one of its members because they did not like that member's race or religion, they could be sued in court under the name "The South Bend Book Club." If the Woodward Ave. Bowling Club, consisting of residents who lived on Woodward Ave. in Detroit, took out an advertisement defaming the members of a rival bowling club as thieves and drug dealers, the bowling club could be sued for defamation under the name, "The Woodward Ave. Bowling Club." And if the Octogenarians' Knitting Club of Des Moines, Iowa, picketed the residence of a local physician who performed abortions, the "Octogenarians' Knitting Club of Des Moines, Iowa" could be sued under that name in state court by the physician, seeking an injunction against the club's targeted residential picketing. The examples defense counsel rely on provide them no help and demonstrate the speciousness of their reasoning.

The Individual Defendants' response/request to set aside entry of default is woefully deficient. Their filing contains conclusory statements without any factual support or citations to supporting legal authority.

Among other conclusory statements, the Individual Defendants summarily state that they: (1) were not properly served; (2) did not receive the complaint until February 8, 2019, because they were out of town the eight weeks prior to that date ... ; and (3) have a meritorious defense. Because the Individual Defendants fail to support these conslusory statements in any way whatsoever, they are not entitled to any weight.

Here, defense counsel have similarly engaged in repeated conclusory assertions, with no legal citations. On p. 7 of the brief, they state, "Those claims [alleged in Plaintiffs' First Amended Complaint] face substantial (and likely insurmountable) difficulties because the Protestor Defendants' conduct, as alleged by Plaintiffs, is protected under the First Amendment, as affirmed by a long line of well-settled Supreme Court and Sixth Circuit precedent." Defense counsel cited none of these decisions. As demonstrated above, the conclusory assertion that Plaintiffs face "insurmountable" difficulties in distinguishing such uncited precedents is false. While Plaintiff acknowledges there are, indeed, numerous Supreme Court and 6th Circuit cases which do assert that legitimate political speech is protected by the 1st Amendment, the facts in the instant lawsuit are distinguishable from those precedents. Despite the fact that in averment 83 of the 1st Amended Complaint Plaintiffs cited numerous Supreme Court and lower federal court cases which demonstrate the Protester Defendants' exercise in hate speech in proximity to a house of worship in a residential area is not protected by the 1st Amendment, e.g., *Beauharnais, supra; Frisby, supra,* defense counsel have made no effort to address these cases, and simply make the conclusory assertion that Plaintiffs arguments are "novel and not supported by any controlling precedent," despite the citation of such precedents in the 1st  Amended Complaint. Defense counsel have also made conclusory assertions in their Answer opposing the motion for entry of a default judgment, without any citation to legal authority, that Witnesses was not

properly served with the 1st Amended Complaint.[8] The Protester Defendants have therefore failed to demonstrate "good cause" under Fed. R. Civ. P. 55(c) for setting aside the default of Witnesses. Their request that Plaintiffs' counsel be assessed sanctions under 28 U.S.C. §1927 is wholly without merit. Rather, it is defense counsel who should be sanctioned under Fed R. Civ. P. 11(b)(2) for their mischaracterizations of fact and frivolous arguments.

## CONCLUSION AND RELIEF

Based on the above arguments, the Protester Defendants' motion to set aside the entry of default against Jewish Witnesses for Peace and Friends should be denied.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

By: ____s/ Marc M. Susselman_____

Dated: February 13, 2020                    Attorney for Plaintiffs

---

[8] Similarly, on p. 5 of their brief, defense counsel state:

> The failure to appear and move for an extension of the deadline to file a first responsive pleading on behalf of Jewish Witnesses for Peace and Friends was not the product of willfulness, but merely an honest mistake. Counsel for the Protestor Defendants thoroughly reviewed the original 85-page Complaint **and raised their concerns in the *ex parte* motion to extend the deadline to answer the complaint, as well as during the January 3, 2020 telephone conference. Among those concerns was JWP was not a legal entity, but rather only a name the protestors called themselves.** (Emphasis added.)

The emphasized statements are blatant misrepresentations. Nowhere in their *ex parte* motion, nor in the brief in support of the motion (ECF No. 5) did defense counsel raise any question regarding the legal status of Witnesses; nowhere did they state they did not believe Witnesses was a legal entity, but only a name the protesters called themselves; and nowhere, other than in the case heading, was the name "Jewish Witnesses for Peace and Friends" or the acronym "JWF" even mentioned. Nor did they overtly assert, by stating that it was just a name they call themselves, during the telephone conference with the Court, that Witnesses was not a legal entity.

23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Marvin Gerber, Dr. Miriam Brysk,

      Plaintiffs,

vs.                                             Civil Action No. 2:19-cv-13726
                                                Hon. Victoria Roberts

Henry Herskovitz, *et al.*,

      Defendants, Jointly and Severally.

_____/

**CERTIFICATE OF SERVICE**

      I hereby certify that on February 13, 2020, I electronically filed **Plaintiffs' Response To Protester Defendants' Motion To Set Aside The Default Of Jewish Witnesses For Peace And Friends And Brief In Support, Index of Exhibits, and the 14 Exhibits designated in the Index of Exhibits, along with this Certificate of Service,** with the Clerk of the Court for the Eastern District of Michigan, using the ECF system, which will send notification of such filing to the following registered participants of the ECF system as listed on the Court's Notice of Electronic Filing:

**All counsel of record via the ECF system**

                                Marc M. Susselman (P29481)
                                Attorney at Law
                                43834 Brandywyne Rd.
                                Canton, Michigan 48187
                                (734) 416-5186
                                marcsusselman@gmail.com

                    By:      s/ Marc M. Susselman_____
Dated: February 13, 2020          Attorney for Plaintiffs