## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Marvin Gerber, Dr. Miriam Brysk,

     Plaintiffs,

vs.                                                                                  Civil Action No. 2:19-cv-13726
                                                                                     Hon. Victoria Roberts

Henry Herskovitz, Gloria Harb, Tom Saffold,
Rudy List, Chris Mark, Deir Yassin Remembered, Inc.,
Jewish Witnesses for Peace and Friends, the City of Ann Arbor,
Ann Arbor Mayor Christopher Taylor, in his official
and individual capacities, Ann Arbor Community Services
Administrator Derek Delacourt, in his official and individual
capacities, Ann Arbor City Attorney Stephen Postema, in his
official and individual capacities, and Senior Assistant
City Attorney Kristen Larcom, in her official and
individual capacities,

     Defendants, Jointly and Severally.

_____/

Marc M. Susselman (P29481)                          Cynthia Heenan (P53664)
Attorney at Law                                     Hugh M. Davis (P12555)
43834 Brandywyne Rd.                                Constitutional Litigation Associates, PC
Canton, Michigan 48187                              Attorneys for Defendants Henry Herskovitz,
(734) 416-5186                                      Gloria Harb, Tom Saffold, Rudy List and
marcsusselman@gmail.com                             Chris Mark
Attorney for Plaintiffs                             220 Bagley St., Ste. 740
                                                    Detroit, MI 48226
                                                    (313) 961-2255/Fax: (313) 922-5130
                                                    Heenan@CoLitPC.Com
                                                    Davis@ConLitPC.Com

                                                    John A. Shea (P37634)
                                                    Attorney for Defendants
                                                    Herskovitz, Harb, Saffold, List and Mark
                                                    120 N. Fourth Avenue
                                                    Ann Arbor, Michigan 48104
                                                    (734) 995-4646
                                                    jashea@earthlink.net

Timothy W. Wilhelm (P67675)
OFFICE OF THE CITY ATTORNEY
Attorneys for the City of Ann Arbor.
Derek Delacourt, Kristen D. Larcom,
Christopher Taylor and Stephen K. Postema
301 E. Huron St., P.O. Box 8647
Ann Arbor, MI 48107-8647
Phone: (734) 794-6170
spostema@a2gov.org
twilhelm@a2gov.org

_____/

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT CITY OF ANN ARBOR AND BRIEF IN SUPPORT

Plaintiffs, by and through their attorney Marc M. Susselman, hereby move for partial summary judgment against the Defendant City of Ann Arbor (hereinafter "City") pursuant to Fed. R. Civ. P. 56, and in support of this motion state as follows:

1.      The original Complaint in this lawsuit naming the City of Ann Arbor and several administrators as Defendants was filed on December 19, 2019.  (Docket #1)

3.      The Certificates of Service via the returned signed certified mailing receipts were filed on January 28, 2020.  (Docket #13)

4.      Plaintiffs filed a First Amended Complaint, which was served on all of the Defendants who had appeared, by the ECF system on January 10, 2020.  (Docket #11)

5.      Plaintiffs move for partial summary judgment with respect to averment 30 of the 1st Amended Complaint, alleging that, "The protesters' conduct violates the Ann Arbor City Code ("Code"), since it is clear that the Code either requires that the protesters have a permit to place the signs on the grass sections in question, or they are prohibited from placing the signs there altogether," since there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law.

6.      Fed. R. Civ. P. 56 provides that, "Unless a different time is set by local rule or the

court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  The Court's Order of January 3, 2020 (Docket #10), granting Defendants until March 10, to answer or otherwise plead, does not preclude the filing of the instant motion and brief, since the Order addressed the filing of pleadings, and a motion for summary judgment and a brief in support are not pleadings under Fed. R. Civ. P. 7(a).  Under Fed. R. Civ. P. 12(b), a motion to dismiss for failure to state a claim is pleading a defense in the form of a motion, in lieu of including it in the defendant's Answer, and therefore is still construed as a responsive pleading.  Moreover, nothing in the Court's Order has precluded the Defendants, including the City Defendants, from answering or otherwise pleading prior to March 10, 2020.

7.      Plaintiffs also move for partial summary judgment with respect to averments 36-38 and 72, 74 and 76 of the 1st Amended Complaint, demonstrating that the City has failed and refused for 16 years to enforce the Code provisions prohibiting the protesters' conduct, despite being aware of their conduct, since there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law.

8.      Pursuant to LR 7.1(2)(A), there was a telephone conference on February 17, 2020, between attorneys entitled to be heard on the motion in which counsel for the movants explained the nature of the motion and its legal basis but did not obtain concurrence in the relief sought. Attorneys Hugh Davis, attorney for Defendants Herskovitz, Garb, Saffold, List and Mark, declined to grant concurrence.  On February 17, 2020, Plaintiffs' counsel spoke by telephone with Attorney Timothy Wilhelm, attorney for the City of Ann Arbor and the individually named Defendants Taylor, Delacourt, Postema and Larcom, and sought his concurrence after explaining the nature of the motion and its basis.  Mr. Wilhelm also declined concurrence.

9.      The motion is supported by the accompanying brief and exhibits.

**WHEREFORE,** Plaintiffs request that their motion for partial summary judgment against the City of Ann Arbor be granted.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

By:      s/ Marc M. Susselman_____
Attorney for Plaintiffs

Dated:  February 19, 2020

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Marvin Gerber, Dr. Miriam Brysk,

     Plaintiffs,

vs.                                                                Civil Action No. 2:19-cv-13726
                                                                   Hon. Victoria Roberts

Henry Herskovitz, Gloria Harb, Tom Saffold,
Rudy List, Chris Mark, Deir Yassin Remembered, Inc.,
Jewish Witnesses for Peace and Friends, the City of Ann Arbor,
Ann Arbor Mayor Christopher Taylor, in his official
and individual capacities, Ann Arbor Community Services
Administrator Derek Delacourt, in his official and individual
capacities, Ann Arbor City Attorney Stephen Postema, in his
official and individual capacities, and Senior Assistant
City Attorney Kristen Larcom, in her official and
individual capacities,

     Defendants, Jointly and Severally.

