IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARVIN GERBER, et al.,

     Plaintiffs,

                      No. 19-cv-13726

vs.

                      Hon. Victoria A. Roberts

HENRY HERSKOVITZ, et al.,

     Defendants.

_____/

## AMICUS CURIAE BRIEF
## OF THE AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN

Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

Attorney for Amicus Curiae

March 17, 2020

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF INTEREST..........................................1

FACTS ...........................................................................................................4

ARGUMENT ...................................................................................................6

I.     The First Amendment protects the expression of ideas that are deeply unpopular and profoundly disturbing, with political speech on streets and sidewalks receiving the highest level of constitutional protection.........................................................................6

II.    The protests in this case are protected by the First Amendment. .........9

     A.    The "targeted picketing" and "captive audience" concepts do not apply because there is no law or ordinance in place designed to limit protests in this situation. ......................................................................9

     B.    Small group protests do not require a permit, and the city is not permitted to use its sign ordinances as a vehicle to restrict the protesters' speech....................................................10

     C.    A protest does not lose First Amendment protection when others think it is racist, bad for children, or has gone on too long.......................................................................12

     D.    The protesters are not engaged in intimidation, harassment, or obstruction that falls outside of First Amendment protection..............................................................14

III.   The plaintiffs' claims should be dismissed. .......................................16

     A.    Civil rights statutes do not prohibit peaceful political protest on a public sidewalk even when the speech is perceived to be racist...................................................................16

     B.    The city does not violate the law by choosing not to restrict political protesters' speech............................................18

     C.    Political protesters are not state actors.....................................20

D.    The First Amendment protects political protesters from state-law tort claims. ...................................................21

CONCLUSION ......................................................................24

# INDEX OF AUTHORITIES

## Cases

*Am. Steel Foundries v. Tri-City Cent. Trades Council*,
    257 U.S. 184 (1921)...................................................................15

*Am.-Arab Anti-Discrim. Comm. v. City of Dearborn*,
    418 F.3d 600 (6th Cir. 2005) .....................................................10

*B & B Entm't, Inc. v. Dunfee*, 630 F. Supp. 2d 870 (S.D. Ohio 2009)....................21

*Barger v. Playboy Enters., Inc.*, 564 F. Supp. 1151 (N.D. Cal. 1983)....................22

*Bible Believers v. Wayne Cty.*, 805 F.3d 228 (6th Cir. 2015).......................8, 12, 24

*Boos v. Barry*, 485 U.S. 312 (1988).......................................................................6, 7

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
    531 U.S. 288 (2001)...................................................................20

*Butler v. Michigan*, 352 U.S. 380 (1957)...................................................................13

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ............................................................1

*Connick v. Myers*, 461 U.S. 138 (1983)......................................................................6

*Curtis v. Evening News Ass'n*, 352 N.W.2d 355 (Mich. Ct. App. 1984) ...............23

*Dean v. Bylerly*, 354 F.3d 540 (6th Cir. 2004) ....................................................9, 10

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989)...................................................................18

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996)......................................................22

*Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) .........................19

*Frisby v. Schultz*, 487 U.S. 474 (1988)................................................................9, 10

*Ghanam v. Does*, 845 N.W.2d 128 (Mich. Ct. App. 2014) ....................................21

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006)...................................................................19

*Gordon v. Marrone*, 590 N.Y.S.2d 649 (Sup. Ct. 1992) ......................................3, 4

*Greenbelt Co-op Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970) ................................21

*Hazime v. Fox TV Stations, Inc.*,
    2013 WL 4483485 (E.D. Mich. Aug. 19, 2013) ..........................22

*Hill v. Colorado*, 530 U.S. 703 (2000) .....................................................................15

*Hodgins v. Times Herald Co.*, 425 N.W.2d 522 (Mich. Ct. App. 1988)................21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)................................................................16, 17

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988).....................................21, 23

*Ireland v. Edwards*, 584 N.W.2d 632 (Mich. Ct. App. 1998) ..........................22, 24

*Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000) .....................................20

*Letter Carriers v. Austin*, 418 U.S. 264 (1974) ........................................................23

*Locricchio v. Evening News Ass'n*, 476 N.W.2d 112 (Mich. 1991)........................22

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) ..............................15

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ....................................................................13

*McCullen v. Coakley*, 573 U.S. 464 (2014) .............................................................7

*McGlone v. Bell*, 681 F.3d 718 (6th Cir. 2012) .......................................................7

