# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Marvin Gerber, Dr. Miriam Brysk,

      Plaintiffs,

vs.                                              Civil Action No. 2:19-cv-13726
                                                Hon. Victoria A. Roberts

Henry Herskovitz, *et al.*,

      Defendants, Jointly and Severally.

_____/

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
Attorney for Plaintiffs

Ziporah Reich (3979639)
The Lawfare Project
633 Third Ave., 21st Floor
New York, N.Y. 10017
(212) 339-6995
Ziporah@thelawfareproject.org
Co-Counsel for Plaintiffs

Timothy S. Wilhelm (P67675)
OFFICE OF THE CITY ATTORNEY
Attorneys for the City of Ann Arbor,
Christopher Taylor, Derek Delacourt,
Stephen Postema, and Kristen Larcom
301 E. Huron St., P.O. Box 8647
Ann Arbor, Michigan 48107-8647
(7340 794-6170
twilhelm@a2gov.org

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Constitutional Litigation Associates, PC
Attorneys for Defendants Henry Herskovitz,
Gloria Harb, Tom Saffold, Rudy List and
Chris Mark
220 Bagley St., Ste. 740
Detroit, MI 48226
(313) 961-2255/Fax: (313) 922-5130
Heenan@CoLitPC.Com
Davis@ConLitPC.Com

John A. Shea (P37634)
Attorney for Defendants
Herskovitz, Harb, Saffold, List and
Mark
120 N. Fourth Avenue
Ann Arbor, Michigan 48104
(734) 995-4646
jashea@earthlink.net

_____/

## PLAINTIFFS' RESPONSE OPPOSING THE CITY DEFENDANTS'
## MOTION TO DISMISS

## TABLE OF CONTENTS

QUESTIONS PRESENTED ................................................................ iii

CONTROLLING AUTHORITY ........................................................ iv

INDEX OF AUTHORITIES ............................................................. vi

COUNTER-STATEMENT OF FACTS ............................................. 1

PRELIMINARY STATEMENT ........................................................ 5

STANDARD OF REVIEW ............................................................... 6

ARGUMENT ................................................................................... 6

I.      THE PLAINTIFFS HAVE STANDING TO SUE ................................. 6

     A.      The Plaintiffs Have Suffered A Concrete Injury......................... 7

     B.      The Plaintiffs' Injuries Are Causally Connected To The
           City's Conduct................................................................... 15

     C.      The Plaintiffs' Injury Would Be Redressed By A Ruling
           Against The City.................................................................. 16

II.     PLAINTIFFS HAVE PLED CONGNIZABLE CLAIMS AGAINST
     THE CITY. ................................................................................... 17

     A.      Plaintiffs Have Pled A Cognizable Claim Against The City Under
           42 U.S.C. §1983................................................................. 17

     B.      Plaintiffs Have Pled Viable Conspiracy Claims Against The City. 21

           1.      The City aided and abetted the Protesters' violation of
                  U.S.C. 1982....................................................................... 23

           2.      The Protesters have clearly been engaged in a conspiracy,
                  which the City aided and abetted by its failure to enforce its
                  Code, in violation of 42 U.S.C. §1983. ............................... 24

           3.      The City aided and abetted the Protesters' violation of
                  42 U.S.C. §1985(3)............................................................ 25

           4.      The City has violated 42 U.S.C. §1986. ............................ 26

C.        **The City Has Violated The Plaintiffs' Substantive Due Process Rights.** ................................................................... 26

D.        **The City Violated Plaintiffs' Right Of Access To The Courts.** ... 28

E.        **Plaintiffs Have Pled Cognizable Claims Under The RFRA and RLUIPA.** ................................................................... 29

III.    **THE CITY DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.** ................................................................... 31

**CONCLUSION AND RELIEF** ........................................................... 33

## QUESTIONS PRESENTED

I.    Whether the Plaintiffs have standing to sue the City Defendants.

      Plaintiffs answer "Yes."

II.   Whether the City Defendants' motion to dismiss should be granted with respect to any of the counts Plaintiffs have pled against the City Defendants in the First Amended Complaint.

      Plaintiffs answer "No"

**CONTROLLING AUTHORITY**

*Adkins v. Bd. of Educ. of Magoffin County*, 982 F.2d 952 (6th Cir.)

*Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252 (1977)

*Beauharnais v. Illinois*, 343 U.S. 250 (1954)

*Burkhardt v. United States*, 13 F.2d 841 (6th Cir. 1926)

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000)

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998)

*Frisby v. Schultz*, 487 U.S. 474 (1988)

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)

*Hunt v. Sycamore Community School District Bd. of Education*, 542 F.3d 529 (6th Cir.)

*Jaimes v. Toledo Metropolitan Hous. Authority*, 758 F.2d 1086 (6th Cir. 1985)

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002)

*Jones v. Mayers Co.*, 392 U.S. 409 (1968)

*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974)

*Loubser v. Thacke*, 440 F.3d 439 (7th Cir. 2006)

*Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333 (2d Cir. 1974)

*Pena v. Deprisco*, 432 F.3d 98 (2d Cir. 2005)

*Phelps-Roper v. Strickland*, 539 F.3d 356 (6th Cir. 2008)

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987)

*Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973)

*Sullivan v. Little Hunting Park*, 396 U.S. 229 (1969)

*Tillman v. Wheaton-Haven Recreation Assn.*, 410 U.S. 431 (1973)

*U.S. v. Brown,* 49 F.3d 1162 (6th Cir. 1995)

*Vittitow v. City of Upper Arlington,* 43 F.3d 1100 (6th Cir. 1995)

*Wells v. Rhodes,* 928 F. Supp.2d 920 (S.D. Ohio 2013)

*Women's Health Care v. Operation Rescue,* 773 F. Supp. 258 (D. Kan. 1991)

# INDEX OF AUTHORITIES

## CASES                                                                  Pages

### Federal

*Adkins v. Bd. of Educ. of Magoffin County,* 982 F.2d 952 (6th Cir.) ........................ 31

*Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252 (1977) ............... 7

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ........................................................................ 6

*BB Entertainment, Inc. v. Dunfee,* 630 F. Supp.2d 870 (S.D. Ohio 2009) .............. 20,21

*Beauharnais v. Illinois,* 343 U.S. 250 (1954) ............................................................ 19,27,32

*Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 1984) ..................................... 28

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................ 6

*Blount v. D. Canale Beverages, Inc.,* No. 02-2813-MaV (W.D. Tenn. 2003) .......... 26

*Bray v. Alexandria Clinic,* 506 U.S. 263 (1993) ..................................................... 25

*Brenner v. L. 514, United Brotherhood of Carpenters,* 927 F.2d 1283 (6th Cir. 1991)   27

*Brokaw v. Mercer County,* 235 F.3d 1000 (7th Cir. 2000) ....................................... 25

*Bryant v. Polston,* Cause No. IP00-1064-C-T/G (S.D. Ind. 2000) .......................... 24

*Burkhardt v. United States,* 13 F.2d 841 (6th Cir. 1926) ....................................... 22,24

*Caldwell v. City of Louisville,* 120 F. App'x 566 (6th Cir. 2004),
      *aff'd on rehearing*    ............................................................................. 14

*Carpenters v. Scott,* 463 U.S. 825 (1983) ............................................................... 25

*Cellini v. City of Sterling Heights,* 856 F. Supp. 1215 (E.D. Mich. 1994) .............. 18

*Chicago Observer, Inc. v. City of Chicago,* 929 F.d2d 325 (7th Cir. 1991) ............. 32

*Christie v. Iopa,* 176 F.3d 1231 (9th Cir. 1999) ...................................................... 14

*City of Boerne v. Flores,* 521 U.S. 507 (1997) ........................................................ 29,30

*Clair v. Northern Ky. Independent Health Dist.,* 504 F. Supp.2d 206 (D. Ky. 2006)   27

*Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000)..................................................26

*Coalition for the Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974)....................7

*Coulter-Owens v. Rodale, Inc.*, Case No. 14-12688 (E.D. Mich. 2015).................7

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)...............11,21

*Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993)........................................14

*Felber v. Yudof*, 851 F. Supp.2d 1182 (N.D. Cal. 2011) ........................................14

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) ......................................32

*Frazier v. Michigan*, 41 Fed. Appx. 762 (6th Cir. 2002) ........................................19

*Frisby v. Schultz*, 487 U.S. 474 (1988).................................................................26,28,31,32

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)...........................................................25

*Haffner v. Brown*, 983 F.2d 570 (4th Cir. 1992)....................................................22

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................31

*Harrison v. Springdale Water Sewer Com'n*, 780 F.2d 1422 (8th Cir. 1986)...........29

*Hope v. Pelzer*, 536 U.S. 730 (2002).....................................................................31

*Hunt v. Sycamore Community School District Bd. of Education*, 542 F.3d 529 (6th Cir.)   11,14

*Hurley v. Atlantic City Police Dep't*, 174 F.3d 95 (3d Cir. 1999) ..........................12

*Ind. Coal. for Pub. Educ v. McCormick*,  338 F. Supp.3d 926 (S.D. Ind. 2018)......16

*Jaimes v. Toledo Metropolitan Hous. Authority*, 758 F.2d 1086 (6th Cir. 1985)......7

*James v. Village of Willowbrook*, No. 11-cv-9126 (N.D. Ill. 2012).........................23

*Jennings v. Patterson*, 488 F.2d 436 (5th Cir. 1974) .............................................14

*Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*,
    968 F.2d 286 (2d Cir. 1992) ...........................................................................25

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002)...................................24

*Johnson v. City of Shelby*, __ U.S. ___ ; 135 S.Ct. 346 (2014) ..............................19

*Jones v. Mayers Co.*, 392 U.S. 409 (1968) ............................................................22

*Jones v. Reynolds,* 438 F.3d 685 (6th Cir. 2006) ......................................... 13

*King Enterprise v. Thomas Township,* 215 F. Supp.2d 891 (E.D. Mich. 2002) ....... 15

*Lawrence v. Reed,* 406 F.3d 1224 (10th Cir. 2005) ..................................... 31

*LeBlanc-Sternberg v. Fletcher,* 781 F. Supp. 261 (S.D.N.Y. 1991),
   *aff'd,* 67 F.3d412 (2d Cir. 1995) ........................................................ 25

*Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974) ............................... 32

*Linda R. S. v. Richard D,* 410 U.S. 614 (1973) ......................................... 20

*Little Mack Entertainment v. Township of Marengo,*
   625 F. Supp.2d 570 (W.D. Mich. 2008) ................................................ 15

*Loubser v. Thacke,* 440 F.3d 439 (7th Cir. 2006) ...................................... 22

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ................................... 6

*Macera v. Village Bd. of Ilion,* Case No. 6:16-CV-668 (N.D.N.Y. 2019) .............. 14

