IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Marvin Gerber, Dr. Miriam Brysk,

      Plaintiffs,

vs.

Henry Herskovitz, *et al.*,

      Defendants, Jointly and Severally.

Civil Action No. 2:19-cv-13726
Hon. Victoria A. Roberts

_____/

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com
Attorney for Plaintiffs

Ziporah Reich (3979639)
The Lawfare Project
633 Third Ave., 21st Floor
New York, N.Y. 10017
(212) 339-6995
Ziporah@thelawfareproject.org
Co-Counsel for Plaintiffs

Timothy S. Wilhelm (P67675)
OFFICE OF THE CITY ATTORNEY
Attorneys for the City of Ann Arbor,
Christopher Taylor, Derek Delacourt,
Stephen Postema, and Kristen Larcom
301 E. Huron St., P.O. Box 8647
Ann Arbor, Michigan 48107-8647
(7340 794-6170
twilhelm@a2gov.org

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Constitutional Litigation Associates, PC
Attorneys for Defendants Henry Herskovitz,
Gloria Harb, Tom Saffold, Rudy List and
Chris Mark
220 Bagley St., Ste. 740
Detroit, MI 48226
(313) 961-2255/Fax: (313) 922-5130
Heenan@CoLitPC.Com
Davis@ConLitPC.Com

John A. Shea (P37634)
Attorney for Defendants
Herskovitz, Harb, Saffold, List and
Mark
120 N. Fourth Avenue
Ann Arbor, Michigan 48104
(734) 995-4646
jashea@earthlink.net

_____/

**PLAINTIFFS' RESPONSE OPPOSING THE PROTESTER DEFENDANTS'
CORRECTED MOTION TO DISMISS**

## TABLE OF CONTENTS

QUESTIONS PRESENTED ............................................................... iii

CONTROLLING AUTHORITY ........................................................ iv

INDEX OF AUTHORITIES ............................................................. vi

COUNTER-STATEMENT OF FACTS ............................................. 1

PRELIMINARY STATEMENT ........................................................ 1

STANDARD OF REVIEW ............................................................... 2

ARGUMENT                ............................................................... 2

I.   THE PLAINTIFFS HAVE STANDING TO SUE THE PROTESTERS.   2

II.  AN INJUNCTION WOULD BE CONTENT AND VIEWPOINT NEUTRAL.   2

III. THE PROTESTERS' CONDUCT IS NOT ABSOLUTELY PROTECTED
     BY THE FIRST AMENDMENT.............................................. 4

     A.  The Decision In *Beauharnais v. Illinois,* 343 U.S. 250 (1954),
         Is Dispositive. ......................................................... 4

     B.  Speech May Be Regulated By Reasonable Time, Place
         And Manner Restrictions.. ........................................ 7

     C.  The Protesters' Speech Violates Federal Law Enacted Under The
         13th Amendment..................................................... 8

     D.  Use Of The Signs Constitutes Targeted Picketing In A Residentially
         Zoned Area.   ......................................................... 11

     E.  The Congregants Constitute A Captive Audience....................... 12

     F.  Plaintiffs Are Entitled To The Protection Of
         The Free Exercise Clause.. ......................................... 16

IV.  PLAINTIFFS HAVE PLED CONGNIZABLE CLAIMS AGAINST
     THE PROTESTERS............................................................. 18

     A.  The Protesters' Conduct Violates 42 U.S.C. §1981. .................... 18

     B.  The Protesters' Conduct Violates 42 U.S.C. §1982.  ................... 20

**C.**     **The Protesters' Conduct Violates 42 U.S.C. §1983.** ....................     22

**D.**     **The Protesters' Conduct Violates 42 U.S.C. §1985(3).** ................     24

**E.**     **Plaintiffs Have Pled Cognizable Conspiracy Claims** ..................     27

**CONCLUSION AND RELIEF** ...........................................................................     30

## QUESTIONS PRESENTED

I.     Whether the Plaintiffs have standing to sue the Protester Defendants.

       Plaintiffs answer "Yes."

II.    Whether the Protester Defendants protest activity in front of Beth Israel Synagogue and across Washtenaw Ave. in Ann Arbor is absolutely protected such that the court is precluded from entering any injunction against their conduct, including an injunction which  places reasonable time, place and manner restrictions on such conduct.

       Plaintiffs answer "No."

III.   Whether the Protester Defendants' motion to dismiss should be granted with respect to any of  the counts Plaintiffs have pled against the Protester Defendants in the First Amended Complaint.

       Plaintiffs answer "No"

## CONTROLLING AUTHORITY

*Beauharnais v. Illinois,* 343 U.S. 250 (1954)

*Burkhardt v. United States,* 13 F.2d 841 (6th Cir. 1926)

*Burton v. Wilmington Pkg. Authority,* 365 U.S. 715 (1961)

*Chapman v. Higbee Co.,* 319 F.3d 825 (6th Cir. 2003),
    *cert. denied,* 542 U.S. 945 (2004)

*Daniels v. Board of Education of the Ravenna City School District,* 805 F.2d 203 (6th Cir. 1986)

*Doe v. McKesson,* 945 F.3d 818 (5th Cir. 2019)

*Foti v. City of Menlo Park,* 146 F.3d 629 (9th Cir. 1998)

*Frisby v. Schultz,* 487 U.S. 474 (1988)

*Griffin v. Breckenridge,* 403 U.S. 88 (1971)

*Jobe v. City of Catlettsburg,* 409 F.3d 261 (6th Cir. 2005)

*Johnson v. City of Cincinnati,* 310 F.3d 484 (6th Cir. 2002)

*Jones v. Mayer Co.,* 392 U.S. 409 (1968)

*Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974)

*Loubser v. Thacke,* 440 F.3d 439 (7th Cir. 2006)

*Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994)

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)

*Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415 (2d Cir. 2009)

*Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2d Cir. 1974)

*Pangburn v. Culbertson,* 200 F.3d 65 (2d Cir. 1999)

*Phelps-Roper v. Strickland,* 539 F.3d 356 (6th Cir. 2008)

*Porter v. Warner,* 328 U.S. 395 (1946)

*Pritchard v. Hamilton township Board of Trustees,* 434 F. App'x 492, 507 (6th Cir. 2011)

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)

*Reeves v. Rose*, 108 F. Supp.2d 720 (E.D. Mich. 2000)

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987)

*Sullivan v. Little Hunting Park*, 396 U.S. 229 (1969)

*Tillman v. Wheaton-Haven Recreation Assn.*, 410 U.S. 431 (1973)

*United States v. Varani*, 435 F.2d 758 (6th Cir. 1970)

*U.S. v. Brown*, 49 F.3d 1162 (6th Cir. 1995)

*Virginia v. Black*, 538 U.S. 343 (2003)

*Vittitow v. City of Upper Arlington*, 43 F.3d 1100 (6th Cir. 1995)

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)

*Wells v. Rhodes*, 928 F. Supp.2d 920 (S.D. Ohio 2013)

*Wheeler v. Commissioner of Highways*, 822 F.2d 586 (6th Cir. 1987)

*Women's Health Care v. Operation Rescue*, 773 F. Supp. 258 (D. Kan. 1991)

*Wyatt v. Cole*, 504 U.S. 158 (1992)

# INDEX OF AUTHORITIES

## CASES                                                                      Pages

### Federal

*Abington School Dist., v. Schempp*, 374 U.S. 203 (1963) ......................................   3

*Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971).....................................................   17

*American Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)............................   24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................................   2

*Beard v. Alexandria*, 341 U.S. 622 (1951) ...............................................................   13

*Beauharnais v. Illinois*, 343 U.S. 250 (1954) ...........................................................   4,6,7

*Beckett v. Ford*, 613 F. Supp.2d 970 (N.D. Ohio 2009).............................................   28

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................   2

*Bible Believers v. Wayne Cty.*, 805 F.3d 228 (6th Cir. 2015)...................................   7

*Bray v. Alexandria Clinic*, 506 U.S. 263 (1993)........................................................   26

*Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000).........................................   26

*Bryant v. Polston*, Cause No. IP00-1064-C-T/G (S.D. Ind. 2000)............................   22

*Burkhardt v. United States*, 13 F.2d 841 (6th Cir. 1926)............................................   27

*Burton v. Wilmington Pkg. Authority*, 365 U.S. 715 (1961)......................................   22

*Canter v. Hardy*, 188 F. Supp.2d 771 (E.D. Mich. 2002) .........................................   22

*Cantwell v. Connecticut*, 310 U.S. 296 (1940). ........................................................   17

*Carpenters v. Scott*, 463 U.S. 825 (1983)..................................................................   26

*Chapman v. Higbee Co.*, 319 F.3d 825 (6th Cir. 2003),
   *cert. denied*, 542 U.S. 945 (2004)..............................................................   18,19,21,22

*Chicago Observer, Inc. v. City of Chicago*, 929 F.d2d 325 (7th Cir. 1991).............   29

*Clark v. International Union, United Mine Workers of America*,
   722 F. Supp. 250 (W.D. Va. 1989) ..............................................................   8

*Collin v. Smith*, 578 F.2d 1197 (7th Cir. 1978)..................................................... 14

*Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016) ........................................ 27

*Cooper v. Molko*, 512 F. Supp. 563 (N.D. Cal. 1981)............................................. 22

*Cooper v. Parrish*, 203 F.3d 937 (6th Cir. 2000).................................................. 29

*Daniels v. Board of Education of the Ravenna City School District*
   805 F.2d 203 (6th Cir. 1986)............................................................................. 21

*Dean v. Byerley*, 354 F.3d 540 (6th Cir. 2004)...................................................... 12

*Dicenso v. Cisneros*, 96 F.3d 1004 (7th Cir. 1996)............................................... 22

*Doe v. McKesson*, 945 F.3d 818 (5th Cir. 2019)..................................................... 8

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ............................................................ 3

*Douglas v. Brownell*, 88 F.3d 1511 (8th Cir. 1996)............................................... 11

*Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).......................................... 27

*Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir. 1985)............. 18

*Ex Parte Peterson*, 253 U.S. 300 (1920) ................................................................... 3

*520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708 (7th Cir. 2014)   9

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) ..................................... 29

*Frisby v. Schultz*, 487 U.S. 474 (1988).................................................................. 11,13

*Gant v. Wallingford Board of Education*, 195 F.3d 134 (2d Cir. 1999).................... 17

*Geinosky v. City of Chicago*, 675 F.3d743 (7th Cir. 2012) .................................... 25

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).................................................... 8

*Green v. Wal-Mart Stores, Inc.*, Case No. 2:09CV00457 (D. Utah 2010).............. 19

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)............................................................ 25

*Gutierrez v. Lynch*, 826 F.2d 1534 (6th Cir. 1987).............................................. 28

*Haffner v. Brown*, 983 F.2d 570 (4th Cir. 1992).................................................... 27

*Hampton v. City of Chicago*, 484 F.2d 602 (7th Cir. 1973) ................................. 28

*Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979) ................................................ 28

*Hanas v. Inner City Christian Outreach, Inc.,* 524 F. Supp.2d 683 (E.D. Mich. 2008) .... 23

*Harvey v. Plains Township Police Dept.,* 635 F.3d 609 (3d Cir. 2011 ................... 22

*Hecht Co. v. Bowles,* 321 U.S. 324 (1944) ............................................................... 3

*Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640 (1981) ................... 8