_____/

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
Attorney for Plaintiffs

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Constitutional Litigation Associates, PC
Attorneys for Defendants Henry Herskovitz,
Gloria Harb, Tom Saffold, Rudy List and
Chris Mark
220 Bagley St., Ste. 740
Detroit, MI 48226
(313) 961-2255/Fax: (313) 922-5130
Heenan@CoLitPC.Com
Davis@ConLitPC.Com

John A. Shea (P37634)
Attorney for Defendants
Herskovitz, Harb, Saffold, List and Mark
120 N. Fourth Avenue
Ann Arbor, Michigan 48104
(734) 995-4646
jashea@earthlink.net

Timothy W. Wilhelm (P67675)
OFFICE OF THE CITY ATTORNEY
Attorneys for the City of Ann Arbor.
Derek Delacourt, Kristen D. Larcom,
Christopher Taylor and Stephen K. Postema
301 E. Huron St., P.O. Box 8647
Ann Arbor, MI 48107-8647
Phone: (734) 794-6170
spostema@a2gov.org
twilhelm@a2gov.org
                                                                                              /

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST DEFENDANT CITY OF ANN ARBOR**

## TABLE OF CONTENTS

**QUESTIONS PRESENTED** ................................................................................ ii

**CONTROLLING AUTHORITY** ........................................................................ iii

**INDEX OF AUTHORITIES** .............................................................................. iv

**STATEMENT OF FACTS** ................................................................................. 1

**ARGUMENT** .................................................................................................... 4

**I.      THE PROTESTERS' CONDUCT IS, AND HAS BEEN
         FOR YEARS, PROHIBITED BY THE CITY'S CODE.** ...................... 8

     **A.      The City's Current Unified Development Code And Its Predecessor
                Prohibited The Protesters' Placing Their Signs, Placards And
                American Flags On The Grass Section In Front Of Beth Israel Synagogue,
                As Well As On The Grass Section Across Washtenaw Ave.** ....... 10

     **B.      Even Assuming, For The Sake Of Argument, That The Unified
                Development Code And Chapter 51 Did Not Prohibit The Protesters
                From Placing Their Signs, Placards And American Flags On
                The Grass Section In Front Of Beth Israel Synagogue, Or Across
                Washtenaw Ave., The Protesters Were Required, At The Very Least,
                To Obtain A Permit To Engage In Their Conduct, But They Never
                Obtained A Permit And The City Never Required ... That They
                Have A Permit.** .............................................................................. 15

**II.     THE CITY AND ITS ADMINISTRATORS HAVE BEEN AWARE OF
         THE   PROTESTERS' CONDUCT FOR THE LAST 16 YEARS,
         AND HAVE BEEN AWARE, OR SHOULD HAVE BEEN AWARE, THAT
         THE PROTESTERS' CONDUCT VIOLATED, AND CONTINUES TO
         VIOLATE, THE CITY'S CODE, YET THEY HAVE TAKEN
         NO ACTION WHATSOEVER TO ENFORCE THE CODE'S PROVISIONS
         AGAINST THE PROTESTERS, DESPITE THE SYNAGOGUE'S REPEATED
         REQUESTS THAT THEY DO SO.** ...................................................... 18

**CONCLUSION AND RELIEF** .......................................................................... 20

**CERTIFICATE OF SERVICE** ......................................................................... 21

i

## QUESTIONS PRESENTED

1.      Whether the Court should grant Plaintiffs' motion for partial summary judgment against the City of Ann Arbor with regard to whether the City's Code prohibited the protesting conduct in which the protesters in front of Beth Israel Synagogue have been engaging for 16 years.

Plaintiffs answer "Yes."

2.      Whether the Court should grant Plaintiffs' motion for partial summary judgment regarding their claim that the City of Ann Arbor, although it knew about the protesters' conduct, failed to enforce the City's Code provisions which prohibited the protesters from engaging in their conduct.

Plaintiffs answer "Yes."

## <u>CONTROLLING AUTHORITY</u>

Fed. R. Civ. P. 56

*Hansen v. Williamson,* 440 F. Supp.2d 663 (E.D. Mich. 2006)

*Moldowan v. City of Warren,* 578 F3d. 351 (6th Cir. 2009)

*GMAC LLC v. Department of Treasury,* 286 Mich. App. 365 (Mich. Ct. App. 2009)

*Kircher v. City of Ypsilanti,* 269 Mich. App. 224 (Mich. Ct. App. 2005)

# INDEX OF AUTHORITIES

## CASES                                                                    Pages

### Federal

*Bowers v. Ophthalmology Grp. LLP*, 648 F. App'x 573 (6th Cir. 2016)..................                  7

*Comerica Bank v. JP Morgan Chase Bank, N.A.*, Case No. 11-14252 (E.D. Mich. 2012)       7

*Day v. NCB Mgmt. Servs., Inc.*, Case No. 18-10682 (E.D. 2018)...........................                  6

*Hansen v. Williamson*, 440 F. Supp.2d 663 (E.D. Mich. 2006)...............................               9

*Iron Workers' Pension Fund v. McGuire Steel Erection*,
     352 `F. Supp.2d 794 (E.D. Mich. 2004)......................................................       5

*Jimeniz v. Allstate Indem. Co.*, 765 F. Supp.2d 986 (E.D. Mich. 2011)...................                 9

*Mich. Millers Mut. Ins. Co. v. Travelers Indem. Co. of Conn.*,
     Case No. 16-11767 (E.D. 2016) ...............................................................    6

*Moldowan v. City of Warren*, 578 F3d. 351 (6th Cir. 2009)...............................                4

*Rouster v. County of Saginaw*, 749 F.3d 437 (6th Cir. 2014)................................             5

*Scott v. State Farm Fire & Cas. Co.*, 86 F. Supp.3d 727 (E.D. Mich. 2015) ...........                    7

*Short v. Oaks Corr. Facility*, 129 F. App'x 278 (6th Cir. 2005).............................           7

*Tower Realty v. City of East Detroit*, 196 F.2d 710 (6th Cir. 1952) .......................            10

*U.S. v. Plavcak*, 411 F.3d 655 (6th Cir. 2005) ................................................        10

*U.S. v. Smith*, 481 F. Supp.2d 846 (E.D. Mich. 2007)...........................................          10

### State

### Michigan

*GMAC LLC v. Department of Treasury,* 286 Mich. App. 365 (Mich. Ct. App. 2009)        8, 15

*In re Schwein Estate*, 314 Mich. App. 51 (Mich. Ct. App. 2016)...........................                8

*Jennings v. Southwood*, 446 Mich. 125 (1994).......................................................      10

iv

*Kenneth Henes Special Projects Procurement v. Cont'l Biomass (In re Certified Question)*
        468 Mich. 109 (2002) ................................................................. 10

*Kircher v. City of Ypsilanti*, 269 Mich. App. 224 (Mich. Ct. App. 2005)............... 9

*Mich. Dep't of Transp. v. Tomkins*, 481 Mich. 184 (2008) .................................... 10

*Wilcoxon v. City of Detroit Election Comm'n*, 301 Mich. App. 619 (Mich. Ct. App. 2013)   8

**UNITED STATES CONSTITUTION**

U.S. Const. amend. I        ................................................................. 3, 4, 20

**COURT RULES**

Fed. R. Civil P. 7(a)        ................................................................. 6

Fed. R. Civ. P. 56        ................................................................. 4, 5, 6