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)........................................21, 22

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)...........................................25

*Prater v. City of Burnside, Ky.*, 289 F.3d 417 (6th Cir. 2002) ...............................19

*QSP, Inc. v. Aetna Cas. & Sur. Co.*, 773 A.2d 906 (Conn. 2001)..........................22

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................................13

*Reno v. ACLU*, 521 U.S. 844 (1997) ......................................................................13

*Revis v. Meldrum*, 489 F.3d 273 (6th Cir. 2007) ...................................................20

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989)...................................13

*Sarkar v. Doe*, 897 N.W.2d 207 (Mich. Ct. App. 2016).........................................23

*Siefert v. Hamilton Cty.*,
    __ F.3d __, 2020 WL 1023010 (6th Cir. 2020)............................................20

*Snyder v. Phelps*, 562 U.S. 443 (2011)............................................................passim

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949)...................................................6

*Texas v. Johnson*, 491 U.S. 397 (1989) ..................................................................5

*Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748 (2005)..............................18

*Tucker v. City of Fairfield*, 398 F.3d 457 (6th Cir. 2005) ................................11, 18

*United States v. Schwimmer*, 279 U.S. 644 (1929).................................................13

*Virginia v. Black*, 538 U.S. 343 (2003) .........................................................6, 7, 14

**Statutes**

42 U.S.C. § 1981 ....................................................................................................16

42 U.S.C. § 1982 ....................................................................................................16

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

*Cantwell v. Connecticut*, 310 U.S. 296, 310 (1940)

## INTRODUCTION AND STATEMENT OF INTEREST

The American Civil Liberties Union of Michigan ("ACLU") is the Michigan affiliate of a nationwide, nonpartisan organization with over a million members dedicated to protecting rights and liberties guaranteed by the United States Constitution. As an organization committed to protecting the rights to freedom of speech and religious liberty, the ACLU has a strong interest in the proper resolution of this case.

ACLU amicus briefs are particularly important in free speech cases because, unlike a party whose speech is at issue, the ACLU has no particular interest in supporting or agreeing with the ideas expressed. In fact, the ACLU and its membership often strongly disagree with and oppose the speech that the ACLU stands up to protect. Instead, the ACLU's interest is that of supporting the guarantees of the First Amendment so that the freedom of expression remains protected for all of us.

1

In this case, the ACLU agrees with the serious concerns that have been raised by the plaintiffs, other members of the Beth Israel Congregation, and individuals and groups throughout the Ann Arbor community about the message and tone of the challenged protests. Whatever one's views about Israel and Palestine, it is offensive, upsetting, and distasteful for activists to stage political demonstrations outside a synagogue. And while most of the demonstrators' signs are about Israel and Palestine, some have taken on a more disturbing tone that is widely seen to be anti-Semitic, such as those that read "Resist Jewish Power" and "Jewish Power Corrupts." Especially in light of alarming incidents throughout our country indicating that anti-Semitism is on the rise, leaders in Ann Arbor are right to condemn the disturbing overtones of these protests. The ACLU, too, condemns such rhetoric and urges all protesters to pursue their political aims without resorting to inflammatory tropes about an entire religion, race, or ethnic group.

But there is a big difference between condemning an offensive political protest and asking a court to shut it down. First Amendment rights are indivisible: If public officials and courts have discretion to suppress speech they don't like, then none of us truly enjoys the freedom of speech. Therefore, even the most outrageous speech on matters of public concern must be constitutionally protected. Where, as here, a small group of citizens peaceably assemble on a public sidewalk with signs and placards to publicize their political views, that activity is

2

constitutionally protected—even though other groups of citizens are deeply offended, distressed, or hurt by the demonstrators' message.

When political protesters are sued, the litigation itself has a chilling effect on speech. This phenomenon is known as a "strategic lawsuit against public participation," or SLAPP:

> SLAPP suits function by forcing the target into the judicial arena where the SLAPP filer foists upon the target the expenses of a defense. The longer the litigation can be stretched out, the more litigation that can be churned, the greater the expense that is inflicted and the closer the SLAPP filer moves to success. The purpose of such gamesmanship ranges from simple retribution for past activism to discouraging future activism. Needless to say, an ultimate disposition in favor of the target often amounts merely to a pyrrhic victory. Those who lack the financial resources and emotional stamina to play out the "game" face the difficult choice of defaulting despite meritorious defenses or being brought to their knees to settle. The ripple effect of such suits in our society is enormous. Persons who have been outspoken on issues of public importance targeted in such suits or who have witnessed such suits will often choose in the future to stay silent. Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined.