*Mandel v. Board of Trustees of the California State University,*
   Case No. 3:17-cv-03511-WHO (N.D. Cal., 2018) ..................................... 14

*Mansell v. Saunders,* 372 F.2d 573 (5th Cir. 1967) .................................... 23

*May v. Franklin County Bd. of Commissioners,* 59 Fed. Appx. 786
   (6th 'Cir. 2003) (unpublished) .......................................................... 14

*Minnesota Bd. for Community Colleges v. Knight,* 465 U.S. 271 (1984) ............... 28

*Mohammed v. Union Carbide Corp.,* 606 F. Supp. 252 (E.D. Mich. 1985) ............ 28

*Monell v. Dept. of Soc. Services,* 436 U.S. 658 (1978) ................................. 20

*N.Y. State Org. for Women v. Terry,* 886 F.2d 1339 (2d Cir. 1989)
   *aff'd as modified,* 886 F.2d 1339 (2d Cir.) ........................................... 23

*Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2d Cir. 1974) ................. 23

*Pembauer v. City of Cincinnati,* 475 U.S. 409 (1986) .................................. 20

*Pena v. Deprisco,* 432 F.3d 98 (2d Cir. 2005) .......................................... 12

*Peterson v. Ne. Local Sch. Dist.,* Case No. 3:13cv00187 (S.D. Ohio, 2014) ........... 14

*Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012) ................... 9

*Phelps-Roper v. Ricketts*, 867 F.3d 883 (8th Cir. 2017)............................................ 9

*Phelps-Roper v. Strickland*, 539 F.3d 356 (6th Cir. 2008) ........................................ 9

*Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834 (6th Cir. 2000) ...................... 28

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)............................................................... 21,32

*Ricketson v. Experian Info. Solutions, Inc.*, 266 F. Supp.3d 1083 (W.D. Mich. 2017)     7

*Ryan Outdoor Advertising, Inc. v. U.S.*, 559 F.2d 554 (9th Cir. 1977) ..................... 30

*Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) ........................................................ 29

*Selevan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009) ...................... 25

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ........................................ 23

*Sharp v. Johnson*, 669 F.3d 144 (3d Cir. 2012) .......................................................... 31

*Shorts v. Bartholomew*, 255 F. App'x 46 (6th Cir. 2007) ........................................... 19

*Siegel v. U.S. Dep't of the Treasury*, 304 F. Supp.3d 45 (D.D.C. 2018)................... 16

*Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006)....................................... 31

*Sines v. Kessler*, 324 F. Supp.3d 765 (2011) .............................................................. 9

*Smith v. City of Elyria*, 857 F. Supp. 1203 (N.D. Ohio 1994) ................................... 18

*Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) ................................................................. 18

*Snyder v, Phelps*, 562 U.S. 443 (2011)......................................................................... 8

*Spencer v. Casavilla*, 903 F.2d 171 (2d Cir. 1990) .................................................... 25

*Sullivan v. Little Hunting Park*, 396 U.S. 229 (1969) ................................................ 23

*Tillman v. Wheaton-Haven Recreation Assn.*, 410 U.S. 431 (1973)......................... 23

*Tolle v. Carrol Touch, Inc.*, 977 F.3d 1129 (7th Cir. 1992) ....................................... 19

*Toms v. Taft*, 338 F.3d 519 (6th Cir. 2003).................................................................. 12

*Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748 (2005) .................................. 10

*Tucker v. City of Fairfield, Ohio*, 398 F.3d 457 (6th Cir. 2005)................................. 32

*U.S. v. Brown*, 49 F.3d 1162 (6th Cir. 1995) ............................................. 23

*United States v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018) ............................ 22

*U.S. v. Greer*, 939 F.2d 1076 (5th Cir. 1991), *aff'd en banc*,
   968 F.2d 433 (5th Cir. 1992), *cert. denied*,
   ___ U.S. ___, 113 S.Ct. 1390 (1993) ............................................. 23

*Vietnamese Fishermen's Ass'n v. Knights of KKK*, 543 F. Supp. 198 (S.D. Tex. 1982)   25

*Vittitow v. City of Upper Arlington*, 43 F.3d 1100 (6th Cir. 1995) .......................... 32

*Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984)....................................... 26

*Washington Gas Light Co. v. Virginia Electric & Power Co.*,
   438 F.2d 248 (4th Cir. 1971) ............................................. 12

*Wells v. Rhodes*, 928 F. Supp.2d 920 (S.D. Ohio 2013)...................................... 23,25

*Wheeler v. Commissioner of Highways*, 822 F.2d 586 (6th Cir. 1987).................... 32

*Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999) ............................................. 31

*Women's Health Care v. Operation Rescue*, 773 F. Supp. 258 (D. Kan. 1991)....... 22.24

### State

### Michigan

*Alan v. Wayne County*, 388 Mich. 210 (1972)................................................ 28

*Barkey v. Nick*, 11 Mich. App. 381 (Mich. Ct. App. 1968)................................ 28

*Barrett v. Breault*, 275 Mich. 482  (Mich. 1936) ............................................. 28

*Lumber Village v. Siegler*, 135 Mich. App. 685 (Mich. Ct. App. 1984)................. 28

*Macomb County Prosecutor v. Murphy*, 464 Mich. 149 (2001)............................ 28

*Papazian v. Goldberg (In re Mardigian Estate)*, 502 Mich. 154 2018).................. 29

*Square Lake Hills Condo. Ass'n v. Bloomfield Twp.*, 437 Mich. 310 (1991)........... 15

*Watts v. Placzyk*, 242 Mich. App. 600 (Mich. Ct. App. 2000) ............................ 29

**Other**

*People, Dept. of Transportation v. Naeglele Outdoor Advtg. Co.,*
    38 Cal.3d 509 (Cal. 1985) ............................................................... 30

*St. David's Episcopal Church v. Westboro Baptist,*
    921 P.2d 821; 22 Kan. App. 2d 537 (Kan. Ct. of Appeals, 1996)................ 9

## UNITED STATES CONSTITUTION

U.S. Const. amend. I        ....................................................................  *passim*

U.S. Const. amend. XIV     ....................................................................  *passim*

## STATUTES

### Federal

42 U.S.C. §1981        ....................................................................  *passim*

42 U.S.C. §1982        ....................................................................  *passim*

42 U.S.C. §1983        ....................................................................  *passim*

42 U.S.C. §1985(3)     ....................................................................  *passim*

42 U.S.C. §1986        ....................................................................  *passim*

Religious Freedom Restoration Act (RFRA), 42 U.S.C. §2000bb. *et seq.*............... 29

Religious Land Use And Institutionalized Person Act of 2000 (RLUIPA),
    42 U.S.C.2000cc, *et seq.* ............................................................ 29,30

## COURT RULES

Fed. R. Civ. P. 11        ....................................................................  28

Fed. P. Civil P. 12(b)(1)  ....................................................................  5

Fed. R. Civil P. 12(b)(6)  ....................................................................  16

## COUNTER-STATEMENT OF FACTS

Every Saturday morning since September, 2003, for the last 16 ½ years, Defendant Herskovitz has led a group of protesters, numbering from 6 to 12 individuals at any one time, to place signs, posters, placards and miniature American flags on the grass section adjacent to the sidewalk in front of Beth Israel Synagogue ("Synagogue"), located at 2000 Washtenaw Ave., Ann Arbor, Michigan, as well as on the grass section across Washtenaw Ave., facing the Synagogue. The Synagogue is located in an area of Ann Arbor which is zoned residential. (First Amended Complaint, "FAC," ¶22). Herskovitz is the founder of an organization named "Jewish Witnesses for Peace and Friends" ("Witnesses"), which has organized the protests.[1] Defendants Harb, Saffold, List and Mark are members of Witnesses and are currently engaging in the weekly protests with Herskovitz. (Hereinafter collectively referred to as "Protesters.")

The signs bear such statements as:  "Resist Jewish Power"; "Jewish Power Corrupts"; "Zionists are Nazis"; "Dual Loyalty?"; "Fake News: Israel Is A Democracy"; "Stop Funding Israel"; "End the Palestinian holocaust"; "No More Holocaust Movies"; "The United States of Israel?!"; "America First"; etc.  (Photographs of the signs are attached to the FAC as Exhibits 1 and 2.) They number 18-20 signs. Most of the signs are placed on the grass sections leaning against trees and portable chairs which the Protesters bring with them. Some of the Protesters also carry signs, either holding them in their hands or attached to twine hanging from their necks. Every week they also include a large banner of the Israeli flag, with a red circle and a red slash across it covering the Star of David.[2] (*See* photograph of the banner, attached as Exhibit 1.)

---

[1]  Approximately two years ago, Herskovitz dropped the word "Jewish" from the name of the organization, and now it is known as "Witnesses for Peace and Friends."

[2]  The red circle with a red slash through it is the international symbol for "Prohibited." The Star of David is the recognized symbol representing Judaism and the Jewish people. Placing the "Prohibited" symbol over the Star of David states that Jews are not welcome and are expendable, as they were during the Holocaust. As discussed *infra,* its use in front of a Jewish house of worship (Footnote continued.)

The Protesters arrive every Saturday morning, the Jewish Sabbath, at approximately 9:30 A.M., position their signs/placards in place, and stay until approximately 11:00 A.M. The time period coincides with the time when members of the Synagogue arrive to enter the Synagogue, or to attend Sabbath services in the annex next door, in order to conduct and participate in the Sabbath service. All the signs are anti-Israeli and anti-Zionist. Several of the signs are also flagrantly Antisemitic, e.g., "Resist Jewish Power"; "Jewish Power Corrupts"; "Zionists Are Nazis"; "End the Palestinian holocaust"; "Dual Loyalty?"; and "No More Holocaust Movies." These signs promote age-old Antisemitic tropes about purported Jewish outsized influence in world finance, controlling power in international political affairs, and dual national loyalties. Plaintiffs maintain that they also promote factually erroneous and inflammatory statements relating to the Israeli-Palestinian conflict. The messages on the signs are readily visible to the congregants, many of whom are accompanied by children, as they enter their house of worship.

Over this 16 ½ year period, the Protesters have not picketed any other house of worship in Ann Arbor of any other religion.[3] Plaintiffs maintain that this focus only on a Jewish house of worship, to the exclusion of all other houses of worship, demonstrates, in addition to the Antisemitic content of several of the signs, that the motive for the Protesters' project of picketing Beth Israel Synagogue is an overriding commitment to Antisemitism.

---

is as insulting and inflammatory to Jews as placing the photograph of a burning cross in front of the home of an African-American family, or in front of a church whose congregants are predominantly African-American, would be to African-Americans. (A color photograph of the banner, showing the red circle over the Star of David, is included in the Judge's courtesy copy.)