*Hill v. Colorado,* 530 U.S. 703 (2000) ...................................................................... 13

*Honce v. Vigil,* 1 F.3d 1085 (10th Cir.) ..................................................................... 22

*Hooks v. Hooks,* 771 F.2d 935 (6th Cir. 1985) .......................................................... 23

*Hurley v. Irish-American Gay, Lesbian Bisexual Group,* 515 U.S. 557 (1995) ....... 19

*In re Estate of Ferdinand Marcos Human Rights,* 25 F.3d 1467 (9th Cir. 1994) ...... 3

*James v. Village of Willowbrook,* No. 11-cv-9126 (N.D. Ill. 2012) ........................ 25,27

*Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,*
    968 F.2d 286 (2d Cir. 1992) ............................................................................. 26

*Jobe v. City of Catlettsburg,* 409 F.3d 261 (6th Cir. 2005) ...................................... 29

*Johnson v. City of Cincinnati,* 310 F.3d 484 (6th Cir. 2002) ................................... 26

*Jones v. Mayer Co.,* 392 U.S. 409 (1968) ................................................................. 10,20

*Konigsberg v. State Bar,* 366 U.S. 36 (1961) ........................................................... 6

*LeBlanc-Sternberg v. Fletcher,* 781 F. Supp. 261 (S.D.N.Y. 1991),
    *aff'd,* 67 F.3d412 (2d Cir. 1995) .................................................................... 20,26

*Lehman v. City of Shaker Heights,* 418 U.S. 298 (1974) .......................................... 12

*Longmire v. City of Oakland,* No. C 10-01465 (N.D. Cal. 2010) ........................... 20

*Loubser v. Thacke,* 440 F.3d 439 (7th Cir. 2006) ..................................................... 25,27

*Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994) ............................... 4,11

*Mansell v. Saunders,* 372 F.2d 573 (5th Cir. 1967) .................................................. 27

*McCullen v. Coakley,* __ U.S. __; 134 S.Ct. 2518 (2014) ....................................... 4

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...................................... 21

*Miller v. Phelan*, 845 F. Supp. 1201 (N.D. Ill. 1993) ................................................ 20

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ........................................ 8,9

*Nat'l Ass'n for the Advancement of Colored People, Inc. v. Molly Darcy, Inc.*,
    Civil Action No. 4:11-cv-01293 (D.S.C. 2012) ............................................. 20

*National Socialist Party v. Skokie*, 432 U.S. 43 (1977) ............................................. 14

*New York v. Ferber*, 458 U.S. 747 (1982) ................................................................. 6

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ............................................. 9

*N.Y. State Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989)
    *aff'd as modified*, 886 F.2d 1339 (2d Cir.) ................................................. 27

*Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415 (2d Cir. 2009) ........ 30

*Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333 (2d Cir. 1974) ..................... 20,21

*Pangburn v. Culbertson*, 200 F.3d 65 (2d Cir. 1999) ............................................. 27

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) ............................................... 6

*Patrick v. Miller*, 953 F.3d 1240 (10th Cir. 1992) ................................................. 20

*Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) ........................ 16

*Phelps-Roper v. Ricketts*, 867 F.3d 883 (8th Cir. 2017) ......................................... 16

*Phelps-Roper v. Strickland*, 539 F.3d 356 (6th Cir. 2008) ..................................... 16

*Porter v. Warner*, 328 U.S. 395 (1946) ................................................................. 3

*Pritchard v. Hamilton township Board of Trustees*,
    434 F. App'x 492, 507 (6th Cir. 2011) ........................................................ 22,25

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ............................................................... 6,7

*Reeves v. Rose*, 108 F. Supp.2d 720 (E.D. Mich. 2000) ........................................ 21,22

*Richardson v. McKnight*, 521 U.S. 399 (1997) ..................................................... 29

*Rowan v. U.S. Post Office Dept.*, 397 U.S. 728 (1970) .......................................... 13

*Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) ..................................... 18

*Schempp v. School Dist. of Abington Township, Pa.,*177 F. Supp. 398 (E.D.. Pa. 1959) ............. 3

*Selevan v. New York Thruway Authority,* 584 F.3d 82 (2d Cir. 2009).................... 26

*Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987) ................................. 10,18,20

*Snyder v. Phelps,* 562 U.S. 443 (2011)........................................................ 14,15

*Spadafore v. Gardner,* 330 F.3d 849 (6th Cir. 2003) ...................................... 28

*Spencer v. Casavilla,* 903 F.2d 171 (2d Cir. 1990)........................................ 26

*Sullivan v. Little Hunting Park,* 396 U.S. 229 (1969) ................................... 20

*Swann v. Board of Education,* 402 U.S. 1 (1971) ........................................ 3

*Thomas v. Review Board of the Indiana Employment Security Division*
    450 U.S. 707 (1981)  .............................................................. 17

*Thorburn v. Austin,* 231 F.3d 1114 (8th Cir. 2000)...................................... 11

*Thorne v. Bailey,* 846 F.3d 241 (4th Cir. 1988) ......................................... 18

*Tillman v. Wheaton-Haven Recreation Assn.,* 410 U.S. 431 (1973)................... 20

*Tolle v. Carrol Touch, Inc.,* 977 F.2d 1129 (7th Cir. 1992) ............................ 28

*Tompkins v. Cyr,* 995 F. Supp. 664, 681, note 10 (N. D. Tex. 1998),
    *aff'd,* 202 F.3d 770 (5th Cir. 2000)............................................... 17

*Trarms, Inc. v. Leapers, Inc.,* Case No. 16-14229 (E.D. Mich. 2017)................. 23

*Unified School Dist. v. Newdow,* 542 U.S. 1 (2004) .................................... 17

*United States v. Gonzalez,* 905 F.3d 165 (3d Cir. 2018) ............................... 6

*United States v. Grace,* 461 U.S. 171 (1983)............................................. 8

*United States v. Salameh,* 152 F.3d 88 (2d Cir. 1998) ................................. 19

*United States v. Schwimmer,* 279 U.S. 644 (1929) ..................................... 12

*United States v. Varani,* 435 F.2d 758 (6th Cir. 1970)................................... 19

*United States v. Waggy,* 936 F3d 1014 (9th Cir. 2019)................................... 18

*U.S. v. Brown,* 49 F.3d 1162 (6th Cir. 1995) ........................................... 20

*U.S. v. Greer*, 939 F.2d 1076 (5th Cir. 1991), *aff'd en banc*,
    968 F.2d 433 (5th Cir. 1992), *cert. denied*,
    ___ U.S. ___, 113 S.Ct. 1390 (1993)............................................................ 20,21

*Vector Research v. Howard Howard Attys., P.C.*, 76 F.3d 692 (6th Cir. 1996)........ 29

*Vietnamese Fishermen's Ass'n v. Knights of KKK*, 543 F. Supp. 198 (S.D. Tex. 1982) 26

*Virginia v. Black*, 538 U.S. 343 (2003) .................................................................. 6

*Vittitow v. City of Upper Arlington*, 43 F.3d 1100 (6th Cir. 1995) ........................... 29

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)............................................... 8

*Wells v. Rhodes*, 928 F. Supp.2d 920 (S.D. Ohio 2013)......................................... 21,26,27

*Wheeler v. Commissioner of Highways*, 822 F.2d 586 (6th Cir. 1987).................... 29

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) .......................................................... 19

*Women's Health Care v. Operation Rescue*, 773 F. Supp. 258 (D. Kan. 1991)........ 27

*Wyatt v. Cole*, 504 U.S. 158 (1992)........................................................................ 29

*Yohn v. Coleman*, 639 F. Supp. 2d 776 (E.D. Mich. 2009) ...................................... 38

*Zorach v. Clauson*, 343 U.S. 306 (1952) ................................................................ 17

### State

### Michigan

*John v. John*, 47 Mich. App. 413 (Mich. Ct. App. 1973)........................................ 8

*Rosenberg v .Rosenberg Bros. Special Account*,
    134 Mich. App. 342 (Mich. Ct. App. 1984)................................................ 29

*Suttons Bay Yacht Vill. Condo Ass'n v. Bd. of Representatives of*
    *Port Sutton Community*, No, 325327 (Mich. Ct. App. 2016) (unpublished) 8

*TM v. MZ*, 326 Mich. App. 227 (Mich. Ct. App. 2018) ............................................ 6

### Other

*People v. Borrelli*, 77 Cal. App. 703 (Cal. Ct. App. 2000)...................................... 15

*People v. Carboy*, 37 Misc. 3d 83, 86 (N.Y. App. Div. 2012) ................................ 15

*State v. Dyson,* 74 Wash. App. 237 (Wash. Ct. App. 1994) ...................................... 15

*St. David's Episcopal Church v. Westboro Baptist,*
    921 P.2d 821; 22 Kan. App. 2d 537 (Kan. Ct. of Appeals, 1996)................ 15

## UNITED STATES CONSTITUTION

U.S. Const. amend. I            ............................................................... *passim*

U.S. Const. amend. XIII         ............................................................... 10 ,26

U.S. Const. amend. XIV          ............................................................... 23

## STATUTES

### Federal

42 U.S.C. §1981                 ............................................................... *passim*

42 U.S.C. §1982                 ............................................................... *passim*

42 U.S.C. §1983                 ............................................................... *passim*

42 U.S.C. §1985(3)              ............................................................... *passim*

42 U.S.C. §1986                 ............................................................... *passim*

42 U.S.C. §3601 *et seq.* (Federal Housing Act)................................. 21,22

### Michigan

M.C.L. §750.411h                ............................................................... 15,19

### Other

Virginia Statute For Religious Freedom................................................ 17

## COURT RULES

Fed. P. Civil P. 12(b)(1)       ............................................................... 1

Fed. R. Civil P. 12(b)(6)       ............................................................... *passim*

## MISCELLANEOUS

Lasson, <u>To Stimulate, Provoke, or Incite? Hate Speech and the First Amendment,</u>
    3 St. Thomas Law Forum 49 (1991)................................................ 6

Salzman, <u>Civil Rights Act of 1866</u>, Encyclopedia of American Civil Liberties, Vol. 1     10

## COUNTER-STATEMENT OF FACTS

Plaintiffs adopt herein the Counter-Statement Of Facts set forth in their Response Opposing The City Defendants' Motion To Dismiss. (Dkt. #50)

## PRELIMINARY STATEMENT

The Protester Defendants ("Protesters") have moved for dismissal of the claims pled against them, arguing under Fed. R. Civ. P. 12(b)(1) that the Plaintiffs do not have standing, and that the counts in question fail to state a claim under Fed. R Civ. P. 12(b)(6). Regarding the latter contention, they maintain their conduct is protected by the 1st Amendment and that the Court has no authority to restrict their conduct by any form of injunctive relief. The Protesters and the *Amicus* claim the Plaintiffs are seeking to "shut down" their right of free speech and prohibit them from conveying their anti-Israel, anti-Zionist message. This is false. Plaintiffs maintain the Protesters have a protected right under the 1st Amendment to engage in their 1st Amendment activity. Plaintiffs are not seeking to "shut down" their protest. What Plaintiffs maintain is that the Protesters are not entitled to engage in their protest wherever and whenever they want. There are some contexts in which they are not permitted to engage in their protest, and in front of a Jewish house of worship is one of them. Voltaire did not declare, "I disapprove of what you say, but I will defend to the death your right to say it, wherever and whenever you may wish to say it."