**STATEMENT OF FACTS**

Every Saturday morning since September, 2003, for the last 16 years, Defendant Herskovitz has led a group of protesters, numbering from 6 to 12 individuals at any one time, to place signs, posters, placards and miniature American flags on the grass section adjacent to the sidewalk in front of Beth Israel Synagogue ("Synagogue"), located at 2000 Washtenaw Ave., Ann Arbor, Michigan, as well as on the grass section across Washtenaw Ave., facing the Synagogue. The signs/placards bear such statements as:  "Resist Jewish Power"; "Jewish Power Corrupts"; "Zionists are Nazis"; "Dual Loyalty?"; "Fake News: Israel Is A Democracy"; "Stop Funding Israel"; "End the Palestinian holocaust"; "No More Holocaust Movies"; "The United States of Israel?!"; "America First"; etc.  (*See* photographs of signs in front of the Synagogue, attached as Exhibit 1; photographs of signs across Washtenaw Ave., facing the Synagogue, attached as Exhibit 2.) They number 18-20 signs. Most of the signs/placards are placed on the grass sections leaning against trees and portable chairs which the protesters bring with them. Some of the protesters also carry signs, either holding them in their hands or attached to twine hanging from their necks.

The protesters arrive every Saturday morning, which is the Jewish Sabbath, at approximately 9:30 A.M., position their signs/placards in place, and stay until approximately 11:00 A.M. The time period coincides with the time when members of the Synagogue arrive to enter the Synagogue, or to attend Sabbath services in the annex next door, in order to conduct and participate in the Sabbath service. All the signs are anti-Israeli and anti-Zionist. Several of the signs are also flagrantly Antisemitic, e.g., "Resist Jewish Power"; "Jewish Power Corrupts"; "Zionists Are Nazis"; "End the Palestinian holocaust"; "Dual Loyalty?"; and "No More Holocaust Movies." These signs promote age-old Antisemitic tropes about purported Jewish outsized influence in world finance, controlling power in international political affairs, and dual

national loyalties. (*See* Affidavit of Professor Emeritus Kenneth Waltzer, retired Professor of Judaic Studies at Michigan State University, attached as Exhibit 3.) They also promote factually erroneous and inflammatory statements relating to the Israeli-Palestinian conflict. The messages on the signs are readily visible to the congregants, many of whom are accompanied by their children, as they enter their house of worship.

During this entire time period, the City of Ann Arbor ("City") has had in place ordinances which either prohibited the conduct in which the protesters were engaging, or required them to have permits in order to engage in that conduct. It is undisputed that the protesters have never applied for a permit and have never been granted a permit allowing them to engage in their conduct.

During this entire time period, the City has been aware of the protesters' conduct and has never acted to curtail said conduct. On occasion, the City has directed the protesters not to block ingress or egress to and from the Synagogue, and, upon information and belief, directed the protesters to stop filming or taking pictures of congregants as they approached the Synagogue. However, the City has never ordered the protesters to stop placing their signs on the grass section in front of the Synagogue, or on the grass section across Washtenaw Ave., despite being asked by the Synagogue to take further action to curtail the protesters conduct. (*See* Affidavit of Prof. Victor Lieberman, attached as Exhibit 4.) The City has claimed that it cannot prohibit, curb or curtail the conduct in question because it is protected by the 1st Amendment, a proposition which Plaintiffs dispute. At no time, however, has the City informed the Synagogue, or acknowledged, that the City's Code prohibits the protesters' conduct of placing the signs on the grass section in front of the Synagogue, or on the grass section across Washtenaw Ave.[1]

---

[1] The instant motion is directed only at the question of whether the City's Code prohibited the protesters' conduct and whether the City failed and refused to enforce the Code. It does address (Footnote continued)

Indeed, on one occasion, May 11, 2019, the Ann Arbor police were filmed speaking with two of the protesters. The protesters were contending that their conduct never violated the City's Code, particularly with regard to their placing miniature American flags at various places on the grass. (*See* video at https://www.youtube.com/watch?v=2YYAhi_ZvTM&t=127s.)[2] At 2:17 in the video, one of the protesters said to one of the police officers, "We have always been in compliance officer." The officer responds, "Absolutely you are." Then, at 3:34, the officer says, "I am not going to cite you." In the background of the video, one can see a multitude of signs, all sitting on the grass section in front of the Synagogue, placed there in violation of the City's Code.

In addition, on June 1, 2019, Defendant Larcom, Senior Assistant City Attorney, was filmed speaking cordially with Herskovitz. (*See* video at https://www.youtube.com/watch?v=8DkKi5fU9oo.)[3] While she was speaking with Herskovitz, Herskovitz represented that he and the protesters have been scrupulously obeying the law. In the foreground, in plain view of Larcom, were visible numerous signs which violated the City Code. Larcom said nothing. Towards the end of the video, one of the protesters, Defendant Mark, approached Larcom and Herskovitz, and Larcom engaged him in conversation. Immediately in her presence, Mark placed a miniature American flag on the grass section, again in violation of the Code. Larcom still said nothing.

On the morning of December 28, 2019, after the protesters, the City and its named administrators had been served with the original Complaint in which Plaintiffs explained in detail

---

the question of whether the protesters' conduct was protected by the 1st Amendment. That question will be addressed in a separate motion and brief at a later time. Plaintiffs wish in this motion and brief to establish only that the protesters' conduct violated the Code, and the City, although knowing about the protesters' conduct, from the very beginning of that conduct, failed to enforce its Code.

[2] The video was taken by one of the protesters and was posted online by Herskovitz.

[3] The video was taken by Herskovitz and was posted online by Herskovitz.

why the protesters' conduct violated the Code (*see* averments 27-32, and 52-56 of the original Complaint) and why their conduct was not protected by the 1st Amendment (*see* averment 83 of the original Complaint), Plaintiff Gerber and his counsel went to the location of the Synagogue and observed the protesters continuing to engage in their prohibited conduct. Nearby were three police squad cars of the Ann Arbor police. Mr. Gerber and his attorney approached the police and asked them if they saw the signs which were being used by the protesters. The police acknowledge that they did see the signs. Asked if they were going to take any action to enforce the City Code ordinances prohibiting the protesters' conduct, one of the officers, Sgt. Vainner, indicated that they were not going to take any action, since they had been advised that the protesters' conduct was protected by the 1st Amendment. (*See* affidavit of Marvin Gerber, Exhibit 5.)

The protesters have continued to engage in their protest activity on every Saturday since December 29, 2019, and have indicated that they intend to continue to do so. (*See* statements by Herskovitz, Exhibit 6.) The City has continued not to enforce its Code's provisions which prohibit the protesters' conduct.

## ARGUMENT

Fed. R. Civ. P. 56 states, in relevant part:

(a)   MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law The court should state on the record the reasons for granting or denying the motion.