*Gordon v. Marrone*, 590 N.Y.S.2d 649, 656 (Sup. Ct. 1992).

For these reasons, lawsuits like this one must be dismissed at the pleadings stage. If they are not, those who object to advocacy for social change would be emboldened to file lawsuit after lawsuit, hoping that if they assert enough causes of action, one will eventually "stick," thus subjecting political activists to years of burdensome and costly discovery and litigation. And local officials, rather than

acting responsibly to ensure that protesters' rights are protected, would over-enforce city code ordinances and zoning regulations to avoid being sued by those who object to controversial speech. Dangerous precedents would be set, creating "ripple effects" for all protesters and political activists. *Id.* Chilling such speech will seriously threaten First Amendment values at a time when political protests are critical to defending our democracy.

In this particular case, to be sure, the protesters' message and tactics are unsympathetic, unwise, and hurtful. But what of the next lawsuit to shut down a political protest? And the one after that? To ensure that the First Amendment protects us all, this case should be dismissed.

## FACTS

As alleged in the complaint, for many years a small group of anti-Israel protesters has gathered along the public sidewalks in front of the Beth Israel Congregation's synagogue in Ann Arbor every Saturday morning. The protesters carry signs and placards that read "Boycott Israel," "Stop U.S. Aid to Israel," "End the Palestinian Holocaust," "Stop Funding Israel," "Free Palestine," and "No More Wars for Israel." Some of the signs bear much more disturbing messages such as "Resist Jewish Power," "Jewish Power Corrupts," and "No More Holocaust Movies." Some of the protesters personally hold the signs, while others temporarily lean the signs against folding chairs or trees and stand or sit nearby. At

4

the end of their demonstration, the participants take their signs and chairs home with them.

As the protesters stand or sit on or near the public sidewalk in front of the synagogue and on the opposite side of the street, they direct their signs to be visible to passersby on Washtenaw Avenue, a major four-lane road (also known as Business U.S. 23) that runs through the east side of Ann Arbor. The complaint does not allege that they block sidewalks, the synagogue's driveway, or any vehicular or pedestrian traffic. It does not allege that they trespass on the synagogue's private property such as their parking lot or the area of grass and trees behind the sidewalk. Nor is there any allegation that they personally confront worshipers, make any disruptive noise, or even initiate verbal communication with anyone associated with the synagogue.

The plaintiffs' attorney asked the city to take action against the protesters. The city declined, explaining that the First Amendment protects their conduct. The plaintiffs now sue the protesters and the city, seeking damages and injunctive relief.

## ARGUMENT

I. **The First Amendment protects the expression of ideas that are deeply unpopular and profoundly disturbing, with political speech on streets and sidewalks receiving the highest level of constitutional protection.**

As the United States Supreme Court summarized in *Texas v. Johnson*, 491 U.S. 397, 414 (1989): "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Put another way in *Virginia v. Black*, 538 U.S. 343, 358 (2003): "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting."

The Supreme Court has accordingly recognized that the freedom of speech "may indeed best serve its high purpose when it induces a condition of unrest . . . or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Protected speech may "have profound unsettling effects." *Id.* Indeed, since "a principal function of free speech under our system of government is to invite dispute," *id.*, "in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988).

Of particular relevance here, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special

protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Public issues are those that relate "to any matter of political, social, or other concern to the community," including a "subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). "The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern" and is thus "entitled to special protection." *Id*. "Messages [that] may fall short of refined social or political commentary" are protected, *id*. at 454, even if they are "outrageous," "upsetting," or "arouse contempt," *id*. at 458.

The First Amendment also affords special protection to expressive activity, such as picketing with signs and placards, that occurs on streets and sidewalks. *Boos*, 485 U.S. at 318; *McGlone v. Bell*, 681 F.3d 718, 732 (6th Cir. 2012). As recently summarized in *McCullen v. Coakley*, 573 U.S. 464, 476 (2014):

> Such areas occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate. These places—which we have labeled "traditional public fora"—have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.

(Citations and quotation marks omitted.) "In such places, the government's ability to permissibly restrict expressive conduct is very limited." *Grace*, 461 U.S. at 177.