[3] If the Protesters' purported concerns relate to the oppression by one ethnic or religious population of another ethnic or religious population, the oppression by India's Hindu majority of the Moslem minority in the Kashmir deserved equal attention with their objections to what they regard as the oppression of the mostly Moslem Palestinians by the mostly Jewish Israelis. There are numerous Hindu temples in the Ann Arbor vicinity at which they could have voiced their concerns. Plaintiffs maintain that picketing any house of worship, however, for whatever reason, is not protected by the 1st Amendment, and can be regulated by reasonable time, place and manner restrictions.

During this entire time period, the City of Ann Arbor ("City") has had in place several City Code provisions which Plaintiffs maintain either required that the Protesters have a permit to engage in their conduct of placing their signs and placards on the grass sections in front of the Synagogue, and across Washtenaw Ave. (*see* excerpt from City Code, Exhibit 2), or prohibited their placing the signs and placards on the grass sections altogether (*see* excerpt from the Unified Development Code, Exhibit 3.)  The Protesters do not have a permit to engage in their conduct, have never applied for a permit, have never been granted a permit, and the City has never required that they obtain a permit.  In addition, despite the fact that the City has been aware of the occurrence of the protests since their inception in September, 2013, it has never charged the Protesters with violating the Code and has never required that they stop placing their signs and placards on the grass sections in question.  In fact, on numerous occasions, Ann Arbor police have been present when the Protesters have been engaged in their protest and they have never told them to remove their signs from the grass sections in question.[4]

The Synagogue's administration has on several occasions requested that the City take action to curtail the Protesters' conduct. On at least two occasions, Mayor Taylor and City Attorney Postema have addressed the members of the Congregation and indicated there was no action which the City could take to limit or restrict the Protesters' activity. (¶35)

On October 18, 2004, the City passed a Resolution Affirming Freedom To Worship Without Interference And Condemning The Picketing Of Houses Of Worship (Exhibit A attached

---

[4] On at least one occasion, the police told the Protesters their conduct was lawful and did not violate the Code. On May 11, 2019, police officers in a squad car engaged in a conversation with two of the Protesters. The Protesters were contending their conduct never violated the City's Code, particularly with regard to their placing miniature American flags at various places on the grass. (*See* video at https://www.youtube.com/watch?v=2YYAhi_ZvTM&t=127s.) At 2:17 in the video, one of the Protesters says to one of the officers, "We have always been in compliance officer." The officer responds, "Absolutely you are." Then, at 3:34, the officer says, "I am not going to cite you." In the background, one can see a multitude of signs, all sitting on the grass section in front of the Synagogue, placed there in clear violation of the Code. (¶38 of the FAC)

3

to the City's Motion to Dismiss). The Resolution states, in relevant part:

> Whereas, State of Michigan laws prohibit interference with religious services; Whereas, the City of Ann Arbor is home to many cultures and denominations of worship;
>
> **Whereas, In the City of Ann Arbor, at least one house of worship has been subjected to weekly picketers who confront worshipers and ask passersby to honk their horns and cause a disturbance to worship services;**
>
> **RESOLVED, That the Ann Arbor City Council affirms the right of people in the City of Ann Arbor to attend services at houses of worship without interference or obstruction; and RESOLVED, That the Ann Arbor City Council condemns the picketing of houses of worship during the hours when congregants are attending worship services.** (Emphasis added.)

Since the Resolution was passed, the Protesters have appeared every Saturday morning in front of the Synagogue and placed their signs on the grass sections in clear violation of the City's Code. They have done this 806 times since the Resolution was passed, with full knowledge of the City, and despite the City's acknowledgement that "Michigan laws prohibit interference with religious services" and that the Protesters "confront worshipers and ask passersby to honk their horns and cause a disturbance to worship services," the City has not once enforced its Code against the Protesters and ordered them to remove their signs and placards from the grass sections in question. Defendant Larcom, the Senior Assistant City Attorney, has worked as an attorney for the City for 30 years and has acknowledged the she has visited the Synagogue on a Saturday morning on several occasions and has seen the signs used by the Protesters placed on the grass sections in question, but has never required that the Protesters remove the signs. (¶s 39-45)

Prior to filing this lawsuit, Plaintiffs' counsel engaged in an investigation to determine how the City was interpreting its Code provisions and why it was not requiring the Protesters to obtain a permit. In the course of that investigation, he spoke by telephone with an employee of the City named Jon Barrett, who was represented to Plaintiffs' counsel as the "expert" on the application of the City's sign ordinances. In the course of a telephone conversation with Barrett, and

in subsequent email exchanges, Barrett indicated that the Protesters could not obtain a permit for what they were doing, because placing signs and placards on the grass sections in question was absolutely prohibited by section 5.24.10(L) of the Unified Development Code ("UDC"). Thereafter, Plaintiffs' counsel received emails from Defendant Delacourt, the City's Community Services Administrator, and Defendant Larcom, indicating that any future communications Plaintiffs' counsel wished to have regarding the City Code should be directed to the City Attorney's Office, or to Delacourt, and that he was not to contact any other City staff regarding the Code. The next day after Plaintiffs' counsel received these emails, Barrett called Plaintiffs' counsel, apparently inadvertently, and when he realized whom he was speaking to, he exclaimed that he was not allowed to talk to Plaintiffs' counsel and hung up. (¶s 46-70)

The Protesters have continued to engage in their protest activity even after being served with the Complaint and First Amended Complaint, and Herskovitz has publicly stated that he and his associates intend to continue to do so. (*See* https://www.mlive.com/news/ann-arbor/2019/12/ann-arbor-synagogue-protests-will-continue-despite-lawsuit-lead.) (¶75)

## PRELIMINARY STATEMENT

The City and the individually named City Defendants (hereinafter cumulatively referred to as "City") have moved for dismissal of all the claims pled against them based on a contention that the Court does not have jurisdiction under Fed. R. Civ. P. 12(b)(1) because the Plaintiffs do not have standing, and that the counts in question fail to state a claim under Fed. R Civ. P. 12(b)(6). Regarding the latter contention, they maintain that the Protesters' conduct is protected by the 1st Amendment, and that, therefore, regardless what the City Code states, the City could not enforce its Code provisions against the Protesters, because such enforcement would violate the 1st Amendment. In addition, putting aside the 1st Amendment, the City maintains it has total

discretion regarding what ordinances it will enforce, and private citizens do not have any right to demand that the City enforce any particular provisions of the Code against third parties.

It is notable, in this regard, the City does not dispute Plaintiffs' position that the UDC prohibited the Protesters' placement of their signs on the grass sections in question (¶s 54-55) and that neither the City administrators, nor the police, have told the Protesters they are violating the sign ordinance or have told them to stop (¶s 72, 74, 76), nor do they dispute the Plaintiffs' assertion that the City's Code provisions relating to signs are, and have been, both content and viewpoint neutral (¶109). Therefore, for purposes of this Response, and in accordance with the standard of review for a 12(b)(6) motion, these assertions are deemed to be true.

## STANDARD OF REVIEW

Plaintiffs accept the standards of review as set forth on pp. 8-9 of the City's brief. Contrary to the City's suggestion, none of the factual averments in the FAC are susceptible to a claim under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), or *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), that the averment is not "plausible" or is merely "conclusory." The FAC contains ample factual allegations sufficient to sustain the viability of every count pled against the City.

## ARGUMENT

I.  **THE PLAINTIFFS HAVE STANDING TO SUE.**

In *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992), the Court set forth the requirements for Article III standing as follows, *id.* at 569-61:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the p[laintiff must have suffered an "injury in fact" – an invasion of a legally–protected interest which is (a) concrete and particularized, ... and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" ... . Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." ... Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." ... (Citations omitted.)

Plaintiffs' standing with respect to the City is based on their standing with respect to the Protesters, who, as required by the second element of the three-part test, **are** before the court. Plaintiffs maintain that the Protesters' signs, many of which are unlawfully placed on the grass sections, cause them extreme emotional distress (¶s 20-21) and interfere with their right to practice their religion without being harassed under the Free Exercise Clause of the 1st Amendment. They allege that the Protesters' conduct is not protected by the free speech provision of the 1st Amendment; that their placing of their harassing signs and placards on the green sections violates the City's Code; and that, therefore, the City could enforce its Code provisions against the Protesters without violating their 1st Amendment rights, and that the City's failure to enforce its Code against the Protesters contributes to the injury caused by the Protesters.

A.    **The Plaintiffs Have Suffered A Concrete Injury.**

Plaintiffs allege that seeing the Protesters' signs, most of which are on the grass sections in question, cause them extreme emotional distress and interfere with their enjoyment of attending religious Sabbath services at the Synagogue and its annex. (¶s 20-21) Such emotional distress suffices as a concrete injury for purposes of standing. *Ricketson v. Experian Info. Solutions, Inc.,* 266 F. Supp.3d 1083 (W.D. Mich. 2017). Loss of enjoyment, such as scenic enjoyment, can be the basis for standing. *See Coalition for the Environment v. Volpe,* 504 F.2d 156 (8th Cir. 1974). Moreover, an allegation that a defendant's conduct has infringed on a plaintiff's constitutional or statutory right, constitutes an injury which confers standing.[5] Plaintiffs maintain the City's failure

---

[5] *See also Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252 (1977) (Village's interference with plaintiff's plans to build low cost housing constitutes an injury conferring standing.); *Jaimes v. Toledo Metropolitan Hous. Authority,* 758 F.2d 1086 (6th Cir. 1985) (plaintiffs had standing based on their allegation that defendants violated their constitutional rights by implementing policies which perpetuated racial segregation in housing projects); *Coulter-Owens v. Rodale, Inc.,* Case No. 14-12688 (E.D. Mich. 2015) (alleged violation of a statutory right confers standing) (copy attached as Exhibit 4).

to enforce its Code against the Protesters, allowing them to place their harassing signs week after week on the grass sections, constitutes infringement by the City on the free exercise of religion protected under the 1st Amendment, and that this infringement constitutes a concrete injury, even if the Protesters do not qualify as state actors. These injuries are actual, not hypothetical, suffered by Plaintiffs every time they attend Saturday morning religious services at their house of worship.