Plaintiffs assert the Protesters' signs, unlawfully placed on the grass section in front of Beth Israel Synagogue ("Synagogue"), cause them extreme emotional distress (¶s 20-21 of the First Amended Complaint ("FAC")) and interfere with their 1st Amendment right to practice their religion without being harassed. They maintain the Protesters' conduct is not absolutely protected by the free speech provision of the 1st Amendment. Notably, while the Protesters agree with the City the Plaintiffs "have no constitutionally protected interest and lack standing" (brief, p. 3) to require the City to enforce the Code, the Protesters, like the City, do not dispute Plaintiffs' posi-

tion that the City's Unified Development Code prohibits the Protesters' placement of their signs on the grass sections (¶s 54-55 of the FAC). Nor do they dispute Plaintiffs' assertion the Code's provisions relating to signs are both content and viewpoint neutral (¶109). Therefore, in accordance with the standard of review for a 12(b)(6) motion, these assertions are deemed to be true.

## STANDARD OF REVIEW

The Protesters claim Plaintiffs do not have standing to sue (brief, p. 11) and maintain they have failed to state any legally cognizable claims against them (brief, p. 3). Plaintiffs accept the standards of review set forth in their brief. Contrary to their assertion, however, none of the factual averments in the FAC are susceptible to a claim under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), or *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), that the averment is not "plausible" or misstates the law as a factual allegation. The FAC contains sufficient factual allegations to sustain the viability of every count pled, and accurately sets forth the legal elements of each count.

## ARGUMENT

**I.    THE PLAINTIFFS HAVE STANDING TO SUE THE PROTESTERS.**

Essentially the same argument and case citations which apply to the Plaintiffs' standing to sue the City, set forth in Argument I of their Response Opposing The City Defendants' Motion To Dismiss (Dkt. #50), apply here. Plaintiffs have suffered extreme emotional distress seeing the Protesters' signs insulting their religion and violating their 1st Amendment right to worship without being harassed, which constitutes a concrete injury. That injury is directly caused by the Protesters' conduct and would be redressed if the Court entered an injunction limiting the time, place and manner they may engage in that conduct. Plaintiffs have standing to sue the Protesters.

**II.    AN INJUNCTION WOULD BE CONTENT AND VIEWPOINT NEUTRAL.**

The Protesters contend that, in the absence of a statute or ordinance already imposing the restrictions on the Protesters' conduct which the Plaintiffs seek, the Court does not have the au-

thority to issue an injunction incorporating such restrictions. This argument is specious. Federal courts have full, inherent equitable authority to issue injunctions to prevent a wrong, with or without the existence of a statute or ordinance imposing such restrictions, in order to enforce the highest law in the nation, the Constitution. *See, e.g., Dombrowski v. Pfister,* 380 U.S. 479 (1965), issuing an injunction against the enforcement of Louisiana's Subversive Activities and Communist Control Law. This inherent authority is not limited to the Supreme Court, but applies to all federal courts. *See, e.g., Abington School Dist., v. Schempp,* 374 U.S. 203, 223 (1963), affirming the trial court's issuance of an injunction against the enforcement of a Pennsylvania statute mandating prayer in public schools of the State, *Schempp v. School Dist. of Abington Township, Pa.,* 177 F. Supp. 398 (E.D.. Pa. 1959). As was stated in *Porter v. Warner,* 328 U.S. 395, 398 (1946): "[T]he comprehensiveness of [the court's] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.'" (Citation omitted.)[1] A federal court's power to redress an alleged violation of a party's constitutional rights is therefore not predicated on enforcing the terms of an existing statute or ordinance.

The Protesters' contention that the Court may not issue an injunction in the absence of enforcing a statute or ordinance because such an injunction, by focusing on particular instances of

---

[1] Similarly, in *Swann v. Board of Education,* 402 U.S. 1 (1971), commenting on the scope of the Court's equitable authority to order the desegregation of the schools in the Charlotte-Mecklenburg school system, the Court stated, *id.* at 31: "[I]n seeking to define the scope of remedial power or the limits on remedial power of courts in an area as sensitive as we deal with here, words are poor instruments to convey the sense of basic fairness inherent in equity. Substance, not semantics, must govern and we have sought to suggest the nature of limitations without frustrating the appropriate scope of equity." *See also Hecht Co. v. Bowles,* 321 U.S. 324, 329 (1944). *Ex Parte Peterson,* 253 U.S. 300, 312 (1920); *In re Estate of Ferdinand Marcos Human Rights,* 25 F.3d 1467, 1476-77 (9th Cir. 1994).

speech, is necessarily not content and viewpoint neutral, and therefore violates the 1st Amendment, was directly rejected by the Supreme Court in *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753 (1994), in which the Court substantially sustained the constitutionality of an injunction issued by a Florida state court which imposed distance and temporal restrictions on the protests of anti-abortion advocates in front of an abortion clinic. The Court stated, *id.* at 762, 765:

> We begin by addressing petitioners' contention that the state court's order, because it is an injunction that restricts only the speech of anti-abortion protesters, is necessarily content- or viewpoint-based. Accordingly, they argue, we should examine the entire injunction under the strictest standard of scrutiny. ... **We disagree. To accept petitioners' claim would be to classify virtually every injunction as content or viewpoint based. An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group. It does so, however, because of the group's past actions in the context of a specific dispute between real parties. The parties seeking the injunction assert a violation of their rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public.** ...
>
> * * *
>
> ... Injunctions, of course, have some advantages over generally applicable statutes in that they can be tailored by a trial judge to afford more precise relief than a statute where a violation of the law has already occurred. ... (Emphasis added; citation omitted.)

*See also McCullen v. Coakley,* __ U.S. __; 134 S.Ct. 2518, 2538 (2014). The claim that this Court has no authority to impose an injunction restricting the Protesters' conduct, and cannot do so without violating their 1st Amendment rights, is without merit.

## III.  THE PROTESTERS' CONDUCT IS NOT ABSOLUTLEY PROTECTED BY THE FIRST AMENDMENT.

In ¶83 of the FAC, Plaintiffs delineate numerous reasons why the Protesters' conduct is not protected by the 1st Amendment. They cumulatively allow the Court to enter an injunction against the use of the signs without infringing on their 1st Amendment rights. [2]

### A.  The Decision In *Beauharnais v. Illinois,* 343 U.S. 250 (1954), Is Dispositive.

In *Beauharnais v. Illinois,* 343 U.S. 250 (1954), the petitioner, Beauharnais, was con-

---

[2] Due to space limitations, Plaintiffs will discuss only 6 of the 10 reasons set forth in ¶83.

victed of violating an Illinois criminal statute which stated, in relevant part, *id.* at 251:

> It shall be unlawful for any person, firm or corporation to manufacture, sell, or of-
> fer for sale, advertise or publish, present or exhibit in any public place in this state
> any lithograph, moving picture, play, drama or sketch, which publication or exhi-
> bition portrays depravity, criminality, unchastity, or lack of virtue of a class of
> citizens, of any race, color, creed or religion which said publication or exhibition
> exposes the citizens of any race, color, creed or religion to contempt, derision, or
> obloquy or which is productive of breach of the peace or riots. ...

Beauharnais was charged with violating the statute, and convicted, for engaging in the fol-

lowing conduct, *id.* at 252:

> The information, cast generally in the terms of the statute, charged that Beauharnais "did
> unlawfully ... exhibit in public places lithographs, which publications portray depravity,
> criminality, unchastity or lack of virtue of citizens of Negro race and color and which
> exposes [sic] citizens of Illinois of the Negro race and color to contempt, derision, or ob-
> loquy ...." The lithograph complained of was a leaflet setting forth a petition calling on
> the Mayor and City Council of Chicago "to halt the further encroachment, harassment
> and invasion of white people, their property, neighborhoods and persons, by the Negro
> ...." Below was a call for "One million self respecting white people in Chicago to unite
> ...." with the statement added that "If persuasion and the need to prevent the white race
> from becoming mongrelized by the negro will not unite us, then the aggressions ... rapes,
> robberies, knives, guns and marijuana of the negro, surely will."

At trial, the court rejected a jury instruction requested by Beauharnais that, "in order to

convict they must find 'that the article complained of was likely to produce a clear and present

danger of a serious substantive evil that rises far above public inconvenience, annoyance or un-

rest." The jury convicted Beauharnais and he appealed, arguing the statute was unconstitutional

because it infringed on his 1st Amendment right of free speech. The Court sustained the constitu-

tionality of the statute, with J. Frankfurter stating, *id.* at 258, 261:

> Illinois did not have to look beyond her own borders or await the tragic experience of
> the last three decades to conclude that **wilful purveyors of falsehood concerning racial
> and religious groups promote strife and tend powerfully to obstruct the manifold
> adjustments required for free, ordered life in a metropolitan, polyglot community**.
> ...                               * * *
> In the face of this history and the frequent obligato of extreme racial and religious
> propaganda, we would deny experience to say that the Illinois legislature was without
> reason in seeking ways to curb false or malicious defamation of racial and religious
> groups, made in public places and by means calculated to have a powerful emotional
> impact on those to whom it was presented. ... (Emphasis added; footnotes omitted.)

There was no evidence Beauharnais threatened physical violence against any African-American or blocked the movement of any African-Americans. Yet the Court upheld the constitutionality of the statute generally, and as it was applied to Beauharnais. Here, Plaintiffs are not seeking to have the Protesters arrested or prosecuted, or bar them from engaging in their conduct – using signs such as "Jewish Power Corrupts"; "Resist Jewish Power" which expose Jews to "contempt, derision [and] obloquy" - elsewhere in Ann Arbor, in Michigan, or in the United States.[3] They should just be precluded from engaging in their conduct in front of a Jewish house of worship. A federal court exercising its inherent equity jurisdiction is authorized to enter an injunction prohibiting such conduct within the proximity of a particular house of worship without thereby offending the 1st Amendment. *See also Virginia v. Black,* 538 U.S. 343 (2003) (cross burning with intent to intimidate may be prohibited without abridging 1st Amendment).

The holding in *Beauharnais* has never been overturned or modified.[4] Indeed, it has been favorably cited in numerous other Supreme Court, lower federal court, and state court decisions. *See, e.g., New York v. Ferber,* 458 U.S. 747, 763 (1982); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67 (1973); *Konigsberg v. State Bar,* 366 U.S. 36, 50 (1961); *United States v. Gonzalez,* 905 F.3d 165, 191 (3d Cir. 2018); *TM v. MZ,* 326 Mich. App. 227, 237 (Mich. Ct. App. 2018).[5]

---

[3] *Beauharnais* is not distinguishable from the facts of the instant case on the purported basis that none of the Protesters' signs accuse Jews or Israel of engaging in a crime. The sign "End the Palestinian holocaust" attributes the crime of genocide to Israel, and by association, to the congregants of the Synagogue as being complicit in that international crime. Moreover, the statute which *Beauharnais* was charged with violating did not just prohibit attributing crimes to a particular race or religion, but also attributing "depravity [or] unchastity" and holding up individuals of a race or religion to "contempt, derision, or obloquy." Clearly, a sign which states "Jewish Power Corrupts" subjects Jews to "contempt, derision [and] obloquy." Beauharnais's leaflets referring to the possession of knives and guns by African-Americans did not refer to crimes.