(b)   TIME TO FILE A MOTION. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

In *Moldowan v. City of Warren,* 578 F3d. 351 (6th Cir. 2009), the Court set forth the

parameters that must be satisfied in order to warrant granting a summary judgment motion,

stating, *id.* at 373-74:

> Summary judgment is proper "if the pleadings, the discovery and disclosure
> materials on file, and any affidavits show that there is no genuine issue as to any
> material fact and the movant is entitled to judgment as a matter of law." Fed. R.
> Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over
> facts that might affect the outcome of the suit under the governing law." ...
> However, "[w]here the record taken as a whole could not lead a rational trier of
> fact to find for the non-moving party, there is no 'genuine issue for trial.'" ...
>
> At the summary judgment stage, the moving party bears the initial burden of
> identifying those parts of the record that demonstrate the absence of any genuine
> issue of material fact. ... If the moving party seeks summary judgment on an issue
> for which it does not bear the burden of proof at trial, however, the moving party
> may meet its burden by showing "that there is an absence of evidence to support
> the nonmoving party's case." ... When the moving party has carried this burden,
> "its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts." ... The non-moving party also may not rest upon its
> mere allegations or denials of the adverse party's pleadings, but rather must set
> forth specific facts showing that there is a genuine issue for trial. ...
>
> After the parties have presented their evidence, "the judge's function is not himself
> [or herself] to weigh the evidence and determine the truth of the matte, but to
> determine whether there is a genuine issue for trial." In evaluating the evidence,
> the court must draw all inferences in the light most favorable t the nonmoving
> party. ... "The mere existence of a scintilla of evidence in support of the [non-
> moving party's] position will be insufficient [to defeat a motion for summary
> judgment]; there must be evidence on which the jury could reasonably find for the
> [non-moving party]." (Citations omitted.)

*See also Rouster v. County of Saginaw,* 749 F.3d 437, 446 (6th Cir. 2014); *Iron Workers' Pension*

*Fund v. McGuire Steel Erection,* 352 F. Supp.2d 794, 799 (E.D. Mich. 2004).

As stated in Fed. Rule Civ. P. 56(b), a motion for summary judgment may be filed at any

time, even prior to the defendant having filed an answer or otherwise pleading, and before

discovery has been commenced or completed, unless there is a local rule or an Order has been

entered precluding such filing. There is no such local rule in the Eastern District, and the Court's

Order of January 3, 2020, which extended the time period for the Defendants to answer the 1st

Amended Complaint or otherwise plead, does not prohibit filing a motion for summary judgment,

which is not a pleading under Fed. R. Civ P. 7(a). The only basis for a defendant to object to the filing of such a motion would be a claim that the defendant needs to conduct needed discovery relating to information not within its possession in order to oppose the motion. Such a claim must be made by affidavit or declaration under Fed. R. Civ. P. 56(d). There is no basis for such a claim here, however, because Plaintiffs are relying in support of their motion on public documents which are already in the City's possession, and on the attested observation of witnesses regarding the behavior of the City's own employees, i.e., named police officers and Defendants Taylor, Postema and Larcom. The City has ready access to obtain information from these employees. In *Day v. NCB Mgmt. Servs., Inc.,* Case No. 18-10682 (E.D. 2018) (Exhibit 7), the Court accordingly rejected an argument that the defendant's summary judgment motion was premature because the plaintiff had not had sufficient time to conduct discovery, stating, *id.* at *5:

> The current version of Rule 56 provides that, "[u]nless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). There are no local rules that specify when a motion for summary judgment may be filed, and this Court has not issued a scheduling order yet.

> If a party believes that a motion for summary judgment is filed prematurely, before that party has been able to obtain evidence necessary to oppose the motion, then that party can avail itself of Fed. R. Civ. P. 56(d). Under that subsection, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:" 1) defer considering the motion or deny it; 2) allow time to obtain affidavits or declaration or to take discovery; or 3) issue any other appropriate order. *Id.*

> Here, Plaintiff has not presented the Court with such an affidavit, or identified any specific discovery that Plaintiff would have needed to respond to the pending motion.

Similarly, in *Mich. Millers Mut. Ins. Co. v. Travelers Indem. Co. of Conn.,* Case No. 16-11767 (E.D. 2016) (Exhibit 8), which involved a dispute between two insurance companies regarding the scope of insurance coverage for an insured defendant in a separate personal injury action, the Court asserted, *id.* at *21-23:

6

[I]s summary judgment appropriate at this early stage, prior to formal discovery? Federal Rule of Civil Procedure 56(b) allows a party to file a summary-judgment motion "at any time until 30 days after the close of all discovery." Still, the Court is sensitive to the fact that "[s]ummary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery." ... However, the "non-movant bears the obligation to inform the district court of its need for discovery .. If the non-movant makes a proper and timely showing of a need for discovery, the district court's entry of summary judgment without permitting him to conduct any discovery at all will constitute an abuse of discretion." ...Procedure 56(d) provides a mechanism for making such a showing: the non-movant may show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." And under that rule, upon such a showing, the court may "defer considering the motion or deny it," "allow time to obtain affidavits or declarations or to take discovery," or "issue any other appropriate order."

Nonetheless, "[a] party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating ... how postponement of a ruling on the motion will enable him ... to rebut the movant's showing of the absence of a genuine issue of fact." ...

While Duffy's affidavit also asks for discovery and lists certain proposed discovery requests, neither that nor Michigan Millers' briefing explains how the discovery sought would impact the legal issue that the Court has addressed here: whether EMCASCO's untimely termination notice – a notice that is a creature of Michigan's worker's compensation law and the worker's compensation portion of the policy – would force EMCASCO to cover a defense – pursuant to the employer's liability portion of the policy – for an accident that happened well after the policy expired. Thus, the Court is unconvinced that any discovery could change the outcome and suddenly give rise to EMCASCO having the obligation to provide defense from an accident that happened outside of the policy's term. ... *See Bowers v. Ophthalmology Grp. LLP,* 648 F. App'x 573, 580 (6th Cir. 2016) (noting that "[e]ven if there has been no discovery, ... summary judgment may nonetheless be appropriate where the court deems as too vague the affidavits submitted in support of the motion or if further discovery would not have changed the legal and factual deficiencies" ... *see also Short v. Oaks Corr. Facility,* 129 F. App'x 278, 281 (6th Cir. 2005) (interpreting the prior version of Rule 56(d) to mean that "a plaintiff opposing a motion for summary judgment cannot simply argue that it needs more discovery – instead, the plaintiff must file a[n] ... affidavit or a motion that indicates to the district court 'what material facts it hopes to uncover' by the additional discovery requested.") (Some citations omitted.)