Two recent cases involving upsetting speech on streets and sidewalks demonstrate that such speech is entitled to maximum protection. In *Snyder v.*

*Phelps*, 562 U.S. 443 (2011), seven protesters from the infamous Westboro Baptist Church picketed a fallen soldier's funeral, holding signs with outrageously offensive messages such as "Thank God for 9/11" and "Thank God for Dead Soldiers." *Id.* at 448. The deceased soldier's family sued the protesters and a jury awarded millions of dollars, but the Supreme Court held that the verdict could not stand because the protesters' speech was protected by the First Amendment:

> Westboro conducted its picketing peacefully on matters of public concern at a public place adjacent to a public street. . . .
>
> Simply put, the church members had the right to be where they were. . . . .
>
> Westboro addressed matters of public import on public property, in a peaceful manner, in full compliance with the guidance of local officials. The speech was indeed planned to coincide with [the soldier's] funeral, but did not itself disrupt that funeral, and Westboro's choice to conduct its picketing at that time and place did not alter the nature of its speech.

*Id.* at 456, 457, 460.

A second case, *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) (en banc), involves a similarly outrageous and offensive display of hateful speech in a traditional public forum. During the Arab International Festival in Dearborn, a small group of Christian evangelists marched down Warren Avenue with anti-Muslim messages such as "Islam Is A Religion of Blood and Murder." *Id.* at 235, 238. When an angry crowd threatened violence against the evangelists, police ordered the evangelists to disperse. *Id.* at 240. The Sixth Circuit held that the

evangelists' speech was protected by the First Amendment because it took place in a traditional public forum and could not be subjected to a "heckler's veto" by those who found the speech unacceptably offensive. *Id*. at 242-43, 246-47, 254-55.

## II. The protests in this case are protected by the First Amendment.

In light of the authorities cited above, it is clear that the protesters' speech in this case—an offensive but peaceful demonstration on a public sidewalk displaying controversial messages on matters of public concern—is entitled to maximum protection under the First Amendment. The plaintiffs' argument that the speech is not protected by the First Amendment, *see* Am. Compl., pp. 4-6, 33-38, is wrong.

### A. The "targeted picketing" and "captive audience" concepts do not apply because there is no law or ordinance in place designed to limit protests in this situation.

The plaintiffs' assertion that the protesters are not protected by the First Amendment because they are allegedly engaged in "targeted picketing" rests on a misunderstanding of *Frisby v. Schultz*, 487 U.S. 474 (1988). In that case, the town in question had adopted an ordinance that banned picketing targeted at a residence, and the Supreme Court upheld the ordinance as a narrowly tailored "time, place, or manner" restriction on speech. *Id*. at 487-88. But the Sixth Circuit has made clear that, in the absence of such a law or ordinance, such picketing on a public street or sidewalk remains fully protected by the First Amendment. *Dean v. Byerly*, 354

F.3d 540, 551 (6th Cir. 2004). Here, the plaintiffs allude to no Michigan statute or Ann Arbor ordinance that bans targeted picketing, so *Frisby* does not apply.

*Dean* likewise dooms the plaintiffs' assertion that the protesters' speech is unprotected because the congregants are allegedly a "captive audience." The captive audience concept has been used only to uphold a restriction on speech that is already in place, as in *Frisby*. *See id.*, 487 U.S. at 487 (explaining why "captive audience" concept justified ordinance prohibiting targeting picketing). In the absence of a duly enacted regulation, it has never been recognized as justification to restrict speech in a traditional public forum that is otherwise entitled to maximum constitutional protection. Again, as the Sixth Circuit explained in *Dean*: "Supreme Court precedent makes it clear that citizens have the constitutional right to use streets for assembly and communication. Although the government may restrict that right through appropriate regulations, that right remains unfettered unless and until the government passes such regulations." *Dean*, 354 F.3d at 551.

## B. Small group protests do not require a permit, and the city is not permitted to use its sign ordinances as a vehicle to restrict the protesters' speech.

Contrary to the plaintiffs' assertion, the protesters are not required to obtain a permit. Permits are sometimes required for large events that block streets or sidewalks, use sound amplification equipment, or require preparations for crowd control. But the Sixth Circuit has held that it is unconstitutional to require a permit

for small-group protests that do none of those things. *Am.-Arab Anti-Discrim. Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005). That holding applies here, as the protesters in this case are a small group who stand quietly alongside a public sidewalk without impeding traffic or causing a disturbance.