The City cites several cases which it claims demonstrate that Plaintiffs have not suffered a concrete injury. The cases do not bear on the issue of standing, but rather relate to the merits of the claims themselves,. On the City's theory of standing, only litigants who prevailed on the merits would have standing, while those who lost on the merits never had standing to begin with. Since the City raises these issues here, however, Plaintiffs will address them here. The City claims *Snyder v. Phelps,* 562 U.S. 443 (2011), demonstrates that the Plaintiffs have not suffered a cognizable injury because the Court purportedly held, "protected speech which may be upsetting, hurtful, or misguided to some or that arouses contempt, cannot be restricted," and therefore the Protesters have a 1st Amendment right to engage in their conduct, a right that the City could not infringe on. But the facts in *Snyder* are distinguishable from those present here. In *Snyder* the Court rejected the plaintiff's claim that he and the funeral attendees constituted a captive audience and therefore the Church's signs were not protected by the 1st Amendment, and the Church was therefore liable for the emotional pain the homophobic signs caused him. The Court held, however, they were not a captive audience, because the Westboro signs were too far away from the funeral procession for the father and the attendees to see them at the time of the funeral. The father only learned what the signs said after he watched a news report on television which showed the homophobic messages on the signs. The Court held that since they could not see the signs during the funeral, they were not a captive audience and the signs were protected by the 1st

Amendment.[6] Plaintiffs maintain here that they **are** a captive audience because they can see the signs as they enter their house of worship, since the Protesters deliberately place the signs in proximity to the Synagogue so that they will see them.

*Sines v. Kessler,* 324 F. Supp.3d 765 (2011), actually supports Plaintiffs' claims. *Sines* was a lawsuit by victims attacked and injured in the 2017 Charlottesville, Virginia, white supremacist protest. While some of the plaintiffs were physically attacked and suffered physical injuries, the Court lists the injuries of several of the plaintiffs as consisting solely in emotional injuries (John Doe "suffered various emotional injuries"; Elizabeth Sines "suffered severe emotional distress and shock"; April Muniz "has been diagnosed with acute stress disorder and trauma," *Id.* at 774-75). The Court states of Plaintiff Hannah Pearce: "She is a member of Congregation Beth Israel, a synagogue close to the park where the Saturday rally took place. ... She peacefully protested throughout the weekend and was subjected to anti-Semitic harassment." *Id.* Regarding the application of 42 U.S.C. §1982, the Court stated, *id.* at 784:

> [T]here are no allegations that anyone touched or harmed the synagogue. The worst of the allegations concern unidentified individuals who marched past the synagogue and shouted anti-Semitic slogans. This alleged conduct is very different from the shots fired into synagogues in the above cases **or the repeated harassment found in other cases.** Furthermore, the only allegation concerning an actual Defendant states Defendant Ray carried a banner with anti-Semitic language . ... It does not allege he carried this banner past the synagogue .... (Emphasis added.)

But that is precisely what Plaintiffs accuse the Protesters of engaging in – repeated harassment, by not just marching past the Synagogue on a single occasion, but by placing their harassing, An-

---

[6] In several other cases, courts have sustained the constitutionality of statutes imposing minimum distances on Westboro Church funeral protests and have upheld imposition of a temporary injunction prohibiting Westboro's picketing within a specified distance of a church. *See, e.g., Phelps-Roper v. Strickland,* 539 F3d 356 (6th Cir. 2008); *Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012); *Phelps-Roper v. Ricketts,* 867 F.3d 883 (8th Cir. 2017); *Phelps-Roper v. Heineman,* 57 F. Supp.3d 1146 (D. Neb. 2014); *St. David's Episcopal Church v. Westboro Baptist,* 921 P.2d 821 (Kan. Ct. App. 1996).

tisemitic signs in front of the Synagogue week after week, year after year. Moreover, the Court

dismissed Pearce from the lawsuit, stating, *id.* at 797:

> There is no allegation she **was exposed to** certain anti-Semitic banners allegedly
> carried by a Defendant. ... And the most targeted injuries and insults were made by
> anonymous "co-conspirators," who Plaintiffs have failed to plausibly allege were
> part of Defendants' conspiracy. ... While the Court finds Plaintiff Pearce has insuf-
> ficiently alleged her injuries were caused by overt acts made in connection with
> the conspiracy, she may seek leave to amend with more specific factual allegations
> if she is able to provide them. (Emphasis added.)

The implication being that had Pearce been exposed to an Antisemitic banner which caused her

emotional injury, and had been able to identify the particular protester carrying the banner, she

would have had standing to plead a cognizable legal claim. Here, the Protesters are not anony-

mous, and their participation in the conspiracy has been amply documented.

Citing *Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748 (2005), the City asserts that

Plaintiffs' claims must fail because they "have no right to enforcement of the Code, and they cer-

tainly do not have a right to enforcement in their favor." In *Gonzales,* the plaintiff claimed that

she had a 14th Amendment procedural due process **property interest** in a TRO intended to re-

strain her estranged husband, and that the failure of the police to respond to her repeated requests

for enforcement of the TRO, resulting in the tragic death of her children, violated that property

right. She contended that the failure of the police to enforce the TRO violated her procedural due

process rights to protection of her property right in the TRO. The Supreme Court rejected this

claim, denying that under Colorado law the plaintiff had a property right in the enforcement of

the TRO. The decision has absolutely no application to Plaintiffs' claims here. Plaintiffs are not

claiming that they have a property right in enforcement of the City's Code, and that the City's

failure to enforce the Code has violated their procedural due process rights arising out of that

property right. Rather, they are claiming that the failure of the City to enforce its Code against

violations of its sign ordinance, totaling 806 times since the City passed its Resolution, and a total

of 858 times since the Protesters began their weekly protests in September, 2003, violates the Plaintiffs' **substantive due process rights,** by demonstrating deliberate indifference to infringement on their 1st Amendment right to the free exercise of their religion without harassment, and that such deliberate indifference over a 16 ½ year period shocks the conscience.

Which brings us to *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189 (1989), which the City contends stands for the proposition "the State has no duty to protect citizens from private harms." Plaintiffs submit this is a gross over-simplification of the holding in *DeShaney* and ignores the two exceptions which have been recognized by the Sixth and other Circuits, and have given rise to a panoply of sometimes confusing outcomes in a wide variety of factual scenarios. Summarizing the case simply, the plaintiff claimed that the Winnebago County Dept. of Social Services, by returning her son to the custody of his father despite their knowledge that he had been subjected to physical abuse by his father in the past, resulting in the father's beating of his son causing him severe and permanent physical injury, violated her son's substantive due process rights. The Court rejected this argument, holding that since by returning the boy to the father's custody, "it placed him in no worse position than that in which he would have been had it not acted at all ... ." *Id.* at 201, This ruling has been oversimplified as standing for the proposition that government does not owe a duty to its citizens to protect them from the infliction of harm by nongovernmental third parties. However, in a passage which has been subjected to immense legal parsing, courts have discerned two exceptions to this proposition, known as the "custodial" exception and the "state-created danger" exception.

In their substantive due process claim set forth in Count X of the First Amended Complaint, Plaintiffs obviously are not relying on the custodial exception. They are invoking the state-created danger exception, whose three elements were articulated in *Hunt v. Sycamore Community School District Bd. of Education,* 542 F.3d 529 (6th Cir.), as follows, *id.* at 534:

Under the "state-created danger doctrine," a governmental actor can be held responsible for an injury committed by a private person if

(1) an affirmative act by the governmental actor either created or increased the risk that the plaintiff would be exposed to the injurious conduct of the private person;

(2) the governmental actor's act especially endangered the plaintiff or a small class of which the plaintiff was a member; and

(3) the governmental actor had the requisite degree of culpability.

Plaintiffs are claiming the City's conduct increased the risk of harm they were exposed to by virtue of the Protesters' conduct.[7] Plaintiffs maintain by telling the Protesters they were acting in compliance with the City's sign ordinance, and that they would not issue them a citation, when they were clearly violating the City's sign ordinance, the police engaged in an affirmative act which encouraged the Protesters to continue their protest, knowing they could do so with impunity.[8] In *Pena v. Deprisco,* 432 F.3d 98 (2d Cir. 2005), a police officer who, between shifts, was encouraged to drink to excess by his fellow police officers, some of whom were on and off duty, while returning to the police station ran several red lights and struck and killed a mother, her sister and her son. The Court held that the plaintiff had pled a viable substantive due process claim

---

[7] The Sixth Circuit has rejected the purported action/inaction dichotomy, stating in *Toms v. Taft,* 338 F.3d 519, 527 (6th Cir. 2003): "[T]he action/inaction distinction should not ultimately relieve officials from liability where they knowingly violated the prisoner's constitutional right through inaction rather than through affirmatively prohibiting the exercise of the right." *See also Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 126 (3d Cir. 1999) ("[U]nder New Jersey law, 'inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement.'")

[8] Since the filing of the FAC, Plaintiffs have discovered additional evidence indicating that the City's conduct increased the risk of harm to Plaintiffs.  A video exists which shows Larcom in front of the Synagogue on June 1, 2019. *See* https://www.youtube.com/watch?v=8DkKi5fU9oo. Larcom was approached by Herskovitz and had a cordial discussion with him. As they were speaking, signs were in place on the grass sections in front of the Synagogue, and across Washtenaw Ave., in Larcom's full view, yet she did not tell Herskovitz his conduct violated the Code, and did not order him to remove them. In fact, Herskovitz stated to Larcom that he must not be violating the law, otherwise Larcom would surely have told him that he was, and Larcom agreed. (1:43) Herskovitz then said, "If we are in violation of the law, we want to know." Again, Larcom said nothing. (4:34) Herskovitz interpreted Larcom's response as approval and was emboldened by it. During their discussion, Defendant Mark approached and placed miniature flags in the ground near Larcom, and still she said nothing. Silence means consent. *Washington Gas Light Co. v. Virginia Electric & Power Co.,* 438 F.2d 248, 252 (4th Cir. 1971). Plaintiffs reserve the right to seek leave of Court to amend the FAC to add this additional evidence.

based on the police officers' encouraging another police officer, while off duty and therefore a private citizen, to drive while intoxicated and thereby violate the law. The Court stated, *id.* at 111:

> We conclude that when, as the plaintiffs allege, state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, **liberty** or property of others, those officials can be held liable under section 1983 for injury caused by misconduct ... . **This is so even though none of the defendants are alleged to have communicated the approval explicitly**.  (Emphasis added; citation omitted.)

The Court's reference to liberty makes clear that the injury caused need not be physical. Freedom of religion, interfered with by the Protesters with the encouragement of the police, is part and parcel of the liberty interest protected under the 14th Amendment. *See Legatus v. Sebelius,* 901 F. Supp.2d 980, 987 (E.D. Mich. 2012).