[4] *See* Larson, To Stimulate, Provoke, or Incite? Hate Speech and the First Amendment, 3 St. Thomas Law Forum 49, 62-63 (1991).

[5] The Protesters and the *Amicus* claim that any proposed restriction on the Protesters' conduct because Plaintiffs find it offensive would constitute an endorsement of the "hecklers' veto," citing (Footnote continued.)

Most significant is the approving citation of *Beauharnais* in *R.A.V. v. St. Paul,* 505 U.S. 377, 383 (1992), in which the Court struck down as unconstitutional a St. Paul, Minnesota, ordinance which made it a criminal offense to place a burning cross or Nazi swastika on public or private property, reversing the conviction of a teenager who had been prosecuted for burning a cross in the fenced yard of a Black family. The Court held the ordinance was unconstitutional because, by identifying the particular kind of racist and ethnically offensive speech which was prohibited, the ordinance was not content and viewpoint neutral. The Court made clear a more generically worded ordinance which prohibited hate speech or fighting words generally would be viewpoint neutral, and therefore constitutional, stating, "An ordinance not limited to the favored topics, for example, would have precisely the same beneficial effect." 506 U.S. at 396. The claim by the Pro-testers that *R.A.V.* prohibits any restriction on hate speech, in any form, is therefore erroneous.

**B.    Speech May Be Regulated By Reasonable Time, Place And Manner Restrictions.**

The freedom of speech is not unbounded. Its exercise may be subject to reasonable time,

---

*Bible Believers v. Wayne Cty.,* 805 F.3d 228 (6th Cir. 2015). The facts in *Bible Believers,* however, are readily distinguishable from those present here. In *Bible Believers,* a group of self-avowed Christian evangelists attended the Arab International Festival in Dearborn bearing signs which insulted the Muslim religion. Many of the festival attendees responded hostilely to the Believers' messages, shouting at them and pelting them with debris. Unable to quell the hostile crowd, Wayne County sheriff deputies ordered the Believers to leave. The Believers left, and then filed suit against Wayne County and the Wayne County Sheriff, claiming by ordering them to leave, rather than protecting them from the crowd, the defendants had violated the Believers' 1st Amendment free speech right. The Sixth Circuit agreed, holding that by relenting to the attacks of the mob which found the message of the Believers offensive, the defendants had allowed the "heckler's veto" to prevail over the free speech right of the Believers. In *Believers,* however, there were no protests in proximity to a mosque, interfering with the right of Muslims to worship without being harassed; there was no captive audience, since people offended by the signs had the option to walk away and not look at the signs; finally, it occurred on one occasion, not on a weekly basis. Here, moreover, there have been no hecklers on the part of members of the Syna-gogue. *Believers,* therefore, is not relevant to this case. An argument can be made, moreover, that *Believers* was wrongly decided. Nowhere in the decision did the majority refer to the decision in *Beauharnais.* The messages being communicated by the Believers clearly subjected the Muslim attendees to "contempt, derision [and] obloquy," and as such did not enjoy protection under the 1st Amendment. Even if *Believers* were relevant to this case – which it is not – the Court would be required to follow *Beauharnais,* a Supreme Court decision, over *Believers.*

place and manner restrictions. The Supreme Court has "regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *United States v. Grace,* 461 U.S. 171, 177-78 (1983) (Citations omitted.) "Our cases make clear ... that even in a public forum the government may impose reasonable restrictions of the time, place or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).[6] An injunction is a content and viewpoint neutral regulation. *Madsen, supra.*

## C.    The Protesters' Speech Violates Federal Law Enacted Under The 13th Amendment.

In *Doe v. McKesson,* 945 F.3d 818 (5th Cir. 2019), a police officer was injured by a missile thrown during a Black Lives Matter protest.[7] The officer sued the organizer of the protest, seeking to hold him vicariously liable for the unlawful action of the unknown assailant. McKesson, the organizer, maintained that his role in organizing the protest was protected under the 1st Amendment. The Court rejected his defense, relying on language in *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886 (1982), which upheld the right of the NAACP under the 1st Amendment

---

[6] *See also Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640 (1981); *Grayned v. City of Rockford,* 408 U.S. 104 (1972); *Clark v. International Union, United Mine Workers of America,* 722 F. Supp. 250, 251 (W.D. Va. 1989).

[7] The Court sustained the dismissal of Black Lives Matter from the lawsuit because the organization did not meet the criteria for an unincorporated association under a Louisiana statute. This ruling has no bearing on Plaintiffs' naming Witnesses as a Defendant, since there is no comparable statute in Michigan which defines the criteria which must be met in order to qualify as a voluntary unincorporated association. Under Michigan case law, Witnesses does so qualify. *See John v. John,* 47 Mich. App. 413 (Mich. Ct. App. 1973); *Suttons Bay Yacht Vill. Condo Ass'n v. Bd. of Representatives of Port Sutton Community,* No. 325327 (Mich. Ct. App. 2016) (unpublished) (copy attached as Exhibit 1). Plaintiffs sufficiently identify Witnesses in ¶12 of the FAC as a voluntary unincorporated association formed by Herskovitz for the purpose of organizing the protests in front of the Synagogue. Each of the Protesters is identified as a member and supporter of Witnesses in ¶s 6-10. Consequently, Witnesses is a legal entity which has standing to be sued.

to engage in an economic boycott of stores owned by white proprietors. The Court focused on the following passage in *Claiborne, id.* at 920, note 56: "Of course, the question whether an individual may be held liable for damages merely by reason of his association with others who committed unlawful acts is quite different from the question whether an individual may be held liable for unlawful conduct that he himself authorized **or incited.**" (Emphasis added.) The Court rejected the argument that the plaintiff had failed to state a claim, asserting, 945 F.3d at 829: "We focus here on the fact that Mc[K]esson 'directed ... specific tortious activity' because we hold that Officer Doe has adequately alleged that his injuries were the result of Mc[K]esson's *own* tortious conduct in directing an illegal and foreseeably violent protest." (Italics in the original.)

The Court proceeded to engage in an extensive discussion of an argument advanced by the dissent that under *Claiborne* McKesson could only be held vicariously liable if he directly authorized a violent act, not if he authorized an unlawful protest which happened to incite a violent act. Rejecting this position, the Court stated, 545 F.3d at 831:

> This supposed violence/nonviolence distinction ... does not square with the case law. Take *New York Times Co. v. Sullivan,* 376 U.S. 254 ... (1964). That case held that a public officer cannot "recover[ ] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." ... But defamation is a nonviolent tort, and statements made about public officers are often shouted during political protests. If the dissenting opinion's interpretation is correct, then it would seem that even the narrow "actual malice" exception to immunity was eliminated by *Claiborne Hardware,* at least for statements made during a protest.

> Neither do recent cases vindicate this understanding. The Seventh Circuit examined a boycott similar to the one in *Claiborne Hardware,* this time a boycott by a union of a hotel and those doing business with the hotel. *See 520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1,* 760 F.3d 708 (7th Cir. 2014). The court found that it was "undisputed that the Union delegations all attempted to communicate a message on a topic of public concern." *Id.* at 723. But the court nonetheless held that the boycotters could be found liable if they had crossed the line into illegal coercion, because "prohibiting some of the Union's conduct under the federal labor laws would pose no greater obstacle to free speech than that posed by ordinary trespass and harassment laws." *Id.* **The court's benchmark for liability was illegality, not violence. The court concluded that if "the Union's conduct in this case is equivalent to secondary picketing, and inflicts the same type of economic harm, it too may be prohibited without doing any harm to**

**First Amendment liberties.**" *Id.* The dissenting opinion cannot be squared with this outcome. (Emphasis added.)

The implications of the Court's statement regarding the illegality of secondary boycotts, even boycotts which are conducted via speech, is significant for this case. The Court was holding that conduct, including speech, which violates a federal statute, the constitutionality of which has not been overturned, is *per se* unlawful and therefore not protected by the 1st Amendment – regardless whether it does or does not incite violence. Therefore, speech which violates a constitutional federal statute is, by virtue of that very violation, stripped of its 1st Amendment protection. This is precisely what Plaintiffs maintain regarding the Protesters' speech. Their derisive speech, which is targeted at members of the congregation because they are attending services at a Jewish house of worship, is being targeted at them because they are Jewish. This constitutes conduct aimed at a racial minority motivated by racial animus – conduct which violates both 42 U.S.C. §1981 and §1982.[8] It does not matter that the conduct in question involves speech; it does not matter whether the speech is or is intended to incite violent acts against the congregants. By virtue of the speech violating §§1981 and 1982, it is stripped of its purported 1st Amendment protection altogether. Both §§1981 and 1982 derive from the Civil Rights Act of 1866 which was passed by Congress pursuant to its authority under the 13th Amendment, which states, "Congress shall have power to enforce this article by appropriate legislation." *See, generally, Jones v. Mayer Co.,* 392 U.S. 409, 437-44 (1968); Salzman, Civil Rights Act of 1866, Encyclopedia of American Civil Liberties, Vol. 1. Neither the 13th Amendment, nor the statutes enacted to implement it, requires state action. Since both statutes were directly authorized by a constitutional amendment, they bear the force of the Constitution, rendering the Protesters' speech unlawful and therefore stripped of its purported 1st Amendment protection, regardless their claim that it is protected po-

---

[8] Jews qualify as a race entitled to the protection of 42 U.S.C. §1981, which the Protesters concede (brief, p. 12). *See Shaare Tefila Congregation v. Cobb,* 481 U.S. 615 (1987).

litical speech, or that it is protected because they are using the public right-of-way.

**D.     Use Of The Signs Constitutes Targeted Picketing In A Residentially Zoned Area.**

The Synagogue and its annex are located in an area which is zoned residential.  (*See* Ann Arbor City Zoning Map, attached as Exhibit 2, and Tax Description, Class, designating the Zone as R1B, attached as Exhibit 3.) In numerous cases, the Supreme Court and lower federal courts have held an injunction, ordinance or statute which prohibits "targeted picketing" of a single residence is not unconstitutional and does not violate the free speech rights of the picketers. In *Frisby v. Schultz,* 487 U.S. 474 (1988), the Court sustained the constitutionality of an ordinance which completely banned picketing before or about" any residence. The Court stated, *id.* at 486-88:

> The type of focused picketing prohibited by the Brookfield ordinance is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas. ... In such cases "the flow of information [is not] into ... household[s], but to the public."  ... Here, in contrast, the picketing is narrowly directed at the household, not the public. **The type of picketing banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way.** Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy. The devastating effect of targeted picketing on the quiet enjoyment of the home is beyond doubt[,] ... In this case, for example, appellees subjected the doctor and his family to the presence of a relatively large group of protesters on their doorstep in an attempt to force the doctor to cease performing abortions. But the actual size of the group is irrelevant; **even a solitary picket can invade residential privacy.** ...
>
> . . .
>
> Because the picketing prohibited by the Brookfield ordinance is speech directed primarily **at those who are presumptively unwilling to receive it,** the State has a substantial and justifiable interest in banning it. The nature and scope of this interest make the ban narrowly tailored. **The ordinance also leaves open ample alternative channels of communication and is content neutral.** Thus, largely because of its narrow scope, the facial challenge to the ordinance must fail. ... (Emphasis added.)