*See also Scott v. State Farm Fire & Cas. Co.,* 86 F. Supp.3d 727, 731 (E.D. Mich. 2015);

*Comerica Bank v. JP Morgan Chase Bank, N.A.,* Case No. 11-14252 (E.D. Mich. 2012), *id.* *3-4.

(Exhibit 9)

## I.   THE PROTESTERS' CONDUCT IS, AND HAS BEEN FOR YEARS, PROHIBITED BY THE CITY'S CODE.

There are certain basic rules which apply to the interpretation of the language contained in statutes and ordinances which play a pivotal role in the instant lawsuit. Regarding the interpretation of statutory language, the Michigan Court of Appeals stated in *GMAC LLC v. Department of Treasury,* 286 Mich. App. 365 (Mich. Ct. App. 2009), *id.* at 372:

> The rules of statutory construction provide that a clear and unambiguous statute is not subject to judicial construction or interpretation. ... Stated otherwise, when a statute plainly and unambiguously expresses the legislative intent, the role of the court is limited to applying the terms of the statute to the circumstances in a particular case. ... We may not speculate regarding the intent of the Legislature beyond the words expressed in the statute. ... Once the intention of the Legislature is discovered, this intent prevails regardless of any conflicting rule of statutory construction. ... "Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there." ... The omission of a provision should be construed as intentional. (Citations omitted.)

This doctrine was reiterated by the Michigan Court of Appeals in *Wilcoxon v. City of Detroit Election Comm'n,* 301 Mich. App. 619 (Mich. Ct. App. 2013), stating, *id.* at 189-90"

> The fundamental purpose of judicial construction of statutes is to ascertain and give effect to the intent of the Legislature. ... Once the intention of the Legislature is discovered, it must prevail regardless of any rule of statutory construction to the contrary. ... The language of the statute expresses the legislative intent. ... The rules of statutory construction provide that a clear and unambiguous statute is not subject to judicial construction or interpretation. ... If the language of the statute is plain and unambiguous, effect must be given to the words used, and judicial construction is neither necessary nor permitted. ... Stated otherwise, when a statute plainly and unambiguously expresses the legislative intent, the role of the court is limited to applying the terms of the statute to the circumstances in a particular case. ... The Legislature's use of the term "shall" denotes mandatory action or direction, ... and the term "may" denotes permissive action. .... (Citations omitted.)

In *In re Schwein Estate*, 314 Mich. App. 51 (Mich. Ct. App. 2016), the Court amplified further on the principles set forth in the preceding cases, stating, *id.* at 59:

> Appellate courts presume that the Legislature intended the meaning expressed by the plain, unambiguous language of a statute. . . . When interpreting statutes, **courts should give effect to every phrase, clause, and word included**. ... "If

the statutory language is certain and unambiguous, judicial construction is neither required not permitted, and courts must apply the statute as written." ...(Emphasis added; citation omitted.)

The rules of statutory interpretation apply with equal force to the interpretation of the language of ordinances.  The Court in *Kircher v. City of Ypsilanti*, 269 Mich. App. 224 (Mich. Ct. App. 2005), accordingly declared, *id.* at 228:

> The rules of statutory construction apply to ordinances.  ...  The primary rules of construction are that the courts must give effect to the intent of the Legislature and that unambiguous language must be enforced as it is written.  ...  **Every word, clause, and sentence in a statute is presumed to be intentional, so "we should take care to avoid a construction that renders any part of the statute surplusage or nugatory."**  ...  (Emphasis added.)

In *Hansen v. Williamson*, 440 F. Supp.2d 663 (E.D. Mich. 2006), the Court recognized the application of the above principles under Michigan law, stating, *id.* at 671:

> In Michigan, interpretation of a local ordinance is a question of law. ... The same well settled rules that govern construction of Michigan statutes apply to local ordinances. ... A court's primary goal is to "ascertain and give effect to the intent of the Legislature." ... The first step is to look to the specific language of the statute. ... "If the statute is unambiguous on its face, the Legislature is presumed to have intended the meaning plainly expressed and further judicial interpretation is not permitted." ... "[T]he court must presume that every word has some meaning and should avoid any construction that would render any part of the statute surplusage or nugatory." ... Undefined terms should be given their "plain and ordinary meanings," which may be determined by dictionary definitions. ...
>
> If there is an ambiguity, a court may go beyond the words of a statute t determine legislative intent. "An ambiguity can be found only where the language of a statute as used in its particular context has more than one common and accepted meaning." ... In such situations, the court must " 'give effect to the interpretation that more faithfully advances the legislative purpose behind the statute.'" ...In its analysis, the court must "look to the object of the statute, the evil or mischief which it is designed to remedy, and ... apply a reasonable construction which best accomplishes the statute's purpose." ... "Also, ambiguous statutes [must] be interpreted as a whole and construed as to give effect to each provision and to produce a harmonious and consistent result." ... (Citations omitted.)

Addressing a contention that the literal language of a Michigan statute would lead to "an absurd result," the court in *Jimeniz v. Allstate Indem. Co.*, 765 F. Supp.2d 986 (E.D. Mich. 2011), observed, *id.* 994:

9

Allstate argues that the contractual provision effectuates the purpose of the statute and that *not* reading the tolling provision as conditional upon a denial of *coverage* – as its contractual provision does – leads to the absurd result that the period for suing for underpayment remains open indefinitely. It cites *United States v. Branson,* 21 F.3d 113, 116 (6th Cir. 1994), and *Jennings v. Southwood,* 446 Mich. 125, 133, 521 N.W.2d 230 (1994), for the proposition that statutes should be interpreted to avoid unreasonable results whenever possible. But this canon of construction is always secondary to the command that the plain and unambiguous language of the statute controls. *See Mich. Dep't of Transp. v. Tomkins,* 481 Mich. 184, 192, 749 N.W.2d 716 (2008) ("Where the statute unambiguously conveys the Legislature's intent, 'the proper role of a court is simply to apply the terms of the statute to the circumstances in a particular case.'" (quoting *Kenneth Henes Special Projects Procurement v. Cont'l Biomass (In re Certified Question)* 468 Mich. 109, 113, 659 N.W.2d 597 (2002)))[.]  ...  (Italics in the original; some citations omitted.)

The constitutionality of statutes and ordinances is presumed, as noted in *Tower Realty v. City of East Detroit,* 196 F.2d 710 (6th Cir. 1952), *id.* at 717-18:

In discussing the authorities hereafter, it is to be observed that some of them are concerned with ordinances, others with statutes. The same rule of construction, however, as to validity applies to both ordinances and statutes, as well as the same presumptions. With regard to the presumption of constitutionality, the rule applicable to ordinances of a city government is the same as that applied to statutes passed by the legislature. ... A statute or ordinance will be presumed to be constitutional by the courts unless the contrary clearly appears; and in case of doubt, every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation. ... (Citations omitted.)