The plaintiffs are also mistaken in claiming that the protesters' conduct is not protected by the First Amendment because it allegedly violates the city code. According to the plaintiffs, when some protesters temporarily place their signs on the ground or lean them against trees or chairs, they violate provisions of the code that prohibit placing items or signs in the public right-of-way. But the Sixth Circuit has clearly held that local ordinances may not be used in this way to interfere with peaceful demonstrations. In *Tucker v. City of Fairfield*, 398 F.3d 457 (6th Cir. 2005), protesters used an inflatable rat balloon (a symbol of protest against unfair labor practices) as part of their demonstration in a public right-of-way. *Id.* at 460. They placed the balloon on the ground during their protest, which lasted one to two hours, and temporarily secured it with stakes to make sure it did not tip over. *Id.* Although a local ordinance prohibited placing "structures" in the public right-of-way, the Sixth Circuit held that enforcing the ordinance against the protesters' use of the balloon violated the First Amendment. *Id.* at 460, 464. The balloon was temporary and easily movable, did not create a safety hazard or obstruct traffic, and was integral to their speech in a traditional public forum. *Id.* at 462-64.

In light of these authorities, in this case the city was required, and certainly entitled, to interpret its own code as neither prohibiting the protesters' activities or requiring them to obtain a permit, either by the code's own terms or because its enforcement under the circumstances would violate the First Amendment. *See* Am. Compl. ¶ 69. Notably, the plaintiffs' complaint contains no allegation that the city treated the protesters in this case more favorably than similarly situated protesters with a different message or at a different location. In fact, when a city generally interprets and applies its ordinances so as not to prohibit small-group protest activity of the kind described here, taking action against any individual protest group based on the complaints of those who are outraged by the content of their speech would effectuate a "heckler's veto" and therefore violate the First Amendment. *See Bible Believers*, 805 F.3d at 247.

## C. A protest does not lose First Amendment protection when others think it is racist, bad for children, or has gone on too long.

It is not hard to see why the plaintiffs perceive the protests to be anti-Semitic. Whatever one's views about Israel and Palestine, it is disturbing to see that the protesters have resorted to offensive messages about "Jewish power" and "Holocaust movies" outside a synagogue on a Saturday morning. Speaking out against Jews as a group, in front of a synagogue, is not an effective or appropriate response to the perceived misdeeds of Israel or the United States.

The merit of the plaintiffs' legal claims, however, cannot be contingent upon the disturbing content of the protesters' speech. It is a moral obligation in our community to advocate tolerance and respect for others, but the First Amendment does not allow the government, or this court, to censor speech for not adhering to those values. As the Supreme Court made clear in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992), censoring speech for expressing negative views on the basis of race, religion, and other "disfavored topics" is unconstitutional viewpoint discrimination. "Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

Nor does the protesters' speech lose its protection under the First Amendment because it is alleged to be bad for children. It has been clear for decades that the First Amendment does not allow the government to broadly prohibit speech directed to adults for the sake of protecting children. *See Reno v. ACLU*, 521 U.S. 844, 875 (1997); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-28 (1989). As the Supreme Court recognized more than fifty years ago, the government may not "reduce the adult population of Michigan to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

13

The First Amendment also protects the protesters even though they have been demonstrating for a long period of time and the plaintiffs have grown weary of their activities. Some citizens perceive injustices that demand their sustained, vocal opposition for years on end; the First Amendment does not allow those who remain unpersuaded by their opponents' speech to decide that "enough is enough." Although it is easy to understand why the plaintiffs in *this* case want the protesters to go away, "we cannot react to that pain by punishing the speaker." *Snyder*, 562 U.S. at 461. First Amendment rights do not have an expiration date.

### D. The protesters are not engaged in intimidation, harassment, or obstruction that falls outside of First Amendment protection.

The plaintiffs' complaint is also peppered with references to allegations that they and other congregants are being intimidated or harassed by the protesters. There is no reason to doubt that the plaintiffs and other congregants are genuinely distressed by the protest activity. But when political activity is involved, courts must protect speech even when it causes distress, anger, outrage, and pain. *See Snyder*, 562 U.S. at 457-61. Although true intimidation or harassing conduct would not be protected by the First Amendment, the protesters' alleged activity in this case falls squarely on the constitutionally protected side of the line.