The Sixth Circuit favorably cited *Pena* in *Jones v. Reynolds,* 438 F.3d 685, 696 (6th Cir. 2006), stating, "[B]y continually condoning excessive drinking and driving over the course of an evening, the officers increased the risk that their fellow officer would cause harm." In *Jones,* however, the Court rejected the plaintiff's claim that police officers who failed to stop, but instead encouraged, a drag race, which resulted in the driver of one of the vehicles losing control of his car, which crashed into the crowd of onlookers, killing one of the crowd members, had increased the risk of harm to that particular onlooker. The Court held that the causation chain, between the police officers' encouragement of the illegal drag race, resulting in a driver losing control of his vehicle, launching the vehicle into the crowd, and killing one of many onlookers, was too tenuous with respect to that particular victim. As between the causal chain in *Pena,* and the causal chain in *Jones,* the connection between the Ann Arbor police telling the Protesters that they have been in full compliance with the law – when they clearly were not even as the police spoke to them – and the resulting continued harm to the congregants', including Plaintiffs', right to freely exercise their religion, the facts of this case are closer to *Pena*. While it was not foresee-

able in *Jones* that the driver would lose control of his vehicle, which in turn would result in the injury to a particular member of the crowd, it is entirely foreseeable that congregants of the Synagogue, as they enter their house of worship, will see the signs insulting their religion – **indeed that is the very purpose of the Protesters' conduct**. Moreover, while it was unpredictable which member of the crowd would be injured by a vehicle **if** the driver lost control, the insulting signs of the Protesters, unlawfully placed on the grass sections, are **intended** to affect the congregants, **and the City was already on notice from the Synagogue and the congregants that the signs were in fact adversely affecting the emotional state of the congregants**.[9]

The City's reliance on *Macera v. Village Bd. of Ilion,* Case No. 6:16-CV-668 (N.D.N.Y. 2019), is also misplaced.[10] The case involved a dispute between neighbors, one of whom was operating a day care out of its home. Children who attended the day care irritated the plaintiff family who believed the Village was not adequately enforcing its zoning ordinance against the operation of the day care. The court rejected the claim, stating at *26, "Plaintiffs have no legal entitlement to the enforcement of local zoning or traffic laws. ... In particular, '[i]t is a long standing rule in New York that 'the decision to enforce ... [town building and zoning] code rests in the discretion of the public officials charged with enforcement." The City maintains Plaintiffs accord-

---

[9] *See also Hunt, supra,* 542 F.3d at 536; *May v. Franklin County Bd. of Commissioners,* 59 Fed. Appx. 786, 794 (6th 'Cir. 2003) ("According to the facts alleged, Ratliff's actions emboldened Moss and so increased Kirk's vulnerability to harm. She would have to prove at trial that these actions in fact emboldened Moss, but that is a question for a jury to decide.")(unpublished) (copy attached as Exhibit 5); *Caldwell v. City of Louisville,* 120 F. App'x 566, 575-76 (6th Cir. 2004), *aff'd on rehearing; Peterson v. Ne. Local Sch. Dist.,* Case No. 3:13cv00187, at *22 (S.D. Ohio, 2014) (copy attached as Exhibit 6); *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir. 1993); *Jennings v. Patterson,* 488 F.2d 436 (5th Cir. 1974); *Christie v. Iopa,* 176 F.3d 1231, 1241 (9th Cir. 1999).

[10] Both *Felber v. Yudof,* 851 F. Supp.2d 1182 (N.D. Cal. 2011), and *Mandel v. Board of Trustees of the California State University,* Case No. 3:17-cv-03511-WHO (N.D. Cal., 2018), are irrelevant to this lawsuit. Neither relates to the question the City offers it for – what constitutes a concrete injury for purposes of standing. Nor do their discussions of the scope of free speech have any bearing on the facts in this case. Neither involved a protest in front of a house of worship; repeated, targeted residential picketing; or a captive audience.

ingly have no entitlement to enforcement of its sign ordinances and, therefore, have suffered no constitutional deprivation due to the City's failure to enforce the sign ordinances. Sign ordinances, however, are not zoning ordinances; they are regulatory ordinances, whose enforcement is not subject to the same degree of discretion as zoning ordinances. "A zoning ordinance is defined as an ordinance which regulates the use of land and buildings according to districts, areas, or locations." *Little Mack Entertainment v. Township of Marengo,* 625 F. Supp.2d 570, 574 (W.D. Mich. 2008), quoting from *Square Lake Hills Condo. Ass'n v. Bloomfield Twp.,* 437 Mich. 310 (1991). A regulatory ordinance, by contrast, is "blind to zoning differences." *Little Mack,* 625 F. Supp.2d at 574. "[B]ecause regulatory ordinances are 'blind to zoning differences,' a regulatory ordinance is not subject to the requirement of accommodating nonconforming uses." *King Enterprise v. Thomas Township,* 215 F. Supp.2d 891, 916 (E.D. Mich. 2002). The City's sign ordinances were regulatory, since they applied irrespective of zone, and depended on physical characteristics of the signs. Since regulatory ordinances cannot be avoided on the basis of a nonconforming use, the City's discretion not to enforce their terms as written is more circumscribed. Where, as here, the City has failed to enforce the terms of its ordinances against the Protesters over a period of 858 consecutive weekends, that failure constitutes an abuse of discretion and is arbitrary in a constitutional sense, thereby a violation of substantive due process.[11]

**B.**    **The Plaintiffs' Injuries Are Causally Connected To The City's Conduct.**

The Plaintiffs' injuries are directly traceable to the City's failure to enforce its Code, which Plaintiffs maintain unambiguously prohibited the Protesters from placing any of their signs

---

[11] If the police ignored the fact that the same drunk driver was repeatedly running red lights 858 times and never arrested the driver, even though they knew his identity, the police could not defend themselves by saying they had the sole discretion regarding whether or not to enforce the state's traffic laws. Ignoring the violation of the traffic laws 858 times would not be the exercise of discretion, but constitute the abuse of discretion. It would rise to the level of deliberate indifference to the rights of members of the public whose lives the drunk driver was putting at risk and be a violation of substantive due process.

on the grass sections in front of the Synagogue, and across Washtenaw Ave. Enforcement of the Code would have resulted in the removal of the 15-20 signs which the Protesters place on the grass sections. This would have substantially reduced the number of signs the Protesters would have been able to use, since they would have had to resort to holding any signs they wished to use and would have substantially limited the number of signs that the Plaintiffs would have seen. The causation link to the City's failure to enforce its Code is far more direct than the tenuous link in *Lujan* , where the plaintiffs were challenging the revision of a regulation relating to the protection of endangered species issued by the Fish and Wildlife Service which would have reduced the scope of the regulation to not including species endangered in foreign nations. Here, the Plaintiffs' injury is obviously far more immediate, relating to what they immediately see.[12]

**C.       The Plaintiffs' Injury Would Be Redressed By A Ruling Against The City.**

The City's claim that the Plaintiffs' injury would not be redressed by obtaining the relief requested is erroneous in several respects. Plaintiffs are not just claiming the City failed to enforce the requirement that the Protesters have a permit to engage in their conduct. Plaintiffs maintain the City's Code absolutely prohibited the Protesters from placing their signs on the grass sections altogether. Requiring that the City enforce this prohibition would remove the offending signs from the grass sections, thereby substantially reducing the number of signs the Plaintiffs and the other congregants would see. Moreover, even if Plaintiffs were relying exclusively on the Code's permit provision, which requires the Protesters pay for the permit on a weekly basis, the Protesters may not have been willing, or perhaps could not afford, to pay the permit price every

---

[12] Likewise inapposite is the City's citation of *Siegel v. U.S. Dep't of the Treasury,* 304 F. Supp.3d 45 (D.D.C. 2018), wherein the plaintiffs were challenging how the U.S. Treasury and Dep't of State were expending U.S. taxpayers' funds to support Israel, resulting in injury to Palestinians. Here, Plaintiffs are not claiming standing based on events overseas. The City's reliance on *Ind. Coal. for Pub. Educ v. McCormick,* 338 F. Supp.3d 926 (S.D. Ind. 2018), is unavailing, since the court held the party which was actually causing the plaintiff's injury – Grace College – was not named as a party to the lawsuit. *Id.* at 940. Here, the Protesters are named as Defendants.

week for 16 ½ years, and the Protests may have terminated earlier Finally, Plaintiffs maintain the City's failure to enforce the Code against 858 weekly violations constituted deliberate indifference to the effect the signs were having on the congregants', including Plaintiffs', free exercise of their religion under the 1st Amendment, entitling them to damages, which would redress their injury. Plaintiffs accordingly have standing to pursue this lawsuit against the City.

## II.   PLAINTIFFS HAVE PLED COGNIZABLE CLAIMS AGAINST THE CITY.

### A.   Plaintiffs Have Pled A Cognizable Claim Against The City Under 42 U.S.C. §1983.

Plaintiffs maintain the City's failure to enforce the Code provisions against the Protesters violated the Plaintiffs' 1st Amendment right to freely engage in the exercise of their religion. The City responds that this is not a cognizable claim because the Plaintiffs, and presumably the Synagogue's congregants generally, do not have a right to require that the City enforce its sign ordinance, that the City has total unfettered discretion in whether it will, or will not, enforce any of its Code's provisions. The City fails to recognize, however, that this is not just a case about the City's right to exercise its discretion to enforce its Code provisions on any given single occasion. The question this case raises is whether the City had the right to refuse to enforce its Code provisions **858 times - every Saturday morning, 52 times a year, for 16 ½ years.** At some point a municipality's discretion not to enforce its laws is no longer an exercise in its discretion, but an abuse of discretion that demonstrates deliberate indifference of constitutional magnitude. As in the drunk driving example in note 11, *supra,* at some point the failure to enforce the drunk driving laws against a repeated violator demonstrates deliberate indifference to the violation of the victims' rights under the 14th Amendment and thereby violates substantive due process. That is precisely what has occurred here. The Protesters, with the City's knowledge – **as demonstrated by their own Resolution** – has violated the City's sign ordinance a total of 858 times, with the City's full knowledge, and the City has done nothing. This is not the rightful exercise of discre-

tion – it has risen to the level of an abuse of discretion and subjects the City, including the individually named Defendants, to liability for violating the 1st Amendment rights of the Plaintiffs, and of all the congregants whose right to freedom of worship without harassment was violated by the City's tolerance of the Protesters' violation of the City Code. *See* cases cited in note 9, *supra*.

Moreover, a state or municipality violates the Equal Protection Clause if it enforces a statute or ordinance in a discriminatory manner. Such discrimination may be redressed under §1983. In *Smith v. Ross,* 482 F.2d 33 (6th Cir. 1973), the Court stated, *id.* at 36:

> We agree with appellants that a law enforcement officer can be liable under §1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law. **Acts of omission are actionable in this context to the same extent as are acts of commission.** (Emphasis added.)

*See Cellini v. City of Sterling Heights,* 856 F. Supp. 1215, 1220 (E.D. Mich. 1994) ("Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection."); *Smith v. City of Elyria,* 857 F. Supp. 1203, 1212 (N.D. Ohio 1994) ("There is evidence in the record from which a jury could find the defendants' domestic disputes policy had a discriminatory impact and was motivated by intent to discriminate against women.")