*See also Thorburn v. Austin,* 231 F.3d 1114 (8th Cir. 2000); *Douglas v. Brownell,* 88 F.3d 1511 (8th Cir. 1996). In *Madsen, supra,* the Court, in affirming the state injunction restricting the anti-abortionists' protests near a medical facility in a residential area, stated, 512 U.S. at 767-68:

> The Florida Supreme Court concluded that numerous significant government interests are protected by the injunction. It noted that the State has a strong interest in protecting a

woman's freedom to seek lawful medical or counseling services in connection with her pregnancy. ... In addition, the court believed that the State's strong interest in residential privacy, acknowledged in *Frisby v. Schultz,* 487 U.S. 474 (1988), applied by analogy to medical privacy. ... The court observed that, while targeted picketing of the home threatens the psychological wellbeing of the "captive" resident, targeted picketing of a hospital or clinic threatens not only the psychological, but the physical, wellbeing of the patient held "captive" by medical circumstances. ... We agree with the Supreme Court of Florida that the combination of these governmental interests is quite sufficient to justify an appropriately tailored injunction to protect them. ... (Some citations omitted.)

A house of worship is entitled to the same protection as a medical facility.[9]

### E.    The Congregants Constitute A Captive Audience.

While the 1st Amendment protects the right of a speaker to express even "the thought that we hate," *United States v. Schwimmer,* 279 U.S. 644 (1929), J. Holmes dissenting, at 655, it does not provide a megaphone allowing a speaker to force the thoughts that others may hate down the throats of those who are unwilling to hear them. Such unwilling recipients of the speech of the propagandist are regarded as a "captive audience," and under the 1st Amendment they have a right, reciprocal to that of the speaker who insists on asserting his right of free speech, to invoke the Amendment's protection against such compelled indoctrination. Numerous Supreme Court decisions have held that a speaker's 1st Amendment rights are drastically circumscribed when addressing a captive audience. The leading cases espousing this doctrine is the Court's decision in *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), in which a candidate for public office argued that the city's policy of disallowing political advertising on the inside of its transit system

---

[9] The Protesters invoke the ruling in *Dean v. Byerley,* 354 F.3d 540 (6th Cir. 2004), holding that the plaintiff's targeted picketing of the home of the Regulation Counsel and Director of Professional Standards Division of the Michigan State Bar was protected by the 1st Amendment, which Byerley violated by retaliating against the picketer, a law school graduate seeking admission to the Michigan bar, by sending Dean a threatening letter. *Byerley*, however, is distinguishable on several levels. First, Dean's one-time picketing of Byerley's home, accompanied by two individuals he hired for the purpose, does not compare to the weekly picketing of the Synagogue 858 times over a 16 ½ year period by 5-6 individuals. Second, Byerley did not go to court to request an injunction against Dean's potential future picketing. Instead, Byerley invoked self-help and sent a threatening letter to Dean, suggesting that his hopes to be admitted to the Michigan State Bar were at risk. The *Byerley* decision is not relevant to the facts of this case.

vehicles, and precluding him from purchasing space for a political advertisement, violated his 1st Amendment rights. The Court rejected his position and held his free speech rights were limited by the fact that the patrons of the transit system constituted a captive audience. [10] Justice Douglas, in his concurring opinion, expressed the holding of the decision as follows, 418 U.S. at 307:

> While petitioner clearly has a right to express his views to those who wish to listen, he has no right to force his message upon an audience incapable of declining to receive it. In my view the right of the commuters to be free from forced intrusion on their privacy precludes the city from transforming its vehicles of public transportation into forums for the dissemination of ideas upon this captive audience. ... There is no difference when the message is visual, not auricular. In each the viewer or listener is captive.

The congregants walking towards Beth Israel Synagogue constitute such a captive audience. The only way they can avoid the necessity of repeatedly averting their eyes and turning their heads away from the direction in which the offensive signs are positioned, would be to stay home and forego attending worship services altogether, or choose to attend a different synagogue, one which subscribes to a different denomination of Judaism from the Conservative form of Judaism practiced at Beth Israel, and which they prefer over a Reform synagogue or an Orthodox synagogue. The 1st Amendment does not require that they be put to making such a life changing choice in order to accommodate the 1st Amendment rights of the Protesters. The Protesters dismiss *Lehman* on the basis the advertisements at issue were on the inside of buses, which the Court acknowledged was a nonpublic forum, unlike the public street in front of the Synagogue. The Protesters ignore the fact, however, that the same captive audience factor was relied on in *Frisby*, with respect to targeted picketing on a public street, 487 U.S. at 487-88.

The Protesters cite Supreme Court decisions which they insist constitute counter-examples to the cases cited above and demonstrate that the offensiveness of speech is not grounds for curtailing it in order to appease the sensibilities of an indignant audience. First, they invoke

---

[10] *See also Hill v. Colorado,* 530 U.S. 703 (2000); *Rowan v. U.S. Post Office Dept.,* 397 U.S. 728 (1970); *Beard v. Alexandria,* 341 U.S. 622 (1951).

the decisions by the Supreme Court, *National Socialist Party v. Skokie,* 432 U.S. 43 (1977), and the 7th Circuit Court of Appeals, *Collin v. Smith,* 578 F.2d 1197 (7th Cir. 1978), in which members of the National Socialist Party contested the refusal of the Village of Skokie to issue them a parade permit and challenged the entry of an injunction precluding them from marching in the Village, a particularly sensitive issue, since Skokie was home to a significant number of Jewish Holocaust survivors. The Illinois Supreme Court had refused to issue a stay of the injunction. The Supreme Court reversed the refusal to issue a stay. The Nazis then challenged the constitutionality of Skokie ordinances which prohibited the dissemination of materials which would promote hatred of persons based on their heritage, and which prohibited members of a political party from assembling while wearing military style uniforms. The Village argued the ordinances were constitutional because the Jewish residents constituted a captive audience. The Court rejected the argument, stating, 578 F.2d at 1207, "There need be no captive audience, as Village residents may, if they wish, simply avoid the Village Hall for thirty minutes on a Sunday afternoon, which no doubt would be their normal course of business." Thus, the Jewish residents of Skokie were not a captive audience, since they could avoid going to where the Nazis were going to march. This is clearly distinguishable from the instant matter. The Protesters have brought their offensive signs to the Synagogue. The congregants cannot avoid seeing the insulting materials except by constantly averting their eyes, not going to Sabbath services altogether, or going to a different synagogue. They are not going to where the nuisance is located; the nuisance is coming to them.

The second case relied on by the Protesters is *Snyder v. Phelps,* 562 U.S. 443 (2011), involving the Westboro Baptist Church, which was vehemently opposed to homosexuality as a sin. The Church picketed military funerals, claiming God hates the United States because it tolerates homosexuality in general, and in the military in particular. Phelps, the Church founder, and his adherents traveled to Maryland to picket the funeral of Marine Lance Corporal Matthew Snyder.

They positioned their pickets on public land, approximately 1000 feet from the church where the funeral was conducted, and did not interfere with the funeral ceremony. Corporal Snyder's father did not see the messages on the signs which Phelps had posted. He only learned what they said when he later watched the news. The 4th Circuit Court of Appeals reversed a jury verdict in favor of Mr. Snyder for intentional infliction of emotional distress. The Supreme Court affirmed. Critical to its decision was the Court's rejection of Mr. Snyder's contention that he and the other funeral attendees constituted a captive audience. The Court rejected this claim, stating, *id.* at 460:

> Here, **Westboro stayed well away from the memorial service. Snyder could see no more than the tops of the signs when driving to the funeral.** And there is no indication that the picketing in any way interfered with the funeral service itself. We decline to expand the captive audience doctrine to the circumstances presented here. (Emphasis added; citations omitted.)

The dissimilarities between *Phelps* and the instant matter are obvious. The Protesters' signs are not off in the unseeable distance. They are directly in front of the Synagogue, a few feet from the property line, and are easily readable. Requiring the congregants to avert their eyes means they must walk by the gauntlet of insulting signs with their head turned in the opposite direction, week after week. Under these circumstances, they constitute a captive audience. [11]

In a different lawsuit involving Westboro, *St. David's Episcopal Church v. Westboro Baptist,* 921 P.2d 821; 22 Kan. App. 2d 537 (Kan. Ct. of Appeals, 1996), the Court sustained a temporary injunction against Westboro's picketing activity within a given distance of the Episco-

---

[11] Plaintiffs submit that the protesters' repetitive picketing in front of the same location is a form of stalking. M.C.L. §750.411h defines "stalking" as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, **intimidated**, threatened, **harassed**, or molested and that actually causes the victim to feel terrorized, frightened, **intimidated**, threatened, **harassed**, or molested." (Emphasis added.) The statute prohibits "unconsented contact," which includes, "Following **or appearing within the sight of that individual**." (Emphasis added.) Courts have sustained anti-stalking statutes against claims that they violate the 1st Amendment. *See, e.g., Yohn v. Coleman,* 639 F. Supp. 2d 776 (E.D. Mich. 2009); *People v. Borrelli,* 77 Cal. App. 703, 716 (Cal. Ct. App. 2000); *State v. Dyson,* 74 Wash. App. 237 (Wash. Ct. App. 1994); *People v. Carboy,* 37 Misc. 3d 83, 86 (N.Y. App. Div. 2012).

pal Church.[12] The Church sued Westboro, alleging that its conduct near the church property con-

stituted a private nuisance. The Court stated, *id.* at 828-29:

> The record shows that Westboro conducted its picketing activities for nearly a year be-
> fore St. David's responded with picketing of its own. In addition, although St. David's
> may have engaged in picketing activity at some point, at issue in this case is the *manner*
> in which Westboro conducted its picketing activity at the locality. The affidavits before
> the trial court show that Westboro picketed in such a manner that the religious worship
> of St. David's was infringed by the fear held by St. David's members that physical vio-
> lence might occur. **The trial court found these circumstances particularly escalated**
> **in light of the fact that children accompanied their parents to the religious services**.
> The trial court's findings are supported by the limited record that is before this court.
> Thus, there is substantial evidence to find that the gravity of the harm to St. David's
> outweighed the utility of Westboro's conduct. If the trial court finds that Westboro has
> employed constitutionally unprotected speech as well in its picketing activities, then this
> issue will weigh even more in St. David's favor. (Italics in the original; emphasis added;
> citations omitted.)

The Protesters do not have a 1st Amendment right to impose their harassing and insulting

views on a captive audience who simply want to go to their house of worship to pray.