*See also U.S. v. Plavcak,* 411 F.3d 655 (6th Cir. 2005); *U.S. v. Smith,* 481 F. Supp.2d 846 (E.D. Mich. 2007).

With the above rules of construction in mind, let us examine the provisions of the City's Code relating to the usage of signs.

A.     **The City's Current Unified Development Code And Its Predecessor Prohibited The Protesters' Placing Their Signs, Placards And American Flags On The Grass Section In Front Of Beth Israel Synagogue, As Well As On The Grass Section Across Washtenaw Ave.**

The Unified Development Code ("UDC") (Exhibit 10), which was adopted by the City on July 16, 2018, states as one of its purpose in Section 5.24.1, "to protect public safety, health, and

welfare; minimize abundance and size of Signs to reduce visual clutter and motorist distraction; promote public convenience; preserve property values; and enhance the aesthetic appearance and quality of life within the City." The UDC asserts in sub-section 5.24.1 C. that it "Recognize[s] that the proliferation of Signs is unduly distracting to motorists and nonmotorized travelers, reduces the effectiveness of Signs directing and warning the public, causes confusion, reduces desired uniform traffic flow, and creates potential for accidents."  Allowing the proliferation of the numerous signs in front of the Synagogue, as well as across Washtenaw Ave., flies in the face of these avowed objectives.

The UDC states in Section 5.24.10:

**5.24.10        Prohibited Signs**

Any Sign that is not specifically permitted by this Section 5.24 is prohibited. The following Signs are prohibited:

A.      Signs that incorporate in any manner or are Illuminated by any flashing intermittent, or moving lights. This Section 5.24.10 does not include barber poles that meet the other requirements of this section.

B.      Exterior banners, pennants, spinners and streamers, other than a banner of pennant used as a permitted Sign under Section 5.24.44 or a special event banner under 5:24.9.J.

C.      Exterior string lights used in connection with commercial Premises, other than holiday decorations.

D.      Any Sign which has any visible motion other than permitted flags or banners.

E.      Any Sign which is structurally or electrically unsafe.

F.      Any Sign erected on a tree or utility pole except Signs of any political subdivision of this State.

G.      Any Business Sign or Sign Structure that no longer advertises a bona fide Business conducted or a product sold.

H.      Except as provided in Section 5.24.9D and Chapter 47, Section 4:14, any freestanding Exterior Sign not

11

permanently anchored or secured to either a Building or the ground.

I.     Any Sign on a motor vehicle or trailer that is parked in front of a Business for the purpose of advertising a Business or product or service of a Business located on the Premises where such vehicle is parked.

J.     Any Sign on a motor vehicle or trailer that projects more than 6 inches from the surface of that vehicle when it is parked at a location visible from a Public Right –of-Way street.

K.     Any Sign Structure or frame no longer containing a Sign.

L.     Any Sign erected on the Public Right-of-Way, except for Signs of a political subdivision of this state, portable "open house" Signs as permitted by Section 5.24.9D, Political Signs as permitted by Section 5.24.8B. **The City may remove and destroy or otherwise dispose of, without notice to any Person, any Sign that is erected on the Public Right-of-Way in violation of this chapter.** (Emphasis added.)

Under the express, unambiguous terms of Section 5.24.10, the miniature flags, and the large stationary flag, utilized by the protesters, which they have been placing on the grass section in front of the Synagogue, and on the grass section across Washtenaw Ave., are, and have been, prohibited by sub-section D, which precludes, "Any Sign which has any visible motion other than permitted flags or banners." While the miniature and stationary flags wave, they are not permitted under Section 5.24.9 I, which identifies signs which are permitted and states: "Flags bearing the official design of a nation, state, municipality, educational institution or noncommercial organization, provided that the flag pole is **set back from all Lot Lines a minimum distance of one foot for every one foot of pole height."** (Emphasis added.)  The phrase "set back from all Lot Lines" means that the flags are only permitted if they are on a private property owner's property, set back from the property line. (*See* use of the word "lot" in Chapter 13 of the Code to refer to private, rather than public, property, Exhibit 11.) The flags utilized by the protesters are

positioned in the public right-of-way, and therefore are not set back from a property line, and are, therefore, prohibited.  This is also true of the Israeli flag, with a bisected circle superimposed, which the protesters place on the public right-of-way.

All of the signs which the protesters place on the grass sections, which are, and have been, freestanding and not permanently anchored or secured to either a building or the ground are, and have been, prohibited by sub-section H.

All of the signs were, and have been, further prohibited by sub-section L, because they did not come within any of the exemptions in any of the Sections listed in sub-section L. None of the protesters' signs are "of a political subdivision of this state[,]"  They are not "portable 'open house' signs as permitted by Section 5.24.9D."  Nor are they Political Signs as defined and permitted by Section 5.24.8B, which states, in relevant part:  "The following provisions apply on election days only, to Signs that directly or indirectly make reference to an election, a candidate, or a ballot question and that are erected on property on which a public polling place is located."

In sum, the Unified Development Code expressly and unambiguously prohibits the placing of the signs, placards and American flags on the grass section in front of the Synagogue and on the grass section across Washtenaw Ave.[4]

---

[4]  The thrust of Section 5.24.10 can be illustrated by the following riddle:

Suppose you have a city ordinance which states the following:

Prohibited pets in any apartment within the city.

Any animal that is not specifically permitted by the below to be allowed as a pet in an apartment within the city is prohibited from being a pet in an apartment. The following animals are prohibited from being a pet in an apartment in the city:

1. A camel
2. An elephant
3. A giraffe
4. A tiger

(Footnote continued)

While the UDC was enacted on July 16, 2018, and went into effect on July 29, 2018, its predecessor, Chapter 61 of the City's Code (Exhibit 12) went into effect on June 9, 1975, and remained in effect until it was repealed by the UDC. (*See* Section 5.9.1 C of the UDC, 10.) Chapter 61contained language identical to that of Section 5.24.10 of the UDC in Section5:508. Like Section 5.24.10, Section 5:508(12) stated: "Any sign erected on the public right-of-way, except for signs of a political subdivision of this state, portable "open house" signs as permitted by subsection 5:507(4), political signs as permitted by section 5:506, portable business signs as permitted by Chapter 47, section 4:14, and signs affixed to a freestanding bicycle station as permitted by subsection 5.507(19). The city may remove and destroy or otherwise dispose of, without notice to any person, any sign which is erected on the public right-of-way in violation of this subsection." In Section 5:501(21), the "public right-of-way" was defined as follows: "For purposes of this chapter only, all public streets, highways, sidewalks and alleys." This definition encompassed the grass sections in front of Beth Israel Synagogue, as well as across Washtenaw Ave.