For intimidation, the constitutional standard is governed by *Virginia v. Black*, 538 U.S. 343, 360 (2003): "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a

person or group of persons with the intent of placing the victim in fear of bodily harm or death." A true threat is one in which the speaker "means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359. Whatever else may be said about the protesters' speech in this case, it does not come close to meeting the standard of true threats or "constitutionally proscribable" intimidation.

True harassment outside the protection of the First Amendment would be conduct that invades the rights of others, such as repeatedly and personally accosting individuals who express a desire to be left alone. *See Hill v. Colorado*, 530 U.S. 703, 718 (2000) (discussing the problem of "persistent 'importunity, following and dogging' after an offer to communicate has been declined" (quoting *Am. Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 204 (1921))). But in this case, there is no allegation that the protesters personally confront, follow, or initiate communication with worshipers or anyone else associated with the synagogue. As with intimidation, the complaint alleges no true harassment in the "constitutionally proscribable" sense of that word.

Nor are the protesters alleged to be engaged in other types of obstructive or disruptive conduct that falls outside the First Amendment's protections. In *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994), the Supreme Court partially upheld an injunction against abortion clinic protesters because they had repeatedly

blocked the entrance and exit to the clinic, and their disruptive use of loudspeakers and bullhorns could be heard by vulnerable patients inside the facility. *Id.* at 758, 769, 772. By contrast, in this case the complaint does not allege that the protesters block the sidewalks, the synagogue's driveway, or any vehicular or pedestrian traffic; it does not allege that they trespass on the synagogue's private property; and it does not allege that the protesters make any disruptive noise. Therefore, the protesters' speech remains fully protected by the First Amendment.

## III.   The plaintiffs' claims should be dismissed.

Because the demonstrations in this case are protected by the First Amendment, the plaintiffs' claims should be dismissed for failure to state a claim.

### A.   Civil rights statutes do not prohibit peaceful political protest on a public sidewalk even when the speech is perceived to be racist.

The plaintiffs' complaint asserts that their rights are being violated under various federal and state civil rights statutes, such as 42 U.S.C. §§ 1981 and 1982 and the Elliott-Larsen Civil Rights Act (ELCRA), which in various forms prohibit discrimination in access to goods, services, property, contracts, and public accommodations on the basis of race, religion, and ethnicity. These civil rights statutes are the foundation of our national commitment to equal opportunity under the law. But they cannot be used to silence constitutionally protected speech, even when some of that speech is perceived to be in tension with the values of equality and non-discrimination that our civil rights laws are designed to protect.

16

The leading case in this area is *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), where the Supreme Court held that a public accommodations law could not be used to prevent private parade organizers from excluding an LGBT group from marching. As a general matter, the Court observed, laws prohibiting discrimination based on sexual orientation are perfectly valid, and could be applied without difficulty to prevent discrimination in the provision of publicly available goods, services, and public accommodations. *Id*. at 572. But because parades are inherently expressive, the public accommodations law could not be applied to alter or censor the message of the parade's private organizers, as doing so would violate their First Amendment rights to control their own message in a traditional public forum. *Id*. at 568-69, 572-73.

Here, the same principle applies. The protesters are not engaged in the type of activity validly regulated by federal or state civil rights laws, such as commercial transactions or operating a public accommodation. Nor are they preventing others from using or accessing synagogue property, and they are not even confronting individual worshipers on their way to or from services. Instead, they are engaged in quintessentially expressive activity in a traditional public forum—the precise conduct that the First Amendment protects, regardless of whether the message is "misguided, or even hurtful." *Id*. at 574. The civil rights protections cited by the plaintiffs are profoundly important in commercial activity

17

and public accommodations, but they cannot be used, as the plaintiffs are advocating here, to censor the peaceful expression of views on a public sidewalk because they are perceived to be racist or anti-Semitic.

### B. The city does not violate the law by choosing not to restrict political protesters' speech.

The plaintiffs' complaint also asserts that the city is liable for failing to stop the protests. These claims fail for several reasons.

First, private citizens do not have a freestanding constitutional right to demand that state and local officials enforce their laws or protect citizens from unlawful conduct by others. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748 (2005); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Therefore, even if the protesters were violating a city ordinance as the plaintiffs allege, the city's non-enforcement of that ordinance is not actionable.