The evidence shows the City failed to enforce its sign ordinance against the Protesters 858 times. It could be the case the City chose never to enforce the sign ordinance against any violators, in which case the failure to enforce the ordinance against the Protesters would not be attributable to discrimination against Jews. However, if the City enforced the ordinance even one time against a violator, this would raise the possibility the ordinance was being enforced in a discriminatory manner, by not enforcing the ordinance against signs in front of a Jewish synagogue.[13] As

---

[13] If it is claimed that Plaintiffs failed to explicitly plead this equal protection theory in Count V of the FAC, Plaintiffs reserve the right to seek leave to file a 2nd Amended Complaint to do so. In any case, the Supreme Court has held that a plaintiff is deemed to have pled any legal claims (Footnote continued.)

the number of instances in which the sign ordinance was being enforced increased, the likelihood that it was not being enforced in the case of the Synagogue was attributable to intentional discrimination increases. Whether the data regarding how the City was enforcing the ordinance demonstrates such discrimination requires discovery. Plaintiffs' §1983 claim against the City therefore cannot be dismissed on a 12(b)(6) motion.

The City claims (p. 16), "Plaintiffs appear to presume that every Protester sign violated the Code, but they do not allege facts about which signs, which dates, or where the signs were located." Nonsense. Every sign the Protesters placed on the grass sections every Saturday morning, from September, 2003, through May 23, 2020, violated the City Code. The City has known about this, and has done nothing. The assertion that Plaintiffs have failed to allege which of the Defendants were personally responsible for the failure to enforce the Code is specious. Where a plaintiff alleges the defendant **failed** to do X, and that failure violated the plaintiff's rights, then all the plaintiff has to allege is that X occurred on a certain date, the defendant knew that X occurred on that date, the defendant had the authority to stop X from occurring, and X failed to exercise that authority. Here the individually named Defendants obviously knew the Protesters were harassing the congregants by placing their signs on the grass sections in front of the Synagogue and across Washtenaw Ave. every week on the Jewish Sabbath.[14] The Ann Arbor City Council knew, because it passed a Resolution condemning it. Do the Defendants claim they did not know what the City Council knew, or that they did not know the City Council passed a Resolution con-

_____

which are entailed by the facts which have been pled. *Johnson v. City of Shelby*, __ U.S. ___ ; 135 S.Ct. 346 (2014). "[A] complaint sufficiently raises a claim even if it points to no legal theory or even if it points to the wrong legal theory as a basis for that claim, as long as 'relief is possible under any set of facts that could be established consistent with the allegations.'" *Tolle v. Carrol Touch, Inc.*, 977 F.3d 1129, 1134 (7th Cir. 1992).

[14] *Frazier v. Michigan*, 41 Fed. Appx. 762 (6th Cir. 2002), is inapplicable, because the plaintiff filed a three paragraph complaint with no details. In *Shorts v. Bartholomew*, 255 F. App'x 46 (6th Cir. 2007), the plaintiff named the wrong defendants, and the defendant that was named had no personal involvement in the alleged wrong.

demning it? Moreover, do the Defendants claim they had no authority to enforce the Code provisions prohibiting the Protesters' conduct – that the Mayor of Ann Arbor, the City Services Administrator, the City Attorney, and the Senior Assistant City Attorney did not have the authority to order the Chief of Police to enforce the Code against the Protesters? Again, nonsense. Moreover, in ¶33 of the FAC, Plaintiffs allege, "On at least two occasions, Taylor and Postema have addressed the members of the Congregation and asserted that there is no action which the City can take to prohibit, limit or restrict the protesters' activity in front of the Synagogue." If, as Plaintiffs maintain, the Protesters' conduct was not absolutely protected by the 1st Amendment, then the City had the right to enforce its sign ordinance, which was content and viewpoint neutral, and require that they remove their signs from the grass sections. In ¶s 39-42. Plaintiffs allege that Larcom admitted she was aware that the Protesters were placing their signs on the grass sections and was present at the Synagogue taking pictures of the signs. As Senior Assistant City Attorney, could not Larcom have ordered that the signs be removed, particularly given that she had been identified as the City attorney responsible for enforcing the City's permit requirements (¶37)?

Plaintiffs have sufficiently pled the existence of a policy or custom not to enforce the Code provisions prohibiting placement of signs on the grass sections to satisfy the requirements for municipal liability under *Monell v. Dept. of Soc. Services*, 436 U.S. 658 (1978). Moreover, in ¶105 Plaintiffs allege that the decision not to enforce the Code was made by principal policy makers, rendering the City liable under *Pembauer v. City of Cincinnati*, 475 U.S. 409 (1986).[15]

---

[15] *Linda R. S. v. Richard D*, 410 U.S. 614 (1973), involved prosecutorial discretion to enforce a child support order, and reaffirmed that private citizens who are not the subject of a prosecution have no standing in a criminal proceeding. *BB Entertainment, Inc. v. Dunfee*, 630 F. Supp.2d 870 (S.D. Ohio 2009), likewise involved prosecutorial discretion. and, moreover, the law enforcement officers accused of not enforcing the law "did not personally witness the misdemeanor." *Id.* at 883. Here, the individual Defendants had personal knowledge of the Protesters' use of the signs. (In note 4 of its brief, the City goes outside the record and claims Ann Arbor has a "weak-Mayor
(Footnote continued.)

As demonstrated above, The City's reliance on *DeShaney* for the proposition that Plaintiffs "have no right to enforcement of the City Code" (brief, p. 17) is erroneous, especially when the failure to enforce the Code 858 consecutive times constitutes an abuse of discretion and deliberate indifference. The motion to dismiss this claim should be denied.

**B.     Plaintiffs Have Pled Viable Conspiracy Claims Against The City.**

Plaintiffs have pled four conspiracy claims between the City and the Protesters under 42 U.S.C. §§1982, 1983, 1985(3) and 1986. The conspiracy claims are based on the fact that the City has refused to enforce its sign ordinances against the Protesters who have violated the ordinances 858 consecutive times, over a period of 16 ½ years; on the fact that Taylor and Postema misrepresented to the members of the Congregation and its administration that there was nothing they could do to curtail the Protesters' conduct; on the fact that a video shows the police telling the Protesters that they have been in full compliance with the law and the police will not issue them a citation, even as signs are visible in the video in violation of the City's sign ordinance; on the fact that a video shows Larcom talking to Herskovitz, as Herskovitz expresses the view that if they were violating the law, Larcom would surely tell them, and she says nothing. These facts constitute circumstantial evidence of a conspiracy sufficient to survive a motion to dismiss.[16]

The defense that the City was precluded from enforcing the sign ordinance against the Protesters is erroneous for two reasons: (1) As Plaintiffs will demonstrate more fully in their Response to the Protesters' motion to dismiss, the Protesters' conduct is not absolutely protected by the 1st Amendment and is constitutionally subject to reasonable time, place and manner restric-

---

form of government," and therefore Taylor did not have authority to order that the sign ordinance be enforced. This is a matter better left to discovery and not admissible in a 12(b)(6) motion.)

[16] The City's reliance on *BB Entertainment, supra,* is again misplaced, since, as the Court stated, there was no evidence that the sheriff's deputies had personal knowledge of the trespassers' conduct. It is indisputable here that the City's administrators and its police have had personal knowledge of the Protesters' use of their signs in violation of the City Code.

tions. (2) An ordinance which is content and viewpoint neutral can be enforced against signs without violating the 1st Amendment. *See R.A.V. v. St. Paul,* 505 U.S. 377 (1992). The sign ordinance is content and viewpoint neutral, as has been admitted for purposes of this motion.

"[W]e have recognized that ... 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson,* 200 F.3d 65, 73 (2d Cir. 1999). "Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Haffner v. Brown,* 983 F.2d 570, 577 (4th Cir. 1992). "It is fundamental that a conspiracy need not be established by direct evidence of an unlawful agreement. Its existence may be shown by proof of facts from which the logical inference is that the unlawful overt acts were committed in furtherance of a common design of the alleged conspirators. ... Participation in the formation of the conspiracy was not essential ... to culpability. If, after it was formed, [the governmental officer] aided or abetted it with an understanding of its purpose, he became a party to it. **The rule of acquiescence in or failure to prevent a conspiracy or criminal act is not sufficient to render one liable ... does not apply in every circumstance to one whose duty it is under the law to prevent the act. [A]cquiescence may amount to purposeful furtherance; it may be the deliberate removal of an otherwise troublesome obstacle from the path of the law violator and thus become affirmative cooperation.**" *Burkhardt v. United States,* 13 F.2d 841, 842 (6th Cir. 1926) (Emphasis added; citations omitted).[17] Enough circum-

---

[17] "The dates on which the particular defendants joined the conspiracy are not alleged, but that is not the kind of information that a plaintiff can be expected to have when she files her complaint." *Loubser v. Thacker,* 440 F.3d 439, 443 (7th Cir. 2006). "State involvement in a given conspiracy may occur when the state, unintentionally and unwillingly, furthers the goals of the conspiracy .... Under such circumstances, the state may act as the unwitting dupe of the conspirators. However, **state involvement may also occur under less innocent circumstances, as when the state knows of the existence of the defendant's conspiracy but turns a blind eye to the evils. The state then plays the role of the conspirators accomplice rather than their hapless stooge. In the present case significant questions exist as to the lack of zeal displayed by the City of Wichita in defending the legal rights of the plaintiffs and their patients.**" *Women's Health* (Footnote continued.)

stantial evidence of a conspiracy has been pled to survive a 12(b)(6) motion.