## F.    Plaintiffs Are Entitled To The Protection Of The Free Exercise Clause.

Counter-balancing the Protesters' right of free speech under the 1st Amendment is the

right of the congregants to engage in the free exercise of their religion under the same Amend-

---

[12] *See also Phelps-Roper v. Strickland,* 539 F.3d 356 (6th Cir. 2008), wherein the Court upheld an
Ohio statute which precluded funeral protests from occurring during a time period one hour be-
fore until one hour after a funeral, and prohibited such protests from occurring within "three hun-
dred feet of any residence, cemetery, funeral home, church, synagogue, or other establishment."
The Court noted the solemnity of funerals, *id.* at 366. The Court went on to say, *id.* at 367:
"Friends and family of the deceased should not be expected to opt-out from attending their loved
one's funeral or burial service. .... Nor can funeral attendees simply 'avert their eyes' to avoid
exposure to disruptive speech at a funeral or burial service. **The mere presence of a protester is**
**sufficient to inflict the harm.**"   (Emphasis added.); *Phelps-Roper v. City of Manchester,* 697
F.3d 678 (8th Cir. 2012) (sustaining a city ordinance placing temporal restrictions of one hour be-
fore until one hour after a funeral, and distance restrictions of 300 ft.); *Phelps-Roper v. Ricketts,*
867 F.3d 883 (8th Cir. 2017) (sustaining a Nebraska statute imposing a 500 ft. buffer zone on pro-
testers). An objection may be offered that a funeral is distinguishable from a Sabbath service,
since the former occurs largely outside, while the latter occurs predominantly inside a building.
The distinction is not relevant, since both the Ohio statute and the Manchester ordinance restric-
tions related to both the outside service, and the preceding religious service within the funeral
home, church or synagogue.

ment.[13] The Fee Exercise Clause applies to the states under the 14th Amendment. *Cantwell v. Connecticut,* 310 U.S. 296 (1940). The right to engage in the free exercise of one's religion is clearly as vital a constitutional right as the right to free speech. [14] As Justice O'Connor observed in her concurrence in *Unified School Dist. v. Newdow,* 542 U.S. 1 (2004), *id.* at 35-36: "It is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mottoes, and oaths.  Eradicating such references would sever ties to a history that sustains this Nation even today."

Plaintiffs are as much entitled to the protection of their right to worship without harassment under the Free Exercise Clause as the Protesters are entitled to the protection of the Free Speech Clause.[15] The repetitive use of the signs has transgressed the line that separates legitimate efforts at reasoned persuasion from unreasoned bullying.  Repetitive speech intended to harass is not protected by the 1st Amendment. *See, e.g., Gant v. Wallingford Board of Education,* 195 F.3d

---

[13] *Dicta* in *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971), in which the appellate court affirmed the trial court's issuance of an injunction against the Black Liberation Front which was deliberately disrupting services at a Catholic church, does not support the Protesters' right to picket the Synagogue. The Court's assertion, *id.* at 1232-33, that the protesters would have had the right "to engage in peaceful pamphleteering and picketing on public property, so long as they do not 'unduly interfere with the normal use of the public property by other members of the public with an equal right of access to it[.]'" does not constitute an endorsement of weekly picketing in front of a house of worship for 16 ½ years, nor the use of signs which insult the religion of the congregants.

[14] *See Zorach v. Clauson,* 343 U.S. 306, 313 (1952); *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 713 (1981); *Tompkins v. Cyr,* 995 F. Supp. 664, 681, note 10 (N. D. Tex. 1998), *aff'd,* 202 F.3d 770 (5th Cir. 2000) ("The Court is troubled by the notion that a person may be subjected to focused picketing at their place of worship. Indeed, the right to engage in quiet and reflective prayer without being subjected to unwarranted intrusion is an essential component of freedom of religion. The government certainly has a significant interest in protecting this important First Amendment right.") The Protesters' conduct, displaying signs that express  demeaning messages regarding the congregants' Jewish faith and Israel are interfering with their right to freely exercise their religious beliefs without being harassed and insulted.

[15] While the 1st Amendment does not value one freedom over the other, nor does it require that freedom of religion be sacrificed at the altar of freedom of speech. The Founding Fathers and the Framers of the Constitution would have deemed the idea that the right of free speech protected – indeed, would preclude prohibiting – picketing in front of a house of worship a repugnant abomination. *See* Virginia Statute for Religious Freedom, Exhibit 4; President Washington's letter to the Hebrew Congregation in Newport, Rhode Island, Exhibit 5.

134 (2d Cir. 1999); *Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250 (6th Cir. 1985);

*United States v. Waggy,* 936 F3d 1014 (9th Cir. 2019); *Thorne v. Bailey,* 846 F.3d 241 (4th Cir.

1988). The Protesters have ample other avenues of communication throughout Ann Arbor which

they can utilize in order to persuade others to their point of view without harassing the Synagogue

members on a weekly basis. Motorists who drive by the Synagogue, whom the protesters claim

they are seeking to persuade and/or inform, can be provided the same messages further to the

South and North on Washtenaw Ave., without diminishing the efficacy of their purported mes-

sage. The convergence of the above factors demonstrates that the weekly harassing conduct of the

Protesters is not protected by the 1st Amendment and may be enjoined.

## IV.    PLAINTIFFS HAVE PLED VALID CLAIMS AGAINST THE PROTESTERS.

Plaintiffs maintain the Protesters' conduct violates 42 U.S.C. §§1981, 1982, 1983 and

1985(3). Since their conduct is not absolutely protected by the 1st Amendment, they cannot resort

to the 1st Amendment to protect them from claims they violated these federal statutes.

### A.    The Protesters' Conduct Violates 42 U.S.C. §1981.

42 U.S.C. §1981, entitles all citizens to "the full and equal benefit of all laws and proceed-

ings for the security of persons and property as is enjoyed by white citizens" and protects those

rights against "impairment by nongovernmental discrimination and impairment under color of

State law." Jews qualify as a race under the federal civil right statutes. *Shaare Tefila Congrega-*

*tion, supra.* Section 1981 was also intended to apply to discrimination based on ancestry and eth-

nicity. *Saint Francis College v. Al-Khazraj,* 481 U.S. 604 (1987).. Section 1981 applies to dis-

criminatory acts by private citizens based on race and ethnicity of others. *See Chapman v. Higbee*

*Co.,* 319 F.3d 825 (6th Cir. 2003), *cert. denied,* 542 U.S. 945 (2004). It is self-evident, based on

the messages on the Protesters' signs, the Protesters have targeted the members of the Synagogue

based on the fact that they are Jewish, and therefore, under *Shaare Tefila,* based on their race, and

under *Saint Francis College,* based on their ethnicity. "The First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell,* 508 U.S. 476, 489-90 (1993). *See also United States v. Salameh,* 152 F.3d 88, 110 112 (2d Cir. 1998). "[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Varani,* 435 F.2d 758, 762 (6th Cir. 1970).[16]

The Protesters maintain §1981 does not apply based on the following statement in *Chapman,* 319 F.3d at 832-33: "The 'security of persons and property' language limits the potential class of cases that may be brought under the equal benefit provision. A litigant must demonstrate the denial of the benefit of a law or proceeding protecting his or her personal security or a cognizable property right." They assert that whatever infringement on the freedom of religion their signs may cause, it does not rise to the level of threatening their personal security or infringing on a property right. A violation of §1981, however, can be based on the violation of another law, including a state law, intended to protect the plaintiff's personal security. *See, e.g., Green v. Wal-Mart Stores, Inc.,* Case No. 2:09CV00457 (D. Utah 2010) ("Even though state action is not required, a §1981 equal benefit claim does require some nexus to a relevant state law or proceeding ... In her Complaint, Ms. Green alleges that Walmart violated state laws relating to false imprisonment." *Id.* at *11) (copy attached as Exhibit 6). The Protesters' conduct violates Michigan's anti-stalking law, M.C.L. §750.411h. *See* note 11, *supra.* In addition, Plaintiffs, as dues paying

---

[16] The *Amicus* contends that the Supreme Court decision in *Hurley v. Irish-American Gay, Lesbian Bisexual Group,* 515 U.S. 557 (1995), stands for the proposition that government regulations and statutes may not be enforced if the enforcement would infringe on the 1st Amendment rights of those against whom the regulation or statute is being enforced. The argument fails if Plaintiffs are correct that the Protesters' conduct is not absolutely protected by the 1st Amendment. Moreover, *Hurley* is a "compelled speech" case, not a "limitation on speech" case." Unlike the plaintiffs in *Hurley,* Plaintiffs here are not seeking to force the Protesters to include in their protests pro-Israel, pro-Zionist, or pro-Semitic speech. In *Hurley,* the refusal of the parade organizers to allow plaintiffs to participate was not an affirmative pro-discrimination statement by the organizers, as contrasted with the Antisemitic signs used by the Protesters, targeting Jews, and thereby violating 42 U.S.C. §§1981, 1982, and 1985(3).

members of their houses of worship, have a proportionate property interest in the realty which belongs to the Synagogue. (*See* cases cited in ¶184(b) of the FAC.)[17] As demonstrated above, enforcement of §1981 will not violate their freedom of speech. Moreover, under Argument III(C), their violation of §1981 forfeits 1st Amendment protection. This claim should not be dismissed.

**B.      The Protesters' Conduct Violates 42 U.S.C. §1982.**

42 U.S.C. §1982 states:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

The statute applies to conduct by private actors. *Jones v. Mayer Co., supra; Tillman v. Wheaton-Haven Recreation Assn.,* 410 U.S. 431 (1973). "A narrow construction of the language of §1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by §1 of the Civil Rights Act of 1866 ... from which §1982 was derived. ... ." *Sullivan v. Little Hunting Park,* 396 U.S. 229, 237 (1969). The reference in the statute to "hold[ing]" real property applies to **use** of real property, **as well as the right to come and go from the property as a guest**, even if the citizen does not possess an ownership interest in the property. *See U.S. v. Brown,* 49 F.3d 1162 (6th Cir. 1995); *U.S. v. Greer,* 939 F.2d 1076 (5th Cir. 1991), *aff'd en banc,* 968 F.2d 433 (5th Cir. 1992), *cert. denied,* __ U.S. __ , 113 S.Ct. 1390 (1993); *Olzman v. Lake Hills Swim Club, Inc.,* 495 F.2d 1333 (2d Cir. 1974). The statute applies to the right of Jews to use property without interference and harassment. *Shaare Tefila Congregation, supra; Brown,*

---

[17] *See LeBlanc-Sternberg v. Fletcher,* 781 F. Supp. 261 (S.D.N.Y. 1991), *aff'd,* 67 F.3d 412 (2d Cir. 1995); *Patrick v. Miller,* 953 F.3d 1240 (10th Cir. 1992). The Protesters' harassment interferes with the Plaintiffs' beneficial use of their respective property interests and therefore violates §1981. Numerous cases, moreover, have sustained the application of §1981 in fact situations which did not involve a contract, a threat to the plaintiff's physical security, or encroachment on an existing property right. *See Miller v. Phelan,* 845 F. Supp. 1201 (N.D. Ill. 1993); *Longmire v. City of Oakland,* No. C 10-01465 (N.D. Cal. 2010) (copy attached as Exhibit 7); *Nat'l Ass'n for the Advancement of Colored People, Inc. v. Molly Darcy, Inc.,* Civil Action No. 4:11-cv-01293 (D.S.C. 2012) (copy attached as Exhibit 8).

*supra*. The Protesters' conduct in using the signs to harass and intimidate Plaintiffs and other members of the Congregation in their use of the Synagogue's property violates 42 U.S.C. §1982.