Consequently, the express, unambiguous language of the UDC, and the express, unambiguous language of its predecessor, Chapter 61, prohibits, and has prohibited for the entire 16-year period that the protesters have been engaged in their protest, their placing their signs, placards and miniature American flags on the grass section in front of the Synagogue, and on the

---

5. A dog
6. An alligator

Question:  Under the terms of the above ordinance, is a cat permitted to be a pet in an apartment in the city?

Answer:  No, a cat is not permitted, because the ordinance only itemizes animals which are prohibited as pets, and does not identify any animal which is permitted as a pet. Under the express, unambiguous terms of the ordinance, no pets whatsoever are allowed in apartments in the city.

grass section across Washtenaw Ave. Herskovitz has claimed that this conduct does not violate the cited Code provisions because the signs, placards and miniature flags are "under the group's supervision the entire time and removed at the end of each demonstration.") (Exhibit 6) This purported justification is clearly erroneous. Nowhere in either the UDC or Chapter 61 do the provisions assert that the sign prohibitions do not apply if there is a person sitting or standing nearby the sign, placard, pennant, banner or flag, or if they are removed after having been used in violation of the Code for a period of 1 to 2 hours. "The omission of a provision should be construed as intentional." *GMAC, supra.*

    **B.**    **Even Assuming, For The Sake Of Argument, That The Unified Development Code And Chapter 51 Did Not Prohibit The Protesters From Placing Their Signs, Placards And American Flags On The Grass Section In Front Of Beth Israel Synagogue, Or Across Washtenaw Ave., The Protesters Were Required, At The Very Least, To Obtain A Permit To Engage In Their Conduct, But They Never Obtained A Permit And The City Never Required That They Have A Permit.**

Even assuming, for the sake of argument, that the UDC and Chapter 51 of the prior Code did not prohibit the protesters from placing their signs, placards and American flags on the grass section if front of the Synagogue, or on the grass section across Washtenaw Ave., under the express and unambiguous language of the City's Code, they were, at the very least, required to obtain a permit to engage in their conduct. It is undisputed, however, that the protesters have never had a permit to engage in their conduct, have never applied for a permit, have never been granted a permit, and the City has never required that they obtain a permit. The protesters' conduct therefore violated the City Code ("Code"), since it is clear that the Code either required that the protesters have a permit to place the signs on the grass sections in question, or they were prohibited from placing the signs there altogether.

Code Section 4:1 states: "Streets regulated by this chapter include all areas defined as a "street" by section 1:8 of this Code. ..."  (*See* excerpt from the Code, attached as Exhibit 13.)

15

Code Section 1:8 defines "street" as follows:  "Street, highway, alley. The entire width subject to an easement for public right of way, or owned in fee by the city, county, or state, of every way or place, of whatever nature, whenever any part thereof is open to the use of the public, as a matter of right for purposes of public travel.  The word, "alley," shall mean any such way or place providing a secondary means of ingress and egress from a property. "Sidewalk" is defined as that portion of a street between the curb lines or lateral lines and the right-of-way lines which is intended for the use of pedestrians." Therefore, under the Code, a street includes the sidewalk and extends beyond the sidewalk through to, and including, the street on which vehicles traverse. This would include any grassy section on which the protesters sit or stand and place their signs.

Code Section 4:2 (2) states: "No person shall place or maintain **any article, thing** or obstruction in any street, except as specifically permitted by this Code, but this provision shall not be deemed to prohibit such temporary obstructions as may be incidental to the expeditious movement of articles and things to and from abutting premises, nor to the lawful parking of vehicles within the part of the street reserved for vehicular traffic." (Emphasis added.) The terms "any article [or] thing" is comprehensive and prohibits the placing of any concrete item or thing in any street, which includes the grass sections in front of the Synagogue and across Washtenaw Ave., and encompasses the signs, placards and American flags. None of the protesters, while engaging in their weekly protests, have been engaged in moving articles or things to and from an abutting premise to the Synagogue. They are statically setting their signs and placards "in the street," for which they were required, at the very least, to have a permit, but have never applied for a permit and have never been granted a permit by the City. They have therefore been violating the Code for 16 years, with the City's full knowledge.

Even if the protesters had applied for a permit, under the conditions that must be met in order to be issued a permit listed in Code Section 4:14, they would not have qualified for one. For

example, the manner in which they were engaging in their picketing activity violated the following provisions of Section 4:14:

> (1) The City Administrator may issue revocable permits to occupy a portion of any city street or sidewalk if the Administrator determines the occupancy will not:
>
> ...
>
> (b)    Unreasonably interfere with **the view** or access to or use of property adjacent to said street.
>
> . .
>
> (h)    Conceal or detract from the appearance of landscaping features in or adjacent to the street.
>
> . . .
>
> (j)    Be attached to or reduce the effectiveness of or access to any utility pole, sign or other traffic control device. (Emphasis added,)

The conduct of the picketers violated the above provisions because the multiplicity of the signs and placards interfered with the view and detracted from the appearance of the landscaping features. In addition, their attaching signs to the telephone poles violated sub-section (j).

Moreover, even if the picketers had applied for a permit, there was only one kind of permit that they would have qualified for, a "Daily sidewalk occupancy" under Section 4:14(2)(b), which states,: "All applicants who wish to apply for a daily permit beginning May 1 shall provide written notice addressed to 'Business Owner or Manager' at the address directly adjacent to the sidewalk area to be occupied, at least 72 hours before a permit can be issued to occupy any area between the edge of the vehicle use area of the street and the right-of-way or property line. The notice shall include a description of the area to be occupied, the goods or services to be offered, and listing of the conditions for occupancy under section 4:14(1) above." It is undisputed that the protesters have never given the Synagogue advance notice of their intent to picket the Synagogue 72 hours before any Sabbath.

In sum, the protesters have either been violating the UDC and its predecessor, Chapter 61, every Saturday morning, for 16 years, or they have been violating the Code because they have been engaging in their conduct without a permit every Saturday morning, for 16 years. Plaintiffs are accordingly entitled to partial summary judgment on the issue of whether the protesters have been acting in violation of the City's Code every Saturday morning, for 16 years.