Second, as discussed above, the city had a good reason not to enforce its code against the protesters in the manner the plaintiffs advocate: Doing so would violate the First Amendment. *See Tucker v. City of Fairfield*, 398 F.3d 457, 460-64 (6th Cir. 2005). As the Sixth Circuit recognized in *Tucker*, when an easily movable item like a protest sign is temporarily placed on the ground and does not create a safety hazard or obstruct pedestrian or vehicle traffic, prohibiting the activity through enforcement of a local sign ordinance is not a narrowly tailored means of

serving a significant government interest. The city cannot be held liable for complying with controlling Sixth Circuit law on this issue.

Third, the facts alleged do not plausibly support a claim that the city is treating the plaintiffs differently based on their religion. There is no allegation, for example, that the city enforces its sign ordinance against protesters whose demonstrations affect different religious groups or non-religious groups, while allowing protests affecting the plaintiffs to continue unabated. To the contrary, the city allows (as it must) any and all protesters to demonstrate in a traditional public forum, without regard to whether the nearest building happens to be a synagogue, a mosque, a restaurant, or city hall. So there is no equal protection or free exercise violation. *See Prater v. City of Burnside, Ky.*, 289 F.3d 417, 429 (6th Cir. 2002).

In fact, singling out the protesters for restrictions is exactly what the city cannot do. If the city adopted a practice of treating some protesters differently based on complaints of other citizens who were outraged by the protesters' message, doing so would effectuate a "heckler's veto" in violation of the First Amendment. *See Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."). Therefore, the city is not liable.[1]

---

[1] For similar reasons, the plaintiffs fail to state claims against the city for violating the Religious Freedom Restoration Act (RFRA) and the Religious Land Use and Institutionalized Persons Act (RLUIPA). RFRA applies only to the federal

## C.     Political protesters are not state actors.

The court should reject the plaintiffs' attempts to hold the protesters liable for constitutional violations, as such liability can attach only to state action. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001); *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000). Political activists staging a demonstration on a public sidewalk cannot be deemed state actors merely because actual state actors choose not to stop the protest activity.

There are three tests to determine whether a private entity can be liable for state action: the public function test, the state compulsion test, and the nexus test. *Lansing*, 202 F.3d at 828. None is satisfied here. Plainly, the protesters are not performing a public function "such as holding elections or eminent domain." *Id*. Nor has the city coerced the protesters to take the action that the plaintiffs believe violate their rights. *See id.* at 829. And there is no "sufficiently close nexus" between the city and the protesters such that the acts of the protesters "may be fairly treated" as those of the city itself. *Id*. at 830-34.

Similarly, the allegations in the plaintiffs' complaint do not plausibly support their claims that there is a "conspiracy" between the protesters and the city

government. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 n.1 (2006). And RLUIPA prohibits, in some circumstances, enforcement of land use regulations against a religious institution; it does not require enforcement of an ordinance against a third person at the behest of a religious institution.

so as to subject the protesters to liability for any alleged violation of the plaintiffs' constitutional rights. *See Siefert v. Hamilton Cty.*, __ F.3d __, 2020 WL 1023010, *11 (6th Cir. 2020); *Revis v. Meldrum*, 489 F.3d 273, 290-91 (6th Cir. 2007). Inaction by the city does not plausibly suggest a conspiracy, nor does the city communicating with the protesters regarding their legal rights. *See B & B Entm't, Inc. v. Dunfee*, 630 F. Supp. 2d 870, 881 (S.D. Ohio 2009).

### D.   The First Amendment protects political protesters from state-law tort claims.

The Supreme Court has repeatedly recognized that in a free society, those who are deeply offended or angered by political speech cannot circumvent the First Amendment by artfully pleading common-law torts under state law. *Snyder*, 562 U.S. at 451; *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988). Here, too, because the protesters' speech is constitutionally protected, the plaintiffs' defamation and related state-law tort claims must be dismissed.

"Whether a statement is actually capable of defamatory meaning is a preliminary question of law for the court to decide," and "can be resolved on the pleadings alone." *Ghanam v. Does*, 845 N.W.2d 128, 141, 143 (Mich. Ct. App. 2014). Although true defamation is not protected by the First Amendment, a "statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). "Rhetorical hyperbole"

21

and "exaggerated language" are not defamatory. *Greenbelt Co-op Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970); *Hodgins v. Times Herald Co.*, 425 N.W.2d 522 (Mich. Ct. App. 1988). A statement must be "provable as false" to be actionable. *Ireland v. Edwards*, 584 N.W.2d 632, 637 (Mich. Ct. App. 1998). "Claims of defamation by implication . . . face a severe constitutional hurdle." *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 129 (Mich. 1991).