    1.    **The City aided and abetted the Protesters' violation of 42 U.S.C. §1982.**

Sec. 1982 applies to conduct by private actors. *Jones v. Mayers Co.,* 392 U.S. 409 (1968); *Tillman v. Wheaton-Haven Recreation Assn.,* 410 U.S. 431 (1973). "A narrow construction of the language of §1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by §1 of the Civil Rights Act of 1866 ... from which §1982 was derived. ... ." *Sullivan v. Little Hunting Park,* 396 U.S. 229, 237 (1969)(citing *Jones v. Mayer*). The reference in the statute to "hold[ing]" real property applies to a citizen's use of real property, as well as the right to come and go from the property as a guest, even if the citizen does not possess an ownership interest in the property, and therefore applies to the congregants even if they do not own the property. *See U.S. v. Brown,* 49 F.3d 1162 (6th Cir. 1995); *U.S. v. Greer,* 939 F.2d 1076 (5th Cir. 1991), *aff'd en banc,* 968 F.2d 433 (5th Cir. 1992), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1390 (1993); *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2d Cir. 1974). Under the federal civil rights laws, Jews qualify as a race and are entitled to the protection of these statutes. *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987). 42 U.S.C. §1982 therefore applies to the right of Jews to use property without interference and harassment. *Brown, supra.*

In *Wells v. Rhodes,* 928 F. Supp.2d 920 (S.D. Ohio 2013), two individuals who placed a wooden cross, with the messages "KKK will make you pay," and "Nigger" inscribed on it, on the front lawn of an African-American family, doused it with gasoline and then set it afire, were sued for violating 42 U.S.C. §§1982 and 1985(3). The Court granted the plaintiffs summary judgment on both counts, stating, *id.* at 930, "The Court concludes that §1982 provides an adequate basis

---

*Care v. Operation Rescue,* 773 F. Supp. 258, 266 (D. Kan. 1991) (Emphasis added; citation omitted.) *See also Mansell v. Saunders,* 372 F.2d 573 (5th Cir. 1967); *N.Y. State Org. for Women v. Terry,* 704 F. Supp. 1247, 1261, note 16 (S.D.N.Y. 1989, *aff'd as modified,* 886 F.2d 1339 (2d Cir. 1989), *cert. denied; James v. Village of Willowbrook,* No. 11-cv-9126 (N.D. Ill. 2012) (Exhibit 7).

for a private conspiracy claim under §1985(3)." (Footnote omitted.) By the same token, the Protesters' use of a banner displaying the Israeli flag with the "Prohibited" symbol covering the Star of David – the revered symbol of the Jewish people - is just as insulting and inflammatory for Jews as is a burning cross – even a large photograph of a burning cross – is for African-Americans. The Protesters have used the banner with the Prohibited symbol over the symbol of the Jewish people every Saturday morning for 16 ½ years, and the City and the police have done nothing to enforce the sign ordinance prohibiting this conduct. The fact the banner is placed on public property does not insulate it from the interdiction of §§1982 and 1985(3). The Protesters' conduct in using the signs and banners to harass and intimidate Plaintiffs and other congregants in their use of the Synagogue's property violated, and continues to violate, 42 U.S.C. §1982.[18] The City's acquiescence in their violation of the City sign ordinance, as demonstrated by the video of the police assuring the Protesters that they will not receive a citation, every Saturday for 16 ½ years constitutes circumstantial evidence of a conspiracy. *Burkhardt, supra; Terry, supra.* The motion to dismiss this claim should be denied.

2.  **The Protesters have clearly been engaged in a conspiracy, which the City aided and abetted by failing to enforce its Code, in violation of 42 U.S.C. §1983.**

The Protesters have clearly been acting in concert, arranging to meet in front of the Synagogue every Saturday morning for 16 ½ years, with each Protester bringing some of the signs with them, and chairs to sit in and lean the signs against. The fact that this has been occurring every Saturday for 16 ½ years is not the mere result of happenstance. The failure of the City to enforce its Code prohibiting their placing the signs on the grass sections, indeed the police en-

---

[18] *See also Bryant v. Polston,* Cause No. IP00-1064-C-T/G (S.D. Ind. 2000) ("[T]he Polstons allowed neighbors to gather at their house on the porch to stare, point, and walk back and forth in front of the Bryants' house and incited neighbors to engage in racial bantering whenever persons of African American descent visited the Bryants." *Id.* at 7) (copy attached as Exhibit 8).

couraging them to do so by telling them, erroneously, that they are not violating the law and will not be cited, makes the City a co-conspirator under §1983. *Burkhardt, supra; Women's Health Care, supra.* The motion to dismiss this claim should be denied.

### 3.    The City aided and abetted the Protesters' violation of 42 U.S.C. §1985(3).

Sec. 1985(3) applies to any conspiracy engaged in by private citizens to deprive, either directly or indirectly, any person or class of persons of equal privileges and immunities under the laws, or to any conspirators who deprive any person of exercising any right or privilege of a citizen of the United States.[19] In *Carpenters v. Scott,* 463 U.S. 825, 832 (1983), the Court held §1985(3) does not apply to the infringement of 1st Amendment rights in the absence of state action. The Court held the only private conspiracies encompassed by §1985(3) are those which are "aimed at depriving the plaintiffs of rights protected by the Thirteenth Amendment [against involuntary servitude] and the right to travel guaranteed by the Federal Constitution." The provision applies to any conspiracy of private citizens which interferes with either the interstate or intra-state travel of other citizens, without state action. In *Johnson v. City of Cincinnati,* 310 F.3d 484 (6th Cir. 2002), the Court held intra-state travel was a fundamental right protected by the Constitution.[20] It is self-evident the Protesters are engaged in a conspiracy, since they have been acting in concert, appearing every week at the same location, at the same time, for 16 ½ years. It is self-evident the conspiracy is motivated by a class-based animus towards Jews, based on the messages of several of the signs. In ¶20, Plaintiffs allege the signs have adversely affected Ger-

---

[19] *See Griffin v. Breckenridge,* 403 U.S. 88 (1971). It applies to any conspiracy of private citizens which is motivated by a class-based animus relating to race. *See Bray v. Alexandria Clinic,* 506 U.S. 263 (1993); *Brokaw v. Mercer County,* 235 F.3d 1000 (7th Cir. 2000); *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,* 968 F.2d 286 (2d Cir. 1992); *Vietnamese Fishermen's Ass'n v. Knights of KKK,* 543 F. Supp. 198 (S.D. Tex. 1982); *LeBlanc-Sternberg v. Fletcher,* 781 F. Supp. 261 (S.D.N.Y. 1991), *aff'd,* 67 F.3d 412 (2d Cir. 1995); *Wells, supra.*
[20] *See also Spencer v. Casavilla,* 903 F.2d 171 (2d Cir. 1990); *Selevan v. New York Thruway Authority,* 584 F.3d 82 (2d Cir. 2009).

ber's willingness to travel to the Synagogue for Sabbath services.[21] By failing to enforce the City Code prohibiting the placement of the signs on the grass sections, the City is aiding and abetting the Protesters' interference with Gerber's right to intra-state travel, and thereby constitutes the City as a co-conspirator violating 42 U.S. C. §1985(3). This claim should not be dismissed.

4.     **The City has violated 42 U.S.C. §1986.**

Under 42 U.S.C. §1986, "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refused to do so, if such wrongful act be committed shall be liable to the party injured ... for all damages caused by such wrongful act ... ." It is clear the City and its administrators were aware the actions by the Protesters which violated the Code "were about to be committed" every Saturday morning, and they did nothing. By this failure they violated §1986.[22] The claim should not be dismissed.

C.     **The City Has Violated The Plaintiffs' Substantive Due Process Rights.**

As demonstrated above, the City's failure to enforce the Code's prohibition against the Protesters' placement of the signs on the grass sections for 858 consecutive weeks constitutes deliberate indifference to the violation of the Plaintiffs' 1st Amendment right to religious freedom, and thereby violates substantive due process under the 14th Amendment. As the Court stated in *Claybrook v. Birchwell,* 199 F.3d 350, 359 (6th Cir. 2000):

> Fundamentally, the substantive component of the due process clause insulates citizens against the arbitrary exercise of governmental power. ... Accordingly, conduct of a law enforcement officer towards a citizen which "shocks the conscience"

---

[21] In point of fact, Mr. Gerber has been attending services at a different synagogue in order to avoid seeing the Protesters' signs. Although this is not explicitly stated in the FAC, if necessary to preserve the claim that the Protesters are interfering with his right to intra-state travel from his home to the Beth Israel Synagogue, Plaintiffs reserve the right to request leave of the Court to file a third amended complaint to include this allegation.

[22] *See, e.g., Waller v. Butkovich,* 584 F. Supp. 909, 943 (M.D.N.C. 1984); *Blount v. D. Canale Beverages, Inc.,* No. 02-2813-MaV (W.D. Tenn. 2003) (copy attached as Exhibit 9).

denies the victim fundamental substantive due process. ... **In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action ... their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights.** (Emphasis added; citations omitted.)

The circumstances in the present case represent the epitome of a "reasonable opportunity to deliberate various alternatives prior to electing a course of action." The City Defendants – three of whom are attorneys - had **16 ½ years** to review the provisions of their Code and study the law relating to the 1st Amendment – and they did nothing to protect their Jewish citizens from harassment and the degradation of their religion by a bunch of Antisemitic poseurs who have perverted the 1st Amendment into a vehicle for disseminating messages of racial hatred against a vulnerable minority.[23] The best they could do was pass a Resolution to express an empty message of empathy – while they continued to allow their Jewish citizens to be subjected on a weekly basis to words of "contempt, derision and obloquy," words which the Supreme Court had held in *Beauharnais v. Illinois,* 343 U.S. 250 (1954), could legitimately be restricted without violating the right to free speech. The City instead chose to resort to facile words, rather than meaningful action. "It is said that actions speak louder than words; inaction may sometimes be far more eloquent." *Brenner v. L. 514, United Brotherhood of Carpenters,* 927 F.2d 1283, 1300 (6th Cir. 1991). By its inaction the City abdicated its responsibility to protect the rights of its Jewish citizens and violated the substantive due process rights of all of the congregants, including Plaintiffs, who simply wanted to practice their religion in peace in the house of worship of their choice. Count X of the FAC accordingly states a cognizable claim and should not be dismissed.

---

[23] The denial of a food service permit in *Clair v. Northern Ky. Independent Health Dist.,* 504 F. Supp.2d 206 (D. Ky. 2006), pales by comparison to the City's deliberate indifference to the 16 ½ years of harassment of the congregants here.

**D.     The City Violated Plaintiffs' Right Of Access To The Courts.**

In the FAC, Plaintiffs allege that Larcom, or another attorney or administrator of the City, either threatened or encouraged Barrett to have no further communications with Plaintiffs' counsel regarding the City's sign ordinances and how they were interpreted and implemented. Barrett thereafter refused to speak with Plaintiffs' counsel, when he was previously willing to do so. Plaintiffs maintain that by intimidating Barrett, the City interfered with the Plaintiffs' right to obtain information regarding the functioning of the City, information which was neither classified nor confidential, and which Barrett, as a public employee and therefore a fiduciary under Michigan law (*see Barkey v. Nick,* 11 Mich. App. 381, 385 (Mich. Ct. App. 1968); *Alan v. Wayne County,* 388 Mich. 210 (1972); *Macomb County Prosecutor v. Murphy,* 464 Mich. 149, 164 (2001)), had an obligation to provide to them, via their agent, their attorney. *Barrett v. Breault,* 275 Mich. 482, 494 (Mich. 1936); *Lumber Village v. Siegler,* 135 Mich. App. 685, 695 (Mich. Ct. App. 1984), By Larcom and Delacourt muzzling Barrett (¶s 62-64), the City was seeking to prevent the disclosure of information which could prove embarrassing regarding its failure to enforce the City Code against the Protesters. [24] In short, the City, via Delacourt and Larcom, engaged in a cover-up, in violation of the 1st Amendment right of access to the courts incorporated in the right

---

[24] The cases the City cites are not relevant to this claim. *Putnam Pit, Inc. v. City of Cookeville,* 221 F.3d 834 (6th Cir. 2000), involved a claim the defendants had wrongfully denied the plaintiff electronic access to the city's parking ticket records, a request which required the city to provide copies of documents. Here, Plaintiffs' counsel was not requesting the City provide copies of any municipal documents. He was simply seeking verbal information from a City employee. In *Minnesota Bd. for Community Colleges v. Knight,* 465 U.S. 271 (1984), the Supreme Court held the "meet and confer" provision of a Minnesota statute, which did not provide the plaintiff the opportunity to participate in such sessions, did not violate plaintiff's constitutional rights. Here, Plaintiffs were not demanding the City adopt any new policy. They were only seeking information, via their legal agent, about a policy that was already on the books in the form of an ordinance. The City's claim, moreover, that by interfering with the Plaintiffs' legal agent it did not interfere with the Plaintiffs' rights is frivolous. Interfering with an agent constitutes interference with the principal. Moreover, under Fed. R. Civ. P. 11, Plaintiffs' counsel had an ethical obligation to investigate the facts before filing a lawsuit. Failure to do so could subject their attorney to sanctions. *See Mohammed v. Union Carbide Corp.,* 606 F. Supp. 252 (E.D. Mich. 1985).

of petition.[25] *See Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983); *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984); *Harrison v. Springdale Water Sewer Com'n*, 780 F.2d 1422 (8th Cir. 1986). Though the facts of these cases are more dramatic than those of the instant case, the constitutional violation is no less serious. This claim should not be dismissed.

**E.      Plaintiffs Have Pled Cognizable Claims Under The RFRA And RLUIPA.**

The basis for the RFRA claim is fully set forth in Count XII. In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court was evaluating the enforceability of an ordinance which was intended "to protect, enhance and perpetuate selected historic landmarks" and to "safeguard the City's historic and cultural heritage." When a local church in Boerne, Texas, sought a permit to construct an addition to the church, the city invoked the purpose of the ordinance and denied the permit. The church sued, claiming that denial of the permit violated the RFRA. The Supreme Court held that the passage of the RFRA, as applied in the case before it, exceeded Congress's remedial powers under §5 of the 14th Amendment, because rather than supporting legislation to "remedy or prevent unconstitutional actions" it made a "substantial change in the governing law," (*id.* at 519-36), i.e., in that instance it authorized striking down a city's ordinance, rather than sustaining a remedial city ordinance. **But it is precisely the enforcement of such an ordinance which Plaintiffs are seeking in this case.** The City's ordinance prohibiting the use of the Pro-

---

[25] Larcom's attorney has inappropriately gone outside the record by referring to the denial by the Attorney Grievance Commission of a request to open an investigation of Larcom's conduct for a violation of the MRPC. Plaintiffs' counsel had scrupulously avoided referring to the grievance in any of the pleadings he filed in order to preserve Larcom's confidentiality. By referring to the grievance, Larcom's counsel has waived that confidentiality. Moreover, the AGC's decision not to open an investigation has no bearing on the merits of the claim that she violated the Plaintiffs' right of access to the courts. It is well settled that a determination that an attorney had violated the MRPC is not admissible in a civil lawsuit as evidence that the attorney violated the plaintiff's legal rights. *See Papazian v. Goldberg (In re Mardigian Estate),* 502 Mich. 154, 174 (2018); *Watts v. Placzyk,* 242 Mich. App. 600, 607, note 1 (Mich. Ct. App. 2000). The converse is also true. A finding that an attorney did not violate the MRPC is not admissible to prove that the attorney did not violate a plaintiff's constitutional or other rights. The two determinations are entirely independent of one another.

testers' signs in front of a synagogue **is remedial** and its enforcement is therefore within the scope of Congress's authority under §5 of the 14th Amendment. The City's **failure** to enforce its sign ordinance "substantially burden[s] [the Plaintiffs'] exercise of religion" in violation of the RFRA., under circumstances in which application of the RFRA fulfills the purpose of §5 of the 14th Amendment. The reason for the Court's invalidation of RFRA in *City of Boerne* therefore does not apply to the facts of this case and the RFRA claim should accordingly not be dismissed..

With respect to the RLUIPA claim, the statute prohibits "implement[ing]" a land use regulation in a manner which places "a substantial burden on the religious exercise of a person." Plaintiffs state in ¶184(b) that as dues paying members of the Synagogue and the annex, they have a property interest in whatever property is owned by the Synagogue. This is a factual asser-tion which is plausible and which the City may not challenge in a 12(b)(6) motion. Under Michi-gan law, the Synagogue has a property interest in the public right-of-way adjacent to the side-walk, which includes the grass section on which the Protesters place their signs. (*See* cases cited in ¶184(a) of the FAC.) Therefore, the Plaintiffs own a *pro rata* property interest in the grass sec-tion in front of the Synagogue. The City's sign ordinance qualifies as a land use regulation.[26] The City's implementation of the ordinance by failing to enforce it allows the Protesters to place their signs on the grass section, property in which the Plaintiffs have a property interest, thereby allow-ing "a substantial burden on the [Plaintiffs'] religious exercise" by virtue of their seeing the dis-paraging, Antisemitic signs as they enter their house of worship. The motion to dismiss the RLUIPA claim should be denied.

---

[26] *See, e.g., Ryan Outdoor Advertising, Inc. v. U.S.,* 559 F.2d 554 (9th Cir. 1977); *People, Dept. of Transportation v. Naeglele Outdoor Advtg. Co.,* 38 Cal.3d 509 (Cal. 1985).

## III. THE CITY DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The government official has the burden of proving the applicability of the affirmative defense. *Id.* "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. ... [W]e [have] expressly rejected a requirement that previous cases be 'fundamentally similar.' Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)(Citation omitted.).[27] In *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999), the Court set forth a tripartite procedure for analyzing claims of qualified immunity, stating, 186 F.3d at 691:

> First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official did was objectively unreasonable in light of the clearly established constitutional rights.

Applying the above standards, none of the individual Defendants is entitled to qualified immunity. As demonstrated above, the individual Defendants abridged several constitutional provisions and federal statutes: the 1st and 14th Amendments; 42 U.S.C. §§1982, 1983, 1985(3), 1986, and the RFRA and RLUIPA. The next question is whether the law was sufficiently estab-

---

[27] *See also Sharp v. Johnson*, 669 F.3d 144,159 (3d Cir. 2012) ("In some cases, even though there may be no previous precedent directly on point, an action can still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with obvious clarity."); *Lawrence v. Reed*, 406 F.3d 1224 (10th Cir. 2005) A public official is charged with the responsibility of knowing what is, and what is not, lawful and constitutional conduct within the scope of his employment. *See, e.g., Adkins v. Bd. of Educ. of Magoffin County*, 982 F.2d 952 (6th Cir.); *Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006). This is particularly true here, where three of the Defendants are attorneys.

lished that the Defendants should have known their conduct violated those rights. Defendants have two potential defenses to this question: (1) the sign ordinance did not prohibit the Protesters from placing their signs on the grass sections; (2) their conduct was protected by the 1st Amendment, and if it was not, it was not clearly established during the years 2003-present that it was not. Regarding (1), this is not an issue, since the City has not contested that the sign ordinance prohibited the Protesters' conduct and/or required that they have a permit. Regarding (2), whether or not the Protesters' conduct was protected by the 1st Amendment is really not an issue with respect to enforcement of the sign ordinance. The City has not contested the assertion in ¶109 of the FAC that the signs ordinance was content and viewpoint neutral. In that case, it could be enforced against the Protesters' use of their signs without infringing on their 1st Amendment free speech right. That this was the case had been established by ample case law well before 2003.[28] Moreover, as will be shown more fully in the Plaintiffs' response to the Protester Defendants' motion to dismiss, there was ample authority which indicated that the Protesters' conduct was in fact not absolutely protected by the 1st Amendment and could be regulated by reasonable time, place and manner restrictions without offending the Free Speech Clause of the 1st Amendment. The signs were not protected under the 1st Amendment because, for example, they constituted targeted residential picketing which the Supreme Court had held could be restricted in *Frisby v. Schultz*, 487 U.S. 474 (1988);[29] because the Plaintiffs, and all the congregants, constituted a captive audience and therefore speech targeting them could be restricted, as held in *Frisby* and *Lehman v. City of*

---

[28] *See, R.A.V., supra; Vittitow v. City of Upper Arlington,* 43 F.3d 1100 (6th Cir. 1995); *Wheeler v. Commissioner of Highways,* 822 F.2d 586 (6th Cir. 1987); *Foti v. City of Menlo Park,* 146 F.3d 629 (9th Cir. 1998); *Chicago Observer, Inc. v. City of Chicago,* 929 F.d2d 325 (7th Cir. 1991).

[29] The City's citation of *Tucker v. City of Fairfield, Ohio,* 398 F.3d 457 (6th Cir. 2005), is unavailing. Its holding does not dispel the application of the other 1st Amendment doctrines set forth in the captive audience cases and in *Beauharnais.* Moreover, a decision regarding the use of **a single** balloon, on a **single occasion**, has no relevance to a case involving the use of 15-20 signs 858 times in front of a house of worship every Saturday for 16 ½ years.

*Shaker Heights*, 418 U.S. 298 (1974); because the signs subjected Plaintiffs and all of the congregants to "contempt, derision and obloquy," and therefore could be restricted under the Supreme Court's ruling in *Beauharnais, supra*. Finally, the FAC sets forth sufficient facts indicating that the City Defendants should have known that their conduct violated the Plaintiffs' rights. Accordingly, the individually named Defendants are not entitled to qualified immunity.

## CONCLUSION AND RELIEF

Based on the above arguments, the City's motion to dismiss the claims pled against it should be denied in its entirety.

Respectfully submitted,

Ziporah Reich (3979639)                    Marc M. Susselman (P29481)
The Lawfare Project                        Attorney at Law
633 Third Ave., 21st Floor                 43834 Brandywyne Rd.
New York, N.Y. 10017                       Canton, Michigan 48187
(212) 339-6995                             (734) 416-5186
Ziporah@thelawfareproject.org              marcsusselman@gmail.com

By:    /s  Ziporah Reich_____        /s  Marc M. Susselman_____
       Co-counsel for Plaintiffs           Attorney for Plaintiffs

Dated: May 21, 2020