The Protesters contend *Brown, Greer* and *Olzman* are inapposite because they involved conduct of "an entirely different magnitude" (brief, p. 14), which also violated the law, whereas the Protesters' conduct is protected by the 1st Amendment. They are mistaken. First, as demonstrated above, their conduct is not protected by the 1st Amendment. Second, there are numerous cases in which application of §1982 was sustained involving exclusively verbal or expressive conduct. In evaluating a claim that §1982 has been violated, the courts apply the same standard of proof under the Federal Housing Act, 42 U.S.C. §3601 *et seq.*, and 42 U.S.C. §1981 and §1982. *Reeves v. Rose,* 108 F. Supp.2d 720 (E.D. Mich. 2000). *Reeves* held that under §§1981 and 1982, the courts apply the burden shifting test of in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Daniels v. Board of Education of the Ravenna City School District,* 805 F.2d 203, 207 (6th Cir. 1986). Under that test, any conduct displaying discriminatory bias will suffice to make a *prima facie* case, even speech. The Protesters have unquestionably targeted the Synagogue for their abusive speech because the congregants are Jewish. This satisfies the Plaintiffs' *prima facie* case. The Protesters would claim as their legitimate, nondiscriminatory reason they are expressing their disagreement with the oppressive policies of Israel towards the Palestinians. This explanation is a pretext, since if they really wanted to convey this message effectively, they would not limit their venue to a single location – a Jewish house of worship – week after week, for 16 ½ years. They would bring their message to various locations in Ann Arbor in order to reach a larger audience. That they have rarely done so, and have primarily picketed the Synagogue, demonstrates "a discriminatory reason more likely motivate[s]" them. *Daniels, supra.* Contrary to the Protesters' claim, a violation of §1982 does not require a violent act against persons or property. Racist speech, even symbolic speech, will suffice. *See Wells v. Rhodes,* 928 F.

Supp.2d 920 (S.D. Ohio 2013) (placing a burning cross on the property of an African-American family violated both §1982 and §1985(3)).[18] Plaintiffs have pled a cognizable §1982 claim.

## C.    The Protesters' Conduct Violates 42 U.S.C. §1983.

Only state actors may be held liable under §1983. In order to sustain their §1983 claim against the Protesters, Plaintiffs must allege facts which indicate the Protesters, although private citizens, in the context of these facts qualify as state actors. In *Chapman, supra,* the Court set forth three traditional tests for determining whether private action may be "fairly attributable to the state." 319 F.3d at 833. They are (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. Plaintiffs maintain the Protesters qualify as state actors under the symbiotic relationship/nexus test. The seminal case articulating this test is *Burton v. Wilmington Pkg. Authority,* 365 U.S. 715 (1961), in which a restaurant located in a parking structure owned by the Wilmington Parking Authority refused to serve African-Americans.[19] The

---

[18] *See also Bryant v. Polston,* Cause No. IP00-1064-C-T/G (S.D. Ind. 2000) ("[T]he Polstons allowed neighbors to gather at their house on the porch to stare, point, and walk back and forth in front of the Bryants' house and incited neighbors to engage in racial bantering whenever persons of African American descent visited the Bryants." *Id.* at 7) (copy attached as Exhibit 9); *Honce v. Vigil,* 1 F.3d 1085 (10th Cir.), in which the plaintiff, the defendant's tenant, sued the defendant for sexual harassment and creating a hostile housing environment under the FHA. As noted in *Reeves, supra,* courts apply the same standard of proof in FHA and §1982 cases. The plaintiff alleged she had rejected the defendant's requests for a date, after which he retaliated against her. The Court, over a strong dissent, rejected the plaintiff's claim, holding the defendant's conduct was not sufficiently severe or pervasive to rise to the level of creating a hostile environment. The implication of the Court's decision was that had the defendant's verbal abuse been more severe or pervasive, it would have violated the FHA, and, by the same token, §1982. *See also Dicenso v. Cisneros,* 96 F.3d 1004 (7th Cir. 1996). The Protesters' conduct, by contrast, using their numerous Antisemitic signs on a weekly basis for 16 ½ years, is sufficiently pervasive to rise to the level of creating a hostile environment, redressible under §1982.

[19] The Protesters' claim that the symbiotic/nexus test established by the Supreme Court in *Burton* has fallen into disrepute and disuse is refuted by recent decisions which have cited *Burton* and have applied the nexus test. *See, e.g., Chapman, supra; Harvey v. Plains Township Police Dept.,* 635 F.3d 609 (3d Cir. 2011); *Canter v. Hardy,* 188 F. Supp.2d 771 (E.D. Mich. 2002); *Pritchard v. Hamilton Township Board of Trustees,* 434 F. App'x 492, 507 (6th Cir. 2011) ("If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to §1983."); *Cooper v. Molko,* 512 F. Supp. 563 (Footnote continued.)

restaurant paid rent to the Authority, which therefore benefited from a business which discriminated against African-Americans, in violation of the 14th Amendment – if the restaurant was a state actor under §1983 (since civil rights legislation prohibiting racial discrimination in places of public accommodation had not yet been enacted by Congress). The plaintiff sued the restaurant, arguing that it was a state actor under §1983. The Supreme Court agreed, stating, *id.* at 724-25:

> Addition of all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred, together with the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service, indicates that degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn. ... As the Chancellor pointed out, in its lease with Eagle the Authority could have affirmatively required Eagle to discharge the responsibilities under the Fourteenth Amendment imposed upon the private enterprise as a consequence of state participation. **But no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be**. ... **By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.** (Emphasis added.)

The Court's cautionary words apply to the facts of this case with equal force: the City could have affirmatively required that the Protesters abide by the City's sign ordinance prohibiting the placement of their signs on the grass sections in front of a Jewish house of worship; by failing to do so, the City failed to discharge its duties and abdicated its responsibilities to its Jewish citizens; by its inaction, the City has made itself a party to the Protesters' unlawful use of their signs to harass Jewish worshippers as they approach the Synagogue; the City has elected to place its power and prestige behind the discriminatory conduct of the Protesters; the City has so far insinuated itself into a position of interdependence with the Protesters that it must be recognized as

---

(N.D. Cal. 1981) (favorably cited in *Hooks v. Hooks,* 771 F.2d 935, 943 (6th Cir. 1985)); *Hanas v. Inner City Christian Outreach, Inc.,* 524 F. Supp.2d 683 (E.D. Mich. 2008); *Trarms, Inc. v. Leapers, Inc.,* Case No. 16-14229 (E.D. Mich. 2017) (copy attached as Exhibit 10).

a joint participant in their unlawful activity, rendering the Protesters conduct as state action.

In *American Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40 (1999), cited by the Protesters, the Court stated, *id.* at 52, 57:

> [T]he private insurers in this case will not be held to constitutional standards unless "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the latter may be fairly treated as that of the State itself." ... Whether such a "close nexus" exists, our cases state, depends on whether the State "has exercised coercive power **or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.**" ...
> * * *
> *Burton* was one of our early cases dealing with "state action" under the Fourteenth Amendment, and later cases have refined the vague "joint participation" test embodied in that case. [These cases] ... have established that "privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton*. (Emphasis added; citations omitted.)

In the instant case, it is not a question of the Protesters performing a function which the City would not have performed. In point of fact, the City has had an ordinance in place which prohibits the Protesters from engaging in a substantial part of their conduct, yet the City has seen fit not to enforce the ordinance against the Protesters, notwithstanding that they have violated the ordinance **858 consecutive times**. The City has thereby "provided such significant encouragement, both overt and covert," that the Protesters' choice repeatedly to violate the City's Code must in law be deemed to be that of the City. The City has in fact given its imprimatur to the Protesters' violation of the Code, allowing the Protesters to effectively revoke the sign ordinance, as if the Protesters spoke for, and were agents of, the City, thereby rendering them as state actors under §1983. The §1983 claim pled against the Protesters accordingly should not be dismissed.

**D.      The Protesters' Conduct Violates 42 U.S.C. §1985(3).**

Under 42 U.S.C. §1985(3), it is unlawful for, "two or more persons in any State or Territory [to] conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the law, or of equal privileges and immunities under the

laws; or ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States **... .**" In *Pritchard, supra,* the Court defined a civil conspiracy as follows, 424 F. App'x at 507:

> To successfully plead a civil conspiracy, Plaintiffs must allege that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the Plaintiffs of their constitutional rights, and (3) an overt act was committed." ... "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." (Citations omitted.)

It is indisputable that the Protesters have been acting in concert by their appearing every Saturday morning, year after year, at the same place, approximately the same time, with the same signs and other paraphernalia, that they have been acting pursuant to an agreement, initiated years ago via some means of communication, and renewed from time to time via some medium to assure their reappearance every Saturday morning at the same place and at the same time. This could not be a coincidence or occur by happenstance.[20] Plaintiffs clearly allege, moreover, that the Protesters' conduct has infringed on their constitutional right under the 1st Amendment to engage in the free exercise of their religion. Their appearance every Saturday morning, placing the instruments of their harassment constitute overt acts in furtherance of the conspiracy.

Sec. 1985(3) applies to any conspiracy engaged in by **private citizens** to deprive any person or class of persons of equal privileges under the law, or to any conspirators who, in furtherance of the conspiracy, deprive any person of exercising any right or privilege of a citizen of the United States. *See Griffin v. Breckenridge,* 403 U.S. 88 (1971). It applies to any conspiracy of

---

[20] As rebuttal of the Defendants' claim that Plaintiffs have not adequately pled the conspiracy claims, *see Geinosky v. City of Chicago,* 675 F.3d 743 (7th Cir. 2012); *Loubser v. Thacker,* 440 F.3d 439 (7th Cir. 2006), and *James v. Village of Willowbrook,* No. 11-cv-9126 (N.D. Ill. 2012) (copy attached as Exhibit 11).

private citizens which is motivated by a class-based animus relating to race or religion.[21] The provision also applies to any conspiracy of private citizens which interferes with the intra-state travel of other citizens, without the involvement or support of state action. *See Spencer v. Casavilla,* 903 F.2d 171 (2d Cir. 1990); *Selevan v. New York Thruway Authority,* 584 F.3d 82 (2d Cir. 2009); *Johnson v. City of Cincinnati,* 310 F.3d 484 (6th Cir. 2002).

It is evident, based on the messages of several of the signs, the conspiracy is motivated by a class-based animus toward Jews. In *Carpenters v. Scott,* 463 U.S. 825 (1983). the Court held that §1985(3) does not apply to the infringement of 1st Amendment rights in the absence of state action. The Court accordingly held that the only private conspiracies which are within the scope of §1985(3) are those which are "aimed at depriving the plaintiffs of rights protected by the Thirteenth Amendment [against involuntary servitude] and the right to travel guaranteed by the Federal Constitution." *Id.* at 832. In *Johnson, supra,* the Court held that the Constitution protects not only the right of inter-state travel, but the right of intrastate travel as well. The Protesters discount this holding as not applying to private conspiracies under §1985(3) because no §1985(3) claim was pled in *Johnson.* The Protesters are giving *Johnson* far too narrow a reading. The Court stated, *id.* at 498: "In view of the historical endorsement of a right to intrastate travel and the practical necessity of such a right, we hold that the Constitution protects a right to travel locally through the public spaces and roadways." The fact that the 6th Circuit regarded the right of intrastate travel as fundamental under the Constitution as the right of inter-state travel demonstrates that, regardless that the case did not involve a claim under §1985(3), in the 6th Circuit it is a right protected against infringement by private conspiracies to the same extent that inter-state travel is

---

[21] *See Bray v. Alexandria Clinic,* 506 U.S. 263 (1993)*; Brokaw v. Mercer County,* 235 F.3d 1000 (7th Cir. 2000); *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,* 968 F.2d 286 (2d Cir. 1992); *Vietnamese Fishermen's Ass'n v. Knights of KKK,* 543 F. Supp. 198 (S.D. Tex. 1982); *LeBlanc-Sternberg, supra; Wells, supra.*

protected. The Sixth Circuit reaffirmed its recognition of this fundamental right in *Cole v. City of Memphis*, 839 F.3d 530, 535 (6th Cir. 2016). The Protesters assertion to the contrary is clearly erroneous.[22] This count should accordingly survive the Protesters' motion to dismiss.

### E.      Plaintiffs Have Pled Viable Conspiracy Claims Against The Protesters And City.

Plaintiffs have pled co-conspiracy claims against the Protesters and City under §§1982, 1983, and 1985(3). "[W]e have recognized that ... 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence."[23] *Pangburn v. Culbertson*, 200 F.3d 65, 73 (2d Cir. 1999). "Circumstantial evidence may provide adequate proof of the existence of such a conspiracy." *Haffner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992). In *Burkhardt v. United States*, 13 F.2d 841, 842 (6th Cir. 1926), the Court declared:

> It is fundamental that a conspiracy need not be established by direct evidence of an unlawful agreement. Its existence may be shown by proof of facts from which the logical inference is that the unlawful overt acts were committed in furtherance of a common design of the alleged conspirators. ... Participation in the formation of the conspiracy

---

[22] In *Wells, supra,* the Court held that "§1982 provides an adequate basis for a private conspiracy claim under §1985(3)." 928 F. Supp.2d at 930. The Protesters' conduct has violated the Plaintiffs' property rights under §1982, and therefore satisfies the predicate for a §1985(3) claim. In sum, the Protesters' conspiracy interferes with Gerber's willingness to travel from his home to the Synagogue; the Protesters' conspiracy interferes with Plaintiffs' 1st Amendment right to freely exercise their religion by violating their rights under §1982; the Protesters have also been state actors infringing on Plaintiffs' 1st Amendment right to freely exercise their religion.

[23] "The dates on which the particular defendants joined the conspiracy are not alleged, but that is not the kind of information that a plaintiff can be expected to have when she files her complaint." *Loubser, supra,* 440 F.3d at 443. "State involvement in a given conspiracy may occur when the state, unintentionally and unwillingly, furthers the goals of the conspiracy ... Under such circumstances, the state may act as the unwitting dupe of the conspirators. However, **state involvement may also occur under less innocent circumstances, as when the state knows of the existence of the defendant's conspiracy but turns a blind eye to the evils. The state then plays the role of the conspirators' accomplice rather than their hapless stooge. In the present case significant questions exist as to the lack of zeal displayed by the City of Wichita in defending the legal rights of the plaintiffs and their patients.**" *Women's Health Care v. Operation Rescue,* 773 F. Supp. 258, 266 (D. Kan. 1991) (Emphasis added; citation omitted.) *See also Mansell v. Saunders,* 372 F.2d 573 (5th Cir. 1967); *Dwares v. City of New York,* 985 F.2d 94 (2d Cir. 1993); *N.Y. State Org. for Women v. Terry,* 704 F. Supp. 1247, 1261, note 16 (S.D.N.Y. 1989, *aff'd as modified,* 886 F.2d 1339 (2d Cir. 1989), *cert. denied*); *James v. Village of Willowbrook, supra* (Exhibit 11).

was not essential ... to culpability. If, after it was formed, [the governmental officer] aided or abetted it with an understanding of its purpose, he became a party to it. **The rule of acquiescence in or failure to prevent a conspiracy or criminal act is not sufficient to render one liable ... does not apply in every circumstance to one whose duty it is under the law to prevent the act. [A]cquiescence may amount to purposeful furtherance; it may be the deliberate removal of an otherwise troublesome obstacle from the path of the law violator and thus become affirmative cooperation.**" (Emphasis added; citations omitted).

The conspiracy claims are based on the fact the City has refused to enforce its sign ordinances against the Protesters who have violated the ordinances 858 consecutive times, over a period of 16 ½ years; on the fact that a video shows the police telling the Protesters they have been in full compliance with the law and the police will not issue them a citation, even as signs are visible in the video in violation of the sign ordinance;[24] on the fact that Taylor and Postema misrepresented to the congregants and administration that there was nothing they could do to curtail the Protesters' conduct, despite the fact that they were clearly violating the Code.[25] These facts constitute circumstantial evidence of a conspiracy sufficient to survive a motion to dismiss.

---

[24] As indicated in note 8 of Plaintiffs' Response to the City's Motion to Dismiss (Dkt. #50), there is additional evidence of the City's supporting the Protesters' conspiracy in a video which shows Larcom talking to Herskovitz, as Herskovitz expresses the view that if they were violating the law, Larcom would surely tell them, and she agrees, even as there are a multitude of signs within Larcom's sight which violate the Code. Plaintiffs will be filing a motion for leave to amend adding this additional evidence.

[25] On p. 17, the Protesters claim Plaintiffs have failed to plead the conspiracy claims with the requisite degree of specificity and that their allegations are conclusory and "unsupported by material facts." Contrary to these boilerplate objections, Plaintiffs have alleged sufficient circumstantial facts to put the Protesters on notice of what they are accused of. *See Tolle v. Carrol Touch, Inc.,* 977 F.2d 1129, 1134 (7th Cir. 1992). None of the cases which the Protesters cite in favor of their position involved a 12(b)(6) motion. Three of the cases (*Gutierrez v. Lynch,* 826 F.2d 1534 (6th Cir. 1987); *Spadafore v. Gardner,* 330 F.3d 849 (6th Cir. 2003); *Beckett v. Ford,* 613 F. Supp.2d 970 (N.D. Ohio 2009)) were decided on a motion for summary judgment, after discovery failed to produce sufficient evidence to compensate for the absence of detail pled in the complaint. The fourth case, *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979), involved a post-trial appeal, not a 12(b)(6) motion to dismiss. In fact, in an earlier decision, *Hampton v. City of Chicago,* 484 F.2d 602 (7th Cir. 1973), the Court affirmed the trial court's decision not to dismiss the conspiracy claim, stating, *id.* at 610: "If the alleged conspiracy did exist, **as we must assume at this stage of the case**, and if it did prolong a completely unfounded prosecution, plaintiffs are entitled to relief against each conspirator." (Emphasis added.) The case was remanded to the trial court, where the plaintiffs failed to prove their conspiracy claim at trial, resulting in the second appeal cited above.

The Protesters state on p. 16: "In addition to a joint 'plan,' Plaintiffs must also prove that the conspirators had the intent to commit an unlawful or tortious act," citing *Rosenberg v Rosenberg Bros. Special Account,* 134 Mich. App. 342, 355 (Mich. Ct. App. 1984). The Protesters are misinterpreting the phrase "with intent to commit the tort" to mean the conspirator must know the action s/he is intentionally committing constitutes a tort. This is not what the Court was saying. Rather, the conspirator must **intend to commit the act which is the tort**, rather than commit the act "innocently." The intention applies to the act, not to its being tortious. The Protesters are essentially attempting to introduce a qualified immunity defense for private citizens– that if the accused party does not know his/her acts violate the law, they cannot be held liable. This is the same as the qualified immunity defense applicable to public officers engaging in discretionary acts. Private actors, however, are not entitled to the protection of qualified immunity.[26]

On p. 26, the Protesters state, "The City owed no duty to the Plaintiffs to enforce the sign and street ordinances."[27] As Plaintiffs argue in their Response to the City's motion to dismiss, this assertion might have been true had the Protesters picketed the Synagogue perhaps one or two

---

[26] *See Wyatt v. Cole,* 504 U.S. 158 (1992); *Richardson v. McKnight,* 521 U.S. 399 (1997); *Pritchard, supra,* 424 F. App'x at 507; *Vector Research v. Howard Howard Attys., P.C.,* 76 F.3d 692 (6th Cir. 1996); *Cooper v. Parrish,* 203 F.3d 937 (6th Cir. 2000).

[27] On p. 29 of their brief, the Protesters defend the City by claiming that it could not enforce its Code provisions against the Protesters without violating their 1st Amendment rights. Putting aside Plaintiffs' arguments, *supra,* that their 1st Amendment rights were not absolute under the facts of the case, Plaintiffs have alleged that the Code provisions were content and viewpoint neutral. Neither the City nor the Protesters have contested the validity of this assertion. **As such, the Code's sign provisions could have been enforced against the Protesters without violating their 1st Amendment rights.** *See Jobe v. City of Catlettsburg,* 409 F.3d 261 (6th Cir. 2005); *Vittitow v. City of Upper Arlington,* 43 F.3d 1100 (6th Cir. 1995); *Wheeler v. Commissioner of Highways,* 822 F.2d 586 (6th Cir. 1987); *Foti v. City of Menlo Park,* 146 F.3d 629 (9th Cir. 1998); *Chicago Observer, Inc. v. City of Chicago,* 929 F.d2d 325 (7th Cir. 1991). Three of the City Defendants are attorneys. **They are therefore presumed to have known that the City's sign ordinance was content and viewpoint neutral and therefore could have been enforced against the Protesters without violating their right of free speech under the 1st Amendment. What innocent explanation is there for their having failed to do so 858 times, other than that they supported the Protesters' conduct and therefore were part of their conspiracy?**

times, and the City exercised its discretion not to enforce its Code provisions prohibiting their conduct.  It did not remain true as the Protesters continued to violate the City Code with impunity **858 times, week after week, for 16 ½ years**, and the police told the Protesters, even as they were violating the law, that they would not be issued a citation. The City's conduct rose to the level of deliberate indifference to the Protesters' harassment of the Synagogue's congregants, constituting a violation of substantive due process under the 14th Amendment. *See Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415 (2d Cir. 2009), involving allegations that the police ignored the plaintiff's repeated requests for help against domestic abuse by her boyfriend, and encouraged the boyfriend's continued abuse by engaging in cordial conversation with him.

Plaintiffs and the other congregants have not been subjected to domestic physical abuse by the Protesters. They have, however, been subjected to repeated psychic abuse by the repetitive attacks on their religion and ethnicity, as the police looked on, not enforcing the Code, chatting with them, telling them that they had nothing to fear from the police because they would not be cited for violating the law, even as they flagrantly violated the law. The Protesters' self-serving claim that Plaintiffs had no right to have the City enforce its own Code reinforces the conclusion the Protesters and the City were in league with one another, notwithstanding the meaningless words of empathy in its Resolution. In *Okin,* the plaintiff's claims survived a motion for summary judgment. *A fortiori,* Plaintiffs' analogous claims should survive a 12(b)(6) motion.

## <u>CONCLUSION AND RELIEF</u>

Based on the above arguments, the Protesters' motion to dismiss the claims pled against them should be denied in its entirety.

Respectfully submitted,

By:   /s  Ziporah Reich          /s  Marc M. Susselman
      Co-counsel for Plaintiffs          Attorney for Plaintiffs

Dated: June 10, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2020, I electronically filed **Plaintiffs' Response Opposing The Protester Defendants' Corrected Motion To Dismiss and this Certificate of Service,** with the Clerk of the Court for the Eastern District of Michigan, using the ECF system, which will send notification of such filing to the following registered participants of the ECF system as listed on the Court's Notice of Electronic Filing:

**All counsel of record via the ECF system**

Marc M. Susselman (P29481)
Attorney at Law
43834 Brandywyne Rd.
Canton, Michigan 48187
(734) 416-5186
marcsusselman@gmail.com

By: _____s/ Marc M. Susselman_____

Dated: June 10, 2020                    Attorney for Plaintiffs