II. **THE CITY AND ITS ADMINISTRATORS HAVE BEEN AWARE OF THE PROTESTERS' CONDUCT FOR THE LAST 16 YEARS, AND HAVE BEEN AWARE, OR SHOULD HAVE BEEN AWARE, THAT THE PROTESTERS' CONDUCT VIOLATED, AND CONTINUES TO VIOLATE, THE CITY'S CODE, YET THEY HAVE TAKEN NO ACTION WHATSOEVER TO ENFORCE THE CODE'S PROVISIONS AGAINST THE PROTESTERS, DESPITE THE SYNAGOGUE'S REPEATED REQUESTS THAT THEY DO SO.**

The City has been aware of the protesters' conduct since it began in 2003. As indicated in Prof. Lieberman's affidavit (Exhibit 4), Ann Arbor's police have been present on numerous occasions when the protesters have been engaged in their conduct of placing their signs, placards and American flags on the grass sections in front of the Synagogue and across Washtenaw Ave., and they have done nothing to enforce the City Code's provisions which either prohibit the conduct altogether, or require that the protesters have a permit. Likewise, Prof. Lieberman attests that he has been present when Defendants Taylor and Postema have addressed the members of the Congregation and have claimed that they have no power to curtail their conduct, without informing the Congregation, or acknowledging, that the protesters were violating the City Code.

On May 11, 2019, the Ann Arbor police were filmed speaking with two of the protesters. The protesters were contending that their conduct never violated the City's Code, particularly with regard to their placing miniature American flags at various places on the grass. (*See* video at https://www.youtube.com/watch?v=2YYAhi_ZvTM&t=127s.) At 2:17 in the video, one of the protesters said to one of the police officers, "We have always been in compliance officer." The officer responded, "Absolutely you are." Then, at 3:34, the officer said, "I am not going to cite

18

you." In the background of the video, one can see a multitude of signs, all sitting on the grass section in front of the Synagogue, placed there in violation of the City's Code.

On May 16, 2019, Plaintiffs' attorney wrote a letter to Defendant Larcom, Senior Assistant City Attorney, explaining that he had reviewed relevant ordinances of the City Code and had concluded that the protesters were required to have a permit to engage in their picketing activity, that they were violating the Code by not applying for a permit, and that even if they did apply for a permit, under the terms of the Code, given the nature of their conduct, they were not entitled to obtain a permit. (Exhibit 14) Plaintiffs' counsel asked that if she disagreed with his interpretation of the Code, that she explain specifically how he had misinterpreted it, and if she did not disagree with his interpretation, why the City had not enforced the Code to prevent the protesters from engaging in their conduct without a permit for 16 years. Larcom responded to the letter by email on May 29, 2019, stating, in relevant part: "I have visited the site and observed the picketers in the past and hope to do so again this weekend." (Exhibit 15)

In a entry on Herskovitz's blog, Deir Yassin Remembered, dated May 24, 2019, Herskovitz wrote (Exhibit 16): "[W]e recognize foremost that the relationship between our group and the AAPD ["Ann Arbor Police Department"] has been mutually respectful and we plan to do our part to keep it that way. There are many ways to interpret the ordinance in question, and we recognize that the many calls the AAPD has received from congregants of Beth Israel places the AAPD in an awkward position of trying to enforce a vague ordinance. And since our vigils protest the Congregation's support for the state of Israel, we see no need to create an unnecessary rift with the AAPD, with whom we've always enjoyed good relations."

On June 1, 2019, Larcom, was filmed speaking cordially with Herskovitz. (*See* video at https://www.youtube.com/watch?v=8DkKi5fU9oo.) While she was speaking with Herskovitz, Herskovitz represented that he and protesters have been scrupulously obeying the law. In the

foreground, in plain view of Larcom, were visible numerous signs which violated the City's Code and Larcom said nothing. Towards the end of the video, one of the protesters, Defendant Mark, approached Larcom and Herskovitz and Larcom engaged him in conversation. Immediately in her presence, Mark placed a miniature American flag on the grass section, again in violation of the Code. Again, Larcom said nothing.

Larcom responded to Plaintiffs' counsel's letter by letter dated June 6, 2019, in which she stated, in relevant part (Exhibit 17):

> We write in response to your letter of May 16, 2019, having reviewed the ordinances you cite and your interpretation of them. We disagree with your interpretation. The ordinances you cite do not require one to obtain a permit to engage in the activities you describe. Moreover, the First Amendment right to freedom of speech is a critical consideration in the application of ordinances under these circumstances.

Nowhere in her letter did Larcom explain how Plaintiffs' counsel was misinterpreting the Code sections he cited.

Since the instant lawsuit has been filed, the protesters have continued to engage in their protest activity, in violation of the City's Code. Plaintiff Gerber observed their continuing violation of the Code on December 29, 2019, after both the protesters and the City had been served with the Complaint. (*See* Mr. Gerber's affidavit, Exhibit 5) On that date, three squad cars of the Ann Arbor Police were present, in full view of the signs, placards and American flags placed on the grass sections in front of the Synagogue, and across Washtenaw Ave. When asked whether they would enforce the Code and order the protesters to remove the signs, placards and American flags, the police declined, asserting that they had been informed that the protesters' conduct was protected speech under the 1st Amendment.[5]

---

[5] Plaintiffs reiterate that the purpose of this motion is to demonstrate that the protesters' conduct violated the City's Code for the entire 16-year period they engaged in the conduct, with the full knowledge of the City and its administrators. It is of course true that if the conduct of the (Footnote continued)

## **CONCLUSION AND RELIEF**

Based on the above arguments, Plaintiffs' motion for partial summary judgment should be granted by holding that the protesters' conduct violated, and therefore was prohibited by, the City of Ann Arbor's Code for the entire 16-year period in which the protesters have engaged in such conduct, and that their continuing to engage in that conduct continues to violate the Code. In addition, the Plaintiffs' motion for partial summary judgment on whether the City was aware of the protesters' conduct for the entire 16-year period, and continue to be aware of their continuing conduct, and have failed and declined to enforce the City's Code provisions prohibiting such conduct, should also be granted.

Respectfully submitted,

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

By:        s/ Marc M. Susselman_____
Attorney for Plaintiffs

Dated:  February 19, 2020

---

protesters was completely and absolutely protected by the 1st Amendment, then the City could not enforce the Code without violating the protesters' constitutional rights. But such a defense would be irrelevant as a response to this motion. Plaintiffs, moreover, dispute that the protesters' conduct was completely and absolutely protected by the 1st Amendment. Plaintiffs will address that issue in a separate motion and brief, but they have already demonstrated that the claim is erroneous in Argument I of Plaintiffs' brief in support of their Response To Protester Defendants' Motion To Set Aside The Default Of Jewish Witnesses For Peace And Friends. (Docket #22)

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2020, I electronically filed **Plaintiffs' Motioon For Partial Summary Judgment Against Defendant City Of Ann Arbor And Brief In Support, Index of Exhibits, and the 17 Exhibits designated in the Index of Exhibits, along with this Certificate of Service,** with the Clerk of the Court for the Eastern District of Michigan, using the ECF system, which will send notification of such filing to the following registered participants of the ECF system as listed on the Court's Notice of Electronic Filing:

**All counsel of record via the ECF system**

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

By:    s/ Marc M. Susselman
Attorney for Plaintiffs

Dated:  February 19, 2020

22