Additionally, "it is constitutionally required that a statement be made 'of and concerning' the party allegedly defamed for a cause of action in defamation to lie." *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 773 A.2d 906, 916 n.14 (Conn. 2001); *see also Hazime v. Fox TV Stations, Inc.*, 2013 WL 4483485, *7 (E.D. Mich. Aug. 19, 2013). A plaintiff can be a member of a small group defamed by a statement, but "where [a] group is large—in general, any group numbering over twenty-five members— . . . courts . . . have consistently held that plaintiffs cannot show that the statements were 'of and concerning them.'" *Barger v. Playboy Enters., Inc.*, 564 F. Supp. 1151, 1153 (N.D. Cal. 1983).

Here, the plaintiffs' allegations regarding the protesters' "End the Palestinian holocaust" sign, *see* Am. Compl. ¶ 204, fails to state a claim for at least two reasons. First, whether events or conditions arising from ethnic strife can be characterized as a "holocaust" is a matter of opinion. *See Milkovich*, 497 U.S. at 20. No "evidence" could prove or disprove it as a "fact," as using the term is not

"saying something definite enough to allow a jury to determine whether what you are saying is true or false." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996). Emotionally charged terms like "Palestinian holocaust" are widely recognized as a kind of "rhetorical hyperbole," or "loose, figurative" and "exaggerated language," part "of the conventional give-and-take in our economic and political controversies," and thus not reasonably deemed a factual assertion susceptible to defamation claims. *Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974).

Second, the statement fails the individualized "of and concerning" requirement because it cannot be reasonably interpreted as accusing the plaintiffs, personally, of committing atrocities. *Curtis v. Evening News Ass'n*, 352 N.W.2d 355, 356 (Mich. Ct. App. 1984). No reasonable observer would think that the protesters' "End the Palestinian holocaust" sign implies a factual accusation that the plaintiffs, Marvin Gerber or Dr. Miriam Brysk, are personally responsible, in a factual sense, for the deaths of Palestinians. Expressing political opinions about Israel, Palestine, and American foreign policy near a synagogue may be offensive and wrong, but it is not defamation.

For the same reasons, the plaintiffs' remaining state-law tort claims, such as false light and intentional infliction of emotional distress, must also be dismissed. "When the alleged tortious conduct is a defendant's utterance of negative statements concerning a plaintiff, privileged speech protected by the First

23

Amendment is a defense." *Sarkar v. Doe*, 897 N.W.2d 207, 232 n.24 (Mich. Ct. App. 2016); *see also Snyder*, 562 U.S. at 458-60; *Hustler Magazine*, 485 U.S. at 56; *Ireland*, 584 N.W.2d at 640-41. Because the First Amendment protects the protesters' speech, it requires dismissal of all state-law tort claims.

## CONCLUSION

There are good reasons to condemn the protesters who are being sued in this case, and to empathize with the plaintiffs and their congregation. Whatever one's views about Israel and Palestine, the protesters' decision to express their views by demonstrating in front of a synagogue on Saturday mornings is unseemly and distasteful—particularly when some of their signs and placards appear to speak out against Jews as a group.

But this case is not about whether we approve of the protesters' message or tactics. To protect unobjectionable speech, the First Amendment is rarely needed. "In fact, it is the minority view, including expressive behavior deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment." *Bible Believers*, 805 F.3d at 243. "This protection applies to loathsome and unpopular speech with the same force as it does to speech that is celebrated and widely accepted." *Id*. And to deny that protection is to gamble with the liberties we cherish for all: "If we encroach on the free-speech rights of groups that we dislike today, those same doctrines can be

used in the future to suppress freedom of speech for groups that we like." *Id*. at 264 (Boggs, J., concurring).

The protesters in this case are a small group of citizens who demonstrate "peacefully on matters of public concern at a public place adjacent to a public street." *Snyder*, 562 U.S. at 456. If we are to maintain a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), then the offensive, distressing, and even outrageous nature of their demonstration cannot justify any of the relief the plaintiffs seek here.

For these reasons, the defendants' motions to dismiss should be granted.

Respectfully submitted,

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org

Attorney for Amicus Curiae

Dated: March 17, 2020

25

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2020, I electronically filed the foregoing

document with the Clerk of the Court using the ECF system, which will send

notification of such filing to all counsel of record.

/s/ Daniel S. Korobkin
Daniel S. Korobkin (P